IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Christopher B. Eiland, DVM, MS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2005-CV-459 |
| Dr. Byron L. Blagburn, et al. , | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' NARRATIVE SUMMARY OF UNDISPUTED FACTS
AND BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Dr. Byron Blagburn, Dr. Charles Hendrix, Dr. Joseph Janicki, Dr. Stephen

McFarland, Dr. Ed Richardson and Dr. Lauren Wolfe (collectively, the "Defendants")[1] submit

this narrative summary of undisputed facts and brief in support of their motion for summary

judgment.

**INTRODUCTION**

Plaintiff, Dr. Christopher B. Eiland, is a former Auburn University graduate student who

for a period of time was also an employee of the Parasitology laboratory at Auburn. Defendants

are various members of the faculty and administration of Auburn.

Dr. Eiland alleges that in December 2003, he was dismissed from the Doctor of

Philosophy in Biomedical Sciences ("Ph.D") program at Auburn without due process of law. Dr.

Eiland further alleges that, during the course of events surrounding his alleged dismissal from the

Ph.D program, certain defamatory statements were made by the various defendants to this

---

[1]    Each defendant, with the exception of Dr. Ed Richardson, is sued in both his individual and official capacity. *See Compl*. at 1-3. Dr. Richardson, Auburn's Interim President, is sued in his official capacity only.  *Id.*

lawsuit. Finally, Dr. Eiland alleges that his alleged dismissal and termination from the Parasitology laboratory violated the Rehabilitation Act of 1973 because the action was taken due to a perceived disability.

In the brief that follows, Defendants show that summary judgment should be granted against these claims.

## NARRATIVE SUMMARY OF UNDISPUTED FACTS

### I.    Facts Related to Eiland's Due Process Claims

#### a.    Eiland receives undergraduate degree at Auburn and enters MS and DVM programs

Dr. Eiland enrolled at Auburn as an undergraduate student in 1993. *Eiland* at 9:7-8.[2] Four years later, he earned a Bachelor of Arts in Animal and Dairy Science. *Id.* at 9:9-13. After receiving his undergraduate degree, Dr. Eiland decided to continue his education and, in the Fall of 1998, entered the Masters of Science in Pathobiology program at Auburn. *Id.* at 11:3-6. In the Spring of 1999, Dr. Eiland also entered Auburn's Doctor of Veterinary Medicine program. *Id.* at 18:2-3.

Dr. Eiland's MS program required the completion of a research project/thesis. *Blagburn Decl.* at ¶ 2; *Eiland* at 11:22-12:4. Because there is a research project/thesis component to this program, a student is required to identify a "Major Professor." *Blagburn Decl.* at ¶ 2. A Major Professor is a member of the faculty who provides general guidance and assistance to the student as he goes through the graduate program. *Id.*; *Eiland* at 14:5-11. This guidance includes, but is not limited to, helping the student establish an Academic Advisory Committee, developing a plan of study and assisting the student in identifying a topic for research. *Blagburn Decl.* at ¶ 2.

---

[2]      Dr. Eiland's deposition was taken over the course of two days, by two different court reporters; therefore, there are two transcripts of his deposition. A citation to Dr. Eiland's first deposition taken on April 17, 2006 is designated as *Eiland* at __:__. A citation to Dr. Eiland's continued deposition taken on June 12, 2006 is designated as *Eiland [2]* at __:__.

The Major Professor also oversees the student's progression in his course work and monitors the student's progress in the laboratory and with his research. *Id.*

The student is responsible for identifying a professor who is willing to serve as his Major Professor. *Id.* at ¶ 3. No professor is required to serve as a Major Professor and a professor may deny a student's request that he serve in that role for any reason. *Id.*; *see also Eiland* at 14:21-15:3. In addition, once a professor agrees to serve as a Major Professor, he may resign from that position at any time and for any reason, including if the student and professor have personality differences.[3] *Blagburn Decl.* at ¶ 3. Within the Auburn system, it is not uncommon for a Major Professor to resign. *Id.* When a Major Professor does resign from that position, the student's standing within the school or graduate program is not affected in any manner. *Id.* The student remains in good standing at the University. *Id.* In fact, the student may even continue his course work in the graduate program without a Major Professor. *Id.* To graduate, however, the student must eventually identify a new Major Professor, as he would not be able to complete the research project/thesis component of the program without some faculty member serving in that role. *Id.*

In addition to identifying a Major Professor, a student in the MS program must establish an Academic Advisory Committee ("AAC"). *Id.* at ¶ 4. An AAC serves to, among other things, approve the student's plan of study, conduct required examinations, and direct the required research project/thesis. *Id.* A student and his Major Professor usually work together to establish the student's AAC. *Blagburn* at 122:5-8. The AAC must be formally established by obtaining the consent and signatures of the AAC members on a document which is submitted to the Graduate School. *Blagburn Decl.* at ¶ 4.

---

[3]        In fact, even Dr. Eiland recognized that if a student and a Major Professor can no longer work together because of personality differences, the student should get "another Major Professor." *Eiland* at 113:10-114:3.

Dr. Eiland asked Dr. Byron L. Blagburn, a Distinguished University Professor in the Department of Pathobiology, College of Veterinary Medicine, to serve as his Major Professor in his MS program. *Eiland* at 14:12-18; *Blagburn Decl.* at ¶ 5. Dr. Blagburn agreed to serve in that role. *Id.* Dr. Eiland also established an AAC in his MS program. *Eiland* at 13:9-15. The members of the AAC were Dr. Blagburn, Dr. Jennifer Spencer, Dr. Joseph Newton and Dr. Ray Dillon. *Id.; Blagburn Decl.* at ¶ 5.

**b.     Eiland's MS research project/thesis**

A student's MS thesis must be supported by research which is gathered, recorded and analyzed by the student. *Blagburn Decl.* at ¶ 6. Before a student begins to collect research, however, he must first identify a topic for his thesis. *Id.*  In Dr. Eiland's case, Dr. Ray Dillon, one of the individuals on his AAC, was already working on a large-scale research project focusing on the interaction between chronic lung disease and heart disease in cats. *Dillon* at 26:6-27:20. Dr. Dillon suggested that Dr. Eiland could conduct his research on a more narrow issue within this broader project – the prevalence and diagnosis of feline heartworm infections in shelter animals in Central Alabama.[4] *Id.; Blagburn Decl.* at ¶ 6. Dr. Eiland was interested in the project and accepted Dr. Dillon's suggested research topic. *Eiland* at 23:4-11. Specifically, Dr. Eiland's research consisted of collecting various data from euthanized felines. *Id.* at 12:7-13:5. He collected the majority of the research data at the local humane society.[5] *Id.* at 24:7-10. A volunteer at the humane society assisted Dr. Eiland in collecting the research, although Dr. Eiland described himself as the principal data collector. *Id.* at 23:15-24:17; 22:5-8. Notably, the summer before Dr. Eiland began his research project, Dr. Dillon had employed at least four

---

[4]     When asked who supplied the idea for his research topic, Dr. Eiland stated, "I think Dr. Dillon was thinking of an idea of collecting this information and talked to me about it, and I told him that I would be interested in doing that for my master's." *Eiland* at 23:4-11.

[5]     Dr. Eiland classified his job as doing the "grunt work." *Id.* at 23:12-14.

students to collect the same research data that Dr. Eiland collected, although Dr. Eiland was the only one of the students to use the research to support a graduate thesis. *Dillon* at 28:22-29:23.

A student's research, although physically collected by the student, is the property of Auburn. *Blagburn* at 44:23-45:5. When a student completes his thesis, the research remains at Auburn and is available for use by other students. *Blagburn Decl.* at ¶ 7; *see also Eiland* at 56:17-57:1 (when a student leaves Auburn "they don't take [the research] home with them. They would leave it. The actual information and raw data would be left at Auburn University."). Dr. Eiland collected an abundance of research data to support his MS thesis; in fact, he collected so much data that he was able to support his thesis and have data left over. *Blagburn Decl.* at ¶ 7.

### c.    Eiland receives MS and DVM degrees

Dr. Eiland performed well academically in his MS and DVM programs. *Blagburn Decl.* at ¶ 8. He earned his DVM on May 4, 2003, and his MS on August 4, 2003. *See Compl.* at ¶ 12. In addition to performing well academically, Dr. Eiland's conduct while in these programs was without incident. *Blagburn Decl* at ¶ 8. Dr. Blagburn was aware of no students or faculty having any problems with Dr. Eiland whatsoever during this time, and recalled that Eiland had a good relationship with the Graduate School faculty, including himself.[6]   *Id.*   Dr. Eiland agreed with this sentiment, stating that while in the MS and DVM programs, he had a "good relationship with all of the faculty members," *see Eiland* at 35:2-3, and that he could not recall having any problems with any of the Defendants during this time. *Eiland* at 35:2-3. Specifically, with respect to his relationship with Dr. Blagburn, Dr. Eiland stated, "[i]t was a great relationship. He was always very helpful. He was a very smart man. He's a world-renowned parasitologist and he was there to help me when I needed help." *Id.* at 35:15-18. Dr. Eiland also had a good

---

[6]      In fact, Dr. Eiland was elected Class President of the College of Veterinary Medicine four years in a row. *Eiland* at 35:3-8.

relationship with Dr. Charles Hendrix and Dr. Lauren Wolfe, two Auburn professors who are also defendants to this lawsuit. Dr. Eiland explained that Dr. Hendrix "was a good teacher of parasitology, and any time you needed help, he would help you in parasitology." *Id.* at 39:9-12. Similarly, Dr. Eiland "would see [Dr. Wolfe] frequently" and they "always had a good relationship …. [H]e would tell me [to] stop by and see him if I needed help with something …." *Id.* at 41:1-9.

        **d.**      **Eiland's employment in the Parasitology laboratory**

       For much of the time that he was enrolled at Auburn, Dr. Eiland worked as a student/employee in the Parasitology laboratory (hereinafter sometimes referred to as the "Laboratory"). *Blagburn Decl.* at ¶ 9. The Laboratory is part of the Department of Pathobiology. Dr. Blagburn has primary authority over the research aspects of the Laboratory; however, Jamie Butler, a non-student Research Assistant IV, is the day-to-day manager. *Id.* Ms. Butler has worked in the Laboratory since 1994. Tracy Land, a Research Assistant III, also works daily in the Laboratory. *Id.* Ms. Land has worked in the Laboratory since 1996. *Id.* Dr. Eiland began working in the Laboratory in 1997 as a Student Lab and Research Assistant. *Id.* In 1998, he became a Graduate Student Research Assistant ("GSRA"). As a GSRA, Dr. Eiland had access to the Laboratory to work on his research project/thesis. *Id.* He was also considered an employee of the Laboratory, although Auburn officially designates GRSAs as "temporary" University employees. *Id.* In this role, Dr. Eiland provided general assistance and instruction to students whose programs required work in the Laboratory. *Id.* At times, Dr. Eiland's work in the Laboratory required him to administer and grade student examinations. *Eiland* at 145:21-146:1. Dr. Eiland consistently worked in the Laboratory throughout his enrollment at Auburn, until his employment ended in December 2003. *Id.* at 117:16-118:10.

e.    **Eiland enters Ph.D program**

Before graduating from the MS and DVM programs, Dr. Eiland had decided to further his education by entering Auburn's Ph.D program in Biomedical Sciences. *Eiland* at 85:16-86:1. The Ph.D program is housed administratively in Auburn's Graduate School. *Id.* at 91:18-21. The Ph.D program is similar to the MS program in that it has both a course work and research project/thesis component. *Blagburn Decl.* at ¶ 10. Because there is a research project/thesis component, a student is required to identify a Major Professor and establish an AAC as prerequisites to completion of the degree. *Id.*

Dr. Eiland asked Dr. Blagburn if he would continue to serve as his Major Professor in the Ph.D program. *Eiland* at 85:13-86:9. Dr. Eiland had been a good student in the MS and DVM program, so Dr. Blagburn readily agreed to serve as his Major Professor in his Ph.D program.[7] *Blagburn Decl.* at ¶ 10. Around this same time, Dr. Eiland asked Dr. Blagburn if he could use the excess information that he collected for his MS thesis to support his Ph.D thesis. *Id.* Dr. Blagburn informed Dr. Eiland that he saw no reason why he could not use this research data, although at the time no topic for Dr. Eiland's Ph.D research project/thesis had been identified. *Id.*

Dr. Eiland officially entered the Ph.D program in the Fall of 2003. *Blagburn Decl.* at ¶ 12. Dr. Eiland registered for two classes that semester, Experimental Statistics I and Advanced Endocrinology. *Eiland* at 77:7-10; 158:17-20. Dr. Eiland began these classes in August of 2003. *Blagburn Decl.* at ¶ 12.

---

[7]    Although the members of Dr. Eiland's MS AAC informally discussed the possibility of serving on his Ph.D AAC, Dr. Eiland never officially established an AAC in his Ph.D program. *Blagburn Decl.* at ¶ 12; *Dillon* at 10:8-14.

f.    **Eiland's Experimental Statistics I course**

Dr. Eiland started off well in his Experimental Statistics I course, earning a "B" on the first examination. *Eiland* at 159:13-:14. After the first examination, however, Dr. Eiland began to have difficulties in the course and, although he could not remember the exact grade he received on the second test, he recalls that he failed it. *Id.* at 159:13-160:3. After failing the second test, Dr. Eiland met with the instructor, Dr. Nedret Billor, to discuss his performance.[8] *Id.* Dr. Billor and Dr. Eiland agreed that it would be prudent for him to take an incomplete in the course and then retake the course in the Spring semester, at which time his grade would be converted to whatever grade he received in the Spring. *Id.* at 160:4-12. The incomplete Dr. Eiland received in this course was eventually converted to an "F", however, when, although enrolled in the class in the Spring 2004 semester, Dr. Eiland failed to attend any of the classes and was eventually dropped from the roll. *Id.* at 163:9-165:17; 178:23-179:8.

A graduate student named Lauri Nelms was in Dr. Eiland's Experimental Statistics I class. *Id.* at 185:6-8. Dr. Eiland testified that he and Ms. Nelms had several discussions about their respective performances. *Id.* at 185:18-23. According to Dr. Eiland, in one of these conversations Laurie Nelms stated that she had a 100 average in the class, but that she "would have missed one question on the first test if I wouldn't have talked to – checked with one of the foreign graduate students downstairs …." *Id.* at 186:1-187:10.  Dr. Eiland alleges that he responded by informing Ms. Nelms that checking her answers with another student was improper and "[t]hat if somebody found out about it, it's grounds for dismissal." *Id.*

---

[8]    Dr. Eiland also discussed his performance in the course with Dr. Blagburn. *Eiland* at 104:1-20. Dr. Blagburn told Dr. Eiland that he should talk to Dr. Wright, a professor in the Department of Pathobiology who had experience with statistics work. *Id.* Dr. Eiland admitted that the purpose of Dr. Blagburn pointing him to Dr. Wright was an attempt to "help" him with his struggles in the course. *Id.*

Although Dr. Eiland contends that Laurie Nelms is the person who actually cheated on the exam, he later learned that Ms. Nelms had accused *him* of asking *her* to take an examination for him. *Id.* at 191:4-6. Although no charge of academic dishonesty was ever brought before the Academic Honesty Committee, *see id.* at 196:19-23, several faculty members, including Dr. Blagburn, were made aware that Ms. Nelms had made this accusation. *Blagburn Decl.* at ¶ 13. After being notified of this accusation, Dr. Blagburn went to Ms. Nelms, who corroborated what he had been told. *Id.* Dr. Eiland attempts to explain Ms. Nelms' motivation for making this accusation by stating, "I had assumed that maybe she – I had scared her into thinking that I was going to report her for cheating, and she tried to do a preemptive strike and let them know that I had propositioned her to take the test …." *Eiland* at 192:1-6.

c.     **Eiland's behavioral issues while in the Ph.D program**

Around the same time that Dr. Eiland was having problems with his Ph.D course work, Dr. Blagburn began to receive reports that Dr. Eiland was displaying strange and erratic behavior outside the classroom. *Blagburn Decl.* at ¶ 14. Most importantly to Dr. Blagburn, many of the reports of inappropriate and disruptive behavior concerned conduct that had allegedly taken place in the Parasitology laboratory. *Id.*

The complaints ranged from the unusual to the most serious. As an example of the former, it was reported to Dr. Blagburn that immediately after receiving his DVM, when working in the Laboratory Dr. Eiland would not respond to or even acknowledge any student who referred to him as "Chris" instead of "Dr. Eiland." *Id.* at ¶ 15. This conduct led to altercations between Dr. Eiland and various students in the Laboratory. *Id.* Dr. Blagurn testified that this sort of conduct "may not seem like an important issue, but [in a laboratory environment]

it creates confrontation and creates barriers. It create[d] confrontation and feelings that were palpable to me." *Blagburn* at 69:2-5.

Tracy Land reported another instance of unusual behavior to Dr. Blagburn. *Blagburn Decl.* at ¶ 15. According to Ms. Land, Dr. Eiland related that, when working in an animal hospital, he had become disgruntled with a customer at the clinic and had obtained the customer's home address from the records of the animal hospital and had subscribed to a pornographic magazine in the name of the customer, which he sent to the customer's residence. *Id.* Other reports of strange behavior reported to Dr. Blagburn included that Dr. Eiland had been seen at midnight by Dr. Stuart Price, a faculty member in Veterinary Medicine, digging up shrubbery on the Auburn campus; that Dr. Eiland had unilaterally rearranged the Laboratory, including the personal items of the his co-workers; that Dr. Eiland had completely rearranged Dr. Blagburn's office furniture without permission; and that Dr. Eiland had been seen rummaging through another student's desk without permission. *Id.* Dr. Blagburn was also informed by another professor that Dr. Eiland had fallen asleep in one of his classes and had stayed asleep well after all the other students in the class had left the room. *Id.*

One of the more serious complaints was from a Laboratory student named Courtney Rich. Ms. Rich informed Dr. Blagburn that Dr. Eiland had been aggressively pursuing an unwelcome romantic relationship with her. *Id.* at ¶ 16. Ms. Rich reported that on several occasions, Dr. Eiland had shown up outside her apartment building late at night and that she was concerned for her safety.[9] *Id.* Another graduate student, Kelli Joiner, who was also a lab student, informed Dr. Blagburn that Dr. Eiland had confronted her about an issue between the two and that his conduct had "frightened" her. *Id.*

---

[9]     Dr. Eiland denied pursuing a relationship with Ms. Rich but admitted that since he would sometimes grade the quizzes of students in the Laboratory, it would "possibly" be inappropriate to pursue a romantic relationship with a student in the Laboratory. *Eiland* at 146:2-11.

Dr. Blagburn was not the only faculty member who was advised of Dr. Eiland's inappropriate conduct. Dr. Wolfe, the Head of the Department of Pathobiology, had been made aware of Dr. Eiland's disruptive behavior and met with Dr. Blagburn to discuss the troubling behavioral issues. *Wolfe Decl*. at ¶ 4. Dr. Wolfe informed Blagburn that something had to be done about Dr. Eiland's conduct, although he did not specify what Dr. Blagburn should do and he never ordered Dr. Blagburn to dismiss Dr. Eiland from the Ph.D program, as alleged by Dr. Eiland. *Id.*; *Blagburn Decl*. at ¶ 17. In an attempt to correct Dr. Eiland's behavioral problems, Dr. Blagburn met with him on several occasions. *Blagburn Decl.* at ¶ 18. Dr. Eiland was warned that the complaints had to stop and that he should concentrate on his program. *Id.* Dr. Eiland either denied each instance of inappropriate conduct, or merely shrugged them off as insignificant. *Id.*

Despite Dr. Blagburn's repeated warnings, Dr. Eiland's behavioral problems continued. *Id.* at ¶ 19. In fact, it was not long after Dr. Blagburn's last meeting with Dr. Eiland that Dr. Blagburn was notified of the cheating allegation against Dr. Eiland.[10] *Id.* After the complaints failed to stop, Dr. Blagburn concluded that his mentoring relationship with Dr. Eiland was not working, and he decided to resign as Eiland's Major Professor. *Id.* Dr. Blagburn's resignation as Major Professor would have the additional consequence of ending Dr. Eiland's employment in the Laboratory along with the stipend he received for working in the Laboratory and for studying under Dr. Blagburn.[11] *Id.* By resigning as Eiland's Major Professor, Dr. Blagburn did not hope or

---

[10]     No formal allegation of cheating against Eiland was brought before the Academic Honesty Committee, the body which investigates formal allegations of academic dishonesty at Auburn. *Blagburn Decl*. at ¶ 13; *Eiland* at 196:19-23. Accordingly, no formal University action was taken with respect this accusation. *Blagburn Aff.* at ¶ 13.

[11]     Dr. Eiland received a stipend which was intended to compensate him for his work in the Laboratory and as general compensation that many students receive while pursuing graduate studies. *Blagburn Decl.* at ¶ 11. No student is entitled to a stipend as part of their graduate studies and students may pursue their graduate degree with or without a stipend. *Id.* Moreover, if the student is awarded a stipend, there is no guarantee that a stipend will continue until the student completes his degree. *Id.* Likewise, if a student's Major Professor resigns from that position, it is customary to withdraw the student's stipend, as he will obtain funding from his new Major Professor. *Id.*

intend to end Dr. Eiland's enrollment in the Ph.D program; in fact, quite the contrary is true. *Id.* Dr. Blagburn knew that Dr. Eiland could no longer function appropriately in his Laboratory and thought that a change in his laboratory environment might benefit him in his program. *Id.*

### d. Dr. Blagburn resigns as Eiland's Major Professor

On December 3, 2003, Dr. Blagburn met with Dr. Eiland to resign as his Major Professor. *Blagburn Decl.* at ¶ 20. Dr. Blagburn asked Dr. Hendrix to sit in on the meeting. *Id.* When Dr. Eiland arrived, Dr. Blagburn, with Dr. Hendrix present, told Eiland that he was resigning as his Major Professor. *Id.*; *Hendrix Decl.* at ¶ 2. Dr. Blagburn informed Eiland that he was taking this action due to Dr. Eiland's behavioral issues since he began the PhD program, including the allegation of cheating. *Blagburn Decl.* at ¶ 20. During this meeting, Dr. Eiland was also notified that he would no longer be an employee in the Laboratory and his stipend would continue only until the end of January 2004. *Id.* Dr. Blagburn withdrew Dr. Eiland's stipend because, when a Major Professor resigns, "it's not customary to continue to support a graduate student with your resources if that graduate student then moves to a different laboratory. They simply procure support from the laboratory to which they relocate." *Blagburn* at 103:18-104:1. He continued Dr. Eiland's stipend until the end of January 2004, however, so that Dr. Eiland would be paid until he could make the transition to a new Major Professor. *Blagburn Decl.* at ¶ 20.

Dr. Eiland's recollection of this meeting differs greatly from Dr. Blagburn's and Dr. Hendrix's. Dr. Eiland alleges that Dr. Blagburn did not resign as his Major Professor, but instead stated that he had been ordered to dismiss Eiland from the Ph.D program, and that he "would make a great parasitologist, just not at Auburn." *Eiland* at 197:7-13. Dr. Eiland alleges that he immediately requested a hearing so that he could defend against the accusations, but was told that "[t]hat's the way it was" and that he was "lucky to be leaving with a clean record." *Id.* at

204:1-18. Dr. Eiland also alleges that Dr. Blagburn called him a "cheater." *Eiland [2]* 71:18-72:2. Dr. Eiland denies that Dr. Blagburn said anything about resigning as his Major Professor *Id.* at 213:2-5. Finally, Dr. Eiland alleges that Dr. Blagburn informed him that he would no longer have access to the research he collected while doing his MS thesis. *Id.* at 58:2-7.

Drs. Blagburn and Hendrix deny that Dr. Eiland was ever told that he was dismissed from the Ph.D program. *Blagburn Decl.* at ¶ 21; *Hendrix Decl.* at ¶ 2. Dr. Blagburn also testified that he merely told Dr. Eiland that there had been an accusation of cheating against him, not that he was a cheater. *Id*. Finally, both Dr. Blagburn and Dr. Hendrix deny that Dr. Eiland requested a hearing or that he was told that he would no longer have access to his research, *see id*; however, Dr. Blagburn stated that Dr. Eiland was told to turn in his key to the Laboratory. *Blagburn* at 97:21-98:5.

After the conversation between Dr. Blagburn and Dr. Eiland ended, Dr. Blagburn left the room and Dr. Eiland remained in the room with Dr. Hendrix. *Hendrix Decl.* at ¶ 3. When asked what he and Dr. Hendrix discussed, Dr. Eiland originally stated that they discussed the possibility of Dr. Hendrix serving as his Major Professor. *Eiland* at 251:6-17. When asked on deposition whether this action was inconsistent with his earlier testimony that Dr. Blagburn had dismissed him from the Ph.D program altogether, Dr. Eiland stated, "I was grasping at straws …. [because] it wasn't very clear to what limitations were put on …." *Id.* at 251:18-252:14. Later in the deposition, however, after a break, Dr. Eiland asked to clarify his earlier statement, stating that he had gotten "confused" and that he had actually not asked Dr. Hendrix to serve as his Major Professor during that meeting.[12] *Id.* at 256:3-258:16. In contrast to Dr. Eiland's "confusion," Dr. Hendrix recalled very clearly that after Dr. Blagburn left the room that day, he

---

[12]     However, if one reads Dr. Eiland's deposition testimony, it is very clear that Dr. Eiland was not in any way confused when he originally answered this question. In fact, Dr. Eiland stated not once but twice that this conversation occurred during the December 3, 2003 meeting. *See Eiland* at 251:18-252:14.

and Dr. Eiland discussed potential candidates for his new Major Professor. *Hendrix Decl.* at ¶ 3. Dr. Hendrix offered to assist Dr. Eiland in identifying a new Major Professor and specifically mentioned Dr. Gary Mullen as a potential candidate. *Id.* Dr. Dillon's name was also mentioned as a candidate, although Dr. Hendrix could not recall how his name was brought up. *Id.*

On December 9, 2003, Dr. Blagburn officially resigned as Dr. Eiland's Major Professor. *Blagburn Decl.* at ¶ 22. His resignation was accomplished through a memorandum to Dr. Joseph S. Janicki, the Associate Dean for Research and Graduate Studies, which was sent through Dr. Wolfe, Head of the Department of Pathobiology. *Id.* The memorandum stated: "Effective at the end of Fall Semester, 2003, I will no longer serve as Dr. Christopher Eiland's PhD advisor." A copy of the memorandum is attached as Exhibit "A."

       **e.**      **Eiland meets with Dr. Lauren Wolfe, Head of the Department of Pathobiology**

A few days after his meeting with Dr. Blagburn, Dr. Eiland met with Dr. Wolfe to discuss the events which took place in the meeting with Dr. Blagburn. *Eiland* at 217:9-12. At one point in his deposition, Dr. Eiland testified that he was informed by Dr. Wolfe that he was dismissed from the Ph.D program and that he could not go to another department or identify another Major Professor. *Eiland* at 166:13-18. Dr. Eiland contradicted this statement at another point in his deposition, however, stating that Dr. Wolfe had never actually said that he was dismissed from the program:

> Q. …. But [Dr. Wolfe] never said, you're being dismissed from the – dismissed from the department – from the Ph.D program; is that correct?
>
> A. He never said that exactly.

*Eiland* at 298:5-9. In contrast, although Dr. Wolfe could not remember the specifics of this conversation, he is certain that he did not tell Dr. Eiland that he would not allowed to complete

his Ph.D, as the Ph.D program is an inter-departmental program and he did not have the authority to dismiss a student from the program. *Wolfe Decl*. at ¶ 6. Dr. Wolfe states that it was likely that he did tell Dr. Eiland that continuing to pursue a Ph.D may not the best path for him. *Id.* Dr. Wolfe made this statement because he was concerned about Dr. Eiland's well being. *Id.* He had known Dr. Eiland for quite some time and had never known him to have any behavioral problems until he entered the Ph.D program. *Id.*

        **f.**      **Eiland is informed by Dr. Joseph Janicki, Associate Dean for Research and Graduate Studies, that he had <u>not</u> been dismissed from the Ph.D program**

On December 5, 2003, just after his meeting with Dr. Wolfe, Dr. Eiland met with Dr. Joseph S. Janicki, the Associate Dean for Research and Graduate Studies. *Eiland* at 224:6-10. This meeting is of extreme importance because, in this meeting, which took place just two days after his meeting with Dr. Blagburn and on the same day that he met to Dr. Wolfe, Dr. Eiland was officially informed that he had <u>not</u> been dismissed from the Ph.D program and that he could continue in the program by identifying a new Major Professor. *See Eiland* at 224:17-22 ("Q. And [Dr. Janicki] said that you were not dismissed from the Ph.D program, correct? A. At that point, I wasn't, but I would be if I didn't locate a new major professor ...."). The significance of this cannot be understated, as even Dr. Eiland recognized that, as Associate Dean for Research and Graduate Studies, Dr. Janicki occupies a position higher than Drs. Blagburn and Wolfe in the Graduate School hierarchy. *Id.* at 224:11-16.

Dr. Eiland's actions after this meeting demonstrate that he believed he was still in the PhD program, as he attempted – albeit half-heartedly – to identify a new Major Professor.[13]  To

---

[13]      In addition, Dr. Eiland' subjective belief that he was still a student within the graduate school is demonstrated by the fact that he completed the Advanced Endocrinology course that he was enrolled in for the Fall Semester, earning a "B" in the course. *See* Official Transcript, a copy of which is attached as Exhibit "B"; *see also Eiland* at 78:9-17. Moreover, at no time after the events of December 3, 2003 did Dr. Eiland attempt to attend a class only to be told that he was no longer a student at Auburn. *See Eiland* at 179:16-22.

this end, Dr. Eiland, on or around December 8, 2003, asked Dr. Dillon, a professor in the Department of Clinical Sciences, to serve as his Major Professor. *Eiland* at 252:23-19; 275:12-18. Although Dr. Dillon did not specifically remember Dr. Eiland asking him to serve as his Major Professor, he did recall that at some point during the Fall 2003 semester Dr. Eiland asked him if he had any research funding available. *Dillon* at 8:18-9:3. Dr. Dillon informed Dr. Eiland that he could not support his research due to funding cutbacks in his own research.[14] *Id.*; *Eiland* at 253:5-254:13. As previously set forth, Dr. Eiland also asked Dr. Hendrix if he would serve as his Major Professor, a request which Dr. Hendrix declined due to the fact that his employment at Auburn focuses almost solely on teaching and he has never served as a student's Major Professor. *Hendrix Decl.* at ¶ 3.

Dr. Eiland took no steps to identify a Major Professor beyond these requests to Dr. Dillon and Dr. Hendrix.[15] *Eiland* at 275:12-18. In fact, even though Dr. Hendrix suggested Dr. Mullen as a potential candidate, Dr. Eiland never asked Dr. Mullen if he would serve as his Major Professor. *Eiland* at 255:1-17. Although there was still another professor located in the Department of Pathobiology, Dr. Dystrka, who may have been able to serve as his Major Professor, Dr. Eiland did not even ask her. *Eiland* at 274:17-275:11. In addition, any one of a number of professors outside the Department of Pathobiology could have served as Dr. Eiland's Major Professor. Dr. Eiland did not ask any of these professors to serve, because, he says, "that would not have allowed me to follow my career track of being a professor of parasitology or

---

[14]    Dr. Eiland also alleges that during this conversation Dr. Dillon stated that no one would take him as a student if Dr. Blagburn let him go. *Eiland* at 167:2-11. This is truly a remarkable allegation, however, in that Dr. Dillon testified that he had no knowledge that Dr. Eiland had even entered the Ph.D program, much less that he was let go by Dr. Blagburn. *Dillon* at 14:9-19.

[15]    Not only did Dr. Eiland not take steps to identify a Major Professor beyond his requests to Drs. Dillon and Hendrix, he also did not ask anyone for help in locating a Major Professor. *Eiland* at 274:9-16.

working for a drug company representing parasiticides."[16] *Id.* at 275:19-277:21.  He concedes, however, that he could have continued in the Ph.D program under the direction of a professor outside the Department of Pathobiology. *Id.* at 277:22-278:2.

Finally, after failing in his half-hearted efforts to identify a new Major Professor, Dr. Eiland simply stopped attending class. *Eiland* at 280:22-281:12. In fact, even though he was still a student in good standing at Auburn and was enrolled for classes in the Spring 2004 semester, Dr. Eiland "didn't attend any classes."[17] *Id.* Auburn has a policy to drop a student from a class if the student does not attend the first few classes of a semester. *Blagburn Decl.* at ¶ 23. Because Dr. Eiland did not attend any of his Spring 2004 semester classes, he was dropped from the roll in those classes. After Spring 2004, Dr. Eiland never enrolled in another course at Auburn.

### g.    Eiland is informed by Dr. Stephen McFarland, Dean of the Graduate School, that he is a student in good standing within the Graduate School

In July 2004, Dr. Eiland attempted to file a grievance[18] relating to, among other things, his perceived dismissal from the Ph.D program. *See* Exhibit D, *infra*. This grievance was sent to a number of Auburn faculty and administrators, including Dr. Stephen L. McFarland, Dean of the Graduate School. *Id.* After investigating Dr. Eiland's complaint, Dr. McFarland responded by letter dated August 17, 2004. In pertinent part, this letter stated:

> In your letter of July 27, you made a number of complaints. The main complaint seemed to be you had been dismissed from the program. **According to the College of Veterinary Medicine and the Graduate School, you have not been terminated. You are still a student in good standing at Auburn University. No actions have been taken to terminate your admission to the Doctor of Philosophy program in biomedical sciences.** Your major professor

---

[16]    Dr. Blagburn disputes this statement. He testified that there are other professors within the University outside the Department of Pathobiology who have skills in the area of parasites that would allow them to serve as Dr. Eiland's Major Professor in his chosen discipline. *See Blagburn* at 101:3-18.

[17]    Dr. Eiland admits to receiving a bill for tuition for the Spring 2004 semester. *Eiland* at 170:2-6.

[18]    Dr. Eiland's attempt to file a grievance is discussed in detail below.

has decided to resign from your committee. It is now your responsibility to identify another major professor, should you wish to continue in this program.

(emphasis added). A complete copy of this document is attached as Exhibit "C."

After receiving this letter, Dr. Eiland testified that he believed that he was still a student in good standing at Auburn. *Eiland* at 287:23-288:3 ("Q: Okay. After this, did you, in fact, think you were a student in good standing at Auburn University? A: After this, yes."). Moreover, when asked to explain the meaning of this letter, the following exchange took place:

Q: Right, but I'm asking what you interpret this document to mean.

A. This is what they're saying, and this is what Dr. McFarland is saying. He is saying that in his mind, my major professor has decided to resign from my committee, and its my responsibility to find a new major professor.

Q. He's the dean of the graduate school, correct?

A. That's correct.

Q. And in the hierarchy, he's above Dr. Blagburn, Dr. Hendrix, Dr. Wolfe, Dr. Janicki, correct?

A. Right. And he never –

Q. Wouldn't you think what he says goes?

A. What he says goes? Possibly. He's the dean. He never made any suggestions in here about what exactly my recourse would be or what I needed to do besides –

Q. Well, your recourse, it seems to me, won't you agree, that he's saying if you identify another major professor, you can continue in the Ph.D. program?

A. Sounds easy if a major professor will take me.

Q. Let's talk about that, then … [W]hat steps did you [take] to locate another major professor after receiving this letter?

A. After this letter?

Q. After this letter.

18

A. I didn't talk to anyone about being a major professor.

Q. Okay. So you didn't do anything?

A. As far as finding a major professor, no.

*Eiland* at 291:12-293:1.[19]

> **h.    Eiland attempts to file a grievance related to his perceived dismissal from the Ph.D program**

On July 24, 2004, some seven months after the events in December 2003, Dr. Eiland attempted to file a written "Student Grievance." A copy of this document is attached as Exhibit "D." This document purported to file several grievances. *Id.* One related to the events surrounding his grade in Experimental Statistics I.[20] *Id.* He also attempted to grieve his perceived dismissal from the Ph.D program. *Id.* It is the latter grievance which is relevant to this lawsuit. In this grievance, Dr. Eiland alleged that he was denied due process by being dismissed from the Ph.D program without a hearing. *Id.* Dr. Eiland never received a hearing on this grievance,

---

[19]    Instead of trying to locate a Major Professor so that he could continue in the Ph.D program, Dr. Eiland was preparing for this lawsuit. On May 28, 2004, Dr. Eiland went to the office of Dr. Blagburn under the pretense of discussing issues related to Dr. Blagburn's efforts to assist him in locating employment; however, Dr. Eiland was actually secretly tape recording the conversation. *Eiland* at 235:18-19. Nevertheless, despite his covert efforts to strengthen his impending lawsuit, the tape recording adds no support to Dr. Eiland's position and, in fact, demonstrates that Dr. Blagburn was committed to helping Dr. Eiland in any way he could notwithstanding his resignation as his Major Professor.

[20]    At some point in the Summer of 2004, because Dr. Eiland did not attend Experimental Statistics I in the Spring 2004 semester, the incomplete he received the first time he took the class converted to an "F." *Eiland* at 163:9-165:17; 178:23-179:8. After this occurred, Dr. Eiland ironically requested Dr. Blagburn to assist him in having his grade in the class changed to a withdrawal, so that an "F" would not remain on his permanent record. *Id.* at 181:21-182:9. Dr. Blagburn originally agreed to help Dr. Eiland by talking with Dr. Billor. Before he actually spoke with her, however, Dr. Blagburn decided that it might be inappropriate for him to speak to another professor about changing a student's grade and therefore he never actually discussed Dr. Eiland's situation with Dr. Billor. *Blagburn* at 102:18-103:8. When asked to explain why he thought that Dr. Blagburn would agree to help him, Dr. Eiland testified that "I think he was trying to fix it so that I wouldn't complain to anybody and stir up anything … I think it was tried to be covered up, and he tried to cover it up and Dr. Janicki tried to cover it up the best that they could," *see Eiland* at 184:3-16, or, he says, "[i]t may have been, in the end, to help me." *Id.* at 183:9-11.

In any event, the circumstances surrounding Dr. Eiland's grade in his Experimental Statistics I grade are irrelevant to this lawsuit, as Dr. Eiland has conceded. *See Eiland* at 181:18-23 ("Q. What does this grade change thing have to do with your lawsuit? …. A. Not that I'm aware, the grade change doesn't. It was something that Dr. Blagburn tried to fix."); *see also id.* at 184:17-185:1 ("Q. But [Dr. Blagburn] is not being sued for [trying to help you get your grade changed]. A. No, not for doing it.").

however, as it was not timely filed and suffered from other procedural defects. *See Hendrix Decl.* at 5.

Auburn's procedures for filing a student academic grievance are set forth in the Student Academic Grievance Policy ("SAGP").[21] A copy of the SAGP is attached as Exhibit "E." Rule 4.2, "Procedures for Hearings," provides that, to be entitled to a hearing, "[g]rievances must be filed with the [chairman of the SAGP] within 20 class days of the term following that in which the grievance occurred." *Id.* Rule 4.2.2 provides, "[w]here previous efforts have failed, the student should file a grievance in writing to the chairman of this Committee, accompanied by any initial documentary evidence." *Id.*

Dr. Eiland's grievance did not comply with these timing and notice provisions. *Hendrix Decl.* at ¶ 5. The events which gave rise to his grievance occurred in December 2003. *Eiland [2]* at 55:3-4 ("[t]he first main grievance was on December 3rd."). Twenty class days of the term following that in which the grievance occurred would be on or around February 11, 2004. *Hendrix Decl.* at ¶ 5. Dr. Eiland did not attempt to file a written grievance until July 24, 2004. *Eiland [2]* at 38:19-22. At this time, it was nearly five months late. Moreover, while several Auburn faculty members and administrators were sent copies of this tardy document, Dr. Eiland never sent the grievance to the chairman of the Student Academic Grievance Committee, Dr. Hendrix. *Id.* at 45:5-8 (Q: "And so, you're saying that you never took your grievance in writing to the University Student Grievance Committee? A: Correct"). Therefore, when asked whether

---

[21] Rule 1.1 of the SAGP provides, "[t]he purpose of this procedure shall be to resolve academic grievances of students, which result from actions of faculty or administration." *See* Exhibit E. Moreover, Dr. Hendrix, the former chairman of the Student Academic Grievance Committee testified that "if a student has a grievance regarding actions of a Major Professor, faculty member or administration, the [Student Academic Grievance Committee] would be the appropriate place to file a grievance related to those actions." *Hendrix Decl.* at ¶ 6.

he followed the procedures for filing a student academic grievance, Dr. Eiland admitted "[n]ot completely."[22] *Id.* at 54:16-19.

In deposition, Dr. Eiland attempted to explain his failure to timely file the dismissal-related grievance by stating that he was not sure if it was covered under the Student Academic Grievance Policy. He concedes that his grievance was at least "partially" covered by the Student Academic Grievance Policy, *see Eiland [2]* at 24:3-5, but contends that because his assistantship under Dr. Blagburn was improperly ended, he may have also been able to file a grievance under the Graduate Assistants Grievance Policy. *Id.* at 139:12-140:10. Nevertheless, regardless of whether Dr. Eiland may have been able to file a grievance under the latter policy, he never even attempt to do so. *Id.* at 137:13-138:14.

## II.    Facts Related to Eiland's Defamation Claims

Dr. Eiland alleges that during the events surrounding Dr. Blagburn's resignation as his Major Professor, certain defamatory statements were made by various of the Defendants. The facts surrounding each alleged defamatory statement are discussed below.

As his first allegation of defamation, Dr. Eiland asserts that "Dr. Janicki made statements about Dr. Eiland to Dr. Wolfe and Dr. Blagburn regarding Dr. Eiland propositioning another graduate student to take an exam for him." *Eiland Interrog. Resp. # 14.* In his deposition, however, Dr. Eiland testified that he was not present when this statement was allegedly made and that he actually does "not know what [Dr. Janicki] said." *Eiland [2]* at 62:4-7. In fact, Dr. Eiland conceded that Dr. Janicki "could" have said that Dr. Eiland had been *accused* of asking a

---

[22]    Dr. Eiland failed to properly follow the grievance procedures even though he admitted to having read over the procedures before entering the Ph.D program. *See Eiland* at 98:16-99:7.

female graduate student to take an examination for him, an undisputedly true and benign statement.[23] *Id.* at 61:17-62:1.

Dr. Eiland's second allegation of defamation is that during his December 3, 2003 meeting with Dr. Blagburn, "Dr. Blagburn called Eiland a cheater with Dr. Hendrix present." *Eiland Interrog. Resp. # 14*. Dr. Blagburn, however, denies that he called Dr. Eiland a cheater, although he did inform Dr. Eiland that Eiland had been notified that he had been accused by a classmate of cheating. *Blagburn Decl.* at ¶ 21. Most importantly, Dr. Hendrix, the only other party present at the meeting where this statement was allegedly made, corroborated Dr. Blagburn's version of the events and further testified that he never heard Dr. Blagburn refer to Dr. Eiland as a cheater. *Hendrix Decl.* at ¶ 2.

As his next allegation of defamation, Dr. Eiland contends that "[i]n February 2005, Dr. Blagburn told Dr. Janderlich the reason Eiland was no longer working on his Ph.D was his failure to get along with the women in pathobiology." *Eiland Interrog. Resp. # 14*. According to Dr. Eiland, this statement was made because Dr. Janderlich, a veterinarian in Montgomery, Alabama, contacted Dr. Blagburn to inquire as to Dr. Eiland's suitability for employment. *Eiland [2]* at 78:3-17. Although Dr. Eiland was not present when this statement was allegedly made, he stated that Dr. Janderlich later told him that Dr. Blagburn had made this statement. *Id.* at 80:7-11. In any event, regardless of whether this statement was or was not made, Dr. Eiland admitted that its content was essentially true. *See id.* at 81:14-18 ("Q. Well, I mean whether they're your fault or their fault, there [were] problems with some of [the women who worked in pathobiology]. A. There were – 'problems' is one word you can put with it.").

---

[23]    In fact, Dr. Eiland concedes that if Dr. Janicki did frame the statement to say that Dr. Eiland had been *accused* of asking a fellow graduate student to take an examination for him, that would not be a defamatory statement because "that leaves it open." *Eiland [2]* at 70:12-21.

Dr. Blagburn confirmed that Dr. Janderlich called him seeking an employment recommendation on Eiland. *Blagburn Decl.* at ¶ 25. And, as part of his recommendation, Dr. Blagburn did, in fact, tell Dr. Janderlich that Dr. Eiland had issues with some of the people in the Pathobiology Department, although Dr. Blagburn did not specifically say that Dr. Eiland had problems with the women in pathobiology. *Id.* Nevertheless, Dr. Blagburn's final recommendation to Dr. Janderlich was that Eiland "deserved a chance" at employment. *Id.* Notably, this is a chance that Dr. Eiland received, as he was hired by Dr. Janderlich. *Eiland [2]* at 78:21-79:2.

Dr. Eiland's fourth allegation of defamation is that "[s]tatements were made to the Alabama Veterinary Wellness Program that were defamatory, i.e., he was OCD, on drugs and bipolar." *Eiland Interrog. Resp. # 14.* The Alabama Veterinary Professionals Wellness Program (the "Wellness Program") was established in 2001 and is sponsored by the Alabama State Board of Veterinary Medical Examiners ("Board") and the Alabama Veterinary Medicine Association ("ALVMA"), under a contract with the Medical Association of the State of Alabama. *Hendrix Decl.* at ¶ 8. The Wellness Program's primary purpose is to improve the health and well-being of veterinary professionals by encouraging prevention and early identification of problems that can lead to physical or mental impairment, which, if left untreated, could adversely affect their ability to practice veterinary medicine safely. *Id.* The Wellness Program is assisted and supervised by the Alabama Veterinary Professionals Wellness Committee (the "Wellness Committee"), a group of up to 15 veterinary professionals who are nominated by the ALVMA and appointed by the Board. *Id.* Dr. Hendrix was nominated to serve on the Wellness Committee and began serving his term in 2001. *Id.* He term on the Wellness Committee was renewed in 2004. *Id.* As a member of the Wellness Committee, Dr. Hendrix had an ethical duty to report the

identity of any veterinary professional who he felt may have a substance abuse problem or mental impairment which could adversely affect their ability to practice veterinary medicine. *Id.*

Dr. Hendrix had known Dr. Eiland for several years before he entered the Ph.D program. *Id.* at ¶ 9. During this time, Dr. Hendrix had always known Dr. Eiland to be an excellent student and had never witnessed or even heard of Dr. Eiland having behavioral problems. *Id.* Thus, when Dr. Eiland's behavior changed so drastically after he entered the Ph.D program, Dr. Hendrix was concerned that Dr. Eiland may have been suffering from some sort of impairment which could adversely affect his ability to practice veterinary medicine safely. *Id.* Therefore, consistent with his ethical duty as a member of the Wellness Committee, he identified Dr. Eiland to the chairman of the Wellness Committee as a veterinary professional who might be suffering from an impairment. *Id.* The chairman of the Wellness Committee, a physician, then handles the specific diagnosis of a mental impairment or substance abuse problem, if any. *Id.* Dr. Hendrix testified that "he reported Dr. Eiland to the Wellness Committee, first, because it was my ethical duty and, second, because I was legitimately concerned for [Dr. Eiland's] well-being." *Id.*

Dr. Eiland's final allegation of defamation is that "Elizabeth Landreth heard that Chris Eiland was dismissed from Auburn University for bad behavior and using drugs." *Eiland Interrog. Response # 14*. Dr. Eiland conceded at his deposition, however, that he does not know who made this statement. *Eiland* at 92:2-22. He acknowledged that he does not know if one of the Defendants to this lawsuit made this statement and agrees that "[i]t could have been another employee .... [or] it could have been another student." *Id.*

III.    **Facts Related to Eiland's Claim under the Rehabilitation Act of 1973**

Dr. Eiland also alleges violation the Rehabilitation Act of 1973. Dr. Eiland does not have a disability, nor does he have any conditions or mannerisms that could be perceived as a

disability. *Eiland [2]* at 93:18-94:3. Yet, Dr. Eiland alleges that the actions taken against him "were discriminatory since he was perceived to have a disability." *Compl.* at ¶ 39. Specifically, Dr. Eiland alleges that he was perceived as having "OCD, bipolarism, drug abuse." *Eiland [2]* at 94:18-19. Dr. Eiland admits that he has no direct evidence to support this claim, and that he brought it solely because of the report made to the Wellness Committee. *See id.* at 94:20-95:6. ("Q. Okay. Why do you believe that you were perceived to have that – have a disability? .... A. Because someone notified the Alabama Wellness Committee that they thought that I had those disabilities, the OCD, bipolarism, and drug abuse."). Moreover, when asked whether he had any facts to suggest that Dr. Blagburn perceived him to have a disability, Dr. Eiland testified:

> Q. …. You can't point to any facts that suggest that [Dr. Blagburn] perceived you as having a disability, correct?
>
> A. Facts that he perceived me to have a disability?
>
> Q. Right.
>
> A. No, besides letting me go.

*Eiland* at 96:13-19.

As previously discussed, it was Dr. Hendrix, not Dr. Blagburn, who made the report to the Wellness Committee. *Hendrix Decl.* at 8-9. And it is undisputed that Dr. Blagburn and not Dr. Hendrix made the decision to resign as Dr. Eiland's Major Professor and to end his employment in the Parasitology Laboratory. *Blagburn Decl.* at ¶ 19. Dr. Hendrix was not involved in that decision. *Id.*; *Hendrix Decl.* at ¶ 2; *see also Eiland [2]* at 148:20-149:4 ("Q. …. I've never heard you say that Dr. Hendrix had anything to do with your alleged dismissal from the program. A. That's true. He didn't have anything to do with my – that I know of, my immediate dismissal from the program.").

IV.    **Eiland's Due Process Allegations**

Dr. Eiland's allegations that he was dismissed from the Ph.D program without due process of law are, even giving him the benefit of the doubt, vague and contradictory. For example, at numerous times during his deposition, Dr. Eiland stated that he was dismissed from the Ph.D program outright by Dr. Blagburn and/or Dr. Wolfe.[24] *See Eiland* at 200:17-21 (Q. On that date, December 3rd, 2003, do you allege that you were dismissed from the doctor of philosophy program in biomedical sciences at Auburn? A. In that meeting, yes, I was."). At other times, however, Dr. Eiland stated that he was dismissed from the program because "I went and tried to locate a new major professor, I was dismissed because I wasn't able to do that." *Eiland* at 231:13-18. Further still, certain parts of Dr. Eiland's deposition testimony and other documentary evidence indicate that Dr. Eiland believed that he was dismissed from the Department of Pathobiology, not from the Ph.D program as a whole. *See Eiland* at 217:13-17 ("Q. Tell me about what happened in that conversation. A. I asked him why I was being dismissed from – why he told Dr. Blagburn to dismiss me from the Department of Pathobiology …."); *see also* September 24, 2004 letter to Dr. Ed. Richardson, a copy of which is attached as Exhibit "F."[25] ("It is my understanding that Dr. Wolfe made the decision to dismiss me from the

---

[24]    This allegation, however, is easily disposed of as the individuals who Dr. Eiland alleges dismissed him, Dr. Blagburn and Dr. Wolfe, do not even have the authority to unilaterally dismiss a student from a graduate program. *Blagburn Decl*. at ¶ 19; *Wolfe Decl*. at ¶ 6.

[25]    In this letter, Dr. Eiland informed Dr. Richardson that "he tried to identify another major professor, but was not successful [and that he does] wish to continue in [his] program in Biomedical Sciences with emphasis in Veterinary Parasitology and Feline Respiratory disease." *See* Exhibit F. However, when asked what he did to locate a Major Professor after writing this letter, Dr. Eiland testified:

A. I didn't feel like I was going to be able to find a new major professor.

Q. So is the answer that you did nothing after this date to locate a major professor?

A. That's correct.

Q. Okay, Did you think that Dr. Richardson should come down and find you a major professor?

Department of Pathobiology. I tried to identify another major professor, but was not successful.").

In contrast to the lack of clarity present in his claim that he was dismissed from the Ph.D program without due process of law, it is crystal clear that Dr. Eiland is *not* contending that he had any liberty or property interest infringed by the termination of his *employment* in the Parasitology laboratory:

> Q. Yes. I guess basically what I'm asking is you're not contending as part of this lawsuit that you had a liberty or property interest that was infringed by your termination from the parasitology laboratory?
>
> A. As an employee, no.

*Eiland* at 248:11-17. Therefore, in response to an Interrogatory which requested Dr. Eiland to identify each and every liberty and/or property interest which he contends was infringed by Auburn or any Auburn faculty member or employee, he responded: "Eiland contends that his good name, his right to a hearing, the Ph.D program contractual agreement and his research data were infringed by Auburn University." *Eiland Interrog. Resp. # 12.*

## SUMMARY JUDGMENT STANDARD

The legal standard for summary judgment is well settled and well known to the court. Summary judgment is appropriate only if this court finds that there exists no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P.* 56(c). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catreet*, 477 U.S. 317, 322 (1986); *Turnes v. AmSouth bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

The movant's initial burden is to "show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v.*

---

A. It wouldn't have been a bad idea.

*Eiland* at 299:11-300:4.

*Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  When the burden of proof at trial belongs to the nonmovant, as is the case here, the moving party need not "support its motion with affidavits or other similar material negating the opponent's claim," *Celotex*, 477 U.S. at 323, but nevertheless "may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 331.

Once the moving party meets its burden, the nonmoving party must then "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.  While the court will resolve all doubts as to whether the non-movant has met its burden against the moving party, *Rollings v. TechSouth, Inc*., 833 F.2d 1525, 1528 (11th Cir. 1987), neither "[m]ere general allegations which do not reveal detailed and precise facts," *Resolution Trust corp. v. Dunmar Corp*., 43 F.3d 587, 592 (11th Cir. 1995), merely colorable evidence, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory statements, *see Peppers v Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), nor conjecture will create a genuine issue of material fact.

## ARGUMENT

## I.    Eiland's Due Process Claims Fail as a Matter of Law.

### A.    Dr. Blagburn's resignation as Eiland's Major Professor infringed no liberty or property interest.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). "The success of due process arguments depends upon the finding of a constitutionally protected property interest in the expectation of continued employment or of a liberty interest having been infringed upon by the State; absent such interest, no due process protections attach." *Gray v. Board of Regents of the University System of*

*Georgia*, 150 F.3d 1347, 1350 (11th Cir. 1998). To hold a property interest in a benefit, "a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. Specifically, "property interests stem not from the Constitution, but from such sources as statutes, regulations, ordinances, and contracts." *Arrington v. Helms*, 438 F.3d 1336, 1348 (11th Cir. 2006) (*citing Roth*, 408 U.S. at 575-77)).

Dr. Eiland's due process claims fail because he cannot establish a deprivation of any liberty or property interest. Moreover, even if Dr. Eiland had been deprived of a liberty or property interest, his due process claims would still fail because he failed to take advantage of the grievance procedures provided by Auburn.

> (i).    ***Eiland's claim that he was dismissed from the Ph.D program without due process fails as a matter of law.***

Dr. Eiland's principal due process claim is that he was improperly dismissed from the Ph.D program at Auburn without due process of law. As an initial matter, it is important to note that "no court has decided whether a protected property interest exists in a student's post-secondary education." *Hamil v. Vertrees*, 2001 U.S. Dist. LEXIS 1634 at *23 (M.D. Ala. 2001). It in unnecessary, however, for this Court to decide this issue here, as the undisputed evidence demonstrates that Dr. Eiland was not dismissed from the Ph.D program at Auburn.[26]

Dr. Eiland's claim is based on statements allegedly made by Drs. Blagburn and Wolfe during his meetings with those professors in early December of 2003. However, the accuracy of Dr. Eiland's recollection of the events of these meetings is highly questionable. Both Dr. Blagburn and Dr. Wolfe expressly deny that Dr. Eiland was ever told that he was dismissed from

---

[26]    However, in the event that the Court is not convinced that Dr. Eiland was not dismissed from the Ph.D program, Defendants request that the Court hold that Dr. Eiland has no protected property interest in his enrollment in Auburn's Graduate School.

the Ph.D program. In fact, neither Dr. Blagburn nor Dr. Wolfe has the authority to unilaterally dismiss a student from the graduate school at Auburn. Furthermore, Dr. Hendrix, who was asked to serve as a witness to Dr. Blagburn's resignation as Dr. Eiland's Major Professor, corroborated Dr. Blagburn's version of the events of that meeting and stated that "Dr. Blagburn never told or even suggested to Dr. Eiland that he was dismissed from the Ph.D program." *Hendrix Decl.* at ¶ 2. Moreover, with respect to his meeting with Dr. Wolfe, Dr. Eiland was forced to concede that Dr. Wolfe never directly said that he was dismissed from the Ph.D program.

Perhaps the most compelling evidence that Dr. Eiland was never told that he was dismissed from the Ph.D program comes from Dr. Eiland himself, as he testified that immediately after the December 3, 2003 meeting with Dr. Blagburn, he asked Dr. Hendrix to serve as his new Major Professor. This conduct blatantly contradicts his testimony that Dr. Blagburn dismissed him outright from the Ph.D program during the December 3, 2003 meeting. Later in his deposition, Dr. Eiland tried to "clarify" this statement to say that he did not ask Dr. Hendrix to serve as his Major Professor in that meeting, but his "clarification" is of little consequence in light of Dr. Hendrix's confirmation that he and Dr. Eiland did, in fact, discuss potential candidates for Dr. Eiland's new Major Professor immediately after the December 3, 2003 meeting.

Finally, the documentary evidence in this matter compels the conclusion that Dr. Eiland was never told by either Dr. Blagburn or Dr. Wolfe that he was dismissed from the Ph.D program. For instance, six days after the December 3, 2003 meeting, Dr. Blagburn formally resigned from his position as Major Professor via a memorandum to his superiors in the graduate school. This memorandum stated: "Effective at the end of the Fall Semester, 2003, I will no longer serve as Dr. Christopher Eiland's PhD advisor." *See* Exhibit A. On the other hand, Dr.

Eiland testified that at no time did he ever receive any kind of documentation stating that he was dismissed from the Ph.D program.

But even if there were a question of fact as to what was said in the meetings with Drs. Blagburn and Wolfe, there is <u>undisputed</u> evidence that Dr. Eiland was not <u>in fact</u> ever dismissed from the doctoral program. Just two days after his meeting with Dr. Blagburn and on the same day as his meeting with Dr. Wolfe, Dr. Eiland was expressly informed by Dr. Janicki, the Associate Dean for Research and Graduate Studies, that he was <u>not</u> dismissed from the Ph.D program or graduate school and that he could continue in the program by identifying a new Major Professor. This is significant because, as Dr. Eiland recognized, Dr. Janicki occupies a superior position to Drs. Blagburn and Wolfe in the Graduate School hierarchy.

If that were not sufficient, however, Dr. Eiland would later receive a letter from Dr. McFarland, the Dean of the Graduate School, which, in relevant part, stated:

> In your letter of July 27, you made a number of complaints. The main complaint seemed to be you had been dismissed from the program. **According to the College of Veterinary Medicine and the Graduate School, you have not been terminated. You are still a student in good standing at Auburn University. No actions have been taken to terminate your admission to the Doctor of Philosophy program in biomedical sciences.** Your major professor has decided to resign from your committee. It is now your responsibility to identify another major professor, should you wish to continue in this program.

*See Exhibit* B (emphasis added). Any argument by Dr. Eiland that he was dismissed from the Ph.D program or graduate school is foreclosed by this evidence, as Dr. Eiland admitted that after receiving this letter, he believed he was still a student in good standing at Auburn.

It having been established without dispute that Dr. Eiland was not dismissed from the Ph.D program at Auburn, Dr. Eiland must rely on his "alternative" theories that he was dismissed from the Department of Pathobiology in the Graduate School, *see Eiland* at 217:13-17, or that he

was "constructively" dismissed because he "went and tried to locate a new major professor …
[and] wasn't able to do that." *Eiland* at 231:13-18.

Dr. Eiland's assertion that he was dismissed from the Department of Pathobiology is
inherently flawed because he was never in that department to begin with. The Ph.D program in
Biomedical Sciences is an inter-departmental program, *see Wolfe Decl*. at ¶ 6; *Blagburn* at
104:2-3; therefore, a Ph.D student is not "in" any particular department within the Graduate
School. *Blagburn Decl*. at ¶ 26. Students in the Ph.D program, rather, enter the program under
the direction of a Major Professor. *Id*. The Major Professor, of course, is located in a department;
however, the student himself is not "located" there. *Id*. If the Major Professor resigns, the student
can arrange for a new Major Professor in the same department as his previous Major Professor,
or he can identify a Major Professor in another department (e.g., Anatomy, Histology, Clinical
sciences). *Id*. Either way, the end result is the same: if the student successfully completes the
graduate program, he will receive a Doctor of Philosophy in Biomedical Sciences degree. *Id.;
see also Eiland* at 67:7-69:4.

Even if Dr. Eiland could have been dismissed from the Department of Pathobiology, his
due process claim still would fail. A graduate student simply has no liberty and/or property right
to complete a Ph.D degree in a particular department of a graduate school. Defendants are aware
of no authority which holds that such a property interest exists, nor is there any statute,
regulation, ordinance or contract which establishes such a right.  On the other hand, there is case
law which establishes that not even a tenured university professor has a property interest in
remaining in a particular department of a graduate school. The Eleventh Circuit first recognized
this rule in *Maples v. Martin*, 858 F.2d 1546 (11th Cir. 1988), a case strikingly similar to the

instant case in that it involved a due process claim against several members of the faculty and administration of Auburn University.

In *Maples,* several tenured professors were transferred from the Mechanical Engineering Department ("ME Department") to other engineering departments at Auburn. *Maples*, 858 F.2d at 1548. The plaintiffs were apparently transferred because of differences between them and other faculty within the ME Department. *Id.* The transferred professors filed suit, alleging that "they have an entitlement to continued assignment in the ME Department." *Id.* at 1550. The Eleventh Circuit disagreed, holding that "transfers and reassignments have generally not been held to implicate a property interest." *Id.* Therefore, because no property interest was implicated by the transferred professors' removal from the ME Department, their due process claim was dismissed. *Id.* at 1551-52. Other jurisdictions have similar holdings. *See, e.g., Huang v. Bd. of Governors*, 902 F.2d 1134, 1141-42 (4th Cir. 1990) (concluding that a transfer to a different department did not affect a property right); *Volk v. Coler*, 845 F.2d 1422, 1430 (7th Cir. 1988) (plaintiff has no property interest in employment at particular office of state welfare agency).

The undisputed evidence is that Dr. Eiland was not dismissed from the Department of Pathobiology; in fact, it was not even possible for this to happen. However, even if Dr. Eiland could be dismissed from the Department of Pathobiology, no liberty and/or property interest would be infringed. Dr. Eiland was a graduate student in the Ph.D program at Auburn. To date, no court has ever even held that a student has a property interest in post-secondary education, much less the right to continued enrollment in a particular department of a graduate school. Indeed, not even a tenured university professor has a property interest to remain employed in a particular department of a graduate school. Accordingly, to the extent that Dr. Eiland argues that

he was deprived of a liberty and/or property interest by being dismissed from the Department of Pathobiology, this claim fails as a matter of law.

Dr. Eiland's second alternative theory is that he was "constructively" dismissed from the Ph.D program because he "went and tried to locate a new major professor [and] … wasn't able to do that." *Eiland* at 231:13-18. What Dr. Eiland seems to mean by this statement is that he was dismissed because, in his mind, he could not locate a Major Professor who could supervise a research project with a focus on the discipline of parasitology. Again, as with his allegation that he was dismissed from Department of Pathobiology, there is simply no authority which even remotely suggests that a graduate student has a property right in being able to focus his doctoral research and dissertation on a particular area of study. Accordingly, to the extent that Dr. Eiland argues that he was deprived of a property interest because he could not focus his Ph.D work on parasitology, this claim fails as a matter of law.

While it may be technically true that Dr. Eiland was not able to identity a new Major Professor, the facts indicate that the only impediment to his locating a new Major Professor was his own lack of effort. In fact, Dr. Eiland admitted that he asked only two professors to serve in that role. One of them, Dr. Dillon, could not accept Dr. Eiland as a student due to funding cutbacks in his own research. The other, Dr. Hendrix, is a teaching professor, has never served as a Major Professor and could not accept Dr. Eiland. Beyond his requests to these two professors, Dr. Eiland took no steps to identify a Major Professor, even though he admitted that any one of a number of professors outside the Department of Pathobiology could have served in that role and allowed him to complete his Ph.D degree. Dr. Eiland contends that he did not ask any of the professors outside the Department of Pathobiology to serve as his Major Professor because that would not have allowed him to focus his research on his preferred discipline. Dr. Blagburn,

however, disputes this statement. He testified that there are other Auburn professors outside the Department of Pathobiology who have the skills in the area of parasites which would have allowed them to serve as Dr. Eiland's major professor in his chosen discipline. Of course, Dr. Eiland would likely not know this because he never asked any professor outside the Department of Pathobiology, with the exception of Dr. Dillon, to serve as his Major Professor, nor did he at any time ask anyone at Auburn for help in locating a Major Professor.

Accordingly, to the extent Dr. Eiland argues that he has a property interest in completing his doctoral work in a particular area, this claim fails as a matter of law. A graduate student simply has no property interest in completing a Ph.D in a particular discipline of study. Even if such a property interest did exist, moreover, Auburn did not impair that interest either directly or constructively. The undisputed facts demonstrate that Dr. Eiland failed to make a sufficient effort to identify another Major Professor.

### (ii).    Eiland's claim that he was terminated from the Parasitology laboratory without due process fails as a matter of law.

Dr. Eiland has expressly acknowledged that the termination of his employment in the Parasitology laboratory did not deprive him of any liberty and/or property interest. *See Eiland* at 248:11-17 ("Q. Yes. I guess basically what I'm asking is you're not contending as part of this lawsuit that you had a liberty or property interest that was infringed by your termination from the parasitology laboratory. A. As an employee, no."). However, even if Dr. Eiland did claim a property interest in his employment in the Parasitology laboratory, the claim would fail because a graduate student clearly has no property interest in his continued employment in a research laboratory.

It is well established that a public employee does not hold a property interest in employment at a governmental entity unless such an interest is created by some "existing rule or

understanding that stems from an independent sources such as state law." *Gray*, 150 F.3d at 1350. The Eleventh Circuit has held that a non-tenured professor at a public university lacks a property interest in continued employment at the university. *Id*. at 1352 ("we agree with the district court's decision that Gray never had tenure (and therefore no property right entitled to protection under the Fourteenth Amendment)"). In the instant case, Dr. Eiland was much less than a non-tenured professor; he was a student research assistant, which the University officially designates as a "temporary" employee. *Blagburn Decl*. at ¶ 9. As a "temporary" employee, Dr. Eiland can hardly claim an expectation of continued employment, nor does any statute, regulation, ordinance or contract establish such a right. As a consequence, although Dr. Eiland has claimed no deprivation of a property interest in his employment, even if he did claim such an interest, his claim would fail as matter of law.

> ### (iii). *Eiland's claim that he was denied access to the research he collected to support his MS research project/thesis without due process fails as a matter of law.*

Dr. Eiland alleges that he was deprived of a property interest in the research that he collected to support his MS thesis, to which he claims Dr. Blagburn denied him access after resigning as his Major Professor. As an initial matter, the great weight of the evidence in this case demonstrates that Dr. Eiland was not denied access to any research that he had collected. Dr. Blagburn testified that at no time did he tell Dr. Eiland that he would no longer have access to his research. Moreover, Dr. Hendrix, who was a witness to the events of the December 3, 2003 meeting, testified that Dr. Eiland was never told that he would not have access to the research he had collected. Even if Dr. Eiland had been denied access to the research, however, this claim would still fail as Dr. Eiland had no property interest in the research product.

Dr. Eiland can identify no contract, statute, regulation, or ordinance that provides a graduate student a property interest in the research collected to support a research project/thesis. Moreover, the facts surrounding Dr. Eiland's research demonstrate that he could have no legitimate expectation of a property right, as the idea to collect the research was not even his own, but rather that of Dr. Dillon. Dr. Eiland described his role in collecting the research as doing the "grunt" work, and even admitted that another individual assisted him in collecting the research. In addition, a number of other students had been employed by Dr. Dillon to collect the identical research that Dr. Eiland collected.

Finally, and regardless of anything else, the undisputed evidence is that a student's research, although physically collected by the student, is the property of Auburn. After a student completes his thesis, the research remains at Auburn for use by other students. In fact, even Dr. Eiland recognized this, testifying that when a student leaves Auburn, "they don't take [the research] home with them. They would leave it. The actual information and raw data would be left at Auburn University." *Eiland* at 56:17-57:1.

Accordingly, the undisputed evidence establishes that, even if Dr. Eiland had been denied access to the research he collected to support his MS research/thesis, he had no property interest in this research, as it is the property of the University, not the student who collected it.

> ***(iv).*** ***Eiland's claim that he was good name and reputation were infringed without due process fails as a matter of law.***

Dr. Eiland alleges that his "liberty rights in his good name and reputation … were infringed upon without due process of law being provided to him under the Federal and State Constitutions." *Compl.* at ¶ 15. In order to "establish that a deprivation of a public employee's liberty interest has occurred without due process of law, the employee must prove that: (1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge

(4) was made public (5) by the governmental employer (6) without a meaningful opportunity for employee name clearing." *Gilder-Lucas v. Elmore County Bd. of Edu.*, 399 F. Supp. 2d 1267, 1273 (M.D. Ala. 2005) (*citing Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000)). Further, the plaintiff "must demonstrate that the defendant 'refuse[d] to provide a process sufficient to remedy the procedural deprivation' in order to establish a constitutional violation." *Id.* (quoting *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994)). Finally, a plaintiff must show "that the government official's conduct deprived the plaintiff of a previously recognized property or liberty interest in addition to damaging the plaintiff's reputation." *Cypress Ins. Co. v. Clark*, 144 F.3d 1435, 1436 (11th Cir. 1998). In other words, "[t]he infliction of a stigma on a person's reputation by a state official, without more, does not infringe upon a protected property interest." *Blackburn v. City of Marshall*, 42 F.3d 925, 935 (5th Cir. 1995).

Although Dr. Eiland has not specifically identified what statement(s) he contends were false and stigmatizing, he will presumably assert that one or more of the alleged statements which form the basis of his state law defamation claims satisfies these requirements. No matter which of these statement(s) Dr. Eiland argues satisfies these requirements, it is clear that this claim fails.

The Eleventh Circuit has established that in order to sustain a due process claim for an infringement of a plaintiff's liberty interest in his good name, the plaintiff must show that the government official's conduct deprived the plaintiff of a previously recognized property or liberty interest in addition to damaging the plaintiff's reputation. *See Cypress Ins. Co., supra*. As previously demonstrated, neither Dr. Blagburn's resigning as Dr. Eiland's Major Professor nor the resulting events deprived Dr. Eiland of any liberty or property interest that has been

previously recognized by the Eleventh Circuit or Supreme Court. Dr. Eiland's liberty interest claim, therefore, fails as a matter of law.

Second, Dr. Eiland can prove no public dissemination of a stigmatizing statement. As to the five statements which Dr. Eiland alleges to be defamatory, only one could even arguably be considered to have been publicly disseminated. This is the alleged statement that "Elizabeth Landreth heard that Chris Eiland was dismissed from Auburn University for bad behavior and using drugs." To establish an infringement of a plaintiff's liberty interest in his good name, however, it is essential that the plaintiff prove that the stigmatizing statement was made "public" by the "governmental employer." *Gilder-Lucas, supra.* Here, Dr. Eiland cannot prove this because that he has admitted does not know who made this alleged statement. In fact, Dr. Eiland has acknowledged that he does not even know if one of the Defendants to this lawsuit made the statement. He agrees that "[i]t could have been another employee .... [or] it could have been another student." *Eiland [2]* at 92:7-93:2. Accordingly, Dr. Eiland's claim that his liberty rights in his good name and reputation was infringed without due process fails as a matter of law.

Finally, Dr. Eiland's claim also fails because he had a meaningful opportunity for name clearing and cannot prove that Auburn refused to prove a process sufficient to remedy his alleged due process deprivation. As will be shown in detail below, Dr. Eiland had the opportunity to utilize Auburn's grievance procedures to seek administrative redress of any action taken by Dr. Blagburn that he believed was improper or unlawful. He did not. As firmly established by the Eleventh Circuit, this failure precludes Dr. Eiland from seeking redress of the alleged due process violations in this Court, including the claim of infringement to his good name and reputation. *See Maples, infra.*

**B.    Even if Dr. Eiland suffered a deprivation of a liberty and/or property interest, he has waived his right to seek redress of the deprivation in this Court because he failed to utilize the Auburn's grievance procedures.**

Even assuming that Dr. Eiland was deprived of some protected property and/or liberty interest, he cannot be said to have been denied due process. Dr. Eiland had the opportunity to seek redress of any alleged adverse action taken against him by an Auburn faculty member or administrator by way of Auburn's student grievance procedures. He failed to take advantage of this opportunity until long after the established deadline, and even then did not properly submit his complaint.

In the Eleventh Circuit, it is well-established that a plaintiff is foreclosed from arguing that he was deprived of a property interest without due process, if there was an available grievance procedure which the litigant failed to utilize. A good example of the application of this rule is found in *Maples*, a case involving another Auburn grievance procedure.

As previously discussed, *Maples* held that a tenured university professor does not have a property interest in continued employment in a particular department of a graduate school. In addition to this holding, the *Maples* court also addressed whether the plaintiff professors had waived their right to seek redress of the alleged due process violation by failing to initiate a grievance proceeding under the faculty grievance procedure, a procedure which "satisfie[s] the requirement of due process." *Maples*, 858 F.2d at 1551. The *Maples* court held that they did, writing, "[t]he appellants failed to avail themselves of [the faculty grievance procedures] and presented no evidence that resort to it would have been futile. Thus, an opportunity to be heard that would have met the requirements of due process was lost to the appellants by their own inaction." *Id. See also Johnson v. Atlanta Indep. School System*, 137 Fed. Appx. 311, 315 (11th Cir. 2005) (a "state may cure procedural deprivation by providing a later procedural remedy.

Where the state has adequate remedies to cure due process deprivations, that a plaintiff has not taken advantage of, a plaintiff may not pursue his claim in federal court."); *Lewis v. Hillsborough Transit Auth.*, 726 F.2d 664, 667 (11th Cir. 1983), *cert. denied*, 469 U.S. 822 (1984) (employee who declines to utilize grievance procedure that meets constitutional standards cannot claim denial of opportunity to rebut charges against him). Other jurisdictions have also held that if a litigant fails to access a constitutionally sufficient grievance procedure, the right to seek redress of an alleged due process violation in the federal court system is waived. *See, e.g., Parratt v. Taylor*, 451 U.S. 527 (1981) (although the State of Nebraska may have deprived inmate of property, the state "has provided respondent with the means by which he can receive redress for the deprivation .... This procedure was in existence at the time of the loss here in question but respondent did not use it."); *Krentz v. Robertson Fire Protection Dist.*, 228 F.3d 897, 904 (8th Cir. 2000) ("[o]ur cases explain that an employee waives a procedural due process claim by refusing to participate in post-termination administrative or grievance procedures made available by the state."); *Dusanek v. Hannon*, 677 F.2d 538, 542-43 (7th Cir. 1982).

Just as the *Maples* plaintiffs had the opportunity to initiate a proceeding to challenge the action against them under Auburn's grievance procedures, so did Dr. Eiland. Auburn's Student Academic Grievance Policy declares that "[t]he purpose of this procedure shall be to resolve academic grievance of students, which result from actions of faculty or administration." *See* Exhibit E, Rule 1.1. Dr. Hendrix, the former chairman of the Student Academic Grievance Committee, testified that "if a student has a grievance regarding actions of a Major Professor, faculty member or administration, the [Student Academic Grievance Committee] would be the appropriate place to file a grievance related to those actions." *Hendrix Decl.* at ¶ 6. Therefore, despite the fact that Dr. Eiland had the opportunity to seek redress of the allegedly improper

actions of Dr. Blagburn via the Student Academic Grievance Policy, he, by his own admission, failed to do so in a timely and effective manner.  Dr. Eiland, therefore, has waived his right to seek redress of the alleged due process violations in this Court.[27]

## II.     Eiland's Defamation Claims Fail as a Matter of Law.

Assuming the Court chooses to exercise supplemental jurisdiction over Dr. Eiland's state law claims, *see City of Chicago v. International College of Surgeons,* 522 U.S. 156, 172 (1997) ("[o]ur decisions have established that pendent jurisdiction 'is a doctrine of discretion, not of plaintiff's right,' and that district courts can decline to exercise jurisdiction over pendent claims for a number of valid reasons."), they too are due to be dismissed as a matter of law.

Under Alabama law, to successfully maintain a cause of action for defamation, a plaintiff must prove the following:

> 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting to at least negligence; 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*Brassfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1424, 1436 (M.D. Ala. 1996) (*citing McCraig v. Talledega Publishing Co.*, 544 So. 2d 875, 877 (Ala. 1989)). For Dr. Eiland's defamation claims to survive summary judgment, the evidence must show that he meets all elements of a prima facie case.

### A.     Eiland's claim relating to the cheating allegation

Dr. Eiland's first cause of action for defamation is based on the allegation that Dr. Janicki made comments to Drs. Blagburn and Wolfe regarding Dr. Eiland propositioning another graduate student to take an examination for him.  Dr. Eiland admits that he was not present for

---

[27]     It is clear that the hearing procedures set forth in Auburn's Student Academic Grievance Policy comport with the requirements of due process. In a hearing conducted pursuant to this policy, the student/complainant has the right to appear before an impartial tribunal and testify on his own behalf, present witnesses in support of his position and question the adverse party and/or witnesses against him. *See* Exhibit E, Rules 4.2.5-4.2.9.

these statements and actually does not know what Dr. Janicki said. Moreover, Dr. Eiland admits

that it "could" have been that Dr. Janicki said that he had been "accused" of asking a fellow

graduate student to take an examination for him. *Eiland [2]* at 61:17-62:1. If Dr. Janicki framed

the statement in this manner, Dr. Eiland admits, the statement would not be defamatory, since

"that leaves it open." *Id.* at 70:12-21.

The burden of proof in an action for slander or libel provides that "the plaintiff must

prove, unless it shall be admitted by the defendant, the facts showing that the alleged defamatory

matter was published or spoken of the plaintiff." *Ala. Code* § 6-5-182 (1975). Here, because Dr.

Eiland did not hear the allegedly defamatory statement, nor does he otherwise have affirmative

evidence establishing that Dr. Janicki actually made a defamatory statement, this claim fails as a

matter of law.

Moreover, even if Dr. Janicki had affirmatively stated that Dr. Eiland propositioned

another graduate student to take an examination for him, this claim still would fail, as there was

no publication of the statement. The Alabama Supreme Court has expressly held that "when

officers or employees of a corporation act within the scope of their employment and within the

line of their duties, they are not third persons vis-à-vis the corporation." *Nelson v. Lapeyrouse

Grain Corp.*, 534 So. 2d 1085, 1093 (Ala. 1988). Therefore, there can be no publication of an

allegedly defamatory statement between them. *Id.*; *see also Dixon v. Economy Co.*, 477 So. 2d

353, 354 (Ala. 1985) ("[c]ommunications among the managerial personnel of a corporation

about the company's business do not constitute a publication. . . ."). Here, it can hardly be argued

that Dr. Janicki, the Associate Dean for Research and Graduate Studies, Dr. Wolfe, the Head of

the Department of Pathobiology, or Dr. Blagburn, a professor within the Department of

Pathobiology, were not acting within the line and scope of their employment when discussing the

allegation of cheating against Dr. Eiland. Accordingly, Dr. Eiland's defamation claim against Dr. Janicki fails as a matter of law, as Dr. Eiland cannot prove that there has been a publication of the allegedly defamatory statement (whatever that statement may be).

Finally, "Alabama law has long recognized that certain communications, even some that tend to defame or disparage a person, are protected by a qualified privilege:

> [w]here a party makes a communication and such communication is prompted by duty owed to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged if it is made with good faith and without actual malice."

*Brackin v. Trimmier Law Firm*, 897 So. 2d 207, 224 (Ala. 2004). In *Brackin*, the court recognized that employees acting within the line and scope of their employment for the corporation hold a conditional privilege to communicate regarding matters that may otherwise be defamatory, as long as the statements are not made with actual malice. *Id.* Here, it is undisputed that Drs. Janicki, Blagburn, and Wolfe were acting within the line and scope of their employment when discussing the allegation of cheating against Dr. Eiland. Therefore, to defeat the employees' conditional privilege, Dr. Eiland must show that the allegedly defamatory statement was attenuated with malice. This he cannot do, as the record lacks any evidence that Dr. Janicki made any alleged statement about the accusation of cheating against Dr. Eiland with malice. Accordingly, Dr. Eiland's claim of defamation against Dr. Janicki fails as a matter of law.

**B.    Eiland's claim based on Blagburn's alleged comment to Hendrix**

Dr. Eiland's second allegation of defamation is based on the contention that Dr. Blagburn referred to him a "cheater" in the presence of Dr. Hendrix.  However, Dr. Hendrix testified that he never heard Dr. Blagburn refer to Dr. Eiland as a cheater. It is axiomatic that, where the

plaintiff claims that an alleged statement was made to or heard by a third party, but the third party denies hearing the statement, there has been no publication of the statement.

Even if Dr. Blagburn did refer to Dr. Eiland as a cheater in the presence of Dr. Hendrix, there still would be no publication of the statement. Dr. Eiland cannot prove publication for the same reason that there could be no publication of Dr. Janicki's alleged statement: Drs. Blagburn and Hendrix are both members of the faculty of Auburn and the alleged statement was made in the line and scope of Dr. Blagburn's employment. *See Brackin, supra.*

**C.    Eiland's claim based on employment reference**

Plaintiff's third allegation of defamation is based on allegedly defamatory statements made by Dr. Blagburn to Dr. Janderlich, a veterinarian in Montgomery, Alabama. This conversation took place as a result of Dr. Janderlich's inquiry into Dr. Eiland's potential suitability for employment. Dr. Blagburn informed Dr. Janderlich that Dr. Eiland "deserved a chance" at employment, but advised Dr. Janderlich that Dr. Eiland had some issues with some of the employees in the Department of Pathobiology.

When Dr. Blagburn made his recommendation of employment to Dr. Janderlich, he had a conditional privilege to make statements regarding Dr. Eiland's suitability for employment. *See Brackin, supra.* In providing a prospective employer with information regarding Dr. Eiland's professional behavior, Dr. Blagburn was fulfilling a moral or social duty to provide the best information possible to a potential employer based on his first-hand knowledge of the professional capabilities of a former student. In a similar case, a former employer's communication with a potential employer regarding the potential employee's negligence in a truck accident was considered to be a conditionally privileged communication. *Brown v. Chem Haulers, Inc.*, 402 So. 2d 887 (Ala. 1981). Moreover, it is generally held that any statement

between a former employer and a potential employer is protected by a conditional privilege, as long as the statements were made in good faith and without malice. *Gore v. Health-Tex, Inc.,* 567 So. 2d 1307 (Ala. 1990); *see also Clark v. America's First Credit Union*, 585 So. 2d 1367 (Ala. 1991). Thus, any communication between Dr. Blagburn and Dr. Janderlich regarding the potential employment of Dr. Eiland was conditionally privileged.

If communications are conditionally privileged, the burden of proof is on the plaintiff to show that that the allegedly defamatory statements were made with malice. *Atkins Ford Sales v. Royster*, 560 So. 2d 197 (Ala. 1990). The Alabama Supreme Court has stated that malice exists and will defeat a claim of conditional privilege only when the evidence shows previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like directed from the defendant. *Clark*, 585 So. 2d at 1371. There is no evidence here of ill will or hostility exhibited against Dr. Eiland. In communicating experiences of past difficulties with Dr. Eiland, it was not Dr. Blagburn's attempt to prevent Dr. Eiland from attaining a job with Dr. Janderlich. On the contrary, Dr. Blagburn recommended Dr. Eiland for employment, and claimed he "deserved a chance." This is a chance that Dr. Eiland received, as he was hired by Dr. Janderlich.

Finally, as previously set forth, the truth of the alleged defamatory statement is a complete and absolute defense to a slander action. *Battles v. Ford Motor Credit Co*., 597 So. 2d 688 (Ala. 1992). When asked in his deposition if there were, in fact, problems with some of the people in Pathobiology, Dr. Eiland stated that "'problems' was one of the words you could put with it." Therefore, Dr. Blagburn's statement that Dr. Eiland had some problems with people in Pathobiology is a true statement. Accordingly, because the truth of a statement is a complete and absolute defense to a claim of defamation, and because Dr. Eiland has conceded that the

statement Dr. Blagburn made was essentially true, Dr. Eiland's defamation claim fails as a matter of law.

**D.     Eiland's claim regarding report to Wellness Committee**

Plaintiff alleges that Dr. Hendrix made certain defamatory statements to the Alabama Veterinary Professionals Wellness Committee concerning Dr. Eiland's mental health and fitness to practice veterinary medicine.  Dr. Hendrix was under a duty to report to the Wellness Committee any physical or mental impairment which would prevent a veterinary professional from performing his duties in a safe manner.  *Ala. Code* § 34-29-111(a) (1975).  In an effort to preserve the integrity of the veterinary profession as well as to insure that Dr. Eiland received help, Dr. Hendrix advised the chairman of the Wellness Committee, a physician, that Dr. Eiland might have an impairment which could adversely affect his ability to practice veterinary medicine safely.

Dr. Hendrix was a member of the Wellness Committee, and, as such, was afforded certain immunities.  The Alabama Legislature has provided that:

> [a]ny veterinary professional licensed in Alabama who shall be duly appointed to serve as a member of the Alabama Veterinary Professionals Wellness Committee and any auxiliary personnel, consultants, attorneys, or other volunteers or employees of the committee taking any action authorized by this article, engaging in the performance of any duties on behalf of the committee, or participating in any administrative or judicial proceeding resulting therefrom, shall, in the performance and operation thereof, be immune from any liability, civil or criminal, that might otherwise be incurred or imposed. . . .

*Id.* at § (e).

As a member of the Wellness Committee, Dr. Hendrix was insulated from any liability that may have been imposed on him through the conduct of his affairs as a committee member.  By reporting identifying Dr. Eiland to the Wellness Committee, Dr. Hendrix was performing a duty statutorily delegated to him, and, as such, cannot be subject to any liability resulting

therefrom. Therefore, even if his statements were otherwise defamatory or malicious (which they were not), the legislature granted Dr. Hendrix civil immunity by virtue of his service as a member of the Wellness Committee.

Furthermore, any statement made about Dr. Eiland by Dr. Hendrix to the Wellness Committee would be a conditionally privileged communication. The privilege of this communication is also reflected in the statute, which provides "all investigations, filings, reports, and other submissions to the Wellness Committee are to be considered privileged and confidential." *Id.* at § (f). Thus, as long as the submission communicated to the Wellness Committee by Dr. Hendrix was done so in good faith and without actual malice, the statement is not actionable. Dr. Eiland, by his own admission, has no evidence that there was a malicious intent behind Dr. Hendrix's report to the Wellness Committee. *See Eiland [2]* at 91:7-22. Accordingly, because Dr. Eiland is unable to prove the second element of his prima facie case (that an unprivileged communication was transmitted to a third party), Dr. Hendrix is entitled to judgment as a matter of law.

### E.    Eiland's claim based on alleged statement to Landreth

Dr. Eiland's final allegation of defamation is that Elizabeth Landreth heard that he was dismissed from Auburn University for bad behavior and using drugs. This claim can be easily disposed of, as Dr. Eiland has conceded that he does not know if the statements or rumor allegedly heard by Elizabeth Landreth were made by any of the Defendants to this action. Accordingly, because Dr. Eiland has no evidence that any of the Defendants made the allegedly defamatory statements purportedly heard by Elizabeth Landreth, this claim fails as a matter of law.

**III.**      **Eiland's Claim under the Rehabilitation Act of 1973 Fails as a Matter of Law.**

       Dr. Eiland asserts a cause of action under the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq*., because, he alleges, he was dismissed from the Ph.D program and Parasitology laboratory because he was perceived to have a disability.  Specifically, Dr. Eiland claims that he was perceived as having obsessive-compulsive disorder, bipolarism, and to be a drug abuser.

       Dr. Eiland admits that the sole basis for this claim is the report made to the Wellness Committee. *See Eiland [2]* at 94:20-95:6 ("Q. Okay. Why do you believe you were perceived to have that – have a disability …. A. Because someone notified the Alabama Wellness Committee that they thought I had those disabilities, the OCD, bipolarism, and drug abuse."). Moreover, Dr. Eiland admitted to having no facts to suggest that Dr. Blagburn perceived him to have a disability, other than the fact that Dr. Blagburn "let him go." *Eiland* at 96:13-19.

       It is undisputed that Dr. Hendrix, not Dr. Blagburn, made the report to the Wellness Committee. In addition, it is undisputed that Dr. Blagburn made the decision to resign as Dr. Eiland's Major Professor and to end his employment in the Parisitology laboratory, and that Dr. Hendrix was not in any way involved in this decision. Accordingly, because Dr. Eiland has absolutely no evidence that the person who actually made the decision to terminate his employment in the Parasitology laboratory, Dr. Blagburn, perceived him to have a disability, and then terminated him for that reason, this claim fails as a matter of law.

**IV.**      **Eiland's § 1983 Claims against Defendants in their Official Capacities, to the extent they seek monetary damages, are barred by the Eleventh Amendment.**

       Dr. Eiland's § 1983 claims against Defendants in their official capacities, to the extent that they seek monetary damages, are due to be dismissed because Defendants are immune under the Eleventh Amendment from such suits.

The Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state, except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity. *Lassiter v. Alabama A&M University*, 3 F.3d 1482, 1485 (11th Cir. 1993). "Congress has not abrogated Eleventh Amendment immunity in section 1983 cases." *Carr v. City of Florence, Alabama*, 916 F.2d 1521, 1525 (11th Cir. 1990); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989). The State of Alabama has not waived its immunity. *See, e.g., Alabama v. Pugh*, 438 U.S. 781, 782 (1978). Auburn University, of course, partakes of the State of Alabama's Eleventh Amendment immunity. *See Kelly v. Troy State University*, 923 F. Supp. 1494, 1502 (M.D. Ala. 1996) (the State of Alabama's Eleventh Amendment immunity attaches to its universities); *Rigby v. Auburn University*, 448 So. 2d 345, 347 (Ala. 1984) (Auburn University is an agency of the State of Alabama).

Dr. Eiland has not sued Auburn University directly in this case; however, "it is well established that even though a State is not named a party to the action, the suit may nonetheless be barred by the Eleventh Amendment." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). In *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464 (1945), the Supreme Court observed that "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." Thus, "the rule has evolved that a suit by private parties seeking to impose liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Edelman*, 415 U.S. at 663.

In this action, Defendants are sued in their official and individual capacity. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a

suit against the official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71; *see also Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1524 (11th Cir. 1990). Accordingly, Dr. Eiland's claims against Defendants in their official capacities, to the extent that they seek monetary damages, are barred by the Eleventh Amendment.

V.    **Eiland's § 1983 Claims against Defendants in their Official Capacities, to the extent they seek monetary damages, are due to be dismissed because they are not subject to suit under § 1983.**

Section 1983 renders certain "persons" liable for deprivations of constitutional rights. 42 U.S.C. § 1983. If a defendant is not a "person" within the meaning of § 1983, that defendant is not subject to suit under § 1983. *Id.*; *see also Will*, 491 U.S. at 60. Dr. Eiland's § 1983 claims, to the extent they seek monetary damages, are due to be dismissed because Defendants, in their official capacities, are not "persons" within the meaning of § 1983 when sued for monetary relief.

In *Will*, the Supreme Court was presented with the question of whether a State, or an official of the State while acting in his or her official capacity, is a "person" within the meaning of § 1983. *Id.* The Supreme Court answered that question in the negative, expressly holding that "neither a State nor its officials acting in their official capacities are "persons" under § 1983." *Id.* at 71; *but see id.* at 71 n.10 ("[o]f course, a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the state'"). Accordingly, because Defendants, in their official capacities, when sued for monetary relief, are not "persons" within the meaning of § 1983, Dr. Eiland's claims against Defendants in their official capacities, to the extent they seek monetary damages, are due to be dismissed.

## VI.    Eiland's § 1981 claims are due to be dismissed because they are subsumed by the § 1983 claims.

Dr. Eiland's claims brought pursuant to 42 U.S.C. § 1981 are due to be dismissed because § 1983 provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 in claims against a state actor.

In *Jett v. Dallas Independent School District*, 491 U.S. 701, 735 (1989), the Supreme Court held that § 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." In *Butts v. County of Volusia*, 222 F.3d 891 (11th Cir. 2000), the Eleventh Circuit affirmed the continued validity of this holding after the enactment of the Civil Rights Act of 1991. Defendants in their official capacities are state actors. Dr. Eiland's § 1981 claims are therefore due to be dismissed.

## VII.    Eiland's Claims against Defendants in their individual capacities are barred by the doctrine of Qualified Immunity.

In *Hafer v. Melo*, 502 U.S. 21 (1991), the United Supreme Court held that under certain circumstances public officials sued in their individual capacity may be shielded from liability under the doctrine of qualified immunity. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity is designed to protect public officials in their performance of discretionary functions and protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Purcell v. Toombs County*, 400 F.3d 1313, 1319 (11th Cir. 2005); *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1235 (11th Cir. 1992). Moreover, because "qualified immunity shields government actors in all but exceptional cases, courts

should think long and hard before stripping defendants of immunity." *Alexander v. Univ. of North Florida*, 39 F.3d 290, 291 (11th Cir. 1994). The availability of qualified immunity is a question of law to be determined at the earliest opportunity. *Post v. Fort Lauderdale*, 7 F.3d 1552 (11th Cir. 1993).

To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1267 (11th Cir. 2003). Once the defendant establishes that he was acting within his discretionary authority, "the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate." *Id.* (quoting *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003)).

The threshold inquiry a court must undertake to determine whether qualified immunity is appropriate is whether "the plaintiff's allegations, if true, establish a constitutional violation." *Id.* at 1268 (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)). "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The court is to undertake this determination "in light of the specific context of the case, not as a broad general proposition, in an effort 'to ensure that before public officials are subjected to suit, they are on notice that their conduct is unlawful.'" *Id.* at 1269 (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (internal citations omitted). Thus, "'the salient question … is whether the state of the law at the time of the unconstitutional act gave respondents fair warning that their alleged treatment of the plaintiff was unconstitutional.'" *Id.* at 1270. Generally, a court "must turn to case law to make [this] determination." *Id.* Indeed, the "relevant inquiry is 'fact

specific' and a plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on 'materially similar' facts." *Hamil v. Vertees*, 2001 U.S. Dist. LEXIS 1634 *27 (M.D. Ala. 2001) (*citing Rodgers v. Horsley*, 39 F.3d 308, 311 (11th Cir. 1994) and *Lassiter v. Alabama A&M Univ., Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994)).

Under the foregoing standard, the Defendants are, without question, entitled to qualified immunity. Accepting, *arguendo*, that Dr. Eiland's allegations are true, he cannot establish that any actions taken by a Defendant to this lawsuit violated a clearly established constitutional right.

**Drs. Blagburn and Wolfe**

The undisputed evidence demonstrates that Dr. Eiland was never dismissed from the Ph.D program at Auburn. However, even assuming, *arguendo*, that Dr. Eiland had been dismissed from the Ph.D program, Drs. Blagburn and Wolfe would be entitled to qualified immunity because Dr. Eiland did not hold a clearly established property interest in his continued enrollment in Auburn's Graduate School.

Judge Dement addressed this very issue in *Hamil v. Vertrees*, 2001 U.S. Dist. LEXIS 1634 (M.D. 2001). In *Hamil*, a graduate student at Alabama State University ("ASU") filed a § 1983 and Title VII action against several ASU officials, alleging that the officials had refused to certify her final 21 hours in her graduate program on account of her race, thereby improperly denying her a graduate degree. *Id.* at *5-8. The ASU defendants filed a motion to dismiss, alleging, in part, that they were entitled to qualified immunity because, assuming the plaintiff's allegations to be true, the plaintiff had no clearly established constitutional right in continued enrollment in ASU's Graduate School. *Id.* at *25.

In analyzing this issue, Judge Dement noted that several courts, including the Supreme Court and the Eleventh Circuit, have "assumed," *without holding*, that a student has a property interest in continued enrollment in post-secondary education. *Id.* at *29. Nevertheless, Judge Dement held, "an assumption is no more than dicta and, thus, cannot clearly establish the law for purposes of qualified immunity." *Id.*; *see also Jones v. Canno*, 174 F.3d 1271, 1288 n.11 (11th Cir. 1999) ("this Circuit has held that dicta cannot clearly establish the law for qualified immunity purposes"). Accordingly, because "neither the Supreme Court nor the Eleventh Circuit has clearly established that continued enrollment in a post-secondary education is a property interest protected by the Fourteenth Amendment's guarantee of substantive due process …. the court finds that the individual Defendants are entitled to qualified immunity." *Id.* at *28-29; *see also Clements v. Eastern Kentucky University*, 2006 WL 146417 at *6 (E.D. Ky. 2006) ("Defendant did not brief the issue of whether there is a protected property interest in attaining a Master's Degree … and this issue has not been decided by the Supreme Court."). No Supreme Court or Eleventh Circuit decision since *Hamil* has recognized a property interest in post-secondary education.

It having been established that Dr. Eiland did not even have a clearly established constitutional right in his enrollment in Auburn's Graduate School, it stands to reason that he also had no clearly established constitutional right to complete his graduate degree in a particular department of the Graduate School or to concentrate his Ph.D research project/dissertation on a particular discipline of study. There is simply no authority which even suggests, much less clearly establishes, that such a right exists. Finally, Dr. Eiland had no clearly established property right in his employment in the Parasitology laboratory or in the research he collected to support his MS studies. Drs. Blagburn and Wolfe, therefore, are entitled to qualified immunity.

**The Remaining Defendants**

Dr. Eiland either does not allege or has no evidence that the remaining defendants, Drs. Hendrix, McFarland, Janicki and Richardson, were personally involved in Dr. Blagburn's decision to resign as his Major Professor; therefore, these defendants are entitled to qualified immunity, as Dr. Eiland cannot show that any of them took part in any action which violated a clearly established constitutional right. Even if Dr. Eiland could demonstrate that these defendants were personally involved in Dr. Blagburn's resignation as his Major Professor, they would still be entitled to qualified immunity for the same reason that Drs. Blagburn and Wolfe are immune: Dr. Eiland can identify no clearly established constitutional right that was violated by Dr. Blagburn's actions, even if that action was his outright dismissal from Auburn's Ph.D program (which it undisputedly was not).

**VII.    Eiland's Gender Discrimination Claim Has Been Withdrawn.**

Dr. Eiland also alleged, in addition to his other claims, that the actions taken against him "were discriminatory upon his gender since he was one of two males among several females and that he was replaced by a female." *Compl.* at ¶ 46. Dr. Eiland, however, has withdrawn this claim. *See Eiland* at 144:17-146:10.

CONCLUSION

Based on the foregoing reasons, Defendants' motion for summary judgment is due to be granted.[28]

Respectfully submitted this 1st day of August, 2006.

---

[28]    Defendants have not specifically addressed Dr. Eiland's claims for declaratory judgment or for a writ of mandamus, as these theories of liability either do not state a claim upon which relief can be granted, or are subsumed by the other claims and defenses discussed in this brief.

/s/ G. Lane Knight
One of the Attorneys for Defendants


**OF COUNSEL:**

David R. Boyd (BOY005)
G. Lane Knight (KNI028)
Balch & Bingham LLP
105 Tallapoosa Street
Suite 200
Montgomery, Alabama 36104-2549
Telephone: (334) 834-6500
Facsimile: (334) 269-3115

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of August, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing and/or that a copy of the foregoing has been served upon the following by United States Mail, properly addressed and postage prepaid to the following:

Kathryn Dickey, Esquire
322 Alabama Street
Montgomery, Alabama 36104

/s/ G. Lane Knight
Of Counsel