# EXHIBIT D

[AUBURN UNIVERSITY RECEIVED ADMINISTRATIVE stamp, JUL 29 2004]

07/27/2004
Student Grievance
Auburn University
Auburn, Alabama

Chris Eiland, DVM, MS
8531 Wexford Trace
Montgomery, AL 36117

    Restating 3.1 of the types of grievances, this situation is unique in nature and no list of types of grievances could cover all contingencies. I am filing grievance 3.1.5., which clearly states that capricious, unreasonable, intimidating or arbitrary actions that harm student's performance is a grievance within the court's jurisdiction. My grievance occurred in summer semester 2004, on June 24, 2004; it involves a course that I enrolled for in fall 2003, STAT 7000 or Experimental Statistics I. Dr. Nedret Billor was the instructor, and I was given an Incomplete at the end of Fall Semester. Dr. Billor and I had discussed since the first day of class, that I was missing the prerequisite for this course and may have problems with the software programs. I told her that my goal was to learn statistics and I didn't care if it took the whole year. After the first test, I had an 87 B and had turned in all homework assignments. However, due to my lack of access to working statistical software packages and the lack of requirement for said software, I was unable to keep up with at home assignments and take home tests.

    I discussed my situation with Dr. Billor before the second test, after the second test, and before and after the third test. She and I agreed that I would continue to monitor the rest of her fall semester's class and receive an Incomplete, which would be replaced the following semester with my performance on the tests taken in spring 2004. This would give me time to go ahead and purchase the software no matter the cost, and would allow me the best chance to truly learn statistics. The goal of Dr. Billor was to teach me statistics, and my goal was to learn statistics. We decided the best way to reach our goal was for me to sit in and retake her class the following semester, but not to enroll again for STAT 7000. Since we had discussed our mutual prior concerns about my progress in statistics before the course started and during, then it would be fair and for the best.

    It is true that Dr. Billor did not return the second examination in time to decide whether to Withdraw or not until after the midterm withdrawal deadline. It took her two to three weeks to return tests, but she was always trying to do what was best for the class and her students. This would allow for grievance 3.1.6. to be filed, but by working with me to give me another chance the following semester was fair and would correct grievance 3.1.6. Also, grievance 3.1.7., could be filed since the syllabus was not followed. The syllabus stated that weekly homework assignments were not to be counted toward the courses final grade; however, after midterm Dr. Billor announced that the assignments would count towards 10% of the final grade. She also made no mention of dropping the lowest of three test grades, until after the third test. These decisions were made by Dr. Billor for good reasons; however, grievance 3.1.7. applies in my grievance. The course grading policy was changed from four tests counting 25% each, to three tests counting 30% each- totaling 90%, and homework assignments counting 10%.

    In my situation, I feel that grievances committed by other faculty members' actions besides Dr. Billor's, the instructor for the course in which the grievance occurred, takes precedence. The grade of Incomplete/Failure is not representative of my capabilities, knowledge, or performance in statistics. I was never given the chance to complete the agreement that Dr. Billor and I had. The faculty members in this case have

                                                                                          **00057**
                                                                                          **Eiland**

in my opinion committed serious grievances and have led to far more damage than a grade for a statistics course. The actions of faculty members must be questioned, when they do not follow policy and procedures. Especially when said actions lead to a misrepresentation of what my statistical capabilities truly are, and a fair measurement of my performance in the course was never given. Also, I have always pursued my academic and research work with the utmost honesty and integrity, which now and in the future has been jeopardized due to the negligence of Auburn's faculty.

    The head of the Department of Pathobiology, Dr. Lauren Wolfe, acted capriciously in his action to terminate me from the Department of Pathobiology. The actions of Dr. Wolfe and Dr. Byron Blagburn were intimidating, unfair, and broke basic policies and procedures. Also, Dr. Joseph Janicki, Associate Dean of Research and Graduate Studies, committed grievance 3.1.8. in my situation. The discrimination committed by Dr. Janicki, Dr. Wolfe, and Dr. Blagburn, in my opinion, should be investigated by the University, the Office of Civil Rights, and the Department of Education's Family Policy and Regulations Office. It is clear that rumors and slanderous actions led to my termination, expulsion, or whatever term fits best. Nevertheless, my character has been defamed, my future careers narrowed in their possibilities, and years of my life have been invested in something that was whimsically taken from me. After understanding the stakes involved, the following accusations must be taken with all seriousness.

    I spent 2 years collecting valuable data regarding felines, from June 2001 until June 2003. I graduated with my D.V.M. degree on 5/6/03 and my M.S. on 8/4/03. After completion of my Thesis, I was given an oral examination by my Committee Members, which consisted of Dr. Blagburn, major professor, Dr. Jennifer Spencer, Dr. Ray Dillon, and Dr. Joseph Newton. During this interview, Dr. Blagburn notified the committee of his and my decision to use the excess information gathered during my Master's project for a PhD. This is the only reason I remained in Auburn, and I had planned on this the last two years. The excess information includes radiographs, complete blood cell counts, infectious serology tests results, histopathology, gross pathology, clinical signs, and information that could result in a link between heartworms and asthma in cats. This information is very important to the veterinary community, and could have or still might lead to new feline infectious diseases prevention protocols. Which in turn could lead to multi-million dollar recommendations of certain preventative products, and could lead to new label claims of already marketed products. New market claims of prevention of asthma would lead to a boom in the products already marketed, and would lead to more focused research in the field of feline heartworm disease and feline asthma. My Thesis is being published by Dr. Blagburn and was cited in an article written by Dr. Blagburn in June 2004 issue of DVM Best Practices Feline Medicine, a supplement to dvm newsmagazine. Citing my work, it also states he is presenting my work at conventions and (in press) it is in the process of being published in an upcoming journal.

    Laurie Nelms, a graduate student, was also taking the statistics course. She is in another department at the College of Veterinary Medicine besides Pathobiology. I have only spoken with Laurie Nelms on three occasions. We first spoke after the first test, she said she made a 100 after I told her I made an 87. After the second test, we spoke about the test and she said she thought she did well, and I said I knew I had performed poorly. Between the two-parts of the third exam, the first part was given out over the internet, a

00058
Eiland

2

take home test that was posted on Wednesday night and was to be turned in on Friday, where in class on Friday the second in-class part of the third test would be taken. The Thursday in between I asked her how she did on the second test and she said another 100, and she asked me how I did, and I answered not good at all. She voluntarily told me that she wouldn't have made a 100 on the first test if she wouldn't have checked her answers with another graduate student in the class who happened to be a foreigner. She said she had worked on the second test with two guys from class, but she felt like she helped them more than they helped her. She said they were supposed to work on the third test together that night, but she didn't know if she was going to work with them or not, especially if she was only helping them. I told her that it didn't matter what I made on the third test, that nothing was going to help my grade now. I commented that I didn't have the help she did, and when I was in Veterinary School I made it my responsibility to turn in people who worked together on tests. I told her that in Veterinary School, if someone is cheating, and you know about it, and do nothing, then you are as guilty as them, and can be punished accordingly. This is something that I preached to my classmates in Veterinary School, and she was applying to Vet School that year. I feel Laurie Nelms has committed the following infarction, by knowingly circulating false information that is damaging (slander or libel). She is also guilty of furnishing false information to the University.

    This is what leads to her slanderous actions, by trying to defame me, she goes to Dr. Janicki and tells him that I propositioned her to take a test for me. Dr. Janicki does not lead her in the right direction, which is to take it to the instructor. Instead, she says that she does not want to take it any farther, she just wanted him to know. Dr. Janicki then proceeds to tell Dr. Wolfe who in turn tells Dr. Blagburn, who then calls me. Dr. Janicki was discriminatory in his actions, he believed a female graduate student accusation against another graduate student who happens to be a male, and was President of his class, a graduated Veterinarian with a M.S., and working on a Ph.D. under Auburn's tenth Distinguished Alumni Professor. Dr. Janicki never even called me in to hear my side of the story. He tells Dr. Wolfe that I have been cheating nevertheless. Dr. Wolfe tells Dr. Blagburn, to get rid of Chris. He said, "either you can get rid of him or I will". All based on unsubstantiated charges and accusations.

    Dr. Blagburn called me at home on 12/04/2004 and told me to meet him in the conference room. I asked him what it was concerning, and he told me nothing big, just come when you can. I was in the conference room in ten minutes. Dr. Blagburn was sitting when I came in and asked, "What's up?". Dr. Blagburn then got up and said maybe he should go get Dr. Charlie Hendrix, Pathobiology's other parasitoligist. Dr. Hendrix came in the room and shut the door. Dr. Blagburn then proceed to tell me all about how he didn't want to have to do this, and how this cheating incident was the last straw, the straw that broke the camel's back. He said he didn't mind all the rumors and gossip that floated about this department, but going around asking people to take tests for you was unacceptable. He said, that nothing was going on my record, and I would get good recommendations from him and Dr. Hendrix, but I was being let go from my graduate studies. He said they would continue to pay me December's and January's paycheck, but they didn't want me back in the Parasitology lab ever again. They took my keys away from me, and even blocked my identification badge allowing me access into the College of Veterinary Medicine and the computer labs. This was all before my

                                                                                                   00059
                                                                                                    Eiland

statistics course was even finished. Dr. Blagburn got mad when I told him I didn't want the money, I wanted to have a trial. I said I was being treated as guilty and with no chance to be proven innocent. I told him this was ridiculous and I wouldn't jeopardize what I had to ask someone to take a test for me. Dr. Blagburn said, "It came from Janicki, that you are a cheater, and that the chief has the final word". He got up while I was still defending myself and said he had to go to another meeting, and if I had more questions to take them up with Dr. Wolfe.

  Dr. Wolfe was not available until the next day. I went to his office and entered. I asked him what was going on? I couldn't believe that I could go from one week being considered as a replacement for when Dr. Hendrix retires, to a person no longer welcome in the department because everyone just assumed I was a cheater. He said that a fellow graduate student reported the incident to Dr. Janicki, and Dr. Wolfe said, "When it comes from the top, you don't question it". I told him that I had been a part of this department for the last 7 years, and loved the people here and never had been warned of anything I was doing wrong. I told him I did not cheat and would pursue my innocence to the utmost degree. He said it was out of his control, that I needed to take that up with Dr. Janicki. He started to change the discussion into maybe this is all for the best, maybe I would be happier not getting a Ph.D. Dr. Wolfe said someday we will all look back and see this as a good decision for everyone. I told Dr. Wolfe that I had invested many hours in my work, and that I had no desire to leave my program. I reminded him that this situation was not following policy and procedure as I understood it, and he said this happens all the time. He said my record would be clean and my reasons for leaving would not be discussed outside of Dr. Blagburn, Dr. Wolfe, and Dr. Hendrix. My other Committee members, Dr. Dillon, Dr. Spencer, and Dr. Newton were not present during any meetings, and each was told different reasons for my leaving.

  Dr. Wolfe shook my hand and wished me the best of luck. I went to Dr. Janicki's office. I asked him directly if anyone had come to him accusing me of cheating? He said, "no". I asked him if anyone had filed any complaints ever about me as far as he knew? He said, "no". I could tell in his eyes that he knew he had made a mistake by telling the Department of Pathobiology of the accusation of my cheating. I do not know if he knew it would lead to my termination, but what happened is not what policy and procedure dictates. Dr. Janicki's negligence in telling Dr. Wolfe I had cheated, resulted in my termination. Dr. Janicki said that he had heard I was having problems with some of the other graduate students in my department, but no one had come to him, and he had never told anyone anything bad about me. He told me I could stay in the Graduate School, but that I would loose my fellowship and funding. He also said I would have to find a new department before next semester. I told him that Dr. Dillon and Clinical Sciences Department was my only other salvageable option. After going and talking to Dr. Dillon, I asked him if he had heard what had happened to me? He said that he heard I was kicked out of Pathobiology for cheating, but he didn't believe that. I told him I didn't cheat and planned on defending myself. I asked if there was any way that I could become a graduate student of the Clinical Sciences Department, and Dr. Dillon said no, that he was not able to pay me. I told him I would pay my on way, and he said that there was no way I was going to find another department to take me, if Pathobiology was letting me go.

00060<br>Eiland

4

      I was not made aware of my accuser until 4 months later, when I talked to Dr. Blagburn he told me that he never believed I had cheated. He said you know how women are with their gossip, and Laurie Nelms was no different. I told him that I had a prior understanding with Dr. Billor to take her class over again in the Spring semester of 2004, and due to my hasty release I was unable to complete our agreement. Dr. Blagburn said he would take care of it and would contact the professor and Dr. Janicki, and Dr. Stephen McFarland. I told him that the deadline for correcting it was June 19, 2004, and at that time I would receive a Failing grade. He told me not to worry about it, that he would take care of it. I checked with him on three following occasions to see what progress was being made. He first said he was going to get the course removed from my transcripts, like I never registered for the course. Then after talking to Dr. McFarland, Dr. Blagburn said Dr. McFarland had suggested I receive a W for withdrawal from the course before midterm without having a failing grade at that time. Dr. Blagburn said he thought this was for the best, and I told him that didn't seem right that it would have been for the best if I would have been warned about my termination, if I could have seen a list of grievances against me, if I could have faced my accuser, and if I had been given a chance to take the course over, like Dr. Billor and I had agreed.

      I am unclear on what recourse should be taken for the loss that I have suffered. Damages inflicted upon me from this incident are and have been very emotionally painful and has altered my career goals after 11 years of hard work at Auburn University. My girlfriend of 2 years, has an aunt who works as a lab assistant in the Histopathology Lab. She was informed by Jamie Butler, a research assistant in the Parasitology lab that I was let go for bad behavior and possible drug use. Aunt Elizabeth Landreth then took the privilege of slandering my name to my girlfriend's mom, brother, and other aunt. This caused her family to pull away from me and she followed. My girlfriend's family knew I was dismissed, before I could tell my own parents. The Department of Pathobiology said they would contain my records and what occurred, but that clearly is not what happened. In fact, someone in the Department of Pathobiology called the Alabama Veterinary Wellness Committee and told them I was suffering from bipolarism, O.C.D.- a compulsive disorder, and drug addiction. Local veterinarians, my classmates, and my family all knew of my future intentions of finishing my Ph.D. And everyone knew what a great relationship Dr. Blagburn and I had, I remember in my meetings with Dr. Wolfe and Dr. Janicki that I told them Dr. Blagburn and I have never been in an argument and he had never disciplined me in any fashion. Needless to say, when January rolled around and I wasn't attending school anymore, people started asking questions. Suspicion surrounding me leaving my program led many local veterinarians not to hire me. Therefore, I could not find work in the city of Auburn. I had to commute to Montgomery the first three months of 2004, and only found work as an emergency veterinarian. It allowed me to work 49 hours a week, two 13 hour weeknight duties, and one 23 hour shift from 8 am Sunday until 7 am Monday. I had enrolled for spring 2004 courses, but my schedule was dropped by someone other than me.

      A fundamental requirement of my termination is due process, where I would have been given a fair opportunity to be heard at a meaningful time and in a meaningful manner. What I was given was not reasonable, and when your major professor runs out of the meeting in the middle of your defense, it is not a meaningful time or manner. Students in public universities have Constitutional rights to due process and equal

00061
Eiland

5

protection, when the state action by the college threatens to injure the student with expulsion or suspension. Basic rudimentary guidelines of notice, hearing, list of grievances, and explanations were not given to me in this case. A landmark case in 1961, Dixon v. Alabama State Board of Education, concluded that notice should contain a statement of the specific charges and grounds, and the student has the right to defend said charges and offer testimony and witnesses. Due process will adapt itself to the situation; it is not rigid, but it is best for everyone to grant as much due process allowable. In my case, policy and procedure was broken when students or faculty suspect a cheating incident had occurred. The actions were done by Laurie Nelms, Dr. Janicki, Dr. Wolfe, and Dr. Blagburn. I was never allowed a fair hearing and never was made aware of the situation or my accuser. In fact, Dr. Janicki denied all involvement halting my defense process and obstructing justice by offering false statements to me to protect him and Laurie Nelms. This is discrimination, slander, defamation of character, and a great injustice. For me, my future is not repairable. The damage done by these cruel and unnecessary acts will stay with me for a lifetime, and will be my last impression of what Auburn University is about. Where do I file such a horrific allegations? The Provost office said it was not there area, although my main grievance lies with the Head of the Department, Dr. Wolfe.

It is my recommendation that the President of Auburn University be notified of the injustice and discrimination that is taking place in the College of Veterinary Medicine. A complete investigation of my allegations would lead to the truth, which no one seems to care about. I plan on filing complaints against the University and the faculty who should have known better and can subject both the Administrators and the University to liability. I have retained legal representation and I am awaiting a response. Auburn University should be allowed to police their own departments, but when faculty and administrators conspire to accomplish a common goal, they can accomplish said goal; regardless, if it breaks policies and procedures of the University or even skips the basic Constitutional right of due process. It is my sincere hope that this matter will be resolved in a civilized and just manner.

Thank you for taking the time to here my grievances, and I look forward to seeing what steps will be taken to right this wrong.

Chris Eiland, D.V.M., M.S.

c:  University President, Ed Richardson
    Graduate School Dean, Stephen McFarland
    Provost & VP for Academic Affairs, Thomas Hanley
    Associate Provost, Michael Moriarty
    College of Vet Med Dean, Timothy Boosinger
    U.S. Secretary of Education

00062
Eiland

6