| 1 | A | Just did what I could relief wise for who |
| 2 | | needed somebody. |
| 3 | Q | Okay. |
| 4 | A | The next full-time job for a six-month trial |
| 5 | | was with Doctor Janderlich in February of |
| 6 | | 2005. |
| 7 | Q | What was the name of his clinic? |
| 8 | A | Central Valley Animal Hospital. |
| 9 | Q | Where was that located? |
| 10 | A | Rainbow City, Alabama. |
| 11 | Q | Okay.  And you worked there for six months? |
| 12 | A | Yes, sir. |
| 13 | Q | How much did you make there? |
| 14 | A | It would be $28,000 for six months. |
| 15 | Q | Okay.  Why did you leave that employment? |
| 16 | A | I was no longer offered to be employed there |
| 17 | | anymore.  There wasn't an offer for me to |
| 18 | | stay. |
| 19 | Q | Okay.  And why was there not an offer, if |
| 20 | | you know? |
| 21 | A | I'm unsure of why there wasn't an offer. |
| 22 | Q | Okay.  Do you think it was related to any of |
| 23 | | the events that occurred at Auburn? |

1  A    It's very possible that Doctor Janderlich

2       was affected by that comment.

3  Q    You don't know for sure, though.  He never

4       told you that.

5  A    You would have to ask Doctor Janderlich

6       that.

7  Q    Okay.  Where did you go to work after Doctor

8       Janderlich's office?

9  A    I did some relief work for a couple days at

10      Animal Health Care, and then started a job.

11 Q    Where was that?

12 A    Rainbow City, Alabama.  Started a job in

13      August 2005 at Rainbow City Pet Clinic --

14 Q    Okay.

15 A    -- where I'm currently employed.

16 Q    Okay.  Who's your supervisor there?

17 A    The owner is Theresa Drummond-Rigger.

18 Q    How much do you make there?

19 A    $55,000 a year.

20 Q    Okay.  Tell me this:  A few minutes ago you

21      mentioned I was -- your long-term goals, if

22      you would have got your PhD, would have been

23      teach, and then you said, or go into the

```
 1        pharmaceutical field.  I mean, you can't do
 2        those both at the same time, correct?
 3   A    Do them at the same time.  Teach at Auburn
 4        and work with the pharmaceutical industry --
 5   Q    Right.
 6   A    -- but not get a job with the pharmaceutical
 7        industry.
 8   Q    Okay.  I mean, so what was your -- Which one
 9        was your long-term plan?
10   A    To me, to teach at Auburn was what I wanted
11        to do first and foremost.
12   Q    Okay.  How much would you have made teaching
13        at Auburn?
14   A    I would have to say seventy-five thousand
15        ($75,000) to a hundred and twenty-five
16        thousand ($125,000), somewhere in that
17        range, maybe.  And I want to clarify that,
18        you know, given that opportunity to teach at
19        Auburn, I wanted to take it if I was given
20        that opportunity then.  I'm still interested
21        in the pharmaceutical industry.  But I think
22        I could go into pharmaceutical industry
23        later if I had a PhD.  And the job at Auburn
```

```
 1        might not always be open.  So, it would have
 2        been a decision at that time.
 3   Q    How do you know that you could have gotten a
 4        job as a professor at Auburn?
 5   A    I was being discussed as the possible
 6        replacement for Doctor Hendrix.  Doctor
 7        Blagburn had talked to me about that, and he
 8        said that Doctor Wolfe had -- he had
 9        mentioned it to Doctor Wolfe, and they had
10        talked about it.
11   Q    And when was that?
12   A    It was in the summer and beginning of fall
13        of 2003.
14   Q    Okay.  Had you ever been promised a job to
15        teach at Auburn?
16   A    Nobody promised, as to say.
17   Q    Okay.  I mean, what did they say?
18   A    They said that Doctor Blagburn told me that
19        he would like for me to be considered, and
20        consider the idea of possibly replacing
21        Doctor Hendrix when he retired.  He had
22        considered that and thought about it.  He
23        had talk to Doctor Wolfe about it.  And they
```

| | |
|---|---|
| 1 | both liked the idea.  And wanted to see what |
| 2 | I thought about it.  And there it was. |
| 3 | Q   When did -- When was all this going to take |
| 4 | place?  When was Doctor Hendrix going to |
| 5 | retire? |
| 6 | A   That was Doctor Hendrix's decision.  He had |
| 7 | a certain amount of days until he can |
| 8 | retire.  And then, I'm guessing it's his |
| 9 | decision on when he wants to step down.  And |
| 10 | I really probably couldn't take his place |
| 11 | until I finish my PhD. |
| 12 | Q   And this is all -- |
| 13 | A   So, I was assuming, you know, that what they |
| 14 | were talking about was when I finished my |
| 15 | PhD and when Doctor Hendrix retired. |
| 16 | Q   Right.  This is all kind of -- I mean, it |
| 17 | was speculative, though, wasn't it?  Nothing |
| 18 | was set for sure. |
| 19 | A   It was just discussing it. |
| 20 | Q   Okay.  What about jobs in the pharmaceutical |
| 21 | field? |
| 22 | A   What about them? |
| 23 | Q   Did you have any jobs lined up if you would |

```
 1        have gotten your PhD?

 2   A    No.  Only Doctor Blagburn telling me that,

 3        any time I wanted a job with the

 4        pharmaceutical industry, he could get me

 5        one.

 6   Q    Okay.  He didn't mention any particular job

 7        by name, though, did he?

 8   A    He mentioned the name of one title.  And I

 9        think it's with Bayer.  It's a Veterinary

10        Professional Services, veterinarian.

11   Q    Did he say you can have this job for certain

12        if you want it if you get your PhD?

13   A    He never said that.

14   Q    Okay.  How much would you be making in the

15        pharmaceutical field?

16   A    I only know that Doctor Blagburn told me I

17        would be making six figures, and he could

18        get me a job making one hundred and twenty

19        thousand ($120,00) dollars a year.

20   Q    Okay.  You never talked to any companies in

21        the pharmaceutical field, and they've never

22        told you how much you would be making,

23        correct?
```

| | | |
|---|---|---|
| 1 | A | That's correct, only that if I went to work |
| 2 | | for them.  I've only talked to them, and |
| 3 | | they said I would make more than I did in a |
| 4 | | university setting. |
| 5 | Q | Have you -- Can you get a job in the |
| 6 | | pharmaceutical field without a PhD? |
| 7 | A | There are plenty of jobs in the |
| 8 | | pharmaceutical industry that would not |
| 9 | | require a PhD. |
| 10 | Q | Well, doing what you want to do.  I mean, |
| 11 | | are there -- |
| 12 | A | Doing what I want to do, no. |
| 13 | Q | You have to have a PhD? |
| 14 | A | To do what I want to do, I think, yes. |
| 15 | Q | How do you know that?  Is there job |
| 16 | | requirements that you've seen? |
| 17 | A | I've seen job requirements that said |
| 18 | | veterinarian DVM and PhD as requirements. |
| 19 | Q | Okay.  What jobs were those? |
| 20 | A | Right off the top of my head, I would have |
| 21 | | to look it back up, but they're in the |
| 22 | | veterinary pharmacy field. |
| 23 | Q | Do you know how much those jobs would pay? |

```
 1   A   Not sure off the top of my head.
 2   Q   Okay.  And, again, there was no job that you
 3       had been promised, or nobody said, if you
 4       get your PhD, we're going to hire you on
 5       here, correct?
 6   A   Must have just been leading me on if not a
 7       promise there.
 8   Q   I mean, who was leading you on?
 9   A   Doctor Blagburn.
10   Q   Okay.  None of the actual companies --
11   A   No.
12   Q   -- in the pharmaceutical field?
13   A   No, I hadn't spoken with any companies
14       directly.
15   Q   Okay.  How much can you -- can a vet make at
16       the high end if you stay in the field?
17   A   We would have to get some surveys of that.
18       You could get that information.  I'm not
19       sure off the top of my head.  I'd hate to
20       guess.
21   Q   Okay.
22   A   Fifty-five, somewhere above that.
23   Q   Okay.  One allegation that you've made is
```

```
 1        you've been emotionally damaged by all of

 2        this.  Can you explain that a little bit?

 3   A    I've talked about it previously today,

 4        that --

 5   Q    Well, I mean, just --

 6   A    It was emotional.

 7   Q    Go into detail, you know, about -- go ahead.

 8   A    Go ahead and help me.

 9   Q    Huh?

10   A    Help me with it.

11   Q    Okay.  I mean, just go into detail about how

12        you've been emotionally damaged, what it's

13        caused you to do.  Have you lost sleep,

14        appetite been suppressed?  Or that kind of

15        stuff.

16   A    No.

17   Q    Broke out in hives?  I don't know.

18   A    Very accurate.  When I -- First in December,

19        I did break out with hives or something on

20        my face.  I was very stressed out.  People

21        noticed that I did lose weight.  I felt a

22        lot of anxiety about it, which left me

23        thinking about these things and what the
```

1    future held and kept me up at night and kept

2    me from making decisions and moving on with

3    a future because I didn't know if this dark

4    cloud was going to follow me wherever I

5    went.  So, the whole incident and the way it

6    was handled caused a lot of distress in my

7    life.

8  Q    Okay.

9  A    Until -- and even now.

10 Q    Did this cause you to seek help from any

11   medical professionals?

12 A    Only discussing it, you know, with my family

13   to start with.  And then my home town

14   physician, I discussed it with him.

15 Q    Okay.  Your family -- Are there any medical

16   professionals in your family?

17 A    I mean...

18 Q    That you discussed it with?

19 A    Are there MDs or psychiatrists?

20 Q    (Witness nodding in the affirmative).

21 A    No, they are not MDs or psychiatrists.

22 Q    Okay.  What are they?

23 A    You really want to know what people in my

```
 1        family are?
 2   Q    I mean, they're nothing -- There are no --
 3        None of them are experienced or trained or
 4        have any qualification to discuss any
 5        psychological or emotional problems that you
 6        were having.
 7   A    Twenty-eighty years of being with me, my
 8        family has a lot of --
 9   Q    From a medical standpoint, though.
10   A    Advice and stuff.  Medically, they don't
11        recommend medications or anything like that
12        for me.
13   Q    Did you get on any medications as a result
14        of this incident?
15   A    Only -- I think he did -- My home town
16        doctor prescribed me something for anxiety.
17   Q    Do you know what that was?
18   A    I hate to guess, but I'm thinking it was
19        Alprazolam.
20   Q    Okay.  Did you ever require any
21        hospitalization because of this?
22   A    No, I wasn't hospitalized because of this.
23   Q    Did you go to a psychiatrist, psychologist?
```

```
 1   A    No.

 2   Q    Okay.  Do you contend that the incident

 3        related to your perceived dismissal

 4        prevented you from going to law school or

 5        getting an MBA?

 6   A    I'm sorry.  What was the question?

 7   Q    Do you believe that this incident prevented

 8        you from going to law school or from getting

 9        an MBA?

10   A    The whole incident didn't help my future in

11        any way.

12   Q    Okay.  Well, did it --

13   A    It was a big distraction.  And it did impact

14        how well I could apply for a school and what

15        kind of shape I was in to take on that

16        challenge of an MBA program or a law school

17        program.

18   Q    Okay.  No law school or MBA program denied

19        your admission because of any actions

20        related to the events that occurred at

21        Auburn?

22   A    No.

23   Q    Okay.  In fact, didn't some of the
```

```
 1        professors at Auburn write letters of

 2        recommendation to law schools or to MBA

 3        programs?

 4   A    I did get them to write me letters of

 5        recommendations to the MBA program and the

 6        law school program.  It was Doctor Wolfe,

 7        Blagburn and Janicki.

 8   Q    Were those good letters of recommendation?

 9   A    I would consider them good letters of

10        recommendation.

11   Q    Okay.  How has your good name been damaged

12        as a result of this alleged conduct by

13        Auburn?

14   A    We've talked about it previously today in

15        that, being associated with cheating,

16        bipolarism, drug abuse, being kicked out

17        your PhD program, and changing your main

18        field is -- Are we asking was it defamatory?

19        What were you asking me?

20   Q    No.  I mean, just how has your good name

21        been damaged?

22   A    My good name.  I'm sorry.  Damaged your good

23        name.  That damages my good name, and the
```

1    people at Auburn, you know, who knows what

2    they've heard, and what they -- what reasons

3    they, you know, thought of why I left.  For

4    everybody who knew me, knew that my goal was

5    to finish that PhD program.  And then, I

6    don't know what they were told or what they

7    came up with, why I'm not there.  I should

8    still be there finishing my PhD program or

9    finished with it by now.

10  Q    Kind of -- All this stuff, though, Chris,

11       it's kind of secondary to what your claim

12       that you say due process.  They couldn't

13       dismiss me without giving me a hearing.  I

14       mean, if they would have dismissed you, and

15       if they would have given you a hearing, and

16       then after the hearing still dismissed you,

17       all these problems and damages would have --

18       would have occurred, wouldn't they?

19  A    I'm sorry.  You lost me with the dismissed.

20  Q    Okay.

21  A    If they gave me -- If they dismissed me and

22       then gave me a hearing?

23  Q    Well, I mean, no.  If they would have given

```
 1          you a hearing -- Let's say you're saying

 2          that they should have given me a hearing

 3          before they dismissed me.

 4   A      Right.

 5   Q      Well, if they would have given you a hearing

 6          and then still dismissed you, I mean, that

 7          wouldn't have prevented any of this stuff

 8          that we've been talking about from

 9          happening, correct?

10   A      Being innocent after the hearing, I would

11          hope that they wouldn't dismiss me.  And

12          that --

13   Q      Well, let's assume --

14   A      -- these things wouldn't have happened.

15   Q      Let's assume that they did still dismiss

16          you.

17   A      That didn't happen.

18   Q      I'm asking you to assume that they -- if you

19          had a hearing, you were still dismissed as

20          you allege from the program, that would

21          have -- would it have prevented all this

22          stuff that we've been talking about, all

23          this damage from occurring?
```

```
 1   A    I think it would have.  The shock and the

 2        suddenness of it all without having prior

 3        notice and warning and a chance to plan is

 4        where a lot of the damages comes in.  The

 5        capricious nature of it --

 6   Q    You still couldn't have gotten that job in

 7        the pharmaceutical field that required a

 8        PhD, could you?

 9   A    If I wouldn't have gotten my PhD, that's

10        right.

11   Q    That's right.  Okay.  And you still would be

12        working as a vet just as you are today,

13        correct?

14   A    That's correct.

15   Q    Okay.  And, again, there's no -- You can't

16        point to anyone who has not offered you

17        employment.  You don't know of anyone that's

18        not offered you employment or retained your

19        employment because of the events that

20        occurred at Auburn.

21   A    I don't know and may never know how that

22        will affect my future employers.

23   Q    Okay.  And we spoke about Doctor Janderlich.
```

1      Anybody besides the recommendation that

2      Doctor Blagburn gave to Doctor Janderlich,

3      are there any other recommendations that you

4      are aware of that Doctor Blagburn made to

5      anyone?

6  A   He's had contact with my current employer,

7      but I'm unsure what they've talked about.

8  Q   Okay.  Anybody else?

9  A   I'm not sure of who Doctor Blagburn has

10     talked to about this.  To my knowledge, I

11     don't know.

12  Q  Has he tried to help you get a job in any

13     way?  Has he told you -- In any way, has he

14     told you these people might be hiring, or

15     you might want to try this?

16  A  Only what is recorded on the tape about

17     Dedrickson (phonetic) is the only thing that

18     I'm aware of.

19  Q  Okay.  Have you attempted to enter a PhD

20     program in any other institution?

21  A  No.

22  Q  Why?  Why not?

23  A  It's something that is still unresolved.  I

```
 1        want to see what happens in this court case
 2        first.  I may be back at Auburn.
 3   Q    You do recognize that as an option, correct?
 4   A    What?
 5   Q    That you could go to a PhD -- if you want to
 6        reach your long-term goal is to be a
 7        parasitologist, you could go and enter a PhD
 8        program in another university.
 9   A    That's a possibility, not a guarantee by any
10        means.
11   Q    Okay.
12   A    Highly competitive.
13   Q    And to this point, you've taken no steps to
14        try to get in to another university?
15   A    I'm still arguing that I want back into the
16        university that I wrongfully got dismissed
17        from.  So, until this is resolved, I may be
18        back at Auburn.
19   Q    Well, if you think you may be back at
20        Auburn, what do you think you have to do to
21        get back at Auburn?
22   A    What do I have to do to get back in Auburn?
23   Q    Strike that.  Look at your complaint, which
```

1       is Defendant's Exhibit One.

2              MS. DICKEY:  It's close to lunch time.

3                  Off the record.

4                      (At which time, a recess was

5                      taken.)

6   Q   Chris, what was the name of the person at

7       the Alabama Professional Wellness Committee

8       that you spoke to?

9   A   My best recollection is his name is Doctor

10      Skipper.

11  Q   Who was Doctor Dillon that we spoke of?

12      Doctor Dillon?

13  A   He is a member on my committee that is in

14      the clinical sciences department at the vet

15      school.

16  Q   Okay.  Was it Doctor Dillon that you went

17      and asked if he would serve as your major

18      professor?

19  A   I did go to him and talk to him about him

20      taking me on and being my major professor,

21      finishing my PhD program underneath him.

22  Q   Okay.  Look at Defendant's Exhibit Two.

23      It's your responses to our interrogatories.

```
 1        Interrogatory number 12, the question asked

 2        you to identify the liberty and property

 3        interests -- and/or property interests which

 4        you contend were defamed by Auburn or any

 5        Auburn faculty member or employee.  And

 6        you've identified, "His good name, his right

 7        to a hearing, the PhD contractual agreement,

 8        and his research data."  Explain what you

 9        mean by "his right to a hearing."

10   A    Being accused of the infractions that I was

11        accused of and the subsequent action of

12        being dismissed from my program I think

13        deserved a hearing from the rules and

14        policies and procedures that I can find.

15        So, a hearing on the matter.

16   Q    And what rules, policies, and procedures are

17        you referring to?

18   A    Auburn's rules of how to handle an

19        allegation of cheating, of misconduct, of

20        behavior, of measuring a PhD student's

21        progress.

22   Q    Which one -- Tangibly, what are those

23        documents?
```

1    A    They're found in some policies and

2         procedures that the biomedical sciences

3         department hands out and also the graduate

4         research -- graduate student's research

5         handbook.

6    Q    Okay.  That's one of those --

7    A    That's one.

8    Q    -- in Defendant's Exhibit Six, "graduate

9         studies and biomedical sciences MS and PhD

10        program?

11   A    One of them.

12   Q    Okay.  And what's the other thing that you

13        are referring to?

14   A    The graduate student handbook.

15   Q    Okay.  Did you produce a copy of that?

16   A    Kay told me that she thought she did.

17             MS. DICKEY:  I'm sorry.  I was writing.

18                  Which one?

19             MR. KNIGHT:  The graduate student

20                  handbook.

21   Q    Here's all the documents that you produced.

22        Can you find what you're referring to in

23        there?

```
 1              MS. DICKEY:  We may have that for

 2                   today.  I'm not sure.

 3              MR. KNIGHT:  If it's not in there, Kay,

 4                   can you get that?  I don't know if

 5                   it is or not.

 6              MS. DICKEY:  Sure.  I'm not sure.  I

 7                   mean, there are several different

 8                   handbooks or policies.  I'm not

 9                   sure which one this is, but I'll

10                   look for it.

11    Q    Okay.  And what was the name of it again,

12         Chris?

13    A    Graduate student handbook.

14    Q    Okay.  Anything else?

15    A    It covers your right to a hearing.  I think

16         it mentions it in the bulletin, Auburn

17         Bulletin.  And I think those are the three

18         places that I know of.

19    Q    Okay.

20    A    Tiger Cub, maybe, touches on it.

21    Q    Okay.  I think I recall it the last time we

22         went through the document, the graduate

23         studies document.  So, we won't go through
```

1    that again.

2           Okay.  What about there in

3    interrogatory number 12, the PhD program

4    contractual agreement.  What are you

5    referring to by that?

6  A  I was given and was in an assistantship, and

7    I was a graduate research assistant.  And

8    that is part of being in the PhD program.

9    And that consists of being a student and an

10   employee.  And the pay that I was getting --

11   The pay that I was getting was going to be

12   stopped at the end of January was what I was

13   told.  And my whole program was going to be

14   stopped because I was going to be a great

15   parasitologist, just not at Auburn.  And

16   when they told me that I was dismissed, it

17   was from the PhD program and my

18   assistantship.  And when I no longer had

19   access to my data, it hurt me.

20  Q  Well, what's the contractual agreement?  Is

21   there a contract that you actually signed?

22  A  There wasn't an actual written contract that

23   I signed, but there was an oral agreement

1       that I was in the PhD program and would get

2       paid twenty-three thousand, five hundred

3       ($23,500) dollars every year until I

4       finished it.

5    Q  Who made the agreement?

6    A  Doctor Blagburn was the one who brought that

7       to me.

8    Q  Okay.  And this relates to your employment?

9    A  I know that as an assistant, as a graduate

10      research assistant, you're considered a

11      student and an employee.

12   Q  Okay.  I think you told me last time,

13      though, that you're not claiming a liberty

14      or property interest in your employment; is

15      that correct?

16   A  And I said that I was unsure of how that's

17      going to fall under --

18   Q  This part, the grievance, the assistantship.

19   A  I know that assistantship, it would be

20      covered in there if you're considered a

21      student and an employee.

22   Q  Okay.  An oral agreement was made by you and

23      Doctor Blagburn?

```
 1   A    Not only that, but, I mean, it started, you

 2        know, by paying me, and I was in the

 3        program.  You can see that by the

 4        transcripts and the paychecks.

 5   Q    Okay.  And was there an agreement that if he

 6        withdrew -- resigned as your major

 7        professor, that this would -- this

 8        assistantship money would continue?

 9   A    We never discussed that he would withdraw,

10        that that would even be an option.

11   Q    Either way, was it discussed?

12   A    He didn't discuss that.

13   Q    Okay.  So, he didn't tell you that, "Even if

14        I withdraw as your major professor, this

15        money is going to continue"?

16   A    He told me that, you know, I was going to

17        get my PhD.  And he never mentioned him

18        withdrawing or stopping the funding.

19   Q    Are you saying there was a contractual

20        agreement for him to remain as your major

21        professor?

22   A    If that's what it takes to continue that

23        pay.  I'm not·sure I understand.  I'm
```

```
 1        telling you that he never said that he was

 2        going to.  He said that he would be my major

 3        professor, and I never thought that he

 4        wouldn't since he had been my major

 5        professor for the last five to six years,

 6        working on our seventh year.

 7   Q    Well, essentially, that changed as he

 8        alleges, he says, resigned as your major

 9        professor.  Wouldn't you -- Let's assume

10        that to be true.  Wouldn't you expect that

11        money to no longer be there?

12   A    If there was a change in that, I should have

13        been notified in writing.

14   Q    Well, that's your opinion.

15   A    That's the rules.

16   Q    Outside of that --

17   A    That's what the rules say.

18   Q    What rule says that?

19   A    Graduate student handbook.

20   Q    Which we don't have.

21   A    Which has been made available to you.

22   Q    Well, can you tell me where it says that in

23        the graduate student handbook?
```

```
 1   A    I can show you.

 2   Q    All right.  Can you get access to it now?

 3             MS. DICKEY:  Let me see if this is --

 4                  that was one of the last ones you

 5                  sent me?

 6             THE WITNESS:  I think so.

 7                       (At which time, a recess was

 8                       taken.)

 9   Q    All right.  Can you tell me where in here --

10        And let me mark that as Defendant's Exhibit

11        15.

12                       (At which time, the

13                       referred-to document was

14                       marked as Plaintiff's Exhibit

15                       No. 15 by the Reporter.)

16   Q    Okay.  Can you tell me what Defendant's

17        Exhibit 15 is?

18   A    It is a handbook for a graduate assistant

19        made by Auburn University's graduate school.

20   Q    Okay.  Can you tell me where in here it says

21        that professor should resign as major

22        professor in writing?

23   A    We -- I said that -- on page 12 of 14.
```

1    Q    12 of 14?

2    A    12 of 14.

3    Q    Okay.

4    A    It says, "In addition to their rights" --

5         first paragraph.  "In additional to their

6         rights as students at Auburn University, all

7         graduate assistants have certain other

8         rights as assistants.  First, they have the

9         right to receive notification of all

10        decisions, actions, or contingencies that

11        will affect their assistantship.  For

12        example, they should receive in advance an

13        account of the procedures by which they will

14        be evaluated as an assistant.  They should

15        also receive notice of reappointment

16        procedures well in advance, so they can

17        prepare their request for applications."

18   Q    Okay.  Did you ever request written

19        notification from Doctor Blagburn that he

20        had resigned as your major professor, or, as

21        you say, that you were dismissed from the

22        PhD program?

23   A    Why would I ask that?  The written

```
 1         notification, it doesn't really make sense

 2         for me to ask for that written notification

 3         when -- with what was going on.

 4    Q    Well, it doesn't say that you shall receive

 5         written notification.  It says you have a

 6         right to receive written notification,

 7         correct?

 8    A    It does say that I have the right to

 9         receive.

10    Q    Okay.  So, you never requested written

11         notation?

12    A    It doesn't say that I have to request it.

13    Q    Okay.  Any other place in here where you

14         think imposes that duty or obligation?

15    A    I think this would cover it, that any

16         change, action, or contingency that would

17         affect my assistantship, I should be

18         notified in a written manner that explains

19         it clearly --

20    Q    Okay.

21    A    -- where there's no room for confusion.

22    Q    How does this relate, in your opinion, to

23         your lawsuit?
```

```
 1    A    The whole graduate research assistant
 2         handbook or this one particular statement?
 3    Q    Yeah, this provision that you are pointing
 4         out.
 5    A    It says that I have a right as a student to
 6         receive this written notification of change
 7         in my assistantship, and I was denied that
 8         with my dismissal.  And they did not
 9         document and notify me in the proper way
10         that they are supposed to follow their rules
11         and procedures.  There wouldn't be this
12         confusion.
13    Q    Are you contending that Auburn's failure to
14         follow their own procedures related to
15         written notification regarding an
16         assistantship gives rise to one of your
17         claims that you have in your lawsuit?
18    A    I think it definitely is associated with it.
19    Q    Okay.  Associated.  Doesn't it give rise to
20         a claim, then, in and of itself?
21    A    I'm not a lawyer.  I would have to discuss
22         that.
23    Q    Anything else in this Graduate Assistant
```

```
 1        Handbook that relates to any of your claims

 2        in your lawsuit?

 3   A    There is a good deal of information in here

 4        that covers things associated with the

 5        lawsuit.

 6   Q    Okay.  Can you tell me what those are?

 7   A    I think this one is relevant.  The last

 8        page -- I mean, last paragraph of page 12.

 9   Q    Okay.

10   A    Where it says, "Finally, just as an

11        assistant may encounter problems in carrying

12        out their duties, so they become the

13        subjects of complaints or grievances brought

14        by others.  When the assistant's supervisor,

15        academic advisor, or department head or

16        chair receives such complaints, the graduate

17        assistant has the right to receive prompt

18        notification and to offered the opportunity

19        to respond to the complaint, presenting

20        evidence in defense.  Here, too, the burden

21        of proof should rest on the person making

22        the complaint."

23   Q    And can you explain how you believe that
```

```
 1          relates to your lawsuit?
 2    A     I think that denying me the opportunity to
 3          be notified of the accusations and the
 4          infractions that I committed, I never
 5          received prompt notification.  I didn't get
 6          a real, true opportunity to respond to the
 7          complaint, present evidence in my defense,
 8          which is, to my knowledge, associated with
 9          due process and fairness.
10    Q     That's in your mind, correct?  I mean,
11          that's in your opinion?
12    A     Whose else would it be in?
13    Q     Tell me about the second paragraph of this
14          page.  Did you follow the graduate
15          assistant -- Did you try to state a
16          grievance under the graduate assistant's
17          grievance policy?
18    A     I did not know that that existed.
19    Q     Okay.  Was this document available to you at
20          the time that you were a student at Auburn
21          in the PhD program?
22    A     It was not given to me, nor was I told where
23          to exactly find it.  But, like I said --
```

1    Q    Do you know what this was?

2    A    I could have found it.

3    Q    Okay.  Do you know if this was in place when

4         you were a student?

5    A    To my knowledge, yes.

6    Q    Why?  What do you base that knowledge on?

7    A    I had heard reference to it before but

8         didn't have a copy of it and didn't exactly

9         find it.

10   Q    Okay.  So, it goes without saying that you

11        did not follow the steps of the policies set

12        forth here for filing a graduate assistant

13        grievance; is that correct?

14   A    Didn't know it existed.

15   Q    All right.

16   A    I was surprised Doctor Hendrix never

17        mentioned it.

18   Q    So, if you didn't know it existed, you

19        obviously didn't follow the policies and

20        procedures set forth in it, correct?

21   A    Not their policies, that's right.

22   Q    Okay.  And that would have been the

23        appropriate -- if you're claiming that you

1       were -- did not receive -- you weren't given

2       a chance to address complaints brought by

3       other students arising from this handbook,

4       don't you think it would have been

5       appropriate to file that complaint that you

6       have about that not being followed with the

7       academic grievance policy?  Is that a

8       confusing statement?

9    A  Yeah.

10   Q  I thought it was.

11   A  You lost me.

12   Q  Well, you're claiming that certain

13      procedures in this handbook were not

14      followed, correct?

15   A  Just in general procedures of giving me

16      notification and a chance to defend myself,

17      and it's covered here too.

18   Q  Well, let's just keep it specific to this

19      handbook, correct?

20   A  Okay.

21   Q  And you claim that procedures of this

22      handbook were not followed by Auburn,

23      correct?

1   A   That's correct.

2   Q   Okay.  Don't you think it would be

3       appropriate if procedures were not followed,

4       to file a grievance related to Auburn's

5       failure to follow those procedures with the

6       Graduate Assistant Grievance Committee,

7       which is set forth in this book?

8   A   If I would have known it existed or if

9       Doctor Hendrix would have told me about it,

10      believe me I would have.

11  Q   Okay.  Okay.  And if this was -- but if

12      this -- If this was, in fact, in place

13      during the time you were a student, you

14      would have had access to this, correct?  I

15      mean, it's on the web site, right?

16  A   It's on the web site.

17  Q   Okay.  If you would have looked for it, you

18      probably could have found it, correct?

19  A   I did look.  I just didn't find it.

20  Q   Okay.  Well, how did you find it this time

21      now that we have a lawsuit?

22  A   How is, I did another search.

23  Q   Okay.  So, you were able to find it when it

```
 1          was relevant to the lawsuit, not when it was

 2          relevant to the events that were going on,

 3          correct?

 4     A    If that's the way you see it.

 5     Q    Well, I'm --

 6     A    I'm just saying that I didn't know about it

 7          before.  I wished I would have.

 8     Q    Okay.  And you didn't -- Okay.  Tell me

 9          about your research data.  I know we spoke

10          of that in the last deposition.  Is that --

11          Is that what this claim relates to, the

12          research that you collected in your Master's

13          that you were going to use in your PhD that

14          you claim you were wrongfully denied access

15          to?

16     A    That's my research that I'm talking about.

17          I collected it while I was working on my

18          Master's, and there was excess information

19          that was going to be used toward my PhD.

20          degree.

21     Q    Okay.  And you believe you have a property

22          interest in that research?

23     A    Yes.
```

```
 1    Q    Okay.  What facts and what claims out of

 2         your complaint -- and you might want to look

 3         through your complaint -- are you alleging

 4         against Doctor Richardson?

 5    A    I think that Doctor Richardson, holding the

 6         position of president of Auburn University,

 7         is associated with all of the causes of

 8         action.

 9    Q    I mean, are there any specific facts which

10         support your claims against him?

11    A    His failure to resolve or, you know -- and

12         he's the top man over all this.

13    Q    Okay.

14    A    It makes him kind of responsible.

15    Q    What about your -- Tell me what facts

16         support your claim against Doctor Steven

17         McFarland, and which claims are brought

18         against him.

19    A    I would have to say, that I know of, the due

20         process relates to Steven McFarland.

21    Q    Okay.  And what facts give rise to a due

22         process claim against him?

23    A    The fact that he's over the graduate school,
```

```
 1        and I'm a graduate student.  And he didn't

 2        see that I received due process on this

 3        issue.

 4   Q    Okay.  The other claims are not alleged

 5        against Steven McFarland?

 6   A    I'm really unsure on the specifics of it, of

 7        what they are or not covered under -- I hate

 8        to say either way.

 9   Q    I mean, you know, I hate to press you on it,

10        Chris, but, I mean, this is a lawsuit.  He's

11        sued.  I think he has a right to know which

12        claims are alleged against him.  I mean --

13   A    The way it stands, are all of them alleged

14        against him right now?

15   Q    I'm asking you.

16   A    I'm thinking they all are.  We'll assume

17        they all are.

18   Q    What facts support your claim against him

19        under the Rehabilitation Act of 1973?

20   A    He's the dean of the graduate school, and

21        I'm a graduate student.  And I was perceived

22        to have a disability, and he didn't right

23        that.
```

1   Q    But not by him.

2   A    He knew about it or should have been made

3        aware of these things if he's the Dean of

4        the graduate school.

5   Q    Okay.  What about the defamation claim

6        against Steven McFarland?

7   A    I mean, I don't think we listed him directly

8        in our interrogatories as part of the

9        defamation claim.  But after our

10       depositions, he very well may be under that.

11  Q    Usually you have the facts before -- I mean,

12       there's no facts that you had prior to

13       filing the lawsuit that would give you a

14       basis to file a defamation claim against

15       Steven McFarland?

16  A    I'm unsure about that.

17            MR. KNIGHT:  Tell me this:  Kay, we've

18                spoken about this.  The gender

19                discrimination claims and the

20                claim for writ of mandamus.  I

21                understand that you-all are

22                withdrawing that claim from this

23                lawsuit?

1        MS. DICKEY:  I don't have a problem

2            withdrawing those.

3        MR. KNIGHT:  Okay.

4        MS. DICKEY:  I didn't draft this

5            complaint.  I inherited the

6            complaint.  Had I drafted it, I

7            would not have.

8        MR. KNIGHT:  Okay.

9        MS. DICKEY:  But, you know, for now, we

10           have not, so, you know, we have to

11           consider that they're still in

12           there.

13       MR. KNIGHT:  Well, I mean, then, that's

14           what I'm trying to figure out.  If

15           they're still in there, I'm going

16           to go into the gender

17           discrimination claim now.  And I

18           was trying to save time if you

19           will state on the record that

20           you'll --

21       MS. DICKEY:  Let me talk before I state

22           anything on the record with my

23           client.

```
 1                    (At which time, a recess was

 2                 taken.)

 3          MS. DICKEY:  Okay.  On the record,

 4              Doctor Eiland is comfortable

 5              dropping the gender but not the

 6              writ.

 7          MR. KNIGHT:  Okay.

 8          MS. DICKEY:  So, on the record, the

 9              gender cause of action is over.

10          MR. KNIGHT:  Right.  Okay.  Thank you.

11   BY MR. KNIGHT:

12   Q    What is the your writ of mandamus claim?  I

13        mean, I don't understand that.

14   A    For real.  The way I was explained -- It was

15        explained to me by deceased former attorney

16        was that the courts could step in and make

17        it right the wrong that was done to me.  And

18        if that is reinstatement into my program,

19        then I'd like to keep that on the table, if

20        that's what it entails.

21   Q    Okay.  And the facts that support that claim

22        are what?

23   A    I'm no longer in my program, and I want to
```

1    be.

2    Q    The facts we've discussed thus far.  No

3         additional facts that you have to add that

4         relate to that claim, correct?

5    A    I'm going to say that's right, right now.

6    Q    Okay.  Okay.  What facts support your claim

7         against Doctor Wolfe?

8    A    About?

9    Q    Okay.  I mean, which -- Why is he being

10        sued, basically?

11   A    To my knowledge, he was the one who said to

12        get rid of me.  Doctor Blagburn said Doctor

13        Wolfe said to get rid of you.

14   Q    Okay.  Is the discrimination under the

15        Rehabilitation Act claim alleged asserted

16        against Doctor Wolfe?

17   A    If he was the one taking the action and he

18        perceived me to have a disability, I'm not

19        sure what they discussed.

20   Q    You don't know if he did or did not perceive

21        you to have a disability, though?

22   A    I'm not sure that he did.

23   Q    Okay.  Any defamation claim against Doctor

```
 1        Wolfe?  I don't recall that he was listed.

 2        I might be wrong on that.  Interrogatory 14.

 3   A    Not -- Not at this time.

 4   Q    Okay.  What facts support your claim against

 5        Charles Hendrix?

 6   A    For?

 7   Q    Anything.  I mean, which claims -- Which of

 8        these claims are alleged against him?

 9   A    I don't have it anymore.  You've got it.

10   Q    There you go.  The Rehabilitation Act?

11   A    Possibly, yes.

12   Q    Okay.

13   A    And --

14   Q    Possibly, I mean?

15   A    I mean, to my knowledge right now, he's

16        under the Rehabilitation Act and the due

17        process, the writ.

18   Q    He never -- I mean, he didn't have authority

19        to dismiss you from the program, correct?

20        And it wasn't Doctor Hendrix that you -- I

21        mean, up until this point, I've never heard

22        you say that Doctor Hendrix had anything to

23        do with your alleged dismissal from the
```

1       program.

2    A  That's true.  He didn't have anything to do

3       with my -- that I know of, my immediate

4       dismissal from the program.

5    Q  Then how is there a due process claim

6       against him?

7    A  How this thing is evolving, it may reach to

8       him.

9    Q  But you don't know that.  There's no facts

10      that you can point to at this point,

11      correct?

12   A  Right now, no.

13   Q  Okay.  Defamation.  Didn't see any -- Doctor

14      Hendrix listed as being attributed to any of

15      the statements there.

16   A  Not at this time.  I can't prove that fact.

17   Q  Okay.  So, at this time, defamation is not

18      alleged against Doctor Hendrix.  It's 14, I

19      think.

20   A  Unless he made the statements to the Alabama

21      Veterinary Wellness Program, or he made the

22      statements to Elizabeth Landreth.

23   Q  Okay.  At this point, though, you don't know

```
1          that he did make either of those statements?

2     A    I have no proof right now that he made

3          either one of those statements.

4     Q    Okay.  Any additional facts that support

5          your claims against Doctor Blagburn that we

6          haven't already discussed?

7     A    Not that I'm aware of.

8     Q    Okay.  And all your -- All causes of action

9          are asserted against Doctor Blagburn?

10    A    Yes.

11    Q    Okay.

12             MR. KNIGHT:  Can I take about three

13                minutes?

14             MS. DICKEY:  Sure.

15                    (At which time, a recess was

16                    taken.)

17             MR. KNIGHT:  I'm done.

18             MS. DICKEY:  Oh, okay.

19             MR. KNIGHT:  No questions.

20                CROSS-EXAMINATION

21    BY MS. DICKEY:

22    Q    All right.  I just have a few follow-up.

23                Doctor Eiland, how many years did
```

```
 1        you attend Auburn University?
 2   A    Almost ten years.
 3   Q    And how many degrees did you receive from
 4        Auburn University?
 5   A    Three degrees:  A Bachelor of Science,
 6        Master's of Science, and Doctor of
 7        Veterinary Medicine.
 8   Q    Did you know Doctor Blagburn the entire time
 9        you were at Auburn University?
10   A    Not the entire time.  I met him after my
11        Bachelor's degree.
12   Q    Was he one of your professors while you were
13        in the School of Veterinary Medicine?
14   A    He was.
15   Q    Is Doctor Blagburn considered an expert in
16        the field of parasitology?
17   A    He's world renowned.  He is an expert in
18        parasitology.
19   Q    Had you formed a close student/professor
20        relationship with Doctor Blagburn?
21   A    Very close relationship with him.
22   Q    And due to this relationship, had you
23        discussed with him -- or had he discussed
```

```
 1         with you that he would help you find
 2         employment?
 3    A    He did.
 4    Q    Okay.  Do you know -- or do you have a
 5         relationship with anyone else in another
 6         university --
 7    A    I don't.
 8    Q    -- that's anywhere close to your
 9         relationship with Doctor Blagburn?
10    A    It would take years to build that
11         relationship that we had.
12    Q    Okay.  Who from the Alabama Wellness
13         Committee contacted you?
14    A    Doctor Skipper, to my knowledge.
15    Q    And what was the substance of your
16         conversation?
17    A    That someone had telephoned him and told him
18         that I might be suffering from OCD,
19         bipolarism, and drug abuse.  And he wanted
20         to know what I -- if I was suffering from
21         those and if I needed some help finding
22         counseling.
23    Q    Did you ask him who had made that call?
```

1    A    I'm not sure if I asked him or if he

2         volunteered the information.  I'm pretty

3         sure that I asked, and he said that there

4         were two individuals from the department of

5         pathobiology, one a professor and possibly a

6         student.

7    Q    But he didn't give you the names?

8    A    He never gave me the names.

9    Q    What department does Elizabeth Landreth work

10        in?

11   A    Pathobiology.

12   Q    And who's her supervisor?

13   A    Doctor Wolfe.

14   Q    Did Doctor Hendrix receive a copy of your

15        July 27th, 2004, letter?

16   A    Not sent by me directly to him.

17   Q    But do you know whether or not he received a

18        copy?

19   A    He was --

20             MR. KNIGHT:  Object to the form.  Go

21                 ahead.

22   Q    You can still answer it.

23   A    He discussed it as if he had a copy of it in

```
 1          front of him.

 2   Q      And when was this?

 3   A      It was in August of 2004.

 4   Q      Were you in his office?  I mean, where did

 5          this conversation take place?

 6   A      He telephoned me on my cell phone, and I was

 7          in Montgomery.

 8   Q      Okay.

 9              MS. DICKEY:  I have no other questions.

10              MR. KNIGHT:  Nothing else from me.

11

12                  (Deposition concluded at

13                   approximately 12:59 p.m.)

14          *       *       *       *       *

15          FURTHER DEPONENT SAITH NOT

16

17

18

19

20

21

22

23
```

```
 1        R E P O R T E R'S   C E R T I F I C A T E

 2

 3   STATE OF ALABAMA)

 4   ELMORE COUNTY)

 5

 6            I, Jeana S. Boggs, Certified Professional

 7   Reporter and Notary Public in and for the State of

 8   Alabama at Large, do hereby certify on Monday, June

 9   12, 2006, that pursuant to notice and stipulation on

10   behalf of the Plaintiff, I reported the deposition

11   of BYRON L. BLAGBURN, who was first duly sworn by me

12   to speak the truth, the whole truth, and nothing but

13   the truth, in the matter of CHRISTOPHER B. EILAND,

14   DVM, MS, Plaintiff, versus DR. BYRON L. BLAGBURN,

15   individually and in his official capacity, DR.

16   CHARLES HENDRIX, individually and in his official

17   capacity, DR. JOSEPH JANICKI, individually and in

18   his official capacity, DR. STEPHEN McFARLAND,

19   individually and in his official capacity, DR. ED

20   RICHARDSON, in his official capacity as President of

21   Auburn University, and DR. LAUREN WOLFE,

22   individually and in his official capacity,

23   Defendants, Civil Action No. CV-459-VPM, now pending
```

1  in the United States District Court for the  Middle

2  District, Eastern Division of  Alabama; that the

3  foregoing colloquies, statements, questions and

4  answers thereto were reduced to 155 typewritten

5  pages under my direction and supervision; that the

6  deposition is a true and accurate transcription of

7  the testimony/evidence of the examination of said

8  witness by counsel for the parties set out herein;

9  that the reading and signing of said deposition was

10  not waived by witness and counsel for the parties.

11       I further certify that I am neither of

12  relative, employee, attorney or counsel of any of

13  the parties, nor am I a relative or employee of such

14  attorney or counsel, nor am I financially interested

15  in the results thereof.  All rates charged are usual

16  and customary.

17       This the 27th day of June, 2006.

18

19

20

21  Jeana S. Boggs
    Certified Court Reporter and
22  Notary Public
    Commission expires: 8/14/2006

23