Transcript of the Testimony of

# Byron L. Blagburn, MS, PhD

**Date:** June 12, 2006

## Christopher Eiland, DVM, MS

## Vs

## Byron L. Blagburn, MS, PhD, et al

## Case No. 2005-CV-459-VPM

Boggs Reporting & Video
Phone:334.264.6227
Fax:334.285.0448
Email:jboggs@boggsreporters.com
Internet: www.boggsreporters.com

Case 3:05-cv-00459-WKW-WC    Document 26-8    Filed 08/01/2006    Page 2 of 36

Dep of: Byron L. Blagburn, MS, PhD                                    June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al      2005-CV-459-VPM

**[1]**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  CHRISTOPHER B. EILAND, DVM, MS,
6  Plaintiff,
   CIVIL ACTION
7  VS.
   FILE NO. 2005-CV-459-VPM
8
   DR. BYRON L. BLAGBURN, individually
9  and in his official capacity, DR.
   CHARLES HENDRIX, individually and in
10 his official capacity, DR. JOSEPH JANICKI,
   individually and in his official capacity,
11 DR. STEPHEN McFARLAND, individually and in
   his official capacity, DR. ED RICHARDSON,
12 in his official capacity as President of
   Auburn University, and DR. LAUREN WOLFE,
13 individually and in his official capacity,
14 Defendants.
15 * * * * *
16 DEPOSITION OF BYRON L. BLAGBURN, MS, PhD
17 taken on behalf of the Plaintiff, pursuant to the
18 stipulations set forth herein, before Jeana S.
19 Boggs, Certified Court Reporter and Notary Public,
20 at the law offices of Kathryn Dickey, LLC, 322
21 Alabama Street, Suite B, Montgomery, Alabama,
22 commencing at approximately 1:32 p.m., Monday, June
23 12, 2006.

**[2]**

1  APPEARANCES OF COUNSEL
2  FOR THE PLAINTIFF:
3  HONORABLE KATHRYN DICKEY
4  Attorney At Law
5  THE LAW OFFICES OF KATHRYN DICKEY LLC
6  322 Alabama Street, Suite B
7  Montgomery, Alabama  36104
8  334.262-0728
9  FOR THE DEFENDANTS:
10 HONORABLE LANE KNIGHT
11 Attorney At Law
12 BALCH & BINGHAM
13 P.O. Box 78
14 105 Tallapoosa Street
15 Montgomery, Alabama  36104
16 334.834.6500
17 ALSO PRESENT:
18 MR. CHRISTOPHER EILAND
19
20 Examination by Ms. Dickey - 6, 123
21 Examination by Mr. Knight - 121, 123
22
23

**[3]**

EXHIBIT INDEX

1
2  Plaintiff's Exhibit No. 1.....................NA
3  Plaintiff's Exhibit No. 2.....................107
4  Plaintiff's Exhibit No. 3.....................109
5  Plaintiff's Exhibit No. 4.....................110
6  Plaintiff's Exhibit No. 5.....................111
7  Plaintiff's Exhibit No. 6.....................NA
8  Plaintiff's Exhibit No. 7.....................111
9  Plaintiff's Exhibit No. 8.....................112
10 Plaintiff's Exhibit No. 9.....................112
11 Plaintiff's Exhibit No. 10....................NA
12 Plaintiff's Exhibit No. 11....................NA
13 Plaintiff's Exhibit No. 12....................NA
14 Plaintiff's Exhibit No. 13....................113
15 Plaintiff's Exhibit No. 14....................114
16 Plaintiff's Exhibit No. 15....................114
17 Plaintiff's Exhibit No. 16....................NA
18 Plaintiff's Exhibit No. 17....................110
19 Plaintiff's Exhibit No. 18....................115
20 Plaintiff's Exhibit No. 19....................117
21 Plaintiff's Exhibit No. 20....................116
22 Plaintiff's Exhibit No. 21....................118
23 * * *

**[4]**

1  STIPULATION
2  It is hereby stipulated and agreed by and
3  between counsel for the respective parties and the
4  witness that the deposition of BYRON L. BLAGBURN,
5  MS, PhD, is taken pursuant to notice and stipulation
6  on behalf of the Plaintiff; that all formalities
7  with respect to procedural requirements are waived;
8  that said deposition may be taken before Jeana S.
9  Boggs, Certified Professional Reporter and Notary
10 Public in and for the State of Alabama At Large,
11 without the formality of a commission; that
12 objections to questions, other than objections as to
13 the form of the questions, need not be made at this
14 time, but may be reserved for a ruling at such time
15 as the deposition may be offered in evidence or used
16 for any other purpose as provided for by the Federal
17 Rules of Civil Procedure.
18 It is further stipulated and agreed by and
19 between counsel representing the parties in this
20 case that the filing of the deposition of BYRON L.
21 BLAGBURN, MS, PhD, is hereby waived and that said
22 deposition may be introduced at the trial of this
23 case or used in any other manner by either party

**[1]  (Pages 1 to 4)**

Dep of: Byron L. Blagburn, MS, PhD
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al

June 12, 2006
2005-CV-459-VPM

**[5]**

1  hereto provided for by the Statute, regardless of
2  the waiving of the filing of same.
3      It is further stipulated and agreed by and
4  between the parties hereto and the witness that the
5  signature of the witness to this deposition is
6  hereby not waived.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**[6]**

1      BYRON L. BLAGBURN, MS, PhD,
2  of lawful age, having been first duly sworn, was
3  examined and testified as follows:
4
5      DIRECT EXAMINATION
6  BY MS. DICKEY:
7  Q  Doctor Blagburn, I'm Kay Dickey, and I'm one
8     of the attorneys in this case representing
9     Doctor Eiland. And we're in what's called
10    the discovery stage. All we're doing is
11    trying to find out facts that relate to the
12    lawsuit that's been filed against Auburn
13    University. I have a few questions. This
14    should not take a long time, but if you need
15    a break, be sure and let me know.
16  A  Thank you.
17  Q  If you don't understand a question, just ask
18    me to repeat it, and I'll be happy to try to
19    make it more understandable. If you do
20    answer a question, I'll assume that you
21    understood it and we'll accept your answer.
22  A  Understood.
23  Q  Are you on any kind of medication?

**[7]**

1  A  No.
2  Q  Okay. Any reason why you couldn't give
3    honest, clear testimony today?
4  A  No.
5  Q  Okay. All right. Would you state your full
6    name for the record?
7  A  Byron L. Blagburn.
8  Q  Could you spell your last name?
9  A  B-L-A-G-B-U-R-N.
10  Q  Okay. And, Doctor Blagburn, just give us a
11    little summary of your educational history.
12  A  Okay. I received an undergraduate degree in
13    biology from Andrews University in Berrien
14    Springs, Michigan. Stayed on at Andrews
15    University, earned a Master's degree, Master
16    of Science degree in biology, with an
17    accompanying Master's thesis, working on
18    coccidiosis, using a model Eimeria species.
19    My major professor at Andrews, then -- after
20    I had inquired about an advanced degree, a
21    doctoral degree, suggested one of his
22    friends at the University of Illinois, Ken
23    Todd, who was working in a similar area at

**[8]**

1    the College of Veterinary Medicine. So, I
2    then moved to Urbana-Champaign and spent
3    four years earning a doctorate in veterinary
4    science with a major in parasitology. I
5    received that in 1982.
6  Q  Okay. And you answered probably my next
7    question, but are you considered an expert
8    in parasitology?
9  A  By traditional definitions, yes, veterinary
10    parasitology. Certainly parasitology is a
11    broad field. It involves human disease,
12    exotic animal disease, and domestic animal
13    disease. And I think when it comes to
14    domestic and companion animal, the answer
15    would be yes.
16  Q  Okay. After graduating from school, what
17    was your first employment position?
18  A  Auburn University.
19  Q  And when did you start there?
20  A  March 1, 1982.
21  Q  And what is your current position?
22  A  My current position title?
23  Q  Yes.

**[2]  (Pages 5 to 8)**

**[9]**

1  A   Distinguished university professor,
2      Department of Pathobiology, College of
3      Veterinary Medicine.
4  **Q   Okay.  Now, how do you get the title of**
5  **distinguished?**
6  A   Well, you're nominated by your department
7      head, your dean, your qualifications, the
8      impacts that you've had in your field, both
9      nationally and internationally, are assisted
10     by a committee of your peers at the college
11     level.  And after deliberation, examination
12     of your documents, the decision is made to
13     either award you one of the distinguished
14     chairs or not to award you.  And I was
15     fortunate enough to have been awarded one.
16 **Q   And how long have you held that position?**
17 A   Since 1999.
18 **Q   What are your responsibilities?**
19 A   In the College of Veterinary Medicine, most
20     of us -- and I'll tell you what mine are
21     specifically in just a minute.  Most of us
22     are involved in one of four disciplines:
23     Teaching, research, diagnostic services or

**[10]**

1      service some call it, and outreach or
2      continuing education.  And my specific
3      responsibilities involve each.  On paper,
4      I'm about forty (40%) percent teaching,
5      maybe forty (40%) percent research, and then
6      maybe ten (10%) percent of each of the other
7      two involvements.
8  **Q   Tell me about your forty (40%) percent**
9  **research responsibilities.**
10 A   Well, all of us at Auburn University or any
11     other university, for that matter, are
12     encouraged to pursue some scholarly
13     activity.  And research would fulfill that
14     component of scholarly endeavor activity.
15     My research involves researching a number of
16     different diseases that are parasite induced
17     in a variety of host species: Dog, cat,
18     cow, pig, small ruminant horse.  We've
19     worked in a variety of areas.
20          So, my research has sort of
21     spanned a breadth of topic areas in all
22     those species.  Probably the one that I
23     spend the most of my time in is what I would

**[11]**

1      call collaborative development of new
2      pharmaceuticals with the pharmaceutical
3      industry.  And what we do is in
4      collaboration with the veterinary segments
5      of the pharmaceutical industry, I identify
6      and develop and deliver to the marketplace
7      companion animal, food animal, parasites.
8  **Q   Which pharmaceutical companies do you have**
9  **most of your association with?**
10     **THE WITNESS:  Lane, I have**
11         **confidentiality agreements with**
12         **those companies.  I suppose I**
13         **could give the names without**
14         **sharing the details of that**
15         **research?**
16     **MR. KNIGHT:  Kay, would be that be --**
17     **MS. DICKEY:  Yeah, that's fine.**
18 A   Okay.  Nevardis Animal Health; Meriel, which
19     used to be Merck; Pfizer Animal Health;
20     Bayer Animal Health; Ford/Dodge Animal
21     Health, and a number of smaller ones.  But
22     certainly that would comprise the greater
23     proportion.

**[12]**

1  **Q   Okay.  Do you serve as a major professor for**
2  **graduate students?**
3  A   I do.
4  **Q   Tell me about your responsibilities as a**
5  **major professor.**
6  A   Well, a major professor is essentially the
7      mentor for the student.  They help the
8      student identify an advisory committee,
9      which is a group of individuals, which
10     together with the major professor, will
11     advise that student on his or her course
12     work, his or her research, help them design
13     it and monitor their progress.  But
14     ultimately, principally, it's the
15     responsibility of the major professor to
16     provide guidance for the committee and to
17     deal with any issues or problems that arise
18     and to solve those problems.
19 **Q   Okay.**
20 A   And that might relate to academic problems.
21     It might relate to other issues that involve
22     student's matriculation or progress through
23     the program.

**[3]  (Pages 9 to 12)**

Dep of: Byron L. Blagburn, MS, PhD
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al

June 12, 2006
2005-CV-459-VPM

[13]

1  Q   About how many students do you serve as
2      their major professor in a year?
3  A   Well, of course, programs generally take
4      three -- two to four years, depending on
5      whether they are Master's program or PhD
6      programs. And so, it's possible that
7      programs could overlap. And so, I could be
8      supervising two master students and one PhD
9      student at the same time. A PhD student can
10     graduate. A Master's student could
11     graduate, and we could be in between
12     students. There could be a period of time
13     when I could be supervising none.
14         So, the answer is that it would
15     depend on where those students are in their
16     individual programs and at what point in
17     time you ask me.
18 Q   At one time, were you the major professor
19     for Doctor Chris Eiland?
20 A   I was.
21 Q   And what period of time were you serving as
22     his major professor?
23 A   Well, there were actually two periods. I

[14]

1  served as his mentor and major professor
2  during his Master's program, which --
3  Actually, Chris was involved in sort of a
4  joint matriculation program in which he was
5  enrolled in the professional degree program,
6  and at the same time enrolled in the
7  graduate school. Although, keep in mind
8  that there will be times when he's not doing
9  both. Sometimes he will be doing both.
10     So, I guess, beginning maybe
11 sometime during his sophomore year as a
12 professional student, we discussed his
13 enrollment as a Master's candidate,
14 discussed his research topics. And so,
15 without giving you a definite date when that
16 started, unless I went back to the program
17 in biomedical sciences that would give us
18 the chronology, I would say from -- you
19 graduated in -- he graduated in 2003 as a
20 veterinarian.
21     So, I would say 2001 through, I
22 think, December of 2003. And that would
23 have encompassed his Master's program as

[15]

1  well as a short period of time when I
2  advised him during his doctorate program.
3  Q   Okay. What type of research projects did
4      Doctor Eiland work on for you when you were
5      his major professor?
6  A   Well, of course, his responsibility was to
7      research feline heartworm infection disease,
8      and our interest was clarifying diagnosis,
9      correlating diagnosis with disease, and
10     trying to better characterize the nature of
11     heartworm disease in cats. That was the
12     subject of his Master's thesis.
13         It wasn't at all unlikely that
14     Doctor Eiland might have been involved in
15     other projects that were ongoing in the
16     laboratory with other collaborating
17     pharmaceutical companies.
18         So, it depends on whether your
19     question is what in every instance was he
20     involved in, or what he was involved in that
21     related only to his graduate work.
22 Q   Primarily talking about his graduate work.
23 A   Okay. So, his Master's thesis was, as I

[16]

1  described, trying to clarify diagnosis and
2  disease characteristics of feline heartworm
3  disease. And although we had not nailed it
4  down in detail entirely for his PhD program,
5  we presumed in my discussions with Chris and
6  with other members who were likely to serve
7  on his committee or who were involved in the
8  past, that his doctoral disorientation would
9  be a continuation in some sort of work that
10 he had done as a Master's candidate.
11 Q   Did he do an excess amount of research
12     during his Master's program that would have
13     carried over to the PhD program?
14 A   He did some work that certainly wasn't
15     included in any detail in his Master's
16     thesis. We had talked about perhaps using
17     some of that additional work in pursuit of
18     his doctoral degree. But until that
19     research and its details were identified in
20     a research proposal, submitted to the
21     committee, and approved, it's nothing more
22     than speculation and discussion. Do you see
23     what I mean? The committee has to approve

[4] (Pages 13 to 16)

[17]

1     whatever research you're going to do for
2     your, in this case, your doctoral degree.
3 Q  **What research did he do -- All right. You**
4    **said heartworm?**
5 A  Uh-huh (positive response).
6 Q  **Feline heartworm research --**
7 A  Yes, ma'am.
8 Q  **-- for his Master's degree?**
9 A  Uh-huh (positive response).
10 Q  **Who were members of his -- Was there an**
11    **advisory committee at the Master's level?**
12 A  There was. As I recall, it was myself,
13    Doctor Jenny Spencer, Doctor Joe Newton, and
14    I think we added Doctor Ray Dillon, Allen R.
15    Dillon, subsequently.
16 Q  **All right. Were those members going to**
17    **continue on as his advisers in the PhD**
18    **program?**
19 A  Not necessarily. We had not identified
20    those individuals definitively. And it's
21    not uncommon at all for those who would
22    advise during the doctoral portion of a
23    program or research or career to be

[18]

1     different than those that would advise
2     during the Master's. And the reason for
3     that is that if we did elect to pursue other
4     areas or if his research took turns that we
5     had not discussed yet or that we felt that
6     would be more productive, then it would be
7     wise, prudent, to include persons who were
8     experts in those areas who could better
9     advise us on those components of the
10    research.
11 Q  **During the short time that Doctor Eiland was**
12    **enrolled in the PhD program, had his**
13    **research at that time continued from his**
14    **Master's, or was there a change?**
15 A  Well, I'm not aware that we had decided in
16    any detail what we were going to do. As you
17    had alluded to or mentioned earlier, Doctor
18    Eiland and I had certainly talked about
19    continuing and using some of the additional
20    data that we had not analyzed thoroughly and
21    pursue it further. But until the committee
22    is formed and until the proposal is written
23    and signed off on by the PhD advisory

[19]

1     committee, any discussions of research is
2     simply unofficial. The graduate school
3     recognizes the -- the research proposal
4     after the committee is satisfied that the
5     research that's planned and presented to
6     them in a proposal is legitimate, is likely
7     to fulfill the requirements in terms of
8     amount, appropriate kind of work suitable
9     for and consistent with a doctoral degree.
10    Does that make sense?
11 Q  **It does. Do you remember an exit interview**
12    **following his Master's degree fulfillment?**
13 A  You're talking about his sort of final
14    examination?
15 Q  **Right.**
16 A  Uh-huh (positive response), I do.
17 Q  **Tell me about that.**
18 A  Well, in a final examination, we really
19    don't call it an exit interview. We call
20    it, in essence, a final examination.
21    Qualifying examination, some people call it.
22    The purpose is to -- Well, it's done
23    differently in different committees. And I

[20]

1     don't mean to deviate or elaborate or not
2     answer your question, and I'll certainly get
3     back to it in a second.
4     But what I want to point out is
5     that the process varies tremendously from
6     committee to committee. The graduate school
7     has elected, and rightly so, and certainly
8     I'm supportive of it, of decentralizing
9     requirements and placing the
10    responsibilities of identifying research,
11    identifying the curriculum that's
12    appropriate for the student in terms of
13    course work, and their plan of study, or
14    their research plan, back in the hands of
15    the committee.
16    So, our committee may have elected
17    to question Doctor Eiland only on his
18    research without a written component, and
19    that's what we did. We essentially sat
20    down, and we said, "Has everyone looked at
21    Doctor Eiland's Master's thesis?" And
22    everyone in attendance said, "Yes, we have."
23    Okay. Let's then question Doctor Eiland

[5]  (Pages 17 to 20)

Dep of: Byron L. Blagburn, MS, PhD                                June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al      2005-CV-459-VPM

[21]

1  about his thesis. The intention of the
2  final examination or the qualifying
3  examination is to determine -- The candidate
4  has already passed the course work
5  component.
6      And so, the intention here, then,
7  is to assure the committee that the
8  candidate has a grasp of what was conducted.
9  If this person who will be presumed by all
10 those who read his or her thesis as an
11 expert of sorts in that area, that that
12 person truly is capable of answering
13 questions that might relate directly to what
14 he did or she did, and also might relate to
15 other aspects of that research that weren't
16 necessarily a component of his research.
17 Let me give you an example.
18     His research involved using
19 shelter animals and necropsy cases to either
20 confirm or deny agreements between antigen
21 tests and necropsy results. Someone might
22 ask a question like, "Are you familiar with
23 the current patient side or point of care

[22]

1  test for diagnosis of heartworm?"
2  Certainly, Doctor Eiland would know what I'm
3  talking about. And he would say, "Yes, I
4  am." "Well, talk to us about what they are,
5  who manufactures them, how the veterinarian
6  would use them, and how you feel that they
7  should be used in a practice situation."
8  Now, those might not relate to directly to
9  what he did, but it allows the committee to
10 assess his skills as a scientist in this
11 area.
12     So, the purpose is to -- is to
13 concentrate on any aspect of the thesis that
14 we felt was weak or that wasn't clearly
15 written. Normally, what we do is we return
16 it to the candidate and say this is, you
17 know, not -- this needs some revision or
18 here are my suggestions. It's not customary
19 to get to an exam and say, "Well, this won't
20 work. It's all wrong." Because all that
21 would have done prior. By the time we get
22 to the exam, we're interested in determining
23 the candidate's breadth of knowledge in this

[23]

1  topic and to deal with specific issues. A
2  committee member might say, "On page eight
3  paragraph two, you mentioned something
4  that -- after having read it a second time,
5  I'm not so sure that you have evidence to
6  support that."
7      And then he would make a note --
8  Doctor Eiland would make a note, and then we
9  would make a decision about whether to
10 change it or leave it. And you mentioned
11 what role of the major professor is. The
12 role of the major professor is to oversee
13 that process and to make a decision when
14 there's disagreement between Doctor Eiland
15 and a committee member, between two
16 committee members. Someone has to take
17 charge and manage the situation. That's the
18 role of the major professor.
19     But having said that, the purpose
20 of the final examination is an assessment of
21 the candidate's skills in that area of
22 research and to -- if anything needs to be
23 addressed -- address any deficiencies that

[24]

1    are present in the feces in this case.
2  Q  Were there deficiencies that needed to be
3    addressed?
4  A  In Chris's Master's thesis?
5  Q  Right.
6  A  No. Actually the committee was quite happy
7    with Doctor Eiland's performance in that
8    Master's thesis.
9  Q  What members were in attendance for that?
10 A  All of those members were in attendance.
11 Q  Okay. Do you remember telling that
12   committee at that time that there was a
13   possibility that they would be asked to
14   serve as his advisory committee for his PhD
15   program?
16 A  We may have discussed -- The answer to your
17   question is, no, I do not remember
18   specifically saying that, but I'm not
19   denying that I didn't say it. What we may
20   have talked about was Doctor Eiland has some
21   desire to continue in the program. We --
22   We, at least at this point, may pursue
23   certain avenues that either were pursued,

[6]  (Pages 21 to 24)

[25]

1   plus additional avenues that weren't pursued
2   that relate to feline heartworm infection.
3   But as I mentioned earlier, what I would
4   have said then might have been simply a --
5   Oh, by the way, there's nothing official
6   about it until all of those committee
7   members are identified by signature on a
8   plan of study and agreed upon by the
9   graduate school. Yes, ma'am.
10  Q   Have you discussed with Doctor Eiland the
11      possibility of him continuing with the PhD?
12  A   Yes, ma'am.
13  Q   Tell me about those discussions.
14  A   Well, Chris had an interest in research. He
15      had completed his DVM degree and a Master's
16      degree, and had discussed with me perhaps
17      alternative career paths. Maybe he wanted
18      to do something else. At least, I took it
19      to mean that that was an option. And
20      certainly it's not an option that I
21      discourage because in our discipline now, we
22      encourage veterinarians to consider other
23      options besides traditional veterinary

[26]

1   practice.
2   So, if and when and under what
3   circumstances Chris and I discussed that, I
4   would not have discouraged him from pursuing
5   it. Because during his Master's program, he
6   had performed certainly acceptably, and all
7   committees signed off on his work. His
8   course work, at least to the extent that I
9   was familiar with it, was well done. I
10  didn't have any problems with it.
11  So, to discuss a continuation
12  wouldn't be out of the ordinary at all under
13  those situations -- under that situation.
14  Q   What alternative employment paths or
15      professional paths did he discuss with you?
16  A   Well, I think -- I think Chris had mentioned
17      an interest in the pharmaceutical industry.
18      I had tried on a couple of occasions to --
19      after I had seen a couple of openings, to
20      contact individuals and had encouraged --
21      The way these things usually work is their
22      openings are discussed -- their openings are
23      posted on their web sites usually. And I

[27]

1   would ask Chris, "Go see if there's anything
2   that you like and that interests you." And
3   then the process of application is via the
4   Internet. I said, "It always helps if you
5   have someone that you know, and I know all
6   of them." And I said, "If there's any way
7   that I can help, I would be happy to talk to
8   them. If you have a specific position that
9   you're interested in, and if there's someone
10  that I can talk to that I know, I would
11  certainly be happy to do that."
12  Q   If a student at Auburn University gets his
13      Master's and then his -- what is it -- DV --
14      MR. KNIGHT: DVM.
15  Q   -- M? And then a PhD, does that improve his
16      marketability with a pharmaceutical company?
17  A   It could. It could very well do that. A
18      lot of it depends on the position to which
19      he's applying. Positions in professional
20      services, which is a segment of our
21      industry, pharmaceutical industry in which
22      veterinarians actually oversee their field
23      veterinarians, that would not be a

[28]

1   qualification that an employer would
2   necessarily be interested in. That employer
3   in that instance would be more interested in
4   the individual's practice experience. If
5   they had some research background, it might
6   be helpful but not necessarily so. A person
7   who had an interest in research and
8   development, a pharmaceutical company in --
9   Do you mind if I just elaborate just to sort
10  of -- it will sort of help explain this.
11  Q   Go ahead.
12  A   The pharmaceutical industry is divided into
13      a number of different disciplines and
14      sections. Research and development, which
15      can be discovery and product evaluation and
16      delivery, it could be pharmacal vigilance.
17      It can be professional services, in which it
18      deals with products and issues in the field.
19      It could be regulatory, in which they deal
20      with the regulatory agency. It can be
21      marketing. It can be sales.
22      So, all of these different areas
23      in the pharmaceutical industry require

[7]  (Pages 25 to 28)

**Dep of: Byron L. Blagburn, MS, PhD**
**Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al**

June 12, 2006
2005-CV-459-VPM

[29]

1    different skills.  In some instances the
2    PhD, particularly in research and
3    development, might help.  In other
4    instances, marketing, sales, professional
5    services, even pharmacal vigilance, they may
6    not help.
7        So, it would depend on the
8    position.  It would be hard to say unless I
9    saw the specific position whether it would
10    help or not.
11  Q   **If someone is interested, as I think Doctor**
12      **Eiland was, in getting his PhD focusing on**
13      **parasitology and going to work for a**
14      **pharmaceutical company, say, in the area of**
15      **research, what type of initial salary could**
16      **he expect?**
17  A   Gosh.  I would have to say I don't know,
18      because I don't ask my colleagues what they
19      make and really have never had any one of
20      them tell me what they make.  You would have
21      to -- You could ask them that.  They would
22      be able to tell you.
23  Q   **On these job postings that you see, do they**

[30]

1        **give a salary range?**
2   A  Generally, they'll say salary commensurate
3      with experience, background.  Sometimes they
4      may give a range.  I've not been in the
5      market for a job for a long time, so I've
6      really not looked at them.  I'm perfectly
7      happy where I am.
8          So, I really have little need to
9      visit these sites and to talk to people
10      about actual salary figures.  Now, I would
11      tell you that I'm often called by colleagues
12      who are applying and would ask for a
13      reference, and I would write a reference for
14      them.  But they might provide he for me a
15      description of the position but not
16      necessarily a salary figure.
17          So, I would have to say that I
18      really couldn't answer that accurately.
19  Q   **Okay.  You had mentioned a plan of study.**
20      **Tell me where you were in the process of**
21      **creating a plan of study for Doctor Eiland**
22      **in the PhD program.**
23  A  We had not as yet identified a plan of

[31]

1    study.  I'm not aware.  I've not seen a
2    record of a plan of study that a committee
3    which had not been based on what I'm
4    familiar with decided upon and signed.  I
5    have no such document.  We may have talked
6    about additional course work, or we may have
7    sat down, and probably did, since he had
8    enrolled in courses in the fall of 2003, and
9    probably did talk about course work.
10        But to tell you a bit about how
11    this works, the graduate school has made
12    every attempt to encourage mentors, major
13    professors and candidates to identify
14    committees as soon as possible, to identify
15    course work as soon as possible.  But
16    oftentimes, probably more often than not,
17    that doesn't necessarily happen, you know,
18    during the first few months, sometimes
19    during the first six months of a candidate's
20    program.  Certainly I would be a proponent
21    of doing it as early as possible.  But it's
22    not at all unusual for it not to be
23    submitted and signed on, decided upon, and

[32]

1    placed in the file two or three months into
2    a program officially.
3   Q   **How many months was he into this program?**
4      **Do you remember?  I know this is December,**
5      **and I'm not sure when the quarter started.**
6   A  The quarter starts August 15th now.  So,
7      you're talking about four months.
8   Q   **So, after four months, you hadn't even**
9      **started a plan of study?**
10  A  No.  We had not drafted a plan of study.  We
11      had not decided on a committee yet at that
12      point.  And, again, that's not at all
13      unusual.
14  Q   **At what point does that usually take place?**
15  A  Well, it depends.  Some candidates who have
16      a very, very good idea of what they want to
17      do and have decided on their research topic
18      and have a good idea of supportive course
19      work that would be necessary, or if we, at
20      this point, would have been knowledge of
21      what supportive course work was necessary,
22      we could do it right away.  What you have to
23      remember is -- I mean, what you should

[8]  (Pages 29 to 32)

**Dep of: Byron L. Blagburn, MS, PhD**                    June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al          2005-CV-459-VPM

[33]

1  remember is -- But what we have to remember
2  is that all these courses aren't offered at
3  the same time. Oftentimes, they're offered
4  on alternate years.
5      So, it's very difficult to sit
6  down and draft a plan of study sometimes two
7  or three years out when you don't
8  necessarily know when courses are going to
9  be available now. The bulletin will tell
10  you that this course is offered every other
11  year or even years or odd years, but that's
12  not necessarily what happens. It depends on
13  the number of students that enroll. A
14  number of factors can come into play.
15      So, it just depends. It varies
16  from student to student.
17  Q  How long is a student generally in a PhD
18     program before graduating?
19  A  Gosh, that's a difficult one, and it depends
20     on the discipline. Certainly, we like to
21     matriculate our students to complete their
22     programs within three years. That's a goal.
23     Without the Master's degree, five years,

[34]

1  usually. We require Master's in our
2  program, at least I do.
3      So, I would say anywhere from
4  three to five years. It's not unusual in
5  some disciplines for candidates to finish in
6  three years. In other disciplines,
7  particularly in anatomic pathology in which
8  residents are co-training in residency
9  programs that are ongoing for it to take
10  five or six years. So, it varies.
11      As I mentioned earlier, the
12  graduate school has made every attempt to
13  flexibilize graduate training and not
14  necessarily to dictate to the committee when
15  they do everything: You will have this done
16  by this point in time. The attempt is to
17  let the committee, who we presume knows the
18  most about the candidate and what the
19  candidate wants to do and what their
20  particular interests are, let's them take
21  charge and manage the program.
22  Q  Would you have been the person who knew more
23     about Doctor Eiland than any of the other,

[35]

1     say, members of the Master's committee?
2  A  What do you mean by "know more about"?
3  Q  I'm just repeating what you just said, that
4     I think you testified that whoever is in
5     charge or the major professor plans or
6     drafts the plan of study because that's the
7     person that is in the position of knowing
8     more about the candidate, the PhD candidate.
9      MR. KNIGHT: Object to the form. I
10         think that's a
11         mischaracterization --
12      MS. DICKEY: Okay.
13      MR. KNIGHT: Yeah, I think that
14         mischaracterizes his testimony.
15  A  There may be members of the committee who
16     perhaps could have talked with Doctor Eiland
17     at one time or another about one particular
18     goal or aspiration that he had more so than
19     me. So, there may be members of the
20     committee who maybe know more about what he
21     wants to do or at least what his latest take
22     on what he wants to do more than me.
23      But I wouldn't disagree with you.

[36]

1  Generally, my discussions with Chris, and
2  frequent discussions with Chris, probably
3  would put me in a better position of
4  determining what his goals were. But it's
5  not entirely true in every instance that the
6  major professor might spend more time
7  talking about future plans. Now, the major
8  professor might spend more time talking
9  about specific components of his research
10  and specific course work and things like
11  that. But if Doctor Eiland were to talk to
12  Doctor Dillon about going to work for these
13  people or doing that, or I notice this, or I
14  notice that, and this is something that
15  might interest me, I might not be aware of
16  that.
17      MR. KNIGHT: Usual stipulations? I
18         don't think we got it on the
19         record.
20      MS. DICKEY: Yes.
21      MR. KNIGHT: Okay.
22  Q  Who gets the plan of study?
23  A  Each member of the committee gets a copy of

[9]  (Pages 33 to 36)

Dep of: Byron L. Blagburn, MS, PhD                                    June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al      2005-CV-459-VPM

[37]

1    the plan of study. One is retained in the
2    school of graduate studies. One is retained
3    in the office of graduate studies in the
4    College of Veterinary Medicine in the
5    program of biomedical sciences.
6    Q    I know that the time frame is flexible, but
7         is there a deadline for forming a plan of
8         study?
9    A    Well, certainly as I mentioned to you, the
10        graduate school likes to see these things
11        move along. But I'm not aware that any
12        particular mentor or advisor or major
13        professor is called periodically, e-mailed
14        periodically, and say we have not received
15        this.
16             In our -- I think in our
17        description of the program in biomedical
18        sciences, we may have statements about when
19        we would like to see a plan of study
20        submitted and when we would like to see a
21        committee assembled. But it's not at all
22        unusual for sometimes to take a bit longer
23        than perhaps guidelines might suggest.

[38]

1    Q    Are you currently a major professor for a
2         student?
3    A    I am.
4    Q    And who is that student?
5    A    Well, her name is Heather Stockdale right
6         now.
7    Q    And is she also a graduate research
8         assistant?
9    A    She is. Uh-huh (positive response). She
10        might be a graduate teaching assistant.
11        There are two designations. And the College
12        of Veterinary Medicine is awarded teaching
13        and research assistantships from the main
14        campus. And when we're awarded one and a
15        student gets it, it allows them to waive
16        tuition and fees. And sometimes they're
17        given GTAs. Sometimes they're given GRAs
18             So, it's not necessarily an
19        attempt to get one over the other. The
20        requirement, of course, with a teaching
21        assistantship is that they do assist us in
22        the teaching laboratory and in the teaching
23        lecture hall. And sometimes GRAs assist in

[39]

1    the laboratory and in the teaching lecture
2    hall. Sometimes GTAs assist with ongoing
3    research in the laboratory.
4         So, a title doesn't necessarily
5    dictate or restrict responsibilities, if you
6    know what I mean.
7    Q    How long have you been her major professor?
8    A    Let's see. Heather arrived, I think, in
9         June of 2004.
10   Q    Does she have a plan of study?
11   A    She does.
12   Q    Does she have an advisory committee?
13   A    She does.
14   Q    Do you remember at what point after she
15        arrived that plan of study was drafted?
16   A    I do not, but I would presume that it was
17        certainly within the first six months of her
18        program. May have been a little longer than
19        that.
20   Q    Tell me the process of getting an advisory
21        committee.
22   A    Well, generally, what you do is you discuss
23        with the candidate, advisory committee

[40]

1    candidates -- Well, first of all, you want
2    to have a good idea of what the research is
3    going to be and what you're going to focus
4    on, and those are oftentimes in the form of
5    objectives or goals, maybe like chapters in
6    a book. One chapter has this component of
7    the research. The next chapter has that
8    component. And one chapter might be
9    serology, which has an immunology component
10        And so, as a major professor and
11   in conjunction with a potential candidate,
12   you would sit down and go over those goals
13   and objectives in research. And you would
14   say, "Okay. Looks like were going to need
15   an immunologist because one component is
16   immunology." And certainly I know
17   immunology, but I want to have somebody that
18   can help me in case we encounter questions
19   or issues that I can't answer. The next
20   component might be a PCR technique, called
21   Polymerase Chain Reaction, which we amplify
22   genes, which is clearly a molecular
23   technique. And if a component of that

[10]  (Pages 37 to 40)

Dep of: Byron L. Blagburn, MS, PhD                                      June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al        2005-CV-459-VPM

[41]

1   involves molecular techniques, then we would
2   ask a member of the committee who was an
3   expert in that area.
4        And so, they're identified based
5   on their expertise. Sometimes they're
6   identified based on that. And if they have
7   general knowledge, if they're well-trained
8   in a broad base of disciplines and have been
9   good collaborators and mentors and student
10  supporters in the past, to me, that's as
11  important as having someone who's an expert
12  in an area. So, it's a combination of
13  things. Identifying people that can
14  contribute, that will contribute, that will
15  take an active role. People that are
16  experts in certain areas, whose expertise is
17  consistent with the candidate's research
18  goals. Does that answer your question?
19 Q  I think so. At the time that you were
20   Doctor Eiland's major professor, were you
21   also another student's major professor?
22 A  At this point, I can't remember. If I was,
23   it would have been Sarah Billeter, I think.

[42]

1   She may have come after him. There may o
2   may not have been a student that was in
3   training concurrent. She may have finished
4   just before. She may have come on board
5   just after. The more I think about it, I
6   think Sarah came on after Doctor Eiland.
7   And then there were several that preceded
8   Doctor Eiland, both male and female.
9        But at the time as I recall, I
10  think Chris was the only graduate student in
11  the laboratory, but I may be wrong. There
12  may have been a couple of months overlap
13  with students.
14 Q  What area is your specialty or major
15   expertise? Is that the parasitology --
16 A  Right.
17 Q  -- that we've already discussed?
18 A  I'm what you would term a classical
19   parasitologist, which means that I've been
20   trained very broadly in a lot of areas, in a
21   lot of aspect of parasites and parasitic
22   diseases. My knowledge, one might draw an
23   analogy and say is a mile wide and an inch

[43]

1   deep. And a molecular biologist on the
2   committee knowledge might be a mile deep and
3   an inch wide, if you see what I mean.
4 Q  I do. How many other students besides
5   Doctor Eiland has shown an interest in
6   parasitology for the PhD program?
7 A  Over the course of my career, recently?
8 Q  Let's say in the last ten years.
9 A  Oh, gosh. If I would have known you would
10   have asked that question, I would have
11   brought my vitae and could have given you
12   their names and when they started and when
13   they applied. And there's always a number
14   of students who apply.
15 Q  Let me modify the question. It might make
16   it easier. After receiving a DVM, how many
17   students have you had who were interested in
18   getting a PhD after their DVM?
19 A  Or a Master's or a PhD or just a PhD?
20 Q  PhD.
21 A  I can't recall a single one; but if we were
22   to list those students at Auburn University
23   in the last ten years who fell into that

[44]

1   category, there would be very few too.
2   We've had some difficulty in recruiting
3   veterinarians into PhD programs. And by
4   "we," I mean, Auburn University's College of
5   Veterinary Medicine because -- I'll offer a
6   variety of reasons. Oftentimes, graduate
7   veterinarians want to practice. They want
8   to hone those skills. They've been going to
9   school for years. They want to get out
10  there and use, that many have debt. We do
11  have a few, one or two, at the college right
12  now that are pursuing a PhD immediately
13  after getting their DVM. But when you
14  consider, you know, over the last five years
15  that we've graduated, you know, almost five
16  hundred students, the number that do that is
17  really very few.
18 Q  We talked earlier about research that Doctor
19   Eiland did while he was a student, both for
20   the Master's program and the PhD. What
21   happens to that research when a student
22   leaves the university?
23 A  Well, historically, I think the policy of

[11]  (Pages 41 to 44)

**Dep of: Byron L. Blagburn, MS, PhD**
**Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al**

June 12, 2006
2005-CV-459-VPM

[45]

1   the University is that data generated at a
2   university remains the property of the
3   university, remains in the laboratory of the
4   principal investigator, or, in this case,
5   the major professor.
6       Now, certainly it's prudent to
7   want to publish or present that work. And
8   certainly, with Doctor Eiland's work, we did
9   that with him as first author, primary
10  author. Because his work, I think, after
11  having been conducted, was worthy of
12  presentation.
13  Q   And what publication was that?
14  A   Well, it was a presentation at the National
15  Association of -- American Veterinarian
16  Medical Association 2004, I think, in
17  Philadelphia. It was published as an
18  abstract. I think I provided you with a
19  copy of that abstract.
20  Q   And that was in 2004?
21  A   Uh-huh (positive response).
22      MS. DICKEY: Do I have that? I
23          don't --

[46]

1       MR. KNIGHT: No. I have it produced.
2           They are due tomorrow. I was just
3           putting them together.
4       MS. DICKEY: I knew we were getting
5           close on the date.
6       MR. KNIGHT: Yeah.
7       MS. DICKEY: Okay. So, I'll see that
8           later.
9       MR. KNIGHT: I think, actually, you
10          might have produced a copy of that
11          as well. I don't know what that
12          is.
13  A   Yeah, it looks like that it didn't copy very
14  well. No, no, no, no. No, we're not
15  getting -- it's a -- National meetings, what
16  we normally do is submit an abstract. And
17  that abstract, which is a brief summary of
18  the published research with contributing
19  investigators, authors, which in this
20  instance was simply his committee, and then
21  with Chris listed first. I simply stand up
22  at the national meetings with me listed
23  last. And my first statement, and there are

[47]

1   persons who were there that can corroborate
2   it, is that this work is entirely the work
3   of Doctor Chris Eiland, and I'm presenting
4   it at this meeting. And it appears as an
5   abstract, a summary. It's not subjected to
6   purview or assessment. It's simply a
7   summary of what each individual will
8   present. And I indicated to Chris that I
9   was going to present that work. He knew
10  about it.
11  Q   Are there other publications that you've
12      written where you've recognized Chris Eiland
13      as the -- as a contributor for the research?
14  A   Probably not, because he would not have --
15  Not that I'm aware of because he would not
16  have participated to the extent that would
17  warrant what we call co-authorship. Student
18  assistants providing day-to-day labor and
19  assistance with a project sometimes are
20  acknowledged; sometimes not. Their
21  acknowledgment is the wage that they get for
22  assisting with the project. But it's not
23  customary to include persons on a paper

[48]

1   unless they're -- unless they contribute
2   substantially to the generation of the
3   science, the evaluation of the science. In
4   this instance, the conception and monitoring
5   of the science, hence the committee members,
6   that sort of thing. I'm not aware -- I
7   don't recall any of them.
8       MR. KNIGHT: I don't know if you --
9           those are documents that you
10          produced. I don't know if you're
11          referring to those.
12  A   Well, there are lots of them. In my vitae
13  there are -- and please don't presume that
14  this arrogance in any way. But there are
15  300 of them, and you can go back and look at
16  them. And sometimes graduate students are
17  cited if their contributions are
18  substantial. Sometimes laboratory
19  participants, like Jamie Butler, Tracy Land,
20  who are research assistant threes in the
21  laboratory serve as co-author because their
22  contributions are substantial. In the
23  identification of specific methodologies,

**[12]  (Pages 45 to 48)**

[49]

1   they're help in interpretation of the
2   results or conduct of statistics or
3   preparation of tables.
4         I mean, the practice of science is
5   different in different laboratories. Some
6   laboratories, if a person had lunch with
7   you, they might be a collaborating author.
8   In other laboratories, it's a bit more
9   demanding. So, it just depends.
10  Q   **Explain the process used at Auburn**
11      **University for selecting a major professor.**
12  A   Well, normally, it would depend on the
13      application process. If the applicant was
14      unbeknownst to us and applied via the
15      Internet or simply made inquiries to the
16      college but had an interest in one
17      discipline or another, that individual might
18      be given the names of persons to talk to.
19      If that person enrolled in the college -- or
20      enrolled in the graduate school and was
21      accepted because of prior record -- and
22      we've had students, for example, who came to
23      us from premiere institutions with graduate

[50]

1   record exam score that would put them in the
2   99% percentile -- and those are very
3   desirable students. We don't necessarily
4   know them, and so they might rotate through
5   different laboratories. And what I mean by
6   that is they might do two weeks in my
7   laboratory, two weeks in another faculty
8   member's laboratory. And at the end of that
9   rotation, they would decide based on their
10  interest who they wanted to work with.
11        Another way, which is certainly
12  more the way Doctor Eiland, is to -- by
13  prior relationship, you know, either as a
14  student assistant or by daily interactions a
15  faculty member might say, "I'd like to work
16  with you." You know, "Can we do this." It
17  could happen with anyone in the college.
18  I've seen it happen that a person would work
19  with me at this level and then later on
20  develop a relationship with someone else and
21  work with them at the level of the PhD. It
22  can vary. Does that answer your question?
23  Q   **It does. Well, my next question was how did**

[51]

1   **you become Doctor Eiland's major professor?**
2   A   Uh-huh (positive response). And he and I --
3       because he was a student assistant, because
4       he had an interest in parasitology, I
5       decided that -- well, let's go ahead and try
6       to do a Master's. Let's see how well this
7       works. And in my program, I like to require
8       that students do Master's. Some program
9       mentors will take students on for PhDs
10      without a Master's. But my decision has
11      always been that that can be unwise because
12      the Master's gives you some idea of how well
13      they'll perform at a level that perhaps is
14      not as complex and is not as stressful.
15        PhD is a different program
16      entirely. It requires more independence.
17      It requires more independent conception. It
18      requires more work. It requires more
19      intense work and more vast work oftentimes.
20        So, my feeling is that a Master's
21      degree allows me to gauge a student's
22      performance and then make a decision whether
23      or not to -- they might be an acceptable

[52]

1   candidate. It's not always a guarantee that
2   that person is going to succeed at the PhD
3   level. There are documented instances in
4   which persons performed well at the Master's
5   level and didn't do well at the PhD level at
6   all.
7   Q   **Generally, would it cut down the years to**
8       **get your PhD if you have a Master's?**
9   A   Maybe. It could. Might not necessarily do
10      that depending upon the nature of your
11      research. Like I said, it varies
12      tremendously by discipline and by research
13      project. Some research doesn't work quite
14      well the way you wanted to the first time,
15      and so you have to back up and start again.
16      You have choose a different topic. It
17      happened to me during my research. I
18      started working on, actually, feline
19      aspirates during my PhD. And we decided
20      that there are just too many pitfalls. Too
21      hard too. And so, I moved to a different
22      project. So, it's not at all unusual for a
23      person to change their focus. When that

**[13]   (Pages 49 to 52)**

**Dep of: Byron L. Blagburn, MS, PhD**
June 12, 2006
**Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al**
2005-CV-459-VPM

---

[53]

1   happens, it certainly can delay their
2   progress.
3  Q  Okay.
4        (At which time, a recess was
5        taken.)
6  Q  When did you first become aware of Doctor
7   Eiland's interest in parasitology?
8  A  You know, I really don't know. It's been --
9   Chris worked as a student assistant for us
10  for a number of years. And my guess is that
11  it was probably brought up sometime during
12  his -- during his tenure as a student
13  assistant even before he got into veterinary
14  school, but I couldn't tell you exactly when
15  that was.
16  Q  Were you one of his professors in veterinary
17  school?
18  A  I was.
19  Q  Did you have an opportunity to form an
20  opinion of Doctor Eiland as a student?
21  A  As a professional student. Well, you'll
22  have to keep in mind that I didn't interact
23  with Chris any more than any other

[54]

1  instructor within the professional degree
2  program when it came to course work. I may
3  have -- I may have talked with him more
4  because he worked in the laboratory during
5  his -- during his tenure as a veterinary
6  student if, in fact, he did. I can't
7  remember if he stayed on. Normally, the
8  students don't during their first and second
9  year because they have too much to do. So,
10  I would -- I would know as much as I knew
11  about the other students by looking at the
12  grade book. I would know perhaps a little
13  more about what Chris was doing on a
14  day-to-day basis that didn't relate
15  necessarily to my course because I might see
16  him in the laboratory or see him more often.
17  But aside from his performance in the
18  parasitology course, I wouldn't have any
19  more knowledge of what he was doing or how
20  he was doing it than I would any other
21  student.
22  Q  How did he do in that course?
23  A  He did fine.

[55]

1  Q  Do you know of any positions of honor that
2  Chris Eiland held while he was a student?
3  A  I don't -- I don't recall any. I'm not
4  saying that at one time or another I might
5  not have been aware if he participated in
6  this particular element of the professional
7  degree program or not; but at this point, I
8  don't recall anything specifically.
9  Q  Okay.
10  A  Excuse me. Now, were you talking about,
11  like, offices held?
12  Q  Yes.
13  A  Yeah, I was aware that he was -- he was the
14  class president for the student. Yes,
15  ma'am, I was aware of that.
16  Q  And when was that?
17  A  Well, I was aware that he was class
18  president when he was taking my course.
19  Now, he may have been class president prior
20  to that. He may have been class president
21  after that. But like I said, my
22  interactions with Chris are no more, no less
23  than any other student when they're in my

[56]

1  course.
2      So, you tend to be tuned in, if
3  you know what I mean, to what's going on
4  with a particular class and individuals in
5  that class while you're teaching them during
6  the year that you're teaching them. Then
7  they move on to the next year, even the next
8  semester. When we're done, your daily
9  interactions with them fall off.
10  Q  Okay. Did you recommend to Chris Eiland
11  that he continue his education beyond the
12  DVM program at Auburn University?
13  A  I may have.
14  Q  If you did, why would you have done that?
15  A  Well, a good bit of it probably had to do
16  with the fact that he had approached me and
17  had expressed an interest and had asked me,
18  "I have an interest. Do you think it's
19  something that I should do or could do?
20  Would it benefit me?" And my response would
21  have been the same as it was a minute ago:
22  "Could. And if you have an interest in
23  parasitology, I'll certainly do everything I

**[14] (Pages 53 to 56)**

[57]

1    can to help you pursue it."
2  Q    Did you have discussions with Chris Eiland
3    about the possibility of teaching at Auburn
4    University at some point in the future?
5  A    No.  I might have said something like, and
6    perhaps did, that Doctor Hendrix and I will
7    be retiring soon, you know.  There will be
8    available positions.  But certainly it would
9    not have been my intention to either ensure
10    or to imply that he or anyone else could
11    simply move in or occupy those positions
12    without competing.  I mean, I wouldn't have
13    said that.
14  Q    But you could have suggested that that might
15    be a possibility for him?
16  A    I suppose I could suggest it.  It would be a
17    possibility for Heather too.  It could be a
18    possibility for any other graduate student.
19  Q    But have you discussed it with Heather?
20  A    Oh, of course.  We've discussed -- not
21    particularly my position, but we've
22    discussed any number of positions at
23    academic institutions when person's --

[58]

1    positions become available.  I just
2    discussed one the other day with her that
3    was brought to my attention.
4  Q    Is Doctor Hendrix close to retirement?
5  A    You would have to ask him that.
6  Q    You've not had discussions with him about
7    retiring?
8  A    In a general sense, but not about specific
9    dates or what his intensions are.
10  Q    What has he said to you in a general sense?
11  A    "Well, we're all getting older.  We've been
12    here 25 years.  It's time to start thinking
13    about retirement sometime in the future,
14    isn't it?"  Something like that.  But I
15    could no more tell you what his specific
16    intentions are than I could tell you what
17    yours are or Lane's are.
18        (Thereupon, a discussion was
19        held off the record.)
20  Q    Did Doctor Eiland work as a research
21    assistant in the lab?  I think we've already
22    said he did.
23  A    Yes, ma'am, he did.

[59]

1  Q    How long did he work in the lab?
2  A    Well, like I said, there were probably two
3    or three years prior to his acceptance into
4    veterinary school, and then, maybe,
5    intermittently during his period of
6    enrollment in the professional degree
7    program.  And then, maybe, intermittently
8    during the conduct of his Master's.  His
9    project actually involved a lot of
10    collection off site.
11        So, he did much of his work at the
12    shelter and then would bring his specimens
13    back.  Oftentimes at later hours because,
14    obviously, he was a student and had to do
15    some of these things when he had the time to
16    do them.  And sometimes that would be
17    evenings and weekends when the others
18    wouldn't be around; not all the time, but
19    sometimes.
20  Q    Was there a certain number of hours that he
21    was required to work in the lab?
22  A    No.
23  Q    Was Jamie Butler working in the lab during

[60]

1    the same years that Chris Eiland was there?
2  A    Jamie Butler was the laboratory supervisor.
3    It's her responsibility to coordinate the
4    activities, particularly of student
5    assistants.  And those are her assigned
6    responsibilities from me.
7  Q    And how long has she been in that position?
8  A    Well, I would say now probably about seven
9    or eight years.  So, she's been with me a
10    total of 12 years, or thereabouts.  And
11    during those first three or four years, she
12    was assigned to a post-doc that's working in
13    my lab, so she reported to him.  And then
14    when he moved on, I recognized that Jamie
15    did have some organizational skills and
16    capability to supervise particularly student
17    assistants.  So, she moved into the other
18    laboratory at that point.
19  Q    So, is Jamie Butler paid from funds that you
20    provide?
21  A    In part, and in part by State funds.
22  Q    Okay.
23  A    The reason for that is that part of her

**[15]  (Pages 57 to 60)**

Case 3:05-cv-00459-WKW-WC    Document 26-8    Filed 08/01/2006    Page 17 of 36

Dep of: Byron L. Blagburn, MS, PhD                                      June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al        2005-CV-459-VPM

[61]

1    responsibilities involve teaching and
2    diagnostic services, which serve our clinics
3    and veterinarians statewide and in the
4    Southeast. So, there's a justification for
5    a component of her salary coming from State
6    funds.
7  Q    What about funding for the graduate research
8        assistants? Where does that money come
9        from?
10 A    Well, there are a number of discretionary
11       sources from the office of research. More
12       times than not -- and I think each time in
13       Chris's situation -- they came from my
14       research support that I garner from outside.
15 Q    Was Chris Eiland's position as a graduate
16       research assistant contingent on being a
17       graduate student, PhD student?
18 A    Well, to receive one of the positions
19       through the office of associate dean, which
20       implied a tuition waiver, yes. You have to
21       be a graduate student to get those. You can
22       be a graduate student and either not have a
23       stipend or an assistantship or work on an

[62]

1    hourly basis. There are any number of ways
2    that you can be involved without necessarily
3    being an assistant, having an assistantship.
4  Q    Did you have a good relationship with Chris
5        Eiland when he was a student at Auburn
6        University?
7  A    Chris and I had a very good relationship
8        during his professional degree program and
9        as a student assistant and during the
10       majority of his Master's program.
11 Q    Did you receive complaints about Chris
12       Eiland from anybody?
13 A    Yes.
14 Q    Who did you receive complaints from?
15 A    Well, I received complaints from Jamie
16       Butler, Tracy Land, a number of student
17       assistants, whose names I can provide to
18       you: Brandy Brunson, Kelly Joiner, Pete
19       Christopherson, Stuart Price. I had -- had
20       an incident brought to my attention by Lori
21       Nelms. I had a complaint from -- what is
22       her name? She's our secretary in the front
23       office -- Miranda Webb, Linda King. Perhaps

[63]

1    others. Those are the ones that come to
2    mind right now.
3  Q    What were the complaints from Jamie Butler?
4  A    Well, I think you probably have a --
5            MR. KNIGHT: No, we've produced no
6                documents at this point. They're
7                due tomorrow.
8  A    Okay. Then I'll outline them for you. A
9        number of them, beginning in August of 2003,
10       near the end of August, began with
11       complaints of confrontation with other
12       students in the laboratory. Demands made by
13       Chris about how he'd be addressed. Chris
14       ordering Jamie that he would take -- he
15       could take calls. He was a veterinarian.
16       He could take diagnostic calls. And, of
17       course, that's not necessarily true.
18       Parasitologists are trained professionals.
19       After a period of time and a period of time
20       working in a laboratory and after a number
21       of years, you might be qualified to do that,
22       but just because you're a graduate
23       veterinarian doesn't necessarily mean that.

[64]

1  Q    All right. Hold on just a minute. Let me
2        ask you about that. Chris Eiland told Jamie
3        Butler that he could take diagnostic calls.
4  A    Well, what she told me in one instance, yes,
5        is that she took the phone away from him --
6        from her, attempted to, and said, "I'm a
7        veterinarian. I can answer that question."
8        And the policy in my laboratory is students
9        do not answer questions from veterinarians,
10       you know.
11 Q    What question was Jamie Butler answering?
12 A    Well, Jamie is -- comes to the table with 12
13       years experience in diagnostic parasitology.
14       She does dozens and dozens of examinations
15       and procedures a day on a number of host
16       species and talks with me in detail about
17       the results of those procedures, and has a
18       wealth -- a wealth of experience in
19       diagnostic and clinical parasitology. And
20       the presumption that any person who doesn't
21       share that wealth of experience can come in
22       and counsel anyone who calls in about what
23       they might be seeing, what they might be

[16]  (Pages 61 to 64)

[65]

1   dealing with, is incorrect and improper.
2   Q   **Does Jamie Butler receive a number of those**
3   **type calls in the lab?**
4   A   The laboratory receives, yes, numerous calls
5   per week.
6   Q   **Okay.**
7   A   Do you want me to continue with these
8   people?
9   Q   **Go ahead. Just the complaints from Jamie**
10  **Butler.**
11  A   Well, I might mention to you that she did
12  come to me afterwards and say that -- Well,
13  what I had said to her is why is all this
14  started in August? Why don't -- Why haven't
15  I heard about this in the past. And her
16  response to me was I just didn't bother you
17  with it. We've had these sort of incidents
18  that occur even when Chris was a student
19  assistant. I just didn't bother you with
20  them. I managed them. But at this point,
21  on that particular day, I was called. I
22  was en route to visit my mother. It was
23  Labor Day weekend of 2003, and I was

[66]

1   actually called by Tracy Land, the other
2   person who corroborated the confrontation
3   that was going on in the laboratory, and the
4   discomfort, part of the students and the
5   staff.
6         And so, I simply asked if I could
7   talk to Chris. And I told Chris to go home.
8   You know, leave the laboratory, and let's
9   just move on.
10  Q   **Are you talking about the Labor Day**
11  **weekend --**
12  A   Right.
13  Q   **-- you told him to leave the lab?**
14  A   Well, I told him to go home and quit
15  confronting students, quit confronting
16  staff, just go home, and we'll deal with
17  this when I get back.
18  Q   **Could you be more specific about the**
19  **confrontation with the students?**
20  A   It was a demand to be called "Doctor
21  Eiland." It was a challenge. And I would
22  encourage you to talk with them if you want
23  to know the details. Certainly, they shared

[67]

1   it with me. It was evident to me that they
2   were a bit upset about what was going on in
3   the laboratory about his demeanor.
4   Occasionally, fearful, you know, of the
5   confrontation. Just argumentative, creating
6   a situation in the laboratory that wasn't
7   conducive to persons doing their job and
8   functioning in the laboratory. And Jamie
9   can provide you with the names of those
10  people that were in the laboratory on that
11  specific day and subsequent when those
12  events took place.
13  Q   **How often did Jamie Butler come to you with**
14  **these complaints?**
15  A   Well, let's see. During that August, that
16  was the first. The next one was probably a
17  couple of weeks later in which -- perhaps
18  not that long, in which she had complained
19  about her desk being rearranged and items
20  being put in drawers and stored away, file
21  cabinets being moved from the laboratory and
22  relocated, corroborated by Tracy Land, who
23  is also in the laboratory, corroborated by

[68]

1   Jenny Spencer, who is next door. She's
2   another person you can put on that list.
3   Other incidents that she could account for
4   you in detail better than me. Not any one
5   of them certainly being that weighty, but a
6   combination of all of them over time.
7         That and other instances that we
8   can talk about too as you move down that
9   list that created a situation in which daily
10  operation of the laboratory and further
11  advancement of Doctor Eiland in his research
12  didn't seem possible to me in the
13  laboratory.
14  Q   **Would it have been unusual or would you**
15  **consider it wrong if Doctor Eiland wanted to**
16  **be addressed as Doctor Eiland?**
17  A   I wouldn't necessarily consider it wrong. I
18  would consider it inappropriate because he
19  had worked in the laboratory with those
20  students as a student assistant. And for
21  weeks prior, months prior, he was referred
22  to as Chris, and all of a sudden because he
23  graduated in June, he wanted to be referred

**[17]  (Pages 65 to 68)**

[69]

1   to as Doctor Eiland.
2        In a laboratory environment, it
3   may not seem like an important issue, but it
4   creates barriers. It creates confrontation
5   and feelings that were palpable to me.
6   Q   Does Jamie Butler have regular work hours
7       for the laboratory?
8   A   What do you mean by "regular work hours."
9   Q   Well, what are her hours, her work hours?
10  A   Well, it depends. Some days she's there at
11      7:45 on time. Our normal workday starts at
12      7:45. Oftentimes, Jamie doesn't arrive
13      until later. And I have allowed that for
14      her and other members of my staff simply
15      because oftentimes they work weekends. They
16      work evenings. They are required to come in
17      on holidays. Research doesn't stop just
18      because it's a holiday or a weekend.
19           And one thing that I have learned,
20      and it's become a part of my supervisory
21      policy is that if you create flexibility in
22      the laboratory, people are much more willing
23      to work for you and work when they have to

[70]

1   for you. So, if I tell Jamie to be there at
2   7:45 -- we have a meeting, I want her
3   there -- she's there. If I tell her to be
4   there Saturday morning at 10:00, she's
5   there. Sunday morning, 9:00; Sunday night
6   at 9:00; she's there.
7        So, as a consequence of that, I
8   don't pay a lot of attention to when people
9   show up and when people leave every day. My
10  concern is that the job gets done and that
11  progress is made, that our collaborators are
12  happy with our research results, and the
13  productivity in the laboratory is
14  maintained.
15  Q   Do the graduate research assistants sign in
16      or have time cards?
17  A   They do not. Oh, no. Everyone has security
18      cards that they have to swipe after hours.
19      But during the day, no, it's not necessary.
20      If they're working as student assistants,
21      they have to fill out hours that they work
22      and then give them to Jamie, which she then
23      turns them in. But Mrs. Butler, Mrs. Land,

[71]

1   graduate students, Doctor Spencer, who's the
2   post-doc research fellow, are not required
3   to sign in and out or to document when they
4   arrive or when they leave.
5   Q   And Chris Eiland was not required?
6   A   No.
7   Q   Have you told me all the complaints from
8       Jamie Butler --
9   A   Well, again --
10  Q   -- that you remember?
11  A   Yeah. Right. I would ask that you visit
12      with her, talk to her. She can share more
13      of them with you.
14  Q   Well, I understand that, and I may do that.
15      But what I'm asking you to share is the
16      complaints that she gave to you.
17  A   Well, certainly those are the ones that I
18      remember. It's quite probable that she came
19      to me on other instances talking about this
20      or that, that I don't remember, that she can
21      document.
22  Q   Were these written complaints or verbal?
23  A   She has written and submitted to me a

[72]

1   chronology of problems and incidents.
2   Q   But in August of 2003, did she submit
3       written complaints to you --
4   A   No.
5   Q   -- for Chris Eiland?
6   A   No. Not at that time.
7   Q   When did she do a chronology?
8   A   Sometime during fall of 2003.
9   Q   Are you considered Jamie Butler's immediate
10      supervisor?
11  A   Uh-huh (positive response).
12  Q   What about Tracy Land? What complaints did
13      she make to you?
14  A   Her complaints are going to parallel and
15      corroborate Jamie's because they're in the
16      same laboratory. Her desk is 10 feet away.
17      And so, the issues that face Jamie also face
18      Tracy. I will tell you that she came to me
19      and she told me of an incident that was
20      quite bothersome to me about Doctor Eiland,
21      who had accounted to her, that he had had a
22      confrontation with a client when he was
23      working for Parkview Animal Hospital, in

[18]  (Pages 69 to 72)

Dep of: Byron L. Blagburn, MS, PhD                                           June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al              2005-CV-459-VPM

[73]

1    which he was angered by the client for one
2    reason. She came to me specifically and
3    told me, "I think you ought to hear about
4    this. I'm very bothered by this." Chris
5    told me that he had subscribed to
6    pornographic materials and had them sent to
7    this individual whose name he got from the
8    medical record in the clinic. That's an
9    incident that she brought to me very
10   concerned, bothered by it.
11 Q   When was that?
12 A   Fall of 2003. Again, she can share with
13   you. That's an additional detail that
14   didn't involve Ms. Butler that Ms. Land
15   shared with me in particular. Another issue
16   that Jamie brought to my attention was a
17   student -- a young lady by the name of
18   Courtney, who was being harassed outside the
19   College of Veterinary Medicine by Doctor
20   Eiland after hours. She suggested that
21   Courtney come and talk to me. Courtney came
22   and talked to me and told me about
23   her encounters with Doctor Eiland late at

[74]

1    night at her apartment building. My
2    response to Courtney was "Courtney, you need
3    to contact campus security." I said, "I
4    can -- it's my responsibility to manage the
5    laboratory and what goes on in the
6    laboratory. It's not my responsibility to
7    police what goes on outside the laboratory."
8    Not intending to sound like I wasn't
9    concerned about Courtney, but I said, "At
10   this point, I would advise you to contact
11   campus security." And, again, Courtney can
12   share with you the details of that.
13 Q   And when did Courtney come to you?
14 A   After Jamie had suggested that she come to
15   me. And, again, that would have been the
16   fall of 2003. All these events took place
17   between mid-August and early December, 2003.
18   Those are the principal incidents that I
19   recall in which they came to me. And I'm
20   talking about Ms. Butler and Ms. Land.
21 Q   Okay. Did Chris Eiland ever make a
22   complaint to you about Jamie Butler?
23 A   I don't recall.

[75]

1  Q   Do you remember whether or not he had a
2    discussion with you about a body builder in
3    a bikini picture on the wall in the lab?
4  A   I don't remember that discussion.
5  Q   Do you remember the picture?
6  A   No, I don't, right now, to tell you the
7    truth.
8  Q   You've never seen a picture of a body
9    builder in the lab?
10       MR. KNIGHT: He sees those all the
11       time. I mean, forget that. Just
12       kidding.
13 A   I don't remember a specific picture. I'm
14   not denying it was there. I just don't
15   remember seeing it. I mean, there are
16   muppets all in a row if you go in there.
17   There are innumerable pictures and hangings
18   that people use for their personal space for
19   whatever reason. I would likely not have
20   said anything because part of what I told
21   you before, you know, my people work hard.
22   They do good work, and it's not likely that
23   I'm going to identify something like that.

[76]

1  Q   All right. These complaints started in
2    August of 2003. Did you go to Chris Eiland
3    in August of 2003 --
4  A   I did.
5  Q   -- with these complaints?
6  A   I did.
7  Q   Tell me about that.
8  A   I told him that his confrontation with
9    students is going to have to stop. His
10   disruptions in the laboratory is going to
11   have to stop. Quit moving file cabinets,
12   which -- quit discarding people's private
13   belongings. Do your work and stay out of
14   the laboratory. That was my first meeting
15   with Chris.
16 Q   Okay. Stay out of the laboratory?
17 A   Well, stay out of their laboratory unless
18   your work required that you be in there.
19 Q   Was there another lab where he could have
20   gone? I mean --
21 A   We have three laboratories on that hall.
22 Q   Okay. Could he have gone to any of those
23   three as a graduate research assistant?

[19]  (Pages 73 to 76)

[77]

1  A  Yes.  There's available space that he could
2     have worked at, yes.
3  Q  Did you say Brandy?
4  A  (Witness nodding in the affirmative.)
5  Q  And I missed the last name.
6  A  Brunson, B-R-U-N-S-O-N.
7  Q  What was the complaint from Brandy Brunson?
8     THE WITNESS:  Lane, should I tell that
9        whole story?
10       MR. KNIGHT:  Yeah.  I mean, this is
11          going to be produced.  I think
12          you've requested this in her
13          request for -- in interrogatory.
14          You're entitled to ask it here,
15          obviously.  I don't know if you
16          want to shortcut this discussion.
17  Q  Let me ask you this:  Were most of the
18     complaints from Jamie Butler?
19  A  No.  I had complaints from a number of
20     people.  She probably had more complaints
21     that related to that particular period of
22     time between mid-August and mid-September
23     when a lot of these initial incidents were

[78]

1     taking place.
2        But, no, there were a number of
3     persons who visited my office with what they
4     would characterize as complaints about
5     behavior.
6  Q  Were all of the complaints similar in --
7     I've heard confrontational and argumentative
8     and wanted to be called "Doctor."
9  A  I mean, I'll be happy to detail some of
10    them.  Some of them are certainly different
11    than that.
12       THE WITNESS:  Do you want me to go
13          ahead and do that, then?
14       MR. KNIGHT:  Yeah.  I mean, Kay, if
15          you --
16  Q  Well, let me ask you this:  What did Peter
17     Christopherson tell you?
18  A  Peter Christopherson told me that he found
19     Chris Eiland rummaging through Brandy
20     Brunson's desk looking for notes for a class
21     that he apparently had failed to attend or
22     that she had asked him for.  And he came to
23     me and said your graduate student should not

[79]

1     be rummaging through other persons's desks.
2     That's what he said to me.  And, of course,
3     to put that in perspective, I would have to
4     tell you the story of Brandy Brunson, but if
5     you want to wait and read it in detail,
6     certainly that's fine.
7  Q  Did Brandy and Chris Eiland have a class
8     together?
9  A  They did.
10  Q  Who is Linda King?
11  A  She's our administrative assistant.
12  Q  In the lab?
13  A  No.  She's in the front office.
14  Q  Okay.
15  A  She's second in command to the department
16    head.
17  Q  And who's the department head?
18  A  At that time, it was Lauren Wolfe.
19  Q  Who is it now?
20  A  Calvin Johnson.
21  Q  Who is Miranda Webb?
22  A  Miranda Webb is the clerical worker two, I
23    think, they call them.  She's a secretary.

[80]

1     I'm not so sure that is her title, but she's
2     one of two secretaries in the downstairs
3     office in pathobiology, located right
4     outside the department head's office.
5  Q  Lori Nelms?
6  A  Lori Nelms was a graduate students of Joseph
7     Janicki at the time that all this was going
8     on.
9  Q  Is she a student now?
10  A  She's a professional student, veterinary
11    student, yes.
12  Q  Stuart Price?
13  A  He's a faculty member in the College of
14    Veterinary Medicine.
15  Q  Kelly Joiner?
16  A  She's a graduate student and resident in the
17    Department of Pathobiology.
18  Q  Brandy Brunson?
19  A  She's also a graduate student and a resident
20    in the Department of Pathobiology.
21  Q  Tracy Land?
22  A  She's another of my research assistants that
23    occupied the desk in close proximity to

[20]  (Pages 77 to 80)

**Dep of: Byron L. Blagburn, MS, PhD**
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al

June 12, 2006
2005-CV-459-VPM

[81]

1    Jamie's.
2 **Q**   **All right. After you had your initial talk**
3    **with Doctor Eiland in 2003, August of 2003,**
4    **when was the next time you talked with him**
5    **about complaints?**
6 A   Perhaps three weeks later, and this related
7    to the Brandy Brunson, Pete Christopherson
8    incident and the course that they were
9    taking in advanced endocrinology.
10 **Q**   **And what did Doctor Eiland tell you?**
11 A   Well, it was more what I told him. I don't
12    recall the details of how he responded. I
13    think he denied certain of the accusations
14    that they had made.
15      My response or my instructions
16    with him was to go to class. He wasn't
17    going to class. Go to class and take your
18    own notes, stay out of other people's desks,
19    don't confront those people in their work
20    places, and ask them why they didn't give
21    you the notes to the class. Among, perhaps,
22    a couple of other things, but, again, it was
23    just another sit down and stop doing this.

[82]

1    This is creating too many problems here at
2    the College of Veterinary Medicine. It's
3    creating an environment that's not conducive
4    to teaching research, what we do on a daily
5    basis. So, just stop doing it. And his
6    response, as I recall -- Doctor Eiland's
7    response -- was that, these are accusations,
8    it was their opinions, and I can't believe
9    you believe this, or something to that
10    extent.
11 **Q**   **All right. Did you have an occasion to talk**
12    **with Doctor Eiland after this discussion**
13    **about going through the desk regarding**
14    **complaints?**
15 A   Yes.
16 **Q**   **Okay. When was the next time?**
17 A   The next time was after Kelly Joiner came to
18    me and said that Doctor Eiland confronted me
19    on the front steps. He frightened me. He
20    wanted to ask me about the incident of going
21    through Brandy's desk. As I recall, she
22    said, "I don't want to talk to you. If you
23    want to talk to me, let's go talk to Doctor

[83]

1    Wolfe right now," who was department head at
2    the time. And I simply told Kelly that
3    Chris and I have spoke about this incident,
4    and I'm hopeful that that behavior will
5    cease, that he won't do it again.
6 **Q**   **Did Doctor Eiland deny that he had gone**
7    **through Kelly's -- Brandy's desk?**
8 A   He may have denied that to me, but Doctor
9    Christopherson was a witness to it. And to
10    me, it seemed unlikely that what Doctor
11    Eiland was telling me was true when Doctor
12    Christopherson was there and saw it happen
13    and corroborated what others had said had
14    happened.
15 **Q**   **Did Doctor Christopherson ever tell you that**
16    **the women in the lab were trying to get rid**
17    **of Doctor Eiland?**
18 A   No. I don't remember hearing that.
19 **Q**   **Did you hear that from anybody?**
20 A   No, I didn't hear that.
21 **Q**   **Did you have discussions with anyone else**
22    **about these complaints?**
23 A   Yes. I talked with Brandy Brunson. Brandy

[84]

1    came to me -- And this was another incident
2    in which they're in advanced endocrinology,
3    and Doctor Eiland had apparently fallen
4    asleep in class and remained asleep after
5    the class had left and was sitting there.
6    Doctor Sartin had come to me and said, "Are
7    you aware of Doctor Eiland not coming to
8    class and sleeping through class?" And had
9    mentioned to me that he had continued to
10    sleep well after the class was over and
11    actually had brought other faculty members
12    to the room and said, "Look at that." Amd
13    we've been out of there for 15 minutes.
14      So, Brandy shared that with me,
15    and then she proceeded to share the fact
16    that he had asked for notes.
17 **Q**   **Did you discuss complaints -- not**
18    **necessarily -- I'm not talking about the**
19    **people making complaints. But after the**
20    **complaints were made, did you discuss these**
21    **complaints with anyone else other than Chris**
22    **Eiland?**
23 A   Not that I recall.

**[21]   (Pages 81 to 84)**

Dep of: Byron L. Blagburn, MS, PhD                                    June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al      2005-CV-459-VPM

[85]

1  Q   Okay. Is there a reason why you didn't?
2  A   Well, it's my responsibility as his adviser
3      to -- to restore any sort of order to or to
4      request that this behavior stops. That's
5      the role of the major professor. That's
6      what I implied when I said it's not just
7      academics. It's other aspects of program
8      and training too. It's my responsibility.
9  Q   What was the last complaint that you heard
10     against Doctor Eiland?
11 A   Well, there were several more. The last one
12     that I heard was from Stuart Price, who
13     approached me in the hallway and said
14     that --
15         THE WITNESS: Should I go ahead and
16     discuss this?
17         MR. KNIGHT: Yeah. Just go into it.
18 A   He approach me in the hall, and he said, "Is
19     Chris okay?" And I said, "Why do you say
20     that." He said, "Well, I was leaving work
21     at 11:30 or 12:00 on a Friday night or
22     Saturday night." I can't remember exactly
23     what night it was. And he said, "Chris

[86]

1      jumped out of the bushes and said that he
2      was picking plants, and he was going to take
3      them home and grow them and seemed a little
4      rattled and surprised." And he said, "I
5      just thought that was a bit strange for
6      somebody in the middle of the night to be
7      out picking plants, and what's going on?"
8      And my response to Stuart was, "Stuart, I
9      have no idea what Doctor Eiland was doing."
10 Q   Did you talk with Doctor Eiland about that?
11 A   I don't believe I ever mentioned that
12     incident. I may have. I may have said that
13     Doctor Price -- but I don't recall.
14 Q   And who is Stuart Price?
15 A   He's a professor, associate professor, in
16     the Department of Pathobiology.
17 Q   Did you have any discussion with Doctor
18     Wolfe regarding Doctor Eiland and these
19     complaints?
20 A   I did.
21 Q   Tell me about that.
22 A   Well, after and -- and there were several
23     others that you've not asked me about.

[87]

1          He called me in and he said that,
2      "Doctor Blagburn, seems as though issues
3      related to Doctor Eiland have involved
4      others in the department besides you and
5      your people, and I can't have that and won't
6      have that." And I said, "Understood." And
7      he suggested to me that, "Well, the best
8      thing for you to do is talk to Doctor
9      Wolfe." But he had suggested to me that,
10     "This is not working, that there are too
11     many issues of people inside the laboratory,
12     outside the laboratory, in the department
13     are fearful, unsure. And you have to do
14     something about that."
15 Q   And what did you do?
16 A   Well, ultimately -- and there are actually a
17     couple of other incidents that occurred
18     after that.
19         THE WITNESS: Should I share them?
20         MR. KNIGHT: Yeah.
21 Q   Well, I haven't asked you that. I wanted to
22     know -- Well, first of all, when did you
23     have this conversation with Doctor Wolfe?

[88]

1  A   Probably November of 2003.
2  Q   All right. And Doctor Wolfe said, "You have
3      to do something about that." And my
4      question was: What did you do?
5  A   Well, I visited with Chris again --
6  Q   Okay.
7  A   -- and told him that these problems,
8      incidents, have to stop. I'm getting
9      complaints outside the laboratory. Now,
10     it's not just related to persons in and
11     around the parasitology division, the
12     parasitology laboratory. Now, it relates to
13     anatomical pathologists, microbiologists
14     confronting me in the hallway, or graduate
15     students in physiology upstairs coming to me
16     and relating incidents that have happened.
17     This has got to stop. Concentrate on your
18     program. Forget about everyone else, and
19     get on with your program.
20 Q   Now, when you said to Chris Eiland, "This
21     has to stop," did you specifically lay out
22     all of the complaints?
23 A   Well, each time that I talked with him,

[22]   (Pages 85 to 88)

Dep of: Byron L. Blagburn, MS, PhD                          June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al        2005-CV-459-VPM

[89]

1    yeah, I summarized what the persons had told
2    me and what I knew.
3  Q   And what was his response?
4  A   In some instances, denial; in some
5    instances, just sort of shrugged them off as
6    being insignificant and not of any magnitude
7    to worry about.  Never, as I recall, an
8    admission of doing them.
9  Q   What did you think was going on?
10 A   Well, I didn't know.  I didn't know.  I
11   remember I asked Chris at one time, I said,
12   "Is there something I can help you with?
13   Are you having problems that I'm not aware
14   of?"  That's all I said.  I had no idea.  As
15   I had mentioned to you, in prior years, I
16   apparently wasn't privy to all of these
17   little incidents that were happening.  Jamie
18   later told me, as I mentioned to you, that
19   they happened periodically, but were just
20   not brought to my attention.
21 Q   Does it seem strange to you that someone
22   with those traits or behaviors that you
23   described would be elected president of the

[90]

1    student body?
2  A   I can only comment on what was going on in
3    our laboratory and what was happening around
4    me and based on the persons who came to see
5    me.  What other interactions people have
6    with Chris or what led to his election or
7    what relationships he had -- like I said,
8    I'm not privy to those.
9  Q   Do you know Elizabeth Landreth?
10 A   I do.  Uh-huh (positive response).
11 Q   Who is that?
12 A   The reason I hesitate is because I know her
13   as Beth.
14 Q   Oh, Beth Landreth.
15 A   Beth works in the histopathology laboratory
16   in the department.
17 Q   Have you ever had a discussion with her
18   about Chris Eiland?
19 A   I have.
20 Q   Tell me about that.
21 A   On occasion, she would come to me, and she
22   would say, "Is Chris all right?  Is
23   everything okay?"  And my response was,

[91]

1    "Well, we're having some incidents in the
2    laboratory."  But that's the sum total of
3    what I said to her.  Now, keep in mind that
4    Beth can talk and probably does talk to
5    any number of people.
6         So, I don't remember sharing any
7    details about what -- with what others had
8    told me, but others could have.
9  Q   Was there ultimately a resolution to the
10   complaints brought against Chris Eiland?
11 A   With do you mean by "a resolution"?
12 Q   Did the complaints ever stop?
13 A   Well, they stopped when I resigned as his
14   major professor.
15 Q   And when was that?
16 A   It was December 8th, I think, thereabouts.
17 Q   Do you recall a meeting on December 3rd with
18   Chris Eiland?
19 A   I do.
20 Q   What happened at that meeting?
21 A   Well, I sat down with Chris.  I called him
22   at home, and I said, "Chris, come in.  I
23   want to talk to you."  He said, "What's up?

[92]

1    Why do you want to talk to me?"  I said,
2    "Just come in.  Just come in and visit with
3    me."
4         I then asked Doctor Hendrix, who's
5    the other parasitologist, to join us simply
6    because I wanted him to be there and witness
7    the discussion.  And I told Chris that I
8    think it would be in his best interest and
9    in the best interest of our program if he
10   found another major professor, if he found
11   another program because, based on what has
12   happened, it would be in my opinion
13   impossible for him to work in the laboratory
14   in the environment after what has transpired
15   has transpired.  And I told him, I said, "I
16   will continue your stipend for two months
17   while you look for another major professor."
18   And I got up and left.  And that was the --
19   Go ahead.
20 Q   Did Doctor Hendrix have anything to say at
21   this meeting?
22 A   He -- He didn't have much to say when I was
23   sitting there.  Now, he may have said some

[23]  (Pages 89 to 92)

Dep of: Byron L. Blagburn, MS, PhD

June 12, 2006

Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al

2005-CV-459-VPM

[93]

1   things that I don't recall, but I don't
2   remember there being any substance to them
3   or contributing to the conversation as such.
4   Now, he and Doctor Eiland stayed in the room
5   and talked for a good while after I left.
6 Q   **Have you ever resigned as major professor**
7   **for a student prior to Chris Eiland?**
8 A   I never have.
9 Q   **What course of action did you expect to take**
10   **place after this?**
11 A   Well, first of all, it's not at all uncommon
12   for students to relocate in different
13   laboratories to different mentors.
14   Sometimes it's the fault of the mentor.
15   Sometimes it's the fault of the candidate.
16   Sometimes it's the fault of both. So, it's
17   not at all unusual. It happens all the time
18   in the college and the university.
19   And I presumed -- and it was my
20   intention -- that Chris, since he was still
21   actively enrolled in the graduate school,
22   that he would seek mentorship elsewhere in a
23   different program. I suggested that he talk

[94]

1   to Doctor Dillon, talk to Doctor Sundermann.
2   There are perhaps other folks in the
3   university. And I said that I would be
4   happy to support him.
5 Q   **Would any of those other professors have**
6   **expertise or knowledge in the area of**
7   **parasitology?**
8 A   Doctor Sundermann is a parasitologist.
9   Doctor Dillon is an expert in feline
10   heartworm infection and disease.
11 Q   **To your knowledge, did those conversations**
12   **take place?**
13 A   I don't know. I don't know.
14 Q   **Did you ever talk with Doctor Dillon about**
15   **Doctor Eiland?**
16 A   I believe I said to Doctor Dillon that if
17   Doctor Eiland -- Doctor Eiland may approach
18   you to be his major professor. I would
19   encourage you, if you have the resources, to
20   support Chris, or something to that.
21 Q   **What about Doctor Hendrix? Did you suggest**
22   **that maybe Doctor Hendrix become his major**
23   **professor?**

[95]

1 A   I didn't simply because -- I don't recall
2   that I did. I don't think I would have
3   because Doctor Hendrix doesn't have a
4   significant research program. Doctor
5   Hendrix is involved more in teaching and in
6   outreach efforts. But he is a
7   parasitologist, and I'm not saying by that
8   that he wouldn't be qualified to do it. But
9   historically, he hasn't done it. He has
10   never had a graduate student. That doesn't
11   mean that he couldn't. He couldn't have
12   directed Doctor Eiland at a PhD level
13   because he's not achieved level two graduate
14   faculty status. He only has level one,
15   which would allow him only to direct master
16   students. But certainly, he could have
17   applied for level two, and it would have
18   been a possibility. But I don't remember
19   suggesting that to Doctor Hendrix.
20 Q   **After the December 3rd meeting, you left,**
21   **but you said you didn't resign until**
22   **December 8th?**
23 A   Well, the date of my letter to Doctor

[96]

1   Janicki was December 8th. But it was
2   clearly communicated to Doctor Eiland that I
3   was resigning on December 3rd, or whenever
4   that meeting was.
5 Q   **Did Doctor Eiland get a copy of your**
6   **December 8th letter?**
7 A   I sent it to Doctor Janicki, who is the
8   program chief. He is the associate Dean for
9   research and graduate studies. If he elects
10   to share my letter with Doctor Eiland,
11   that's fine. No, I did not. I didn't
12   appose him sharing that letter with him.
13 Q   **After December 8th, when was your next**
14   **conversation with Chris Eiland?**
15 A   Well, he came in a couple times. I don't
16   remember the exact dates. But the first, he
17   asked me if I would write him a
18   recommendation to law school. And it might
19   have been another -- perhaps graduate school
20   at UAB. I can't remember. But I said to
21   him that I would be happy to. My intention
22   was never to derogate Doctor Eiland and to
23   support him in any way that I could no

**[24]  (Pages 93 to 96)**

Case 3:05-cv-00459-WKW-WC    Document 26-8    Filed 08/01/2006    Page 26 of 36

Dep of: Byron L. Blagburn, MS, PhD                                    June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al      2005-CV-459-VPM

[97]

1    matter what he wanted to do. And I told him
2    I would be happy to do that.
3  Q  Including getting him another major
4     professor?
5  A  Well, it it's not my responsibility to get
6     him another major professor. I resigned. I
7     certainly would be willing to support him in
8     the form of a recommendation to anyone. But
9     it's not my responsibility to find him a
10    major professor.
11 Q  Who is Gregory Skipper?
12 A  I don't know that name.
13 Q  Did you tell Doctor Eiland that he would
14    make a great parasitologist, just not at
15    Auburn University?
16 A  I don't remember that. It doesn't sound
17    like something I would say. I don't deny
18    saying it, but I don't remember saying it.
19    I just repeat it. It doesn't sound like
20    something I would say to a student.
21 Q  Did you also tell Doctor Eiland to clean out
22    his office and turn in his keys for the lab?
23       MR. KNIGHT: Object to the form. Go

[98]

1       ahead and answer.
2  Q  You can still answer.
3  A  The -- It's customary for students who are
4     no longer working in your laboratory to turn
5     in their keys. It's a commonplace request.
6  Q  Did you receive a call, telephone call, from
7     a Doctor Mark Janderlich?
8  A  I did.
9  Q  Do you remember about when that telephone
10    conversation took place?
11 A  Maybe -- You know, I really can't tell you.
12    It was while I was entering department head.
13    So, it probably would have been either
14    summer of 2004 or summer of 2005. I don't
15    remember exactly when.
16 Q  What was the purpose of the call?
17 A  Doctor Janderlich is a former student of
18    mine. And he said, "I'm thinking of hiring
19    Chris Eiland. What can you tell me about
20    him?" I said, "Well, Mark, I can't comment
21    on Chris's clinical skills. I'll tell you
22    that he did a fine job for his Master's
23    thesis. We had some personnel problems in

[99]

1    the laboratory, difficulties, persons
2    getting along with persons. But I
3    would encourage you to give Doctor Eiland a
4    chance." Those are my exact words, and
5    Doctor Janderlich could corroborate that.
6  Q  Have you ever discussed Doctor Eiland with
7     Doctor Drummonds?
8  A  I never have. I don't -- Is she at the
9     Rainbow City Pet Clinic? Is that where she
10    is?
11 Q  I think so.
12 A  I saw Doctor Drummond on a retreat at -- in
13    Puerto Rico, and she told me that Doctor
14    Eiland was working for her. And all I
15    remember saying is, "Oh, tell Chris I said
16    hello." That's all I said.
17 Q  Are there any rules covering a major
18    professor resigning from that position?
19 A  Not that I'm aware of.
20 Q  You're not aware of any rule that says that
21    Doctor Eiland has a right to receive written
22    notification of your decision?
23 A  Well, I am now. And I am aware that there

[100]

1    are posted guidelines, or whatever you call
2    them, whatever they call them there on the
3    graduate school's web site. Frankly, I have
4    not seen that document. I have not seen
5    that. I have had no cause to look at it
6    over the years. And when it was shown to
7    me, that was the first time I saw it.
8  Q  Was Doctor Eiland progressing toward his
9     degree according to plan other than these
10    problems?
11 A  Which degree?
12 Q  The PhD.
13 A  Well, it was very early. I mean, his course
14    work only began August 15th. And so,
15    really, no progress had been made to speak
16    of. So, to qualify his progression, I
17    think, would be premature at that point.
18 Q  Did you ever have discussions with anyone
19    about his progress?
20 A  I don't recall. Perhaps I don't understand
21    the question. Discussion with whom in
22    particular and about what?
23 Q  Anybody in particular about his progress in

[25]  (Pages 97 to 100)

[101]

1    the PhD program.
2  A  Not that I'm aware of.
3  Q  If Doctor Eiland had been accepted to
4     another department, would he have been able
5     to continue in his main field of interest,
6     which was parasitology?
7  A  I believe so. I believe that there are
8     opportunities at Auburn University. There
9     are numerous examples of -- I have a student
10    that I was on her committee, and she was in
11    soils and agronomy, but she's working on
12    parasites. And so there's a lot of
13    interaction across campus. And as I
14    mentioned, there's Doctor Sundermann. You
15    know, there's Doctor Dillon. There are
16    clinicians who certainly -- internists who
17    have skills in his area. My opinion is
18    that, yes, there's opportunity.
19 Q  Did Doctor Wolfe tell you to either get rid
20    of Doctor Eiland or he would?
21 A  I don't know that those are his exact words,
22    but it was very clear to me that that's what
23    he meant. Now, I don't -- I'd prefer not to

[102]

1     view it as "get rid of Doctor Eiland." His
2     words -- And Doctor Wolfe is not the kind of
3     individual that would have used that kind of
4     language. He would have more -- he would
5     more than likely have said something like,
6     "Doctor Blagburn, please solve this problem.
7     And this is obviously not going to work in
8     the department. So, you as the adviser are
9     the person to do something about it." And
10    my decision, then, was to resign.
11 Q  Did you go back and have a discussion with
12    Doctor Wolfe after you made that decision?
13 A  I don't recall that I did, other than
14    routing my letter through him would have
15    been customary for me since a source of
16    support was in our department to route my
17    resignation letter to the department head.
18 Q  Did you try to get Doctor Eiland's
19    statistics incomplete grade changed to a
20    withdrawal?
21 A  I did make a couple of telephone calls to
22    Professor Billor -- is that it -- never
23    reached her. I got her voice mail. She

[103]

1     called me back a couple of times, and we
2     never spoke. And then it occurred to me,
3     probably after our fourth attempt to talk,
4     that perhaps it was inappropriate for one
5     faculty member to try to encourage or
6     discuss another faculty member's grade
7     change policies. So, I made no attempt
8     after that.
9  Q  Who is the point of contact for all
10    departments in the biomedical sciences
11    program?
12 A  At that time it was Joseph Janicki. His
13    title was associate dean of research and
14    graduate studies.
15 Q  Was Doctor Eiland dismissed from the
16    Department of Pathobiology?
17 A  No. We have no authority to dismiss anyone.
18    His support was in my laboratory. When I
19    resigned, of course, it's not customary to
20    continue to support a graduate student with
21    your resources if that graduate student then
22    moves to a different laboratory. It happens
23    all the time. They simply procure support

[104]

1     from the laboratory to which they relocate.
2        So, the program of biomedical
3     sciences is a college-wide program. The
4     only affiliation with pathobiology is that
5     that's my academic home, and that's where
6     the sources of funds were coming. But to
7     say that anyone was dismissed from the
8     department of pathobiology has no meaning to
9     me.
10 Q  What's the process if Chris Eiland were
11    to -- Let's say, if Doctor Dillon became his
12    major professor. What steps would Doctor
13    Eiland have to had -- would have had to
14    take?
15 A  Simply fill out a new plan of study, perhaps
16    with a memo, to Doctor Janicki through the
17    graduate school. Perhaps routing it through
18    me so that I concur, corroborate, stating
19    that it could depend on the situation. It
20    might be irreconcilable differences in some
21    cases. It might be ineffective guidance on
22    the part of the mentor. It might be
23    behavior problems on the part of the

[26]  (Pages 101 to 104)

Dep of: Byron L. Blagburn, MS, PhD                                    June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al      2005-CV-459-VPM

**[105]**

1  students, whatever. It would simply be a
2  letter and a change in that plan of study
3  naming a new professor as a major professor.
4  And then that would become a matter of
5  record, and it would go on file in Janicki's
6  office and with the graduate school.
7  Q  Would he have had to reapply to the graduate
8     program?
9  A  He remained an active graduate student in
10    good standing, and my resignation had
11    absolutely no impact or effect on his status
12    as a graduate student, either in the program
13    in biomedical sciences or at Auburn
14    University.
15 Q  Did you contact anyone at the Alabama
16    Wellness Committee in December of 2003?
17 A  No, ma'am, I did not.
18 Q  Do you know anyone who did?
19 A  I do.
20 Q  Who was that?
21 A  It was Doctor Charles Hendrix.
22 Q  Do you have any knowledge of Doctor Eiland
23    ever being diagnosed with excessive

**[106]**

1  compulsive disorder?
2  A  I do not.
3  Q  Or bipolar?
4  A  I do not.
5  Q  Do you know whether or not Doctor Eiland was
6     on drugs?
7  A  I do not. Never asked him that. He may --
8     Chris may have shared with me at one time or
9     another that some of the medications that he
10    was taking made him sleepy when he was
11    explaining to me why he had fallen asleep in
12    that class. But I didn't ask him what those
13    medications were and didn't pursue it.
14 Q  Who covers your lectures when you're out of
15    town?
16 A  Doctor Hendrix does some. Doctor Jenny
17    Spencer has done some. Oftentimes, I will
18    try to switch with another faculty member in
19    the college if I'm going to be gone on
20    Wednesday. And he teaches on Tuesday and
21    Wednesday; I would do his lecture on
22    Tuesday, and then he or she would do theirs
23    and mine on Wednesday. So, there are a

**[107]**

1  number of ways that we do it.
2  Q  Did Doctor Janicki say that Doctor Eiland
3     was no longer welcome in the Department of
4     Pathobiology?
5  A  He didn't say that to me.
6  Q  Did Doctor McFarland contact you about a
7     letter he received in July of 2004 from
8     Doctor Eiland?
9  A  He did not. I did not see that letter.
10       (At which time, a recess was
11       taken.)
12 Q  Let me show you what's been marked as
13    Plaintiff's Exhibit Two.
14       (At which time, the
15       referred-to document was
16       marked as Plaintiff's Exhibit
17       No. 2 by the Reporter.)
18 Q  This is a copy -- Actually, I think this is
19    from the web site, Auburn University web
20    site, evaluating the academic progress of
21    graduate students. This document actually
22    relates to the responsibilities of an
23    advisory committee. It's my understanding

**[108]**

1  that he never had an advisory committee; is
2  that true?
3  A  For his PhD.
4  Q  For the PhD program.
5  A  Right.
6  Q  Had you talked with anybody about being on
7     his advisory committee? I know it wasn't
8     formal, but had you begun discussions?
9  A  You know, I really don't recall. I could
10    very easily have mentioned it to Doctor
11    Dillon since Doctor Dillon would be an
12    obvious choice, but I really don't remember
13    to what extent I had -- it was just too
14    early. You know, we really weren't sure
15    what we were going to do yet. And the
16    makeup committee is so important, I really
17    wanted to get a better handle on what he was
18    going to do.
19       So, I don't recall, no, of having
20    discussed it with any seriousness that would
21    imply that I was going to presume that I was
22    interested in them being on the committee.
23 Q  Okay. Let me show you Plaintiff's Exhibit

**[27]  (Pages 105 to 108)**

Dep of: Byron L. Blagburn, MS, PhD                                    June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al      2005-CV-459-VPM

[109]

1    Three.
2          (At which time, the
3          referred-to document was
4          marked as Plaintiff's Exhibit
5          No. 3 by the Reporter.)
6  Q   This is a bank statement showing the last
7     payment of money paid to Doctor Eiland for
8     his lab graduate research assistant work.
9     How much did he make? Do you remember what
10    he was earning as a graduate research
11    assistant?
12 A   No. But, again, Linda King could answer
13    that. I don't know what deductions -- I
14    could say that you could probably calculate
15    this. But I don't know what -- I'm not
16    privy to his personal finances and what
17    he has deducted and what goes on. But I
18    really don't remember, but Mrs. King
19    could -- she could come up with that figure.
20    She certainly would have it. She's the
21    administrative assistant that I had
22    mentioned to you.
23 Q   Let me show you what's been marked as

[110]

1    Plaintiff's Exhibit 17.
2          (At which time, the
3          referred-to document was
4          marked as Plaintiff's Exhibit
5          No. 17 by the Reporter.)
6  Q   This is a note that accompanied the last
7     statement that was mailed, and it appears to
8     be a note from you. Do you remember writing
9     this?
10 A   Yeah. It probably got delivered to his
11    mailbox, and then I just forwarded it to him
12    from his mailbox.
13 Q   Okay. Let me show you Plaintiff's Exhibit
14    Four.
15          (At which time, the
16          referred-to document was
17          marked as Plaintiff's Exhibit
18          No. 4 by the Reporter.)
19 Q   This appears to be a statement from Auburn
20    University, billing statement, for spring
21    2004.
22 A   Uh-huh (positive response).
23 Q   Do you know what the two hundred ($200)

[111]

1    dollars would be for?
2  A   I have no idea.
3  Q   Who sends these statements out?
4  A   I really don't know. You know, it's -- I'm
5     not involved in the budget office or any of
6     the activities that go on over there, so I
7     wouldn't have any idea.
8  Q   Let me show you what's been marked as
9     Exhibit Five.
10          (At which time, the
11          referred-to document was
12          marked as Plaintiff's Exhibit
13          No. 5 by the Reporter.)
14 Q   And I think we've already gone over this. I
15    just wanted to put this in the record. As
16    well as number seven, "Guidelines for
17    Graduate Tuition Fellowships."
18          (At which time, the
19          referred-to document was
20          marked as Plaintiff's Exhibit
21          No. 7 by the Reporter.)
22 A   Well, I would remind you that many graduate
23    programs are department based. But the

[112]

1    graduate program at the College of
2    Veterinary Medicine is college wide and not
3    department based. So, references to
4    specific procedures for department-based
5    programs may or may not apply to the program
6    at the college. Does that make sense?
7  Q   It does. All right. Let me show you what's
8     been premarked as Exhibit Eight, "Code of
9     Student Discipline," and I think I have
10    already talked about that too.
11          (At which time, the
12          referred-to document was
13          marked as Plaintiff's Exhibit
14          No. 8 by the Reporter.)
15 Q   Do you recognize what's been marked as
16    Plaintiff's Exhibit Nine?
17          (At which time, the
18          referred-to document was
19          marked as Plaintiff's Exhibit
20          No. 9 by the Reporter.)
21 A   Uh-huh (positive response). This is a cover
22    form that accompanies each thesis.
23 Q   And what does it mean?

[28]  (Pages 109 to 112)

[113]

1  A  It says that the author reserves all
2     publication rights, but none of this has
3     been published. Preparation of abstract
4     does not constitute publication.
5  Q  Okay. You had testified earlier that you
6     made recommendations for Doctor Eiland after
7     resigning from his -- as his major
8     professor. Is this what you were
9     referencing?
10 A  Uh-huh (positive response). Well, it was
11    one of them. I also wrote a letter, I think
12    to --
13 Q  Okay. Would this be the letter?
14 A  It would.
15 Q  Okay. And let me introduce Plaintiff's
16    Exhibit 13 and ask you to just identify that
17    document for the record.
18        (At which time, the
19        referred-to document was
20        marked as Plaintiff's Exhibit
21        No. 13 by the Reporter.)
22 A  This appears to be a recommendation written
23    by Doctor Wolfe similar to the one that you

[114]

1     just showed me.
2  Q  Okay. And the same for Exhibit Fourteen.
3     Could you identify --
4        (At which time, the
5        referred-to document was
6        marked as Plaintiff's Exhibit
7        No. 14 by the Reporter.)
8     MR. KNIGHT: Well, I object to the
9        extent that he's identifying
10       documents that he didn't prepare
11       on both --
12    MS. DICKEY: Right.
13    MR. KNIGHT: -- on Doctor Wolfe and
14       Doctor Janicki.
15    MS. DICKEY: Right. I'm not asking
16       questions about it. I'm just
17       asking him to identify.
18 Q  But all three of you provided
19    recommendations to Doctor Eiland.
20 A  Uh-huh (positive response).
21 Q  This is a letter from Doctor Janicki, same
22    type.
23        (At which time, the

[115]

1        referred-to document was
2        marked as Plaintiff's Exhibit
3        No. 15 by the Reporter.)
4  Q  We had discussed the statistics course that
5     Doctor Eiland took. He had an incomplete
6     and then that grade was later changed. Can
7     you identify this document for the record,
8     Plaintiff's Exhibit 18?
9        (At which time, the
10       referred-to document was
11       marked as Plaintiff's Exhibit
12       No. 18 by the Reporter.)
13 A  Was this supposed to go with this?
14 Q  I think so.
15 A  I mean, I wouldn't -- I don't understand
16    what --
17 Q  Okay. All right. This is a copy of a card,
18    excuse me.
19 A  So, it's not related to this?
20 Q  It's not? Okay. Pardon me.
21    MR. KNIGHT: So, obviously he can't
22       identify them if these documents
23       didn't go together.

[116]

1     MS. DICKEY: They don't go together.
2     MR. KNIGHT: Right. Okay.
3  Q  Do you remember sending a card?
4  A  Well, I mean, I've sent lots of cards. You
5     know, it's certainly not inappropriate to
6     congratulate a student on completing his
7     work, you know. So, I don't know deny at
8     all sending a card congratulating Chris. I
9     would send him another one.
10 Q  This was at the end of his DVM program? Is
11    that when you sent this card?
12 A  Yeah, it would have probably been -- He
13    probably sent me a graduation announcement,
14    and so it probably was accompanied by a
15    graduation gift and a card.
16 Q  Okay. This is the article. I'm not sure
17    how these two got on the same page. But
18    could you identify Plaintiff's Exhibit 20?
19        (At which time, the
20        referred-to document was
21        marked as Plaintiff's Exhibit
22        No. 20 by the Reporter.)
23 A  Uh-huh (positive response).

[29]  (Pages 113 to 116)

Case 3:05-cv-00459-WKW-WC   Document 26-8   Filed 08/01/2006   Page 31 of 36

Dep of: Byron L. Blagburn, MS, PhD                                      June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al        2005-CV-459-VPM

**[117]**

1  Q   And what is it?
2  A   This is an article that I wrote for DVM Best
3      Practices in which I talk about feline
4      parasite control. It doesn't look like the
5      whole article is here. And I simply cited
6      that abstract of AAVP, which is not a
7      published abstract, not a formal
8      publication. Just citing some prevalence
9      data to support the fact that we had
10     discovered and seen, based on Chris's work,
11     prevalences of heartworm in Alabama. It was
12     intended to provide documentation from
13     where -- points that I made and this came
14     from. And Chris clearly received first
15     authorship and credit for the work.
16 Q   Okay. Let me show you Plaintiff's Exhibit
17     19, and this is just to get a perspective of
18     time.
19         (At which time, the
20          referred-to document was
21          marked as Plaintiff's Exhibit
22          No. 19 by the Reporter.)
23 Q   This is the fall quarter, 2003. You had

**[118]**

1      your discussion with Chris Eiland on
2      December 3rd where you resigned as his --
3  A   Yes, ma'am.
4  Q   -- major professor. The last class or
5      classes ended for that semester on December
6      10.
7  A   Uh-huh (positive response).
8      MR. KNIGHT: Kay, there's two pages
9          attached to this. One doesn't
10         look like it goes. The back page
11         doesn't look like it goes with the
12         front page.
13     MS. DICKEY: It doesn't.
14     MR. KNIGHT: Okay.
15     MS. DICKEY: If you want to, you can
16         just tear that back off because
17         that has to do with the statistics
18         course. All I wanted was the
19         calendar for that.
20 Q   Let me show you what has been marked as
21     Plaintiff's Exhibit 21 and ask you to
22     identify that.
23         (At which time, the

**[119]**

1          referred-to document was
2          marked as Plaintiff's Exhibit
3          No. 21 by the Reporter.)
4  A   Uh-huh (positive response). This is a piece
5      that I wrote for another issue of DVM News.
6  Q   Doctor Blagburn, have you ever had a
7      graduate student fall asleep in your class?
8  A   Graduate student, no, I have not.
9  Q   Is it uncommon for a graduate student to
10     fall asleep in class?
11 A   Based on my observations in my classes, it
12     is.
13 Q   What would you do if a student did fall
14     asleep in your class?
15 A   I would probably confront them after class
16     after everyone had left and have a
17     discussion about the cause and the why and
18     make some reference to the fact that they're
19     here for a purpose. And it's difficult to
20     learn if you're not paying attention. And
21     you owe your respect to the instructor, to
22     the other students by remaining alert,
23     active, participating would have been the

**[120]**

1      gist of my discussion.
2  Q   Okay.
3      MS. DICKEY: I may be finished. Let me
4          have a short break, and I'll be
5          right back.
6          (At which time, a recess was
7           taken.)
8  Q   Did you personally have problems with Chris
9      Eiland?
10 A   Prior to August of 2003, no.
11 Q   And the problems that you had beginning in
12     August of 2003 were because of complaints
13     you received from others.
14 A   Right. But clearly resulting in situations
15     and circumstances that affected my lab's
16     productivity and function in the department,
17     yes.
18 Q   Had you noticed a decrease in productivity
19     prior -- in the lab prior to August 2003?
20 A   By whom, relating to what?
21 Q   Had you been placed on notice of any
22     unproductivity?
23 A   No.

**[30]   (Pages 117 to 120)**

Dep of: Byron L. Blagburn, MS, PhD                                                June 12, 2006
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al          2005-CV-459-VPM

[121]

1  Q   Did you witness any of the complaints
2     personally?
3  A   No. Now, excuse me. You mean, was I there
4     when they happened?
5  Q   Right.
6  A   No. I mean, the complaints were brought
7     directly to me. I certainly witnessed the
8     complaints.
9  Q   Yeah. But you didn't witness the behavior
10    that brought on the complaints.
11 A   No, ma'am, I did not.
12 Q   Okay. I have no further questions.
13            CROSS-EXAMINATION
14 BY MR. KNIGHT:
15 Q   Just a couple. Doctor Blagburn, what are
16    the students's obligations or
17    responsibilities with respect to developing
18    a plan of study or academic advisory
19    committee, if any?
20 A   Well, in our programs, we encourage the
21    students to be proactive, to contribute, to
22    identify potential candidates, to plan ahead
23    based on available courses when they were

[122]

1     offered, and come to the major profferer and
2     the committee with a listing of potential
3     courses by year. It doesn't necessarily
4     mean that the committee will approve them or
5     the committee won't change them. But it's
6     customary for the student to bring
7     suggestions about committee members and
8     about the course work. It certainly doesn't
9     mean that the major professor won't also
10    suggest or won't advise as to an
11    inappropriate advisor or inappropriate
12    course. But I can't recall a graduate
13    student that I've had where I didn't see an
14    initial proposed plan of study that we then
15    looked at and decided what we wanted to
16    change, whether it needed changing.
17 Q   Did Chris Eiland approach you to establish
18    an academic advisory committee? Did he
19    approach you --
20 A   I don't recall. Keep in mind it was very
21    early in the program, but I don't recall
22    Chris coming to me with a list of people
23    suggesting who that they would be.

[123]

1  Q   Okay. Does a major professor -- Is there
2     any requirement to accept a student who
3     requests that he be that student's major
4     professor? Is it a requirement that you
5     have to accept a student?
6  A   No, not that I'm aware.
7  Q   Okay. Nothing further.
8            REDIRECT EXAMINATION
9  BY MS. DICKEY:
10 Q   Did Chris Eiland ever discuss with you
11    classes that he would possibly take in the
12    fall?
13 A   He may have. Certainly, the fact that he
14    was enrolled in them does suggest that he
15    may have discussed those classes. But they
16    weren't as yet formulated in a plan of
17    study, an official plan of study.
18 Q   What about for spring, were there any
19    discussions of courses that he would take in
20    the spring?
21 A   I don't -- I don't recall any discussion.
22            RECROSS-EXAMINATION
23 BY MR. KNIGHT:

[124]

1  Q   What department was Doctor Sundermann in?
2  A   She's in biological sciences.
3  Q   Okay. Thank you.
4
5            (Deposition concluded at
6            approximately 4:12 p.m.)
7       *   *   *   *   *
8       FURTHER DEPONENT SAITH NOT
9
10      *   *   *
11
12   R E P O R T E R'S   C E R T I F I C A T E
13
14 STATE OF ALABAMA)
15 ELMORE COUNTY)
16
17      I, Jeana S. Boggs, Certified Professional
18 Reporter and Notary Public in and for the State of
19 Alabama at Large, do hereby certify on Monday, June
20 12, 2006, that pursuant to notice and stipulation on
21 behalf of the Plaintiff, I reported the deposition
22 of BYRON L. BLAGBURN, MS, PhD, who was first duly
23 sworn by me to speak the truth, the whole truth, and

[31]  (Pages 121 to 124)

**Dep of: Byron L. Blagburn, MS, PhD**
**Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al**

June 12, 2006
2005-CV-459-VPM

[125]

1  nothing but the truth, in the matter of CHRISTOPHER
2  B. EILAND, DVM, MS, Plaintiff, versus DR. BYRON L.
3  BLAGBURN, individually and in his official capacity,
4  DR. CHARLES HENDRIX, individually and in his
5  official capacity, DR. JOSEPH JANICKI, individually
6  and in his official capacity, DR. STEPHEN McFARLAND,
7  individually and in his official capacity, DR. ED
8  RICHARDSON, in his official capacity as President of
9  Auburn University, and DR. LAUREN WOLFE,
10  individually and in his official capacity,
11  Defendants, Civil Action No. CV-459-VPM, now pending
12  in the United States District Court for the Middle
13  District, Eastern Division of Alabama; that the
14  foregoing colloquies, statements, questions and
15  answers thereto were reduced to 122 typewritten
16  pages under my direction and supervision; that the
17  deposition is a true and accurate transcription of
18  the testimony/evidence of the examination of said
19  witness by counsel for the parties set out herein;
20  that the reading and signing of said deposition was
21  not waived by witness and counsel for the parties.
22      I further certify that I am neither of
23  relative, employee, attorney or counsel of any of

[126]

1  the parties, nor am I a relative or employee of such
2  attorney or counsel, nor am I financially interested
3  in the results thereof.  All rates charged are usual
4  and customary.
5      This the 26th day of June, 2006.
6
7
8

9  _____
   Jeana S. Boggs
   Certified Court Reporter and
10  Notary Public
   Commission expires: 8/14/2006
11
12
13
14
15
16
17
18
19
20
21
22
23

[32]  (Pages 125 to 126)

**Dep of: Byron L. Blagburn, MS, PhD**
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al

**June 12, 2006**
2005-CV-459-VPM
1

| A | | | | |
|---|---|---|---|---|
| **AAVP** 117:6 | **actively** 93:21 | 11:11 21:20 | **answer** 6:20,21 | **approved** 16:21 |
| **able** 29:22 101:4 | **activities** 60:4 | **agronomy** | 8:14 13:14 | **approximately** |
| **absolutely** | 111:6 | 101:11 | 20:2 24:16 | 1:22 124:6 |
| 105:11 | **activity** 10:13,14 | **ahead** 28:11 | 30:18 40:19 | **area** 7:23 21:11 |
| **abstract** 45:18 | **actual** 30:10 | 51:5 65:9 | 41:18 50:22 | 22:11 23:21 |
| 45:19 46:16,17 | **added** 17:14 | 78:13 85:15 | 64:7,9 98:1,2 | 29:14 41:3,12 |
| 47:5 113:3 | **additional** 16:17 | 92:19 98:1 | 109:12 | 42:14 94:6 |
| 117:6,7 | 18:19 25:1 | 121:22 | **answered** 8:6 | 101:17 |
| **academic** 12:20 | 31:6 73:13 | **Alabama** 1:2,21 | **answering** 21:12 | **areas** 10:19,21 |
| 57:23 104:5 | **address** 23:23 | 1:21 2:6,7,15 | 64:11 | 18:4,8 28:22 |
| 107:20 121:18 | **addressed** 23:23 | 4:10 105:15 | **answers** 125:15 | 41:16 42:20 |
| 122:18 | 24:3 63:13 | 117:11 124:14 | **antigen** 21:20 | **argumentative** |
| **academics** 85:7 | 68:16 | 124:19 125:13 | **anybody** 62:12 | 67:5 78:7 |
| **accept** 6:21 | **administrative** | **alert** 119:22 | 83:19 100:23 | **arrive** 69:12 |
| 123:2,5 | 79:11 109:21 | **Allen** 17:14 | 108:6 | 71:4 |
| **acceptable** | **admission** 89:8 | **allow** 95:15 | **apartment** 74:1 | **arrived** 39:8,15 |
| 51:23 | **advanced** 7:20 | **allowed** 69:13 | **apparently** | **arrogance** 48:14 |
| **acceptably** 26:6 | 81:9 84:2 | **allows** 22:9 | 78:21 84:3 | **article** 116:16 |
| **acceptance** 59:3 | **advancement** | 38:15 51:21 | 89:16 | 117:2,5 |
| **accepted** 49:21 | 68:11 | **alluded** 18:17 | **APPEARAN...** | **aside** 54:17 |
| 101:3 | **advise** 12:11 | **alternate** 33:4 | 2:1 | **asked** 24:13 |
| **accompanied** | 17:22 18:1,9 | **alternative** | **appears** 47:4 | 43:10 56:17 |
| 110:6 116:14 | 74:10 122:10 | 25:17 26:14 | 110:7,19 | 66:6 78:22 |
| **accompanies** | **advised** 15:2 | **Amd** 84:12 | 113:22 | 84:16 86:23 |
| 112:22 | **adviser** 85:2 | **American** 45:15 | **applicant** 49:13 | 87:21 89:11 |
| **accompanying** | 102:8 | **amount** 16:11 | **application** 27:3 | 92:4 96:17 |
| 7:17 | **advisers** 17:17 | 19:8 | 49:13 | 106:7 |
| **account** 68:3 | **advisor** 37:12 | **amplify** 40:21 | **applied** 43:13 | **asking** 71:15 |
| **accounted** 72:21 | 122:11 | **analogy** 42:23 | 49:14 95:17 | 114:15,17 |
| **accurate** 125:17 | **advisory** 12:8 | **analyzed** 18:20 | **apply** 43:14 | **asleep** 84:4,4 |
| **accurately** 30:18 | 17:11 18:23 | **anatomic** 34:7 | 112:5 | 106:11 119:7 |
| **accusations** | 24:14 39:12,20 | **anatomical** | **applying** 27:19 | 119:10,14 |
| 81:13 82:7 | 39:23 107:23 | 88:13 | 30:12 | **aspect** 22:13 |
| **achieved** 95:13 | 108:1,7 121:18 | **Andrews** 7:13 | **appose** 96:12 | 42:21 |
| **acknowledged** | 122:18 | 7:14,19 | **approach** 85:18 | **aspects** 21:15 |
| 47:20 | **affiliation** 104:4 | **angered** 73:1 | 94:17 122:17 | 85:7 |
| **acknowledgm...** | **affirmative** 77:4 | **animal** 8:12,12 | 122:19 | **aspirates** 52:19 |
| 47:21 | **age** 6:2 | 8:14 11:7,7,18 | **approached** | **aspiration** 35:18 |
| **action** 1:6 93:9 | **agency** 28:20 | 11:19,20,20 | 56:16 85:13 | **assembled** 37:21 |
| 125:11 | **ago** 56:21 | 72:23 | **appropriate** | **assess** 22:10 |
| **active** 41:15 | **agreed** 4:2,18 | **animals** 21:19 | 19:8 20:12 | **assessment** |
| 105:9 119:23 | 5:3 25:8 | **announcement** | **approve** 16:23 | 23:20 47:6 |
| | **agreements** | 116:13 | 122:4 | **assigned** 60:5,12 |

**Dep of: Byron L. Blagburn, MS, PhD**
Christopher Eiland, DVM, MS Vs Byron L. Blagburn, MS, PhD, et al

**June 12, 2006**
2005-CV-459-VPM
2

assist 38:21,23
  39:2
assistance 47:19
assistant 38:8,10
  48:20 50:14
  51:3 53:9,13
  58:21 61:16
  62:3,9 65:19
  68:20 76:23
  79:11 109:8,11
  109:21
assistants 47:18
  60:5,17 61:8
  62:17 70:15,20
  80:22
assistantship
  38:21 61:23
  62:3
assistantships
  38:13
assisted 9:9
assisting 47:22
associate 61:19
  86:15 96:8
  103:13
association 11:9
  45:15,16
assume 6:20
assure 21:7
attached 118:9
attempt 31:12
  34:12,16 38:19
  103:3,7
attempted 64:6
attend 78:21
attendance
  20:22 24:9,10
attention 58:3
  62:20 70:8
  73:16 89:20
  119:20
attorney 2:4,11
  125:23 126:2

attorneys 6:8
Auburn 1:12
  6:12 8:18
  10:10 27:12
  43:22 44:4
  49:10 56:12
  57:3 62:5
  97:15 101:8
  105:13 107:19
  110:19 125:9
August 32:6
  63:9,10 65:14
  67:15 72:2
  76:2,3 81:3
  100:14 120:10
  120:12,19
author 45:9,10
  49:7 113:1
authority
  103:17
authors 46:19
authorship
  117:15
available 33:9
  57:8 58:1 77:1
  121:23
avenues 24:23
  25:1
award 9:13,14
awarded 9:15
  38:12,14
aware 18:15
  31:1 36:15
  37:11 47:15
  48:6 53:6 55:5
  55:13,15,17
  84:7 89:13
  99:19,20,23
  101:2 123:6

———— B ————
B 1:5,21 2:6
  125:2

back 14:16 20:3
  20:14 48:15
  52:15 59:13
  66:17 102:11
  103:1 118:10
  118:16 120:5
background
  28:5 30:3
BALCH 2:12
bank 109:6
barriers 69:4
base 41:8
based 31:3 41:4
  41:6 50:9 90:4
  92:11 111:23
  112:3 117:10
  119:11 121:23
basis 54:14 62:1
  82:5
Bayer 11:20
began 63:10
  100:14
beginning 14:10
  63:9 120:11
begun 108:8
behalf 1:17 4:6
  124:21
behavior 78:5
  83:4 85:4
  104:23 121:9
behaviors 89:22
believe 82:8,9
  86:11 94:16
  101:7,7
belongings
  76:13
benefit 56:20
Berrien 7:13
best 87:7 92:8,9
  117:2
Beth 90:13,14
  90:15 91:4
better 15:10

18:8 36:3 68:4
  108:17
beyond 56:11
bikini 75:3
Billeter 41:23
billing 110:20
Billor 102:22
BINGHAM
  2:12
biological 124:2
biologist 43:1
biology 7:13,16
biomedical
  14:17 37:5,17
  103:10 104:2
  105:13
bipolar 106:3
bit 31:10 37:22
  49:8 56:15
  67:2 86:5
Blagburn 1:8,16
  4:4,21 6:1,7
  7:7,10 87:2
  102:6 119:6
  121:15 124:22
  125:3
board 42:4
body 75:2,8 90:1
  92:16 63:3
Boggs 1:19 4:9
  124:17 126:9
book 40:6 54:12
  bother 65:16,19
bothered 73:4
  73:10
bothersome
  72:20
Box 2:13
Brandy 62:18
  77:3,7 78:19
  79:4,7 80:18
  81:7 83:23,23
  84:14
Brandy's 82:21

83:7
breadth 10:21
  22:23
break 6:15
  120:4
brief 46:17
bring 59:12
  122:6
broad 8:11 41:8
broadly 42:20
brought 43:11
  53:11 58:3
  62:20 73:9,16
  84:11 89:20
  91:10 121:6,10
Brunson 62:18
  77:6,7 79:4
  80:18 81:7
  83:23
Brunson's 78:20
budget 111:5
builder 75:2,9
building 74:1
bulletin 33:9
bushes 86:1
Butler 48:19
  59:23 60:2,19
  62:16 63:3
  64:3,11 65:2
  65:10 67:13
  69:6 70:23
  71:8 73:14
  74:20,22 77:18
Butler's 72:9
Byron 1:8,16 4:4
  4:20 6:1 7:7
  124:22 125:2
B-L-A-G-B-U...
  7:9
B-R-U-N-S-O-N
  77:6

———— C ————

C 124:12,12
cabinets 67:21
  76:11
calculate 109:14
calendar 118:19
call 10:1 11:1
  19:19,19,21
  47:17 79:23
  98:6,6,16
  100:1,2
called 6:9 30:11
  37:13 40:20
  65:21 66:1,20
  78:8 87:1
  91:21 103:1
calls 63:15,16
  64:3,22 65:3,4
  102:21
Calvin 79:20
campus 38:14
  74:3,11 101:13
candidate 14:13
  16:10 21:3,8
  22:16 34:18,19
  35:8,8 39:23
  40:11 52:1
  93:15
candidates
  31:13 32:15
  34:5 40:1
  121:22
candidate's
  22:23 23:21
  31:19 41:17
capability 60:16
capable 21:12
capacity 1:9,10
  1:10,11,12,13
  125:3,5,6,7,8
  125:10
card 115:17
  116:3,8,11,15
cards 70:16,18

116:4
care 21:23
career 17:23
  25:17 43:7
carried 16:13
case 4:20,23 6:8
  17:2 24:1
  40:18 45:4
cases 21:19
  104:21
cat 10:17
category 44:1
cats 15:11
cause 100:5
  119:17
cease 83:5
certain 24:23
  41:16 59:20
  81:13
certainly 8:10
  11:22 16:14
  18:18 20:2,7
  22:2 25:20
  26:6 27:11
  31:20 33:20
  37:9 39:17
  40:16 45:6,8
  50:11 53:1
  56:23 57:8
  66:23 68:5
  71:17 78:10
  79:6 95:16
  97:7 101:16
  109:20 116:5
  121:7 122:8
  123:13
Certified 1:19
  4:9 124:17
  126:9
certify 124:19
  125:22
Chain 40:21
chairs 9:14

challenge 66:21
chance 99:4
change 18:14
  23:10 52:23
  103:7 105:2
  122:5,16
changed 102:19
  115:6
changing 122:16
chapter 40:6,7,8
chapters 40:5
characteristics
  16:2
characterize
  15:10 78:4
charge 23:17
  34:21 35:5
charged 126:3
Charles 1:9
  105:21 125:4
chief 96:8
choice 108:12
choose 52:16
Chris 13:19 14:3
  16:5 25:14
  26:3,16 27:1
  36:1,2 42:10
  46:21 47:3,8
  47:12 53:9,23
  54:13 55:2,22
  56:10 57:2
  60:1 61:15
  62:4,7,11
  63:13,13 64:2
  65:18 66:7,7
  68:22 71:5
  72:5 73:4
  74:21 76:2,15
  78:19 79:7
  83:3 84:21
  85:19,23 88:5
  88:20 89:11
  90:6,18,22

91:10,18,21,22
  92:7 93:7,20
  94:20 96:14
  98:19 99:15
  104:10 106:8
  116:8 117:14
  118:1 120:8
  122:17,22
  123:10
CHRISTOPH...
  1:5 2:18 125:1
Christopherson
  62:19 78:17,18
  81:7 83:9,12
  83:15
Chris's 24:4
  61:13 98:21
  117:10
chronology
  14:18 72:1,7
circumstances
  26:3 120:15
cited 48:17
  117:5
citing 117:8
City 99:9
Civil 1:6 4:17
  125:11
clarify 16:1
clarifying 15:8
class 55:14,17
  55:19,20 56:4
  56:5 78:20
  79:7 81:16,17
  81:17,21 84:4
  84:5,8,8,10
  106:12 118:4
  119:7,10,14,15
classes 118:5
  119:11 123:11
  123:15
classical 42:18
clean 97:21

clear 7:3 101:22
clearly 22:14
  40:22 96:2
  117:14 120:14
clerical 79:22
client 72:22 73:1
clinic 73:8 99:9
clinical 64:19
  98:21
clinicians
  101:16
clinics 61:2
close 46:5 58:4
  80:23
coccidiosis 7:18
Code 112:8
collaborating
  15:16 49:7
collaboration
  11:4
collaborative
  11:1
collaborators
  41:9 70:11
colleagues 29:18
  30:11
collection 59:10
college 8:1 9:2
  9:10,19 37:4
  38:11 44:4,11
  49:16,19 50:17
  73:19 80:13
  82:2 93:18
  106:19 112:1,2
  112:6
college-wide
  104:3
colloquies
  125:14
combination
  41:12 68:6
come 33:14 42:1
  42:4 61:8 63:1