IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| Dr. Christopher B. Eiland, DVM, MS ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO. |
| v. ) | 2005-CV-459 |
| ) | |
| Dr. Byron L. Blagburn, et al. ) | |
| ) | |
| Defendants. ) | |

### DECLARATION OF DR. BYRON L. BLAGBURN

Dr. Byron L. Blagburn declares and states as follows:

1.  My name is Dr. Byron L. Blagburn. I am a Distinguished University Professor, College of Veterinary Medicine, at Auburn University ("Auburn"). I have been a professor at Auburn since 1982.

2.  A Master of Science ("MS") program in Auburn's Graduate School requires the completion of a research project/thesis. Because there is a research project/thesis component to this program, a student is required to identify a "Major Professor." A Major Professor is a member of the faculty who provides general guidance and assistance to the student as he goes through the graduate program. This guidance includes, but is not limited to, helping the student establish an Academic Advisory Committee, developing a plan of study and assisting the student in identifying a topic for research. A Major Professor also oversees the student's progression in his course work and monitors the student's progress in the laboratory and with his research.

3.  The student is responsible for identifying a professor who is willing to serve as his Major Professor. No professor is required to serve as a Major Professor and a professor may deny a student's request that he serve in that role for any reason. In addition, once a professor

agrees to serve as a Major Professor, he may resign from that position at any time and for any reason, including if the student and professor have personality differences. Within the Auburn system, it is not uncommon for a Major Professor to resign. When a Major Professor does resign, the student's standing within the school or graduate program is not affected in any manner. The student remains in good standing at Auburn. The student may even continue his course work in the graduate program without a Major Professor. To graduate, however, the student must eventually identify a new Major Professor, as he would not be able to complete the research/thesis component of the program without some faculty member serving in that role.

4.      In addition to identifying a Major Professor a student in the MS program must establish an Academic Advisory Committee ("AAC"). An AAC serves to, among other things, approve the student's plan of study, conduct required examinations, and direct the required research project/thesis. A student and his Major Professor usually work together to establish the student's AAC. The AAC must be formally established by obtaining the consent and signatures of the AAC members on a document which is submitted to the Graduate School.

5.      Dr. Eiland asked me to serve as his Major Professor in his MS program. I agreed to serve in that role. Dr. Eiland also established an AAC in his MS program. I served on his MS AAC, along with Dr. Jennifer Spencer, Dr. Joseph Newton and Dr. Ray Dillon.

6.      A student's MS research project/thesis must be supported by research which is gathered, recorded and analyzed by the student. Before a student begins to collect research, however, he must first identify a topic for his thesis. Dr. Dillon supplied the topic for Dr. Eiland's MS research project/thesis. The topic of Dr. Eiland's thesis was the prevalence and diagnosis of feline heartworm infections in shelter animals in Central Alabama.

7.   A student's research, although physically collected by the student, is the property of Auburn. When a student completes his thesis, the research remains at Auburn and is available for use by other students. Dr. Eiland collected an abundance of research to support his MS thesis; in fact, he collected enough data to support his thesis and have data left over.

8.   Dr. Eiland performed well academically in his MS and DVM programs. In addition to performing well academically, his conduct while in these programs was without incident. I am aware of no students or faculty having any problems with Dr. Eiland during this time. Moreover, I recall that Dr. Eiland had a good relationship with the Graduate School faculty, including myself.

9.   For much of the time that he was enrolled at Auburn, Dr. Eiland worked as a student/employee in the Parasitology laboratory ("Laboratory"). The Laboratory is part of the Department of Pathobiology. I have primary authority over the research aspects of the Laboratory; however, Jamie Butler, a non-student Research Assistant IV, is the day-to-day manager of the Laboratory. Tracy Land, a Research Assistant III, also works daily in the Laboratory. Ms Butler has worked in the Laboratory since 1994. Ms. Land has worked in the Laboratory since 1996. Dr. Eiland began working in the Laboratory in 1997 as a Student Lab and Research Assistant. In 1998, he became a Graduate Student Research Assistant ("GSRA"). As a GSRA, Dr. Eiland had access to the Laboratory to work on his research project/thesis. He was also considered an employee of the Laboratory, although Auburn officially designates GSRAs as "temporary" University employees. In this role, Dr. Eiland provided general assistance and instruction to students whose programs required work in the Laboratory. A graduate student's employment as a GSRA in a laboratory supervised by a Major Professor generally continues

only so long as the student remains under the Major Professor's guidance in the graduate program.

10. Before the Fall 2003 semester, Dr. Eiland decided to enter Auburn's Doctor of Philosophy program in Biomedical Sciences ("Ph.D"). Auburn's Ph.D program is similar to the MS program in that it has both a course work and research project/thesis component. Because there is a research project/thesis component, a student is required to identify a Major Professor and establish an AAC as prerequisites to completion of the degree. Dr. Eiland asked that I serve as his Major Professor in the Ph.D program. Dr. Eiland had been a good student in the MS and DVM programs, so I gladly agreed to serve as his Major Professor in his Ph.D program. Around this same time, Dr. Eiland asked if he could use the excess information that he collected for his MS thesis to support his Ph.D research project/thesis. I informed him that I saw no reason why this information could not be used, although at the time no topic for Dr. Eiland's Ph.D research project/thesis had been identified, nor was one ever identified.

11. I provided Dr. Eiland with a stipend which was intended to compensate him for his work in the Laboratory and as general compensation that many students receive while pursuing graduate studies. No student is entitled to a stipend as part of their graduate studies and students may pursue their graduate degree with or without a stipend. Moreover, if a student is awarded a stipend, there is no guarantee that a stipend will continue until the student completes his degree. Likewise, if a student's Major Professor resigns from that position, it is customary to withdraw the student's stipend, as he will obtain funding from his new Major Professor.

12. Dr. Eiland officially entered the Ph.D program in the Fall of 2003. Dr. Blagburn began taking classes in August of 2003. Although the members of Dr. Eiland's MS AAC

informally discussed the possibility of serving on his Ph.D AAC, Dr. Eiland never officially established an AAC in his Ph.D program.

13. I was informed by Dr. Joseph Janicki, the Associate Dean for Research and Graduate Studies, that a student named Laurie Nelms had accused Dr. Eiland of asking her to take an examination for him. After learning of this accusation, I went to Ms. Nelms, who corroborated what I had been told. No charge of academic dishonesty against Dr. Eiland was ever brought before the Academic Honesty Committee, the body which investigates formal allegations of academic dishonesty at Auburn. Accordingly, no formal University action was taken with respect to Ms. Nelms' accusation. Dr. Janicki informed me of this accusation in his capacity as the Associate Dean for Research and Graduate Studies for the sole purpose of advising me, Dr. Eiland's Major Professor, of an important issue involving the graduate studies of Dr. Eiland.

14. Around the same time that Dr. Eiland began having problems with his Ph.D course work, I began to receive reports that Dr. Eiland was displaying strange and erratic behavior outside the classroom. Most importantly, many of the reports of inappropriate and disruptive behavior concerned conduct that had allegedly taken place in the Laboratory.

15. I received several reports that when working in the Laboratory, Dr. Eiland would not respond to or even acknowledge a student when referred to as "Chris" instead of "Dr. Eiland." This conduct led to altercations between Dr. Eiland and various students in the Laboratory. In addition, Tracy land informed me that Dr. Eiland had related to her that, when working in an animal hospital, he had become disgruntled with a customer at the clinic and had obtained the customer's home address from the records of the animal hospital and had subscribed to a pornographic magazine in the name of the customer, which he sent to the customer's

residence. Other reports of strange behavior reported to me in the Fall of 2003 included, that Dr. Eiland had been seen at midnight by Dr. Stuart Price, a faculty member in Veterinary Medicine, digging up shrubbery on the Auburn campus; that Dr. Eiland had unilaterally rearranged the Laboratory, including the personal items of the his co-workers; that Dr. Eiland had completely rearranged my office furniture without permission; and that Dr. Eiland had been seen rummaging through another student's desk without permission. I was also informed by another professor that Dr. Eiland had fallen asleep in one of his classes and has stayed asleep well after all the other students in the class had left the room.

16. One of the more serious complaints I received during this time was from a Laboratory student named Courtney Rich. Ms. Rich informed me that Dr. Eiland had been aggressively pursuing an unwelcome romantic relationship with her. Ms. Rich reported to me that on several occasions, Dr. Eiland had shown up outside her apartment building late at night and that she was concerned for her safety. Another graduate student, Kelli Joiner, who was also a lab student, informed me that Dr. Eiland had confronted her about an issue between the two and that his conduct had "frightened" her.

17. Dr. Wolfe had also received reports of Dr. Eiland's disruptive behavior. I spoke with Dr. Wolfe about Dr. Eiland's conduct. He informed me that something had to be done about Dr. Eiland's conduct, although he did not specify what I should do, and he never ordered me to dismiss Dr. Eiland from the Ph.D program.

18. I met with Dr. Eiland on several occasions in an attempt to correct his behavioral problems. I warned him that the complaints had to stop and that he should concentrate on his program. He either denied each instance of inappropriate conduct, or merely shrugged them off as insignificant.

19. Despite my repeated warnings, Dr. Eiland's behavioral problems continued. It was not long after my last meeting with Dr. Eiland that I was notified that an allegation of cheating had been made against him. After the complaints failed to stop, I concluded that my mentoring relationship with Dr. Eiland was not working, and I decided to resign as Dr. Eiland's Major Professor. My resignation would have the additional consequence of ending Dr. Eiland's employment in the Laboratory along with the stipend he received for working in the Laboratory and for studying under me. By resigning as Dr. Eiland's Major Professor, I did not hope or intend to end his enrollment in the Ph.D program; rather, I knew that Dr. Eiland could no longer function appropriately in my Laboratory and I thought that a change in laboratory environments might benefit him in his program. In addition, I do not even have the authority to unilaterally dismiss a student from a graduate program. I was the sole decision maker in my decision to resign as Dr. Eiland's Major Professor and to end his employment in the Laboratory.

20. On December 3, 2003, I met with Dr. Eiland to resign as his Major Professor. I asked Dr. Hendrix to sit in on the meeting. When Dr. Eiland arrived, I told him that I was resigning as his Major Professor. I informed him that I was taking this action due to his behavioral issues since he began the PhD program, including the allegation of cheating. During this meeting, I also notified Dr. Eiland that he would no longer be an employee in the Laboratory and his stipend would only continue until the end of January 2004. I continued Dr. Eiland's stipend until the end of January 2004, so that he would continue to be paid until he made the transition to a new Major Professor.

21. During the December 3, 2003 meeting, I never told Dr. Eiland that he was dismissed from the Ph.D program. I do not even have the authority to unilaterally dismiss a student from a graduate program. I never referred to Dr. Eiland as a "cheater" during this

meeting, although I did inform him that there had been an accusation of cheating against him. Also, I never told Dr. Eiland that he would no longer have access to his research; however, I did tell Dr. Eiland that he should turn in his key to the Laboratory. Finally, after my resignation, I allowed Dr. Eiland ample opportunity to offer his explanation and defense. I did not walk out of the room in the middle of his explanation, as alleged. I am not aware that Dr. Eiland requested a hearing with respect to my actions during this meeting.

22.     I officially resigned as Dr. Blagburn's Major Professor on December 8, 2003. To accomplish this, I sent a written memorandum to Dr. Joseph S. Janicki, the Associate Dean for Research and Graduate Studies, through Dr. Wolfe, Head of the Department of Pathobiology.

23.     Auburn has a policy to drop a student from a class if the student does not attend the first few classes of a semester.

24.     Sometime in 2004, I was approached by Dr. Eiland to assist him in having his grade changed in his Experimental Statistics I class from an F to a withdrawal. I originally told Dr. Eiland that I would help him by speaking with Dr. Nedret Billor. However, before I actually spoke with Dr. Billor, I decided that it might be inappropriate for me to speak to another professor about changing a student's grade and, therefore, I never actually discussed Dr. Eiland's situation with her.

25.     I was contacted by Dr. Janderlich to provide a recommendation on employment for Dr. Eiland. As part of my recommendation, I informed Dr. Janderlich that Dr. Eiland had some issues with some of the people in the Department of Pathobiology, although I did not specifically say that Dr. Eiland had problems with the "women" in Pathobiology. My final recommendation, however, was that Dr. Eiland deserved a chance at employment. I am aware that he was ultimately hired for the position.

26.  The Ph.D program in Biomedical Sciences in an inter-department program; therefore, a Ph.D student is not "in" any particular department within the Graduate School. Students in the Ph.D program, rather, enter the program under the direction of a Major Professor. The Major Professor is located in a department; however, the student himself is not "located" there. If the Major Professor resigns, the student can arrange for a new Major Professor in the same department as his previous Major Professor, or he can identify a Major Professor in another department (e.g., Anatomy, Histology, Clinical Sciences). Either way, the end result is the same: if the student successfully completes the graduate program, he will receive a Doctor of Philosophy in Biomedical Sciences degree.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of August, 2006.

_Byron L. Blagburn_
Dr. BYRON L. BLAGBURN