IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| Christopher B. Eiland, DVM, MS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO. |
| v. ) | 2005-CV-259-VPM |
| ) | |
| Dr. Byron L. Blagburn, et al., ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF DR. CHARLES M. HENDRIX

Pursuant to 28 U.S.C. § 1746, I, Dr. Charles M. Hendrix, certify that the following declaration is based upon my personal knowledge.

1. My name is Dr. Charles Hendrix. I am a professor in the Department of Pathobiology, College of Veterinary Medicine, at Auburn University ("Auburn").

2. On December 3, 2003, I was asked by Dr. Byron L. Blagburn to attend a meeting that he had scheduled with Dr. Christopher Eiland. Dr. Blagburn informed me that he had scheduled this meeting for the purpose of resigning as Dr. Eiland's Major Professor in his Doctor of Philosophy in Biomedical Sciences program ("PhD") at Auburn. In this meeting, Dr. Blagburn informed Dr. Eiland that he was resigning as his Major Professor due to behavioral issues associated with Eiland since he began his PhD program, including an allegation of cheating. Dr. Blagburn informed Dr. Eiland that his employment in the Parasitology laboratory would be terminated and that the stipend he received for working in the Parasitology laboratory and for pursuing a PhD under him would continue until the end of January, 2004. After his resignation, Dr. Blagburn allowed Dr. Eiland ample opportunity to offer his explanation and

07/27/2006 10:22 AM FR BALCH BINGHAM   334 426 3115 TO #755918086794710  P.03
JUL 27 2006 10:22 AM FR BALCH BINGHAM   334 426 3115 TO #755918086794710  P.03

defense; he did not walk out of the room in the middle of Dr. Eiland's explanation. During this meeting, Dr. Blagburn never informed or even suggested to Dr. Eiland that he was dismissed from the PhD program. Moreover, Dr. Blagburn did not tell Dr. Eiland that he would no longer have access to the research he collected while completing his MS thesis. Finally, Dr. Blagburn never referred to Dr. Eiland as a "cheater"; rather, Dr. Blagburn told Dr. Eiland that he had been *accused* of asking a fellow graduate student to take an examination for him. I played no part in Dr. Blagburn's decision to serve or resign as Dr. Eiland's Major Professor or to end his employment in the Parasitology laboratory.

3.  After Dr. Blagburn left the room after his resignation, I remained in the room with Dr. Eiland. At this time, Dr. Eiland and I discussed potential candidates for his new Major Professor. My employment at Auburn focuses almost solely on teaching and rarely do I conduct research; therefore, I have never served as a Major Professor and could not agree to serve as Dr. Eiland's Major Professor. However, I did tell Dr. Eiland that if he wanted help in identifying a Major Professor, I would help him in any way that I could. Also, I specifically mentioned Dr. Gary Mullen as a candidate for his new Major Professor. Dr. Eiland and I also discussed the possibility of Dr. Dillon serving as his Major Professor, although I do not recall how the name was brought up.

4.  In 2003-2004, I served as the chairman of the Student Academic Grievance Committee ("SAGC"). The purpose of the Student Academic Grievance Policy ("SAGP") is to resolve grievances of students, which result from the actions of faculty or administration. The SAGP sets forth procedures which a student must follow in order to properly file a grievance. These procedures require the student to first attempt to resolve the issue through communication with the faculty and administration. If the student is unable to resolve his/her issue in this

manner, the student may request a hearing on the issue by taking his/her grievance to the SAGC. This is accomplished by taking the grievance in *writing* to the chairman of the SAGC. A written request for a hearing must be filed with the chairman of the SAGC within 20 class days of the term following that in which the grievance occurred. The SAGC has no duty or obligation to hear a grievance that does not comply with the timing or notice provisions of the SAGP.

5. I am aware that as part of this lawsuit Dr. Eiland claims that he was improperly denied a hearing with respect to his alleged dismissal from the PhD program. However, the deadline to request a hearing under the SAGP for an event that occurred in December 2003 was on or around February 11, 2004. Dr. Blagburn did not provide me, the chairman of the SAGC, with written notification of his alleged grievance on or before that date. In fact, Dr. Eiland never provided me with written notification of any grievance. Accordingly, Dr. Eiland did not comply with the timing or notice provisions of the SAGP and, therefore, did not properly file a grievance related to his alleged dismissal from the PhD program.

6. If a student has a grievance regarding actions of a Major Professor, faculty member or administration, the SAGC would be the appropriate place to file a grievance related to those actions.

7. I am aware that Dr. Eiland has claimed that he immediately requested a hearing when informed that Dr. Blagburn was resigning as his Major Professor. This is inaccurate; Dr. Eiland did not request a hearing at any time during the December 3, 2003 meeting. I am also aware that Dr. Eiland has claimed that he asked me for guidance as to how to appropriately file a grievance related to his alleged dismissal from the PhD program. This statement is also inaccurate; Dr. Eiland and I at no time discussed what steps he should follow if he wanted to file a student academic grievance with respect to his grievance against Dr. Blagburn.

3

8. The Alabama Veterinary Professionals Wellness Program ("Wellness Program") was established in 2001 and is sponsored by the Alabama State Board of Veterinary Medicine Examiners ("Board") and the Alabama Veterinary Medicine Association ("ALVMA"), under a contract with the Medical Association of the State of Alabama. The Wellness Program's primary purpose is to improve the health and well-being of veterinary professionals by encouraging prevention and early identification of problems that can lead to physical or mental impairment, which, if left untreated, could adversely affect a veterinary professional's ability to practice veterinary medicine safely. The Wellness Program is assisted and supervised by the Alabama Veterinary Professionals Wellness Committee ("Wellness Committee"), a group of up to 15 veterinary professionals who are nominated by the ALVMA and appointed by the Board to serve for three years each. I was nominated to serve on the Wellness Committee and began serving my first term in 2001. My term on the Wellness Committee was renewed in 2004. As a member of the Wellness Committee, I had an ethical duty to report the identity of any veterinary professional who I suspected may have a mental impairment or substance abuse problem which could adversely affect their ability to safely practice veterinary medicine.

9. I had known Dr. Eiland for several years before he entered the PhD program at Auburn. During this time, I had always known Dr. Eiland to be an excellent student and had never witnessed or heard of him having any behavioral problems. Therefore, when Dr. Eiland's behavior so drastically changed after he entered the PhD program, I was concerned that he may have been suffering from some sort of impairment which could adversely affect his ability to practice veterinary medicine safely. Therefore, pursuant to my ethical duties as a member of the Wellness Committee, I identified Dr. Eiland to the chairman of the Wellness Committee as a veterinary professional who might be suffering from an impairment. The chairman of the

Wellness Committee, a physician, then handles the specific diagnosis of a mental impairment or substance abuse problem, if any. I reported Dr. Eiland to the Wellness Committee, first, because it was my ethical duty and, second, because I was legitimately concerned for his well-being.

I declare under penalty of perjury that the foregoing it true and correct. Executed on this 27th day of July, 2006.

*DR. CHARLES HENDRIX*