IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED

2006 AUG 30  A 9: 56

CHRISTOPHER B. EILAND, DVM, MS, §

§    CASE NUMBER:
Plaintiff,                              2005-cv-459-W

§

v.

§

DR. BYRON L. BLAGBURN, et al.,

§

Defendants.

§

## PLAINTIFF'S OPPOSITION RESPONSE BRIEF TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In response to the Motion by Defendants for summary judgment filed on August 1, 2006, this Court issued an order on August 9, 2006, requiring that the Plaintiff file his Opposition Response to said Motion on August 31, 2006. Therefore, this Opposition Response is timely submitted, together with supporting brief, affidavits, deposition pages, and exhibits.

### INTRODUCTION

This is a meritorious claim of federal questions resulting in violations of the Plaintiff's civil rights, as well as certain pendent state law claims, by the Defendants. There are genuine issues of fact to warrant a denial of the Defendants' motion for summary judgment. As the following brief will demonstrate, Defendants are not entitled to summary judgment.

### SUMMARY

This case involves Christopher Eiland's arbitrary and willful dismissal from his Ph.D. program, the Pathobiology Department, and his position as a Graduate

1

Research Assistant in the parasitology laboratory at Auburn University in Auburn, Alabama. This unlawful action occurs after Christopher Eiland had spent considerable time and money at Auburn University, earning three degrees, and distinguishing himself as a leader and as an outstanding professional student. Dr. Eiland was a student at Auburn University from 1993 to December of 2003. (Plaintiff's Exhibit 1).

Key figures involved in this unlawful conduct include:

1. Dr. Byron Blagburn, Distinguished University Professor at Auburn University, who served as Christopher Eiland's major professor, and encouraged him to remain at Auburn University beyond receiving his Doctor's of Veterinary Medicine (DVM) degree. Dr. Blagburn summarily dismissed Christopher Eiland on December 3, 2003, at the request of Dr. Lauren Wolfe.

2. Dr. Lauren Wolfe was, at the time of Eiland's dismissal, a Professor and Department Head, Department of Pathobiology at Auburn University. Dr. Wolfe told Dr. Blagburn to dismiss Dr. Eiland from the Department of Pathobiology.

3. Dr. Joseph Janicki, at the time of Eiland's dismissal, was Associate Dean of Research and Graduate Studies.

4. Dr. Charles Hendrix is a professor at Auburn University in the Department of Pathobiology. **He serves as chairperson of the Student Academic Grievance Committee.** He is an expert in the field of parasitology. His primary responsibility is in the area of

2

> teaching. **He does not have much involvement with research
> and never serves as a major professor for a graduate student.**

5.      Jamie Butler – Lab supervisor during the period of time that Dr.
Eiland worked in the parasitology lab as a professional veterinary
medicine student and graduate student at Auburn University. Ms. Butler's
immediate supervisor was Dr. Blagburn. Ms. Butler submitted a summary
of complaints against Dr. Eiland in the summer of 2004 at the request of
Dr. Blagburn. (Plaintiff's Exhibit 2) Dr. Eland worked as a Graduate
Research Assistant for an annual salary of $47,000.00 at the time of his
dismissal from the Department of Pathobiology. (Plaintiff's Exhibit 3)

Following Eiland's dismissal, Doctors Blagburn, Wolfe and Janicki
followed through on a promise to provide him with good
letters/recommendations, if he would just leave. (Plaintiff's Exhibits 4).

For Eiland the dismissal meant leaving not only the university
where he had spent approximately ten years, but a career dream of
becoming a parasitologist. Dr. Eiland obtained a DVM from the School of
Veterinary Medicine and a Master's Degree in Biomedical Science. Had
he been allowed to complete his Ph.D., his career options and his ability to
earn significant income, would have been wide open. With a Ph.D. Dr.
Eiland could have pursued a position at a university or a major
pharmaceutical company. Both career options were discussed with his
mentor, Dr. Blagburn.

In fact, his mentor, Dr. Blagburn, was very influential in Dr. Eiland's decision to remain at Auburn University after earning his DVM and pursuing a Ph.D.

In addition to Dr. Eiland's dismissal, his good name and reputation were defamed.    Dr. Eiland was elected President of his Veterinary Medicine Class and then re-elected each year thereafter by his peers.  Dr. Wolfe states in the recommendation that he provided for Dr. Eiland that in his twenty-three (23) years at Auburn University that he had only known one (1) other individual "to earn that degree of support from his classmates".  (Plaintiff's Exhibit 3).

## FACTS GIVING RISE TO CAUSE OF ACTION

**Dr. Eiland - student at Auburn University from 1993 to Dec. 2003**

**Undergraduate degree 1993-1997**

Plaintiff, Dr. Christopher B. Eiland, is a thirty-one-year-old (DOB 06/27/1975) male, who graduated from high school in 1993 and entered Auburn University as an undergraduate that same year. Dr. Eiland earned a Bachelor of Science Degree in Animal and Dairy Science in 1997. (Eiland dep. p. 9, lines 7 – 13).

After receiving his Bachelor of Science Degree, he remained at Auburn University taking upper-level science courses, such as biochemistry, comparative anatomy, and advanced physiology. Dr. Sartin, a professor in the veterinary school, suggested that these courses would help prepare Dr. Eiland for veterinary school. (Eiland dep. p. 10, lines 15-21).

### Dr. Eiland begins Master of Science program in 1998

Dr. Eiland entered a Master's of Science program with the discipline of parasitology in 1998. To complete this program Dr. Eiland had to take a required number of courses and participate in a research project to be published. Dr. Blagburn, Eiland's major professor, used his research in DVM Best Practices Feline medicine in June of 2004 and again in 2005. (Eiland dep. Volume 1, pp. 5, lines 13-15; 7, lines 15-20; 9, lines 1-23; 10, 1-23; 11, lines 3-23; 12, lines 1-3; 21, lines 20 – 23; 22, lines 1-4; Dr. Eiland's transcript from AU; Blagburn dep. p. 14, lines 19-20).

Dr. Eiland's research project "consisted of going to the humane society. Cats that were to be euthanized were—we collected data from them. We collected blood, we did x-rays, we gave physical exams, we necropsied them, took their heart out and lungs, looked for adult heart worms. We fixed lung lobes with glutoaraldehyde for histopathology later. We took fecal samples. We totaled up a number of prevalence for ear mites. With the blood work we ran CBC's and blood chemistries, I think. We also ran serology, FELV, which is leukemia virus in cats, FTV tests to test their prevalence. We also sent off the blood work to Animal Diagnostics to test for positive serology for heart worms in cats. We also ran in-house tests." There was an Advisory Committee supervising the research. Dr. Byron Blagburn, Dr. Jenny Spencer, Dr. Joseph Newton, and Dr. Ray Dillon were the members of this committee. Dr. Byron Blagburn served as his major professor. (Eiland dep. Volume 1, pp. 12-14).

5

**Dr. Eiland enters school of veterinary medicine in 1999**

**Eiland works on dual degrees (Master's and DVM) simultaneously**

In the fall of 1999 Dr. Eiland entered the doctor of veterinary medicine program. Dr. Eiland was accepted into the college of veterinary medicine after a year's enrolling in the master's program. Dr. Janicki and Dr. Wolfe allowed him to be in the dual programs simultaneously. Dr. Janicki is the associate dean of research at the college of veterinary medicine. Dr. Wolfe was the head of the department of pathobiology at the college of veterinary medicine.

Drs. Janicki, Wolfe, and Blagburn agreed to allow Dr. Eiland to pursue both his DVM and his Master's Degree simultaneously. The DVM program is set up to graduate veterinarians. It requires two to three years of course work and clinical work during a student's last year in the program. Dr. Eiland earned his Veterinary Medicine Degree on May 6, 2003. (Eiland dep. Volume 1, pp. 17, lines 8-23; 18, lines 1-20; Transcript; Eiland dep. Volume 1,  pp.30, lines 6-12; 32, lines 4-23; 33, lines 1-13;).

**Dr. Eiland is elected Class President of his veterinary medicine class**

**He is re-elected each year by his peers for all four years of vet school**

Dr. Eiland was president of his class at the college of veterinary medicine. He was re-elected each year for four years by his classmates in the college of veterinary medicine. This would certainly indicate that he was respected by his peers in the college of veterinary medicine. Additionally, as the class president, he served as the liaison between the faculty and the students. He had a good relationship with all faculty members. (Eiland Volume 1, dep. p. 35, lines 2-18).

6

**The two most important professors during Eiland's tenure at AU: Drs. Blagburn and Hendrix**

Drs. Blagburn and Hendrix are experts in the field of parasitology. "There's two people there who know the most about parasitology, and that would be Dr. Blagburn and Dr. Hendrix. They are the experts in the field of parasitology." (Eiland Dep. Volume I, p. 37, lines 2 – 12). Dr. Eiland did not know anyone at the college of veterinary medicine more knowledgeable in the field of parasitology than Dr. Blagburn. He wanted to know as much as he could about parasitology, because he wanted to be a parasitologist. (Eiland dep. Volume 1, pp. 20, lines 7-12; 37, lines 2-12; 39, 4-12; 64, lines 1-15).

Dr. Blagburn began his employment at Auburn University on March 1, 1982. He currently holds the position of Distinguished University Professor, Department of Pathobiology, College of Veterinary Medicine. He has had that title since 1999. (Blagburn dep. pp. 8-9). Dr. Blagburn was instrumental in Dr. Eiland's interest in pursuing his Ph. D. in the field of parasitology. (Eiland affidavit).

Dr. Eiland had a good relationship with all of the faculty members during his tenure at Auburn University, particularly with Dr. Blagburn. Dr. Blagburn was very helpful. Dr. Eiland was drawn to Dr. Blagburn because of his interest in parasitology. Dr. Blagburn is a world-renown parasitologist. (Eiland Dep. p. 35, lines 12 – 18).

7

## Dr. Eiland enters Ph.D Program at Dr. Blagburns encouragement

Dr. Blagburn recommended that Dr. Eiland continue his education beyond the DVM program at Auburn University. Even though Dr. Blagburn encouraged DVM students to pursue alternative career paths and a PhD, he could not recall a single student, other than Dr. Eiland, who had pursued a PhD following his or her DVM as Dr. Eiland did. (Blagburn dep. p. 43, lines 16-21). In fact, Auburn University had had difficulty in recruiting veterinarians into the PhD programs. (Blagburn dep. pp. 44, lines 2-3; 56, lines 10-13).

Dr. Eiland entered the doctor of philosophy program in biomedical sciences, Ph. D., program under the supervision of Dr. Blagburn. The final authority for acceptance in the Ph.D. program was given by Dr. McFarland, dean of the graduate school. Dr. Blagburn had to clear Eiland's acceptance with Dr. Janicki, associate dean of research with the graduate school. (Eiland dep. Volume 1, pp. 59, lines 19-23; 60, lines 1-3).

At the end of Dr. Eiland's master's thesis, Dr. Blagburn told the committee that Dr. Eiland was going to continue in his Ph. D. and continue doing the work with feline heart worm disease that he started in his master's program. Dr. Eiland was going to use the excess information from the two-year study he did and use it towards his Ph.D., which may consist of more research of experimentally infecting cats with heart worms and comparing the two. (Eiland Dep. Volume I, p. 53, lines 5 – 15).

## Dr. Eiland expressed interest in parasitology early in his education at AU

Dr. Eiland expressed his interest in parasitology research during his

sophomore year. "Chris was involved in sort of a joint matriculation program in which he was enrolled in the professional degree program, and at the same time enrolled in the graduate school." Beginning maybe sometime during his sophomore year as a professional student, we discussed his enrollment as a Master's candidate, discussed his research topics." (Blagburn dep. p. 14, lines 3-14).

"Chris worked as a student assistant for us for a number of years. And my guess is that it was probably brought up sometime during his – during his tenure as a student assistant even before he got into veterinary school." (Blagburn dep. p. 53, lines 6 – 14).

**Dr. Blagburn serves as major professor for Dr. Eiland's Master's and Ph. D.**

Dr. Blagburn served as Dr. Eiland's major professor for two periods. "I would say 2001 through, I think, December 2003. And that would have encompassed his Master's program as well as a short period of time when I advised him during his doctorate program." Dr. Eiland actually began his Master's program in 1998. (Blagburn dep. pp. 13, lines 18-23, 14, lines 21-23; 15, lines1-2; Eiland Aff.).

**Responsibilities of a major professor of graduate student**

Dr. Blagburn serves as a major professor for graduate students. As a major professor his responsibilities are to "help the student identify an advisory committee, which is a group of individuals, which together with the major professor, will advise that student on his or her course work, his or her research, help them design it and monitor their progress. But ultimately, principally, it's the

responsibility of the major professor to provide guidance for the committee and to deal with any issues or problems that arise and to solve those problems". (Blagburn dep. p. 12, lines 4-18).

### Selection process for a graduate student's major professor

Q:     Explain the process used at Auburn University for selecting a major professor.

A:     Well, normally, it would depend on the application process. If the applicant was unbeknownst to us and applied via the Internet or simply made inquiries to the college but had an interest in one discipline or another, that individual might be given the names of persons to talk to. If that person enrolled in the college – or enrolled in the graduate school and was accepted because of prior record – and we've had students, for example, who came to us from premiere institutions with graduate exam score that would put them in the 99% percentile – and those are very desirable students. We don't necessarily know them, and so they might rotate through different laboratories. And what I mean by that is they might do two weeks in my laboratory, two weeks in another faculty member's laboratory. And at the end of that rotation, they would decide based on their interest who they wanted to work with.

Another way, which is certainly more the way Dr. Eiland, is to – by prior relationship, you know, either as a student assistant or by daily interactions a faculty member might say, "I'd like to work with you." You know, "Can we do this." (Blagburn dep. pp. 49, lines 10 – 23; 50, lines 1 – 16).

"......he and I ---- because he was a student assistant, because he had an

10

interest in parasitology, I decided that --- well, let's go ahead and try to do a Master's. Let's see how well this works. And in my program, I like to require that students do Master's." (Blagburn dep. p. 51, lines 2 – 14).

".......we see which professor best fits their particular interests. If they fit their interest, then you become their major professor; otherwise, someone else does." (Dillon dep. p. 8, lines 3 – 8).

"The role of the major professor is to oversee that process and to make a decision when there's a disagreement between Dr. Eiland and a committee member, between two committee members. Someone has to take charge and manage the situation. That's the role of the major professor." (Blagburn dep. p. 23, lines 11 – 18).

Dr. Eiland never had a problem with Dr. Blagburn or Dr. Hendrix during his tenure at Auburn University until December 2003. (Eiland dep. Volume I, p. 42, lines 19 – 23).

## Dr. Eiland's Ph. D. would be a continuation of his Master's Thesis

Dr. Eiland worked in the laboratory and performed research in the area of feline heartworm infection disease while pursuing his Master's thesis. Dr. Eiland and Dr. Blagburn discussed the fact that he would continue at Auburn University in the PhD program and that his research would be a continuation of his Master's degree research. Dr. Eiland's advisory committee for his PhD program would more than likely be the same individuals serving on his Master's program.

Dr. Eiland did an excess amount of research during his Master's program that would have carried over to the Ph. D. program. "He did some work that

11

certainly wasn't included in any detail in his Master's thesis.  We had talked about perhaps using some of that additional work in pursuit of his doctoral degree."  **"Although we had not nailed it down in detail entirely for his PHD program, we presumed in my discussions with Chris and with other members who were likely to serve on his committee or who were involved in the past, that his doctoral disorientation would be a continuation in some sort of work that he had done as a Master's candidate."**  (Blagburn dep. pp. 15-16).

Dr. Blagburn encourages veterinarians to consider alternative career paths. (Blagburn dep. p. 25, lines 10-23).  Having a PhD in addition to Dr. Eiland's DVM would have improved his marketability with a pharmaceutical company. (Blagburn dep. p. 27, lines 12-17).

**Advisory Committee for Ph. D. Program**

Dr. Eiland entered the doctor of philosophy program in biomedical sciences in August of 2003 for the fall semester.  Fall semester was the period August 20, 2003, and December 17, 2003,  (Eiland dep. Volume I, p. 47, lines 17 – 21;  Eiland Aff.).  The members of Dr. Eiland's advisory committee at the Master's level were Dr. Blagburn, Dr. Jenny Spencer, Dr. Joe Newton, and Dr. Ray Dillon. (Blagburn dep. p. 17, lines 10-15).  It would make perfect sense for those members to continue as advisors throughout Dr. Eiland's PhD program. As Dr. Blagburn testified in his deposition, "it would be wise, prudent, to include persons who were experts in those areas who could better advise us on those components of the research."  (Blagburn dep. p. 18, lines 6-10).

Dr. Eiland's advisory committee was very pleased with his research work for his Master's. There were no deficiencies that needed to be addressed. "Actually the committee was quite happy with Dr. Eiland's performance in that Master's thesis." (Blagburn dep. p. 24, lines 2-8). "Because during his Master's program, he had performed certainly acceptably, and all committees signed off on his work. His course work, at least to the extent that I was familiar with it, was well done. I didn't have any problems with it. So to discuss a continuation wouldn't be out of the ordinary at all under those situations – under that situation." (Blagburn dep. p. 26, lines 5-13).

Dr. Blagburn cited Dr. Eiland's research in the DVM Best Practices Feline Medicine in June of 2004 and in June of 2005, he used his research. (Eiland dep. Volume 1, pp. 21, lines10-23; 22, lines 1-8).

Dr. Eiland and Dr. Blagburn planned to continue the same Master Thesis study in greater depth and to use the same advisory committee. (Eiland dep. Volume 2 p. 12, lines 10-20).

During Dr. Eiland's exit interview, Dr. Blagburn told the members of his advisory committee that Dr. Eiland was staying at Auburn University and would continue doing the work with feline heart worm disease that he had started in his Master's research. Dr. Eiland had collected an excess amount of data that would be used towards his Ph.D. program. (Eiland dep. Volume 1, p.53, lines 1-15; 57, lines 1-13).

Dr. Blagburn does not deny that he may have discussed with the advisory committee members for Dr. Eiland's Master's thesis, the possibility of continuing

as his advisory committee for his PhD program. The graduate school "has made every attempt to encourage mentors, major professors and candidates to identify committees as soon as possible, to identify course work as soon as possible." (Blagburn dep. p. 31, lines 10-15).

**Ph. D. Plan of Study**

Dr. Eiland began his Ph. D program on August 15, 2003. (Blagburn dep. p. 32, lines 3-7). A plan of study is usually placed in a graduate student's file two to three months into the program. (Blagburn dep. p. 31, lines 21-23; p. 32, lines 1-2). "Some candidates who have a very, very good idea of what they want to do and have decided on their research topic and have a good idea of supportive course work that would be necessary, or if we, at this point, would have been knowledge of what supportive course work was necessary, we could do it right away." (Blagburn dep. p. 32, lines 14-22). Dr. Blagburn and Dr. Eiland knew Eiland's research for his PhD would be a continuation of his Master's and that the most logical individuals for his advisory committee were those same individuals on the Master's committee. **The most logical person to draft the plan of study is the major professor.** (Blagburn dep. p. 35, lines 5-8).

Dr. Dillon, Professor of Internal Medicine, testifies in deposition that he currently serves as a major professor for a graduate student and that he has a plan of study. "We require within a semester. The graduate school, I think, requires it within two semesters. Here again, that is separate from the enrollment in the graduate program. A plan of study for a Master's can be changed with the signature of the advisory committee at any point. (Dillon dep. p. 6, lines 21 – 23;

14

pp. 20 – 21).

>   Q:     Is it possible to enroll in a Ph. D. program and go six months
>   and not have a plan of study and not have an advisory committee
>   selected?
>
>   A:     I don't think so. Not to my knowledge.

(Dillon dep. p. 16, lines 2 – 6).

In the Ph.D. program Dr. Eiland was continuing with his research from the Master's program, but in greater depth. He was going to "investigate the histopathology behind it, the radiographs, the clinical signs, how that compared to an experimental model of experimentally infecting cats with heart worms, compare that result with the information in the natural setting that we had collected at the humane society. Hopefully, we would learn a connection between feline heart worm disease and radiographic signs of asthma, testing the serology to find a better test to diagnose these heart worm infections." (Eiland dep. Volume 1, pp. 51, lines 2-23; 52, lines 1-23).

**Dr. Eiland and Dr. Blagburn discussed career options**

Dr. Blagburn suggested the possibility of Dr. Eiland teaching at Auburn University following his PhD program. In the summer and beginning of fall of 2003 Dr. Blagburn discussed with Dr. Wolfe the possibility of Dr. Eiland replacing Dr. Hendrix. (Blagburn dep. p. 57, lines 14-16; Eiland dep. Volume II, p. 109, lines 5 - 13).

Dr. Eiland had discussed his interest in the pharmaceutical industry with Dr. Blagburn, who agreed to help him. "…….after I had seen a couple of

15

openings, to contact individuals and had encouraged – The way these things usually work is their openings are discussed—their openings are posted on their web sites usually. And I would ask Chris, 'Go see if there's anything that you like and that interests you'...... **It always helps if you have someone that you know,** and I would be happy to talk to them." (Blagburn dep. pp 26, lines16-23; 27, lines 1-8).

Dr. Eiland's career goals were to either pursue a teaching position at Auburn University or work with a pharmaceutical company in the field of parasitology. Dr. Eiland discussed these goals frequently with Dr. Blagburn, who agreed to help him achieve those goals.

Dr. Eiland was "promised by Drs. Blagburn and Wolfe --- they said that Dr. Hendrix was going to retire in a couple of years, in a year or so, so he was eligible for retirement, and they wanted me to be the next parasitologist at Auburn and take his place. Dr. Blagburn told me that the other parasitologists should always be a veterinarian with a Ph. D." (Eiland dep. Volume I, pp. 155, lines 18 – 23; 156, lines 1 – 3).

**Dr. Eiland works in the parasitology lab from 1998 – Dec. 2003**

Jamie Butler, lab supervisor, hired Dr. Eiland to work in the lab during the summer of 1998. Dr. Eiland worked as a student research assistant and a Graduate Research Assistant in the parasitology lab throughout his years at Auburn University. He was earning a substantial salary as a Graduate Research Assistant in December of 2003 when he was summarily dismissed from his Ph.D. program on December 3, 2003. (Eiland dep. Volume 1, p. 16, lines 2-9; Exhibit

3).

Dr. Eiland "worked in the lab two or three years prior to his acceptance into veterinary school, and then, during his period of enrollment in the professional degree program. And then, maybe, intermittently during the conduct of his Master's. " (Blagburn dep. p. 59, lines 1-9).

**Dr. Blagburn summarily dismisses Dr. Eiland from his Ph.D. Program and his employment as a Graduate Research Assistant on Dec. 3, 2003**

Dr. Eiland was called by Dr. Blagburn on December 3, 2003, to meet him in his office. Dr. Eiland was excited, because he thought they were going to discuss course work related to his Ph.D. program. Dr. Blagburn is a very busy man and Dr. Eiland was happy to have the chance to talk with him.

In spite of Dr. Eiland's long tenure with Auburn University, his good relationship with his major professor, his service as class president, and his academic success, he was summarily dismissed from the PhD program and his employment as a Graduate Research Assistant on December 3, 2003.    Dr. Blagburn called Dr. Eiland at his home to come to his office to dismiss him from the PhD program and his position as Graduate Research Assistant in the lab. (Blagburn dep. pp. 62, lines 4-10).    According to Dr. Blagburn there were complaints against Dr. Eiland that led to his dismissal.    The complaints were primarily from Jamie Butler, Laboratory Manager, and her close friends.

The meeting took place in the pathobiology conference room. The only persons present were Dr. Eiland, Dr Blagburn and Dr. Hendrix. Dr. Blagburn did most of the talking. He told Plaintiff, "Chris, I hate to do this, you know, this is not

my decision, but Dr. Wolfe told me that I needed to let you go or he's going to……………he started to get a little angry and said, you know, you're going around asking people to take tests for you, propositioning a female graduate student to take a statistics test for you, you know, cheating. That's unacceptable. I told him that I didn't cheat, and I was being treated as guilty without a chance to be proven innocent. He said that this cheating incident is the straw -- the final straw, the straw that broke the camel's back." (Eiland dep. Volume 1, pp. 202, 203).

Dr. Eiland was told by Dr. Blagburn to turn in all of his research information to him. A couple of months after Dr. Eiland had left Auburn University, Dr. Blagburn called him to ask where the research information was located. Dr. Eiland went to the college and showed Dr. Blagburn where he had left his research information. (Eiland dep. Volume 1, p. 25, lines 2-20). Dr. Eiland signed an agreement prior to beginning his Master's program stating that the college would need his permission to publish any of his research. (Eiland dep. Volume 1, p. 26, lines12-23). Dr. Eiland was told that he could not take his research with him and that after the December 3, 2003, meeting, he would not have access to that research. (Eiland dep. Volume 1, p. 29. lines 1-14).

Dr. Blagburn dismissed Dr. Eiland from the PhD program, just as he had been instructed by Dr. Wolfe. Dr. Blagburn told Dr. Eiland that he would make a great parasitologist, just not at Auburn, and to turn in his lab keys and clean out his desk. (Eiland dep. Volume II, p. 103, lines 1 – 8; Blagburn dep. p. 97, lines 13-22; p. 98, lines1-5).

**Dismissal came "from the top"**

"I told him I wanted a hearing on these things..............I wanted to be able to confront it. And he said when it came from the top or it came from the chief or the top, which is Janicki --- that's what he said – you don't question it. And I said I didn't think this was right. I didn't think it followed Auburn's policies and procedures. And he said that it was over and done with...........He told me he would write me good letters of recommendation to other schools. They said that I would be leaving with a clean record and I was lucky to be leaving with a clean record. That everybody doesn't leave with a clean record. And if I – I just needed to leave quietly, and it was going to stay in this room. Dr. Hendrix and Dr. Blagburn would be the only two to know about it. And they said I would make a great parasitoligist, just not at Auburn. That I could go to Georgia or Florida or somewhere else, but that it just wasn't going to work there at Auburn." (Eiland dep. Volume 1, pp. 204, 205).

Dr. Janicki heard the rumor regarding the allegation of cheating and met with Dr. Wolfe. In November of 2003, Dr. Wolfe told Dr. Blagburn that "I can't have that and won't have that", regarding the alleged complaints against Dr. Eiland. (Blagburn dep. pp.87, lines 1-23; 88, lines 1-3).

**When asked in deposition if Dr. Wolfe told Dr. Blagburn to "get rid of Dr. Eiland or he would", Dr. Blagburn responded, "I don't know that those are his exact words, but it was very clear to me that that's what he meant."** (Blagburn dep. p. 101, lines 19-23).

Dr. Blagburn made it clear that Dr. Eiland was dismissed from his Ph.D.

program. There was nothing mentioned about his just stepping down as his major professor. (Eiland dep. Volume 1 pp. 206, lines 22-23; 207, lines 1-6; 213, lines 4-9). Dr. Eiland was told to turn his research, his keys to the lab, and his card to get into the building and that after that date he would not be able to use his research anymore. Dr. Eiland was told it was over and done and to "move on with his life". There was no talk regarding alleged complaints against Dr. Eiland and no opportunity for him to defend himself. It was over and done. (Eiland dep. Volume 1, pp. 207, lines 7-10; 208, lines 1-4).

Dr. Blagburn and Dr. Hendrix told Dr. Eiland that if he would just leave, they would write him good letters of recommendation and they would pay him for December and January, even though he wasn't working in the lab, and that he would have a clean record. (Eiland dep. Volume 1, pp. 173, lines 3-9; 208, lines 12-22; 249, lines 5-8).

### Eiland tells Hendrix he wants due process at the Dec. 3, 2003 meeting

Dr. Blagburn left for another meeting without allowing Dr. Eiland to defend himself against the allegations. Dr. Eiland asked for a hearing. Dr. Hendrix that he really did not know what was going on in the lab, since he had been in Washington for most of the year. Dr. Hendrix (who is the chair person of the Student Academic Grievance Committee) told Dr. Eiland to take it to the next chain of command, take it to Dr. Wolfe." Dr. Eiland was told that it was over and done with and to move on with his life. (Eiland dep. Volume 1, pp. 205, 206; 208, lines 1-4 Eiland Aff.).

**Dr. Hendrix supports that the decision to dismiss Dr. Eiland is from the top**

Dr. Hendrix and Dr. Blagburn told Dr. Eiland that it was not their decision, but Dr. Wolfe's decision. (Eiland dep., Volume 1, p. 250, lines 16-22). Dr. Eiland was no longer allowed in pathobiology, after that December 3, 2003, meeting with Dr. Hendrix and Dr. Blagburn. (Eiland dep., Volume 1, p. 251, lines 1-4).

There are procedures to follow to expel a student from a university, or a department, or to resign as a major professor. Those procedures were not followed. (Eiland dep. Volume 1, p. 210, lines 4-16).

**Dr. Janicki changes the story and causes more confusion for Eiland**

On or about **December 9, 2003**, Dr. Janicki told Dr. Eiland that he was not dismissed from his Ph. D program**, but that he had to select a new major professor before spring semester.** If the Court determines that Eiland was not dismissed from the Department of Pathobiology, but that the only action tacken was that Dr. Blagburn stepped down as his major professor and fired him from his position in the lab as a Graduate Research Assistant, then Dr. Eiland was constructively dismissed from the department. He had no other choices before him, but to try to salvage his reputation by submitting to these university power players in order to get good letters of recommendation to other schools. **The semester was over on or about December 17, 2003. Students and faculty left campus for Christmas holidays and break from school. Spring semester began January 13, 2004**. (Plaintiff's Exhibit 5).

Eiland, who is very confused, but hoping that maybe Dr. Janicki was correct, asked Dr. Dillon, the only other person left at the Auburn University campus who could possibly assume the position as major professor. Dr. Dillon declined stating he was "not a good match". (Dillon dep. p. 8, lines 2 – 12; Eiland Aff.)

Even if Dr. Blagburn had only resigned as his major professor, Dr. Eiland had no alternative, but to leave the school, because nobody else would take Dr. Blagburn's place as his major professor. Dr. Dillon was the next most logical person to assume that position, following Dr. Blagburn and Dr. Hendrix, and he had no funding and states in his deposition that he was not the right person, because his credentials were not a good match for Dr. Eiland's interest in parasitology. Dr. Dillon is very clear that he would not have been Dr. Eiland's major professor:

Q:     Are you familiar with Doctor Chris Eiland?

A:     Yes.

Q:     Would you have fit the match for a major professor of his?

A:     No.

Q:     And could you explain why that would be?

A:     Because I only am major professor on people who are in our program in internal medicine, doing a residency, training toward certification, and Chris would not fit that nor did he apply for that nature of a position.

(Dillon dep. p. 8, lines 8 – 19).

Furthermore, Dillon states that he "would not be qualified". (Dillon dep. p.

22

22, lines 10 - 16). Dr. Dillon told Dr. Eiland that if Dr. Blagburn let him go, nobody else would take him (Eiland dep. Volume 1 p. 172, lines 16 – 22).

Dr. Eiland was dismissed from his Ph. D. program. Nobody would step up to the plate to help him, leaving him absolutely no alternative, but to do as Dr. Blagburn asked and just leave.

**The only help Eiland received was help to leave the university**

The only help that Eiland received was help to get him out of Auburn University. Drs. Wolfe, Blagburn, and Janicki wrote absolutely glowing recommendations for Dr. Eiland to another university. (Plaintiff's Exhibit 4). **Notice that all three of these professors stated in their recommendations that Dr. Eiland got along well with people, was mature, and intelligent.** It is clear from their actions that these three professors wanted to get rid of Dr. Eiland.

**The girls in the lab wanted to get rid of Eiland**

Dr. Eiland was told by another veterinary student, Peter Christopherson, to be careful because the girls in the lab are trying to get rid of you". (Eiland affidavit, Eiland dep. Volume 1, p. 154, lines 4-17).

Indeed, most of the complaints came from Jamie Butler, or one of her close friends, Tracy Land and Brandy Brunson. Land and Brunson socialized with Butler outside of Auburn University. (Butler dep. p. 14, lines 9-23; 15 lines 1-9).

**Jamie Butler had motive and opportunity to sabotage Dr. Eiland**

Dr. Blagburn was Jamie Butler's immediate supervisor. The other

23

parasitologist and professor with an office in the lab was Dr. Hendrix. Had Dr.
Eiland completed his Ph. D. program and replaced Dr. Hendrix as one of the
professors at Auburn University, he would have become one of Jamie Butler's
supervisors, something she would not have wanted to happen. (Eiland dep.
Volume I, p. 156, lines 1 - 8; Butler dep. p.16, lines 6-16).

**Complaints against Dr. Eiland that led to Dr. Blagburn dismissing him from
his Ph. D. program and his position as a Graduate Research Assistant**

In August of 2003, Jamie Butler, parasitology lab supervisor, began
making complaints against Dr. Eiland to her supervisor, Dr. Blagburn. Keep in
mind that Dr. Eiland had worked in the lab since 1993, intermittently throughout
his education at Auburn University.

Eiland had graduated from the Veterinary Medicine program. Jamie Butler
claimed that the Plaintiff wanted to be called "Dr. Eiland". Dr. Blagburn agrees
that it would not have been wrong to call him "Dr. Eiland". (Blagburn dep. p. 68,
lines 14-17).

Another dispute between Jamie Butler and Dr. Eiland is whether he could
take diagnostic calls from the lab (Blagburn dep. p. 63, lines 8-16). Tracy Land
called Dr. Blagburn on his cell phone en route to his mother's home on Labor
Day week end of 2003 to inform him that Dr. Eiland was confrontational with
other students and lab staff. (Blagburn dep. p. 65, lines 20-23). Dr. Blagburn
told Dr. Eiland to go home. When pressed regarding what was meant by
confrontation with other students, he testified that Dr. Eiland "demanded to be
called "Dr. Eiland". (Blagburn dep. p. 66, lines 18-21).

Jamie Butler told Dr. Blagburn that Dr. Eiland rearranged her desk and moved file cabinets. None of the complaints from Jamie Butler, or anyone else, were written or formal complaints. Jamie Butler later submitted a chronology of the various complaints in the fall of 2003. (Blagburn dep. p. 72, lines 2-8). Dr. Eiland allegedly subscribed to pornographic materials and had them sent to a client that had angered him. (Blagburn dep. p. 73, lines 4-8). Jamie told Dr. Blagburn that Courtney, an undergraduate student, was being harassed outside the college by Dr. Eiland after hours.   Dr. Blagburn testified that it was not his responsibility to police what went on outside the lab and he advised Courtney to contact the campus security. (Blagburn dep. p. 74, lines 3-11).

**Jamie Butler's complaints about Dr. Eiland began in August 2003 and ended in October 2003. She only reported these complaints on three occasions to Dr. Blagburn and two of them involved the Courtney incident:**

Q:    So, the second and third time were both regarding Courtney?

A:    Yes, probably.

(Butler dep. p. 33, lines 10-12).

After Jamie Butler's first complaint to Dr. Blagburn around August 23 or 24, 2003, Dr. Eiland was moved from Room 151 to Room 153:

A:    ................ He had completed most of his work on his Master's which required him to be in the lab. He did some of his work at the Humane Society and then would come back to the lab to do hearts or whatever he needed to do for that part of the project.

Probably ---- I don't really remember exactly how long. Probably no more

than a couple of hours a day that we were actually in the same room, especially once Chris was moved over to Room 153.

**He was in the room next door. I am not sure exactly when he was there. It does have a separate entrance and is a separate laboratory.**

Q:    When was he moved to 153?

A:    That would have probably been after that weekend in August, as I am checking this, 23rd or 24th, at some point after that, after I made Doctor Blagburn aware of the events of that week end.

……………………………………………

So, at some point during the week after that, after Doctor Blagburn and I discussed that he felt it would be better for Chris to be in 153. So we made some arrangements.

(Butler dep. pp. 20, lines 9 – 23; 21, lines 1 - 23).

After Dr. Eiland was moved to the lab in Room 153, Butler did not see him that much. In fact, Eiland was in the room next door and Butler wasn't sure when he was there!  (Butler dep. p. 20, lines 17 – 22).

Dr. Blagburn testifies that he told Dr. Eiland to "stay out of the laboratory". There were three laboratories on that hall.  (Blagburn dep. p. 76, lines 8- 20).

It is worthy of note that two of the individuals making complaints about Dr. Eiland to Dr. Blagburn were friends of Jamie Butler's, Tracey Land and Brandi Brunson.   They socialized outside of the work environment.   In fact, Butler described Brunson as a "close friend":

A:    I am friends with her, so I probably see her more often and stop by

26

to say hello, a social type of thing.

    Q:    When you say you are friends with her, you are friends socially with

her, outside of the Auburn setting?

    A:    Yes.

    Q:    Do you visit in her home?

    A:    Yes.

    Q:    And she visits in your home?

    A:    Yes.

    Q:    How long have you been friends? ...............

...............................................................

    A:    .........Probably three to five years ago.

    Q:    Would you say that she is one of your best friends?

    A:    I would classify us as close friends.

(Butler dep. p. 14, lines 9-23; 15, lines 1-9).

Jamie Butler and Tracey Land are friends, as well. They socialize outside of the Auburn University setting. Butler's summary that was prepared for Dr. Blagburn references that she and Tracey went to yard sales on the Saturday morning of August 23, 2003. Tracey called her the next day at home. Additionally, in this summary prepared by Jamie Butler, there are references to incidents when she was not even present. (Plaintiff's Exhibit 2).

**Jamie Butler, Tracey Land and Brandi Brunson are close friends and had access to every person who allegedly made complaints about Eiland**

Three individuals making complaints against Dr. Eiland were all females

27

and friends, Jamie Butler, Tracey Land, and Brandi Brunson. A fourth female was Courtney, who talked to Dr. Blagburn at the encouragement of Jamie Butler:

Q:    Did Courtney ever report this to anybody other than you?

A:    After she made me aware of this, I knew Doctor Blagburn would want to speak to her about that. So, they did speak about what had gone on.

(Butler dep. p. 31, lines 19 -22)

………………… **Of course, I just kind of facilitated her talking to Doctor Blagburn, you know, you need to be aware of this, sort of thing.**

(Butler dep. p. 33, lines 6 – 9).

The allegation regarding the cheating incident supposedly was made by a female, but Auburn University has denied that any charges of cheating were ever brought against Dr. Eiland. (Plaintiff Exhibit interrogatory responses) What we have here is a group of females in the parasitology lab gossiping about a graduate student and making frivolous complaints to his supervisor, Dr. Blagburn, who happens to also be Jamie Butler's supervisor. (Butler dep. p. 36, lines 6 – 10; 38, line 2).

**It turns out that Jamie Butler only made three reports to Dr. Blagburn:**

Q:    You said you reported three or four times to Doctor Blagburn during that August 2003 to December, and we are at Number 3. What is the next time?

A:    It may have been only three. There may have been some things in the middle. I don't really recall. Those were three events that I know for sure that I reported to Doctor Blagburn. There may have been a couple of other times

28

that he simply said, Is everything going okay? And I said, well, something minor perhaps.

(Butler dep. p. 34, lines 7 – 18).

All of the informal complaints occurred between mid-August and early December 2003. The complaints named above were the principal incidents that led Dr. Blagburn to dismiss Dr. Eiland from the PhD program. (Blagburn dep. p. 74, lines 16-20).

Peter Christopherson told Dr. Blagburn that he saw Dr. Eiland rummaging through Brandy Brunson's desk looking for notes for a class that he missed. (Blagburn dep. p. 78, lines 18-23). According to Dr. Eiland, Brandy had told him that he could have a copy of her notes for the class that he had missed. (Eiland affidavit).

Lori Nelms, a graduate student, allegedly reported that Dr. Eiland had asked her to take a statistics test for him. (Blagburn dep. p. 80, lines 5-11). Dr. Eiland denies ever propositioning Lori Nelms to take a statistics test for him. He had made arrangements with his statistics professor to get an incomplete grade for fall semester, audit the class in the spring, and retake the test in the spring. (Eiland dep. p. 160, lines 6-12). There was never a formal complaint made of cheating or an attempt to cheat. (Plaintiff's Exhibit 5).

Another complaint also reported by Brandy Brunson was that he fell asleep in Dr. Sartin's class. (Blagburn dep. p. 84, lines 3-13).

Dr. Blagburn had his first talk with Dr. Eiland about the complaints in August of 2003. He had another talk with him about three weeks later. Dr.

Eiland denied the allegations against him.  (Blagburn dep. p. 81, lines 2-14;
(Blagburn dep. p. 82, lines 5-10).  Dr. Eiland told Dr. Blagburn that he thought the
allegations were blown out of proportion, of being insignificant.  He denied them.
Never admitted to any of them.  (Blagburn dep. p. 89, lines 3-8).

The last complaint was from Stuart Price, who said that as he was leaving
work at 11:30 or 12:00 on a Friday or Saturday night, Chris Eiland jumped out of
the bushes and said that he was picking plants, and he was going to take them
home and grow them.  (Blagburn dep. pp. 85-86).

## Dr. Hendrix contacts the Alabama Wellness Center for Veterinarians

Some time in December 2003 Dr. Hendrix contacted the Alabama
Wellness Committee regarding Dr. Eiland.  (Blagburn dep. p. 105, lines 15-21).
Dr. Skipper from the Alabama Wellness Committee contacted Dr. Eiland by
telephone and informed him that his name had been submitted to the committee.
This committee serves all Alabama veterinarians.  Dr. Skipper told Dr. Eiland that
he was told that he was bipolar, OCD, and on drugs.  (Eiland Aff.).

## Dr. Blagburn tries to get Dr. Eiland's statistics grade changed from Incomplete to Withdrawn

Following this December 3, 2003, meeting, Dr. Blagburn tried to get Dr.
Eiland's statistics grade changed from an incomplete to a withdrawal.  "I did
make a couple of telephone calls to Professor Billor –is that it—never reached
her.  I got her voice mail.  She called me back a couple of times, and we never
spoke.  And then it occurred to me, probably after our fourth attempt to talk, that
perhaps it was inappropriate for one faculty member to try to encourage or

discuss another faculty member's grade change policies." (Blagburn dep. pp. 102, lines18-23; 103, lines 1-7). Why would Dr. Blagburn be concerned about changing another professor's grade from an Incomplete to a Withdrawn prior to the end of the semester, unless he wanted to make sure it appeared that Dr. Eiland had withdrawn rather than being dismissed from his Ph.D. program? Four telephone calls are excessive.

## Dr. Blagburn tells Jamie Butler he needs documentation

During the summer of 2003 Jamie Butler began expressing complaints to Dr. Blagburn regarding Dr. Eiland. Butler prepared a summary of those complaints at Dr. Blagburn's request sometime between December of 2003 and summer of 2004, because "Dr. Eiland had made some complaints and he needed some documentation". (Butler dep. pp. 42, lines 21-23; 43, lines 1-3).

### Dr. Blagburn corroborates Butler's testimony:

Q:    Have you told me all the complaints from Jamie Butler –

A:    Well, again –

Q:    --- that you remember.

A:    Yeah. Right. I would ask that you visit with her, talk to her. She can share more of them with you.

Q:    Well, I understand that, and I may do that. But what I'm asking you to share are the complaints that she gave to you.

A:    Well, certainly those are the ones that I remember. It's quite probable that she came to me on other instances talking about this or that, that I don't remember, that she can document.

31

Q:      Were these written complaints or verbal?

A:      She has written and submitted to me a chronology of problems and

incidents.

Q:      But in August of 2003, did she submit written complaints to you –

A:      No.

Q:      --- for Chris Eiland?

A:      No. Not at that time.

Q:      When did she do a chronology?

A:      Sometime during fall of 2003.

(Blagburn dep. pp. 71, lines 7 – 23; p. 72, lines 1 – 8; 74, lines 14 – 20).

## There was no reason to dismiss Dr. Eiland from his Ph. D. program

Dr. Dillon testifies that he has never resigned as a major professor and

that he only knows of two reasons why that would ever occur at Auburn

University:

Q:      Have you ever stepped down or resigned as a major professor for a

graduate student?

A:      Not that I remember, no.

Q:      Are you aware of that occurring at this university?

A:      Yes.

Q:      Why does that generally occur?

A:      Usually, it occurs because there is a change in the direction of the

student or change in emphasis or sometimes a change in the funding or any

number of issues, meaning, whatever you started to do, three to five years down

32

the road changes and usually there is a switch somewhere that occurs.

Q:    So, generally, that occurs when there is a change with the student?

A:    Or a change in the funding source, which is not always

guaranteed…………….

(Dillon dep. pp. 12, lines 19 – 23; 13, lines 1 – 14).

Q:    Are there situations where a major professor may resign because

of just problems with the student?

A:    I am sure there are. I am not personally aware of any.

(Dillon dep. p. 14, lines 2 – 6).

## Eiland did not change directions in his studies

## Funding was still available

Dr. Eiland was progressing towards his career and educational goals when he was summarily dismissed from the Ph. D. program and from the laboratory as a Graduate Research Assistant. There had been no change in his career goals, since his Master Thesis. Dr. Blagburn dismissed Dr. Eiland at the request of Dr. Wolfe. (Eiland dep. p. 47, lines 17-21; Blagburn dep. pp. 100, lines 8-14; 101, lines 19-23).

During Dr. Eiland's tenure at Auburn University, he made good grades (Plaintiff's Exhibits 1 and 4) and served as class president throughout his veterinary medicine program. (Blagburn dep. p. 55, lines 13-21; Eiland dep. Volume 1 p. 35, lines 3-8).

The project Dr. Eiland began with his Master's program was continuing. Dr. Dillon states that "the project was going before Chris came and continued

after Chris left".  (Dillon dep. p. 19, lines 5 – 9).

### Dr. Blagburn says problems were not that bad

The problems were not of the magnitude that one would think should carry enough weight to dismiss a student from the graduate program.  "Not any one of them certainly being that weighty, but a combination of all of them over time." The time frame was August of 2003 to December 3, 2003.  (Blagburn dep. p. 68, lines 4-6).

## SUMMARY JUDGMENT STANDARD OF REVIEW

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact.  **Celotex Corporation v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986), 91 L.Ed. 2d. 265 (1986)**, citing, Fed. Rules Civ. Proc. Rule 56(c).  A fact is material if, under applicable substantive law, it might affect the outcome of the case.  **Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed. 2d. 202 (1986)**. It is genuine if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party.  **Tipton v. Bergrohr GMBH-Siegen, 965 F. 2d 994, 998 (11th Cir. 1992)**.  This Court considers the evidence and all inferences drawn in the light most favorable to the non-moving party.  **Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970);**

**Hairston v. Gainesville Sun Publishing Co., 9 F. 3d 913 (11th Cir. 1993).**

## LEGAL ARGUMENT

It is clear from the deposition testimony of Dr. Blagburn that he dismissed Dr. Eiland from his Ph.D. Program and from his position of Graduate Research Assistant (GRA) on December 3, 2003, at the request of Dr. Lauren Wolfe. There is simply no way to confuse Dr. Blagburn's words when he stated in deposition that he did not think Dr. Wolfe use the words "get rid of him", but "it was clear to me that that's what he meant". (Blagburn dep. p. 101, lines 19-23).

**Due Process, Procedural and Substantive**

A fundamental requirement of due process is notice to the student of charges made against him/her and the opportunity to present their objections. (*Matthews v.* **Eldridge, 424 U.S. 319, 96 S. Ct. 893, 47 L.Ed. 2d 18 (1976)**). Due process guards against unfair dismissals "if that may be done without prohibitive cost or interference with the educational process". (*Goss v. Lopez,* **419 U.S. at 579-80, 95 S. Ct. at 738-39**). Dr. Eiland never received anything in writing regarding any dissatisfaction with his work performance, academic status, or conduct. (Plaintiff's Exhibit 6). The due process clause of the U.S. Constitution, amendment XIV, provides protection from arbitrary decisions that would jeopardize a student's constitutional rights. In the instant case, there are no reasons for the actions taken by Defendants.

In *Nash and Perry v. Auburn University,* **812 F. 2d 655 (11th Cir. 1987)** *quoting,* **Dixon v. Alabama State Board of Education, 294 F. 2d at 157**, the

Court held that "the governmental power to expel the plaintiffs....is not unlimited and cannot be arbitrarily exercised. Admittedly, there must be some reasonable and constitutional ground for expulsion or the courts would have a duty to require reinstatement". The instant case is distinguished from Nash, in that there was no written notice provided to Dr. Eiland as with the Nash Plaintiffs.

The Defendants did not follow the procedures as outlined in the Graduate Assistant Handbook. According to the Graduate Assistant Handbook, Graduate Assistants are made by the head or chair of the academic department. Faculty members who have grant or contract funds designated for GRAs can suggest candidates for appointment. The Graduate Assistant Handbook states that if a graduate assistant encounters problems, he or she seek help from the faculty supervisor. It also states that "to conform with the requirements of due process, departments should also provide the following information to those receiving assistantship offers, whether through the letter of appointment, a separate document, or a departmental orientation session:

1.    Evaluation procedures

2.    Procedures and criteria for reappointment

3.    Conditions under which an assistantship could be terminated.

**"Graduate research assistants have the right to receive written notification of all decisions, actions, or contingencies that will affect their assistantship."** (Plaintiff's Exhibit 6).

Graduate students would not file a written grievance, if they had not been given written notice of specific complaints against them. The Handbook

states that before filing a grievance, graduate assistants should first inform their immediate academic advisor and seek his help. Dr. Eiland did this. If there is no resolution of the problem, the graduate student should then go to the program director or department head and continue up the chain of command to the Provost, if necessary. Dr. Eiland went to all of those individuals and was advised at every level that there was nothing they could do. "At every level of consideration, the assistant is entitled to fair and impartial review." Dr. Eiland met with his major profess, Dr. Blagburn. He met and requested a hearing from Drs. Hendrix, Wolfe, and Janicki, but was not successful. (Plaintiff's Exhibit 6; Eiland Aff.).

And even more important, the handbook states that "assistants may encounter problems in carrying out their duties, so they may become the subject of complaints or grievances brought by others. When the assistant's supervisor, academic advisor, or department head or chair receives such complaints, the graduate assistant has the right to receive prompt notification and to be offered the opportunity to respond to the complaint, presenting evidence in defense...... **The burden of proof rests on the person making the complaint."** (Plaintiff's Exhibit 6).

## Property Rights of Professional University Students

The Defendants are correct in their claim that the courts have not addressed this particular issue. The Court has the opportunity to address that issue with the instant case and right a wrong for professional university students. By the time a student reaches this level in his/her education, significant time and

money has been expended. Professional university students have reached a high level of achievement that should be protected by a property right. In the instant case, Dr. Eiland had completed his education as a professional student. He had obtained his DVM and was continuing with a Ph.D. beyond the DVM. There will continue to be confusion in this area, until the Court clarifies this issue.

To state a substantive due process claim, a plaintiff must allege the existence of a property right and arbitrary and capricious conduct on the part of the university officials by showing there was no rational basis for the university's decision or that the decision was motivated by bad faith or ill will unrelated to academic performance. Clearly, the decision in the instant case was not based upon academic performance.

**Qualified Immunity**

Qualified immunity is an affirmative defense to a 42 U.S.C.S. Section 1983 action against a government official sued in his or her individual capacity. This involves a two-step analysis: 1) whether the defendant was performing a discretionary function and 2) whether the applicable law was clearly established at the time of the challenged action. Defendants were performing discretionary functions when they dismissed Dr. Eiland from the Department of Pathobiology and from his position as at the lab as a Graduate Research Assistant.

While the plaintiffs were not successful in their claims, in the Nash and Dixon cases, and other similar cases, the Courts were clear that university students **could not be arbitrarily dismissed**. Dr. Eiland was called into Dr. Blagburn's office on December 3, 2003, and told he was no longer a Ph.D

38

student in the Department of Pathobilogy and that he no longer had a job in the lab. He was told to turn in his keys and leave.

## Defamation

Dr. Janicki told Drs. Wolfe and Blagburn that Dr. Eiland had propositioned a female student to take a statistics exam for him. Dr. Eiland considered being called a "cheater" as a defamatory statement against his good name and reputation as a licensed veterinary, former class president of the veterinary school, and Ph.D. student. Dr. Blagburn affirms that this was "the straw that broke the camel's back" in his deposition testimony. (Eiland Aff.).

Dr. Blagburn confirms in his deposition testimony that Dr. Hendrix contacted the Alabama Wellness Center regarding allegations that Dr. Eiland was bipolar, OCD, and on drugs. (Blagburn dep. p. 105, lines 15-21). If Dr. Blagburn was aware of that fact, then those allegations were also published to him.

Elizabeth Landreth told Dr. Eiland that he was being dismissed from the Department of Pathobiology because he was "on drugs". (Eiland Aff.).

Clearly, false defamatory statements were made against Dr. Eiland.

In *Liberty National Life Insurance Company and Perry Harley v. Dean Daugherty*, 840 So. 2d 152 (Ala. 2002), the Alabama Supreme Court affirmed a jury verdict in favor of the employee who alleged his employer defamed him by telling former policy holders that he had "pocketed" premiums from worthless cancer policies. The Court held that this statement constituted slander per se In the case at bar, Dr. Eiland's good name and reputation was damaged by the

39

false statements made against him, causing him to be dismissed from the

Department of Pathobiology and terminating his employee position in the lab.

Students who work in the lab as Graduate Research Assistants are students and

employees according to university policy. (Plaintiff's Exhibit 6).

All elements for defamation have been established: False statements

were made about Dr. Eiland and were communicated to others, other than

Plaintiff, that harmed his reputation, and Dr. Eiland was damaged.

## Rehabilitation Act of 1973

Under the Rehabilitation Act of 1973 it is unlawful to deprive an individual

of constitutionally protected rights because that person is regarded as having a

disability. It is clear from the evidence that the Defendants regarded Dr. Eiland

as being bipolar and/or OCD. This perception led to Dr. Hendrix contacting the

Alabama Wellness Committee and submitting Dr. Eiland's name. Dr. Skipper

from the Wellness Committee contacted Dr. Eiland by telephone and inquired

about his mental condition. This perception led to Dr. Eiland's ultimate dismissal

from the Ph.D. program and his position as Graduate Research Assistant at the

lab.

The Rehabilitation Act of 1973 expressly incorporates the remedies,

procedures, and rights set forth in title VI (29 U.S.C. Section 794a(a)(2) and

authorizes an award of backpay.

Congress abrogated the States' Eleventh Amendment immunity under

Title VI, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination

Act of 1975. Additionally, Congress broadened the act when it enacted the Civil

Rights Restoration Act of 1987, Pub. L. 100-259, 102 Stat. 28.

**Damages**

Dr. Eiland lost wages as a result of his dismissal from his position in the lab. Dr. Eiland earned a substantial salary as a Graduate Research Assistant, in addition to paid tuition. (Plaintiff's Exhibit 3).

Dr. Eiland suffered mental anguish and emotional distress. The Eleventh Circuit has correctly held that damages for emotional and mental distress may be proved by the Plaintiff's own testimony. **Banai v. The Secretary, United States Dept. of Housing and Urban Development, 102 F. 3d 1203 (11th Cir. 1997)**. In the instant case Plaintiff suffered embarrassment, headaches, and anxiety. Eiland experienced stress from losing his position as Graduate Research Assistant at the lab. He lost weight and sleep as a result of Defendant's actions. (Eiland Aff.).

The Alabama Supreme Court held in *Liberty National Life Insurance Company and Perry Hartley v. Dean Daugherty* that the evidence supported the award of $300,000 in compensatory damages, stating that the question of damages for mental anguish is for the jury.

**Declaratory Relief**

When Defendants, as in the instant case, are sued in their official capacity, the state is the real party in interest. Auburn University is an agency of the state. Contrary to the Defendant's position that the Defendants are barred from suit by the Eleventh Amendment, the Eleventh Amendment does not insulate state officials acting in their official capacities from suit for prospective

declaratory and injunctive relief. In the instant case, as in **_Hamil v. Vertrees, et_**

**_al_, 2001 U.S. Dist. LEXIS 1634 (11th Cir. 2001)**, Dr. Eiland continues to be

denied his Ph.D. degree from Auburn University.

## CONCLUSION

For all the reasons set forth above, Plaintiff, Christopher B. Eiland,

respectfully request that this Honorable Court deny the Defendant's Motion for

Summary Judgment.

Respectfully submitted this 30th day of August, 2006.

Kathryn Dickey (DIC025)
Attorney for Plaintiff

**OF COUNSEL:**

Kathryn Dickey
322 Alabama Street
Montgomery, AL 36104
(334) 262-0728
(334) 265-7696      FAX

## CERTIFICATE OF SERVICE

I hereby certify the above and foregoing has been served on the following

counsels of record, by placing a copy of the same in the United States Mail, first

class postage prepaid and properly addressed on this the 30th day of August

2006:

Honorable Lane Knight
Honorable David R. Boyd
Balch & Bingham
Post Office Box 306
Birmingham, AL 35201-0306

Honorable Lee F. Armstrong
General Counsel
Auburn University
101 Samford Hall
Auburn, AL 36849

OF COUNSEL