# DR. BYRON BLAGBURN

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                 EASTERN DIVISION

                                        **ORIGINAL**
4

5    CHRISTOPHER B. EILAND, DVM, MS,

6          Plaintiff,
                              CIVIL ACTION

7    VS.
                       FILE NO. 2005-CV-459-VPM

8
     DR. BYRON L. BLAGBURN, individually
9    and in his official capacity, DR.
     CHARLES HENDRIX, individually and in
10   his official capacity, DR. JOSEPH JANICKI,
     individually and in his official capacity,
11   DR. STEPHEN McFARLAND, individually and in
     his official capacity, DR. ED RICHARDSON,
12   in his official capacity as President of
     Auburn University, and DR. LAUREN WOLFE,
13   individually and in his official capacity,

14         Defendants.

15         *      *      *      *      *

16         DEPOSITION OF BYRON L. BLAGBURN, MS, PhD,

17   taken on behalf of the Plaintiff, pursuant to the

18   stipulations set forth herein, before Jeana S.

19   Boggs, Certified Court Reporter and Notary Public,

20   at the law offices of Kathryn Dickey, LLC, 322

21   Alabama Street, Suite B, Montgomery, Alabama,

22   commencing at approximately 1:32 p.m., Monday, June

23   12, 2006.

1  the College of Veterinary Medicine.  So, I

2  then moved to Urbana-Champaign and spent

3  four years earning a doctorate in veterinary

4  science with a major in parasitology.  I

5  received that in 1982.

6  Q  Okay.  And you answered probably my next

7  question, but are you considered an expert

8  in parasitology?

9  A  By traditional definitions, yes, veterinary

10  parasitology.  Certainly parasitology is a

11  broad field.  It involves human disease,

12  exotic animal disease, and domestic animal

13  disease.  And I think when it comes to

14  domestic and companion animal, the answer

15  would be yes.

16  Q  Okay.  After graduating from school, what

17  was your first employment position?

18  A  Auburn University.

19  Q  And when did you start there?

20  A  March 1, 1982.

21  Q  And what is your current position?

22  A  My current position title?

23  Q  Yes.

1    A    Distinguished university professor,

2         Department of Pathobiology, College of

3         Veterinary Medicine.

4    Q    Okay.  Now, how do you get the title of

5         distinguished?

6    A    Well, you're nominated by your department

7         head, your dean, your qualifications, the

8         impacts that you've had in your field, both

9         nationally and internationally, are assisted

10        by a committee of your peers at the college

11        level.  And after deliberation, examination

12        of your documents, the decision is made to

13        either award you one of the distinguished

14        chairs or not to award you.  And I was

15        fortunate enough to have been awarded one.

16   Q    And how long have you held that position?

17   A    Since 1999.

18   Q    What are your responsibilities?

19   A    In the College of Veterinary Medicine, most

20        of us -- and I'll tell you what mine are

21        specifically in just a minute.  Most of us

22        are involved in one of four disciplines:

23        Teaching, research, diagnostic services or

1  Q  Okay.  Do you serve as a major professor for

2     graduate students?

3  A  I do.

4  Q  Tell me about your responsibilities as a

5     major professor.

6  A  Well, a major professor is essentially the

7     mentor for the student.  They help the

8     student identify an advisory committee,

9     which is a group of individuals, which

10    together with the major professor, will

11    advise that student on his or her course

12    work, his or her research, help them design

13    it and monitor their progress.  But

14    ultimately, principally, it's the

15    responsibility of the major professor to

16    provide guidance for the committee and to

17    deal with any issues or problems that arise

18    and to solve those problems.

19 Q  Okay.

20 A  And that might relate to academic problems.

21    It might relate to other issues that involve

22    student's matriculation or progress through

23    the program.

1  Q   About how many students do you serve as

2      their major professor in a year?

3  A   Well, of course, programs generally take

4      three -- two to four years, depending on

5      whether they are Master's program or PhD

6      programs.  And so, it's possible that

7      programs could overlap.  And so, I could be

8      supervising two master students and one PhD

9      student at the same time.  A PhD student can

10     graduate.  A Master's student could

11     graduate, and we could be in between

12     students.  There could be a period of time

13     when I could be supervising none.

14              So, the answer is that it would

15     depend on where those students are in their

16     individual programs and at what point in

17     time you ask me.

18 Q   At one time, were you the major professor

19     for Doctor Chris Eiland?

20 A   I was.

21 Q   And what period of time were you serving as

22     his major professor?

23 A   Well, there were actually two periods.  I

14

1        served as his mentor and major professor

2        during his Master's program, which --

3        Actually, Chris was involved in sort of a

4        joint matriculation program in which he was

5        enrolled in the professional degree program,

6        and at the same time enrolled in the

7        graduate school.  Although, keep in mind

8        that there will be times when he's not doing

9        both.  Sometimes he will be doing both.

10               So, I guess, beginning maybe

11       sometime during his sophomore year as a

12       professional student, we discussed his

13       enrollment as a Master's candidate,

14       discussed his research topics.  And so,

15       without giving you a definite date when that

16       started, unless I went back to the program

17       in biomedical sciences that would give us

18       the chronology, I would say from -- you

19       graduated in -- he graduated in 2003 as a

20       veterinarian.

21               So, I would say 2001 through, I

22       think, December of 2003.  And that would

23       have encompassed his Master's program as

```
 1          well as a short period of time when I
 2          advised him during his doctorate program.
 3     Q    Okay.  What type of research projects did
 4          Doctor Eiland work on for you when you were
 5          his major professor?
 6     A    Well, of course, his responsibility was to
 7          research feline heartworm infection disease,
 8          and our interest was clarifying diagnosis,
 9          correlating diagnosis with disease, and
10          trying to better characterize the nature of
11          heartworm disease in cats.  That was the
12          subject of his Master's thesis.
13               It wasn't at all unlikely that
14          Doctor Eiland might have been involved in
15          other projects that were ongoing in the
16          laboratory with other collaborating
17          pharmaceutical companies.
18               So, it depends on whether your
19          question is what in every instance was he
20          involved in, or what was he involved in that
21          related only to his graduate work.
22     Q    Primarily talking about his graduate work.
23     A    Okay.  So, his Master's thesis was, as I
```

```
 1        described, trying to clarify diagnosis and

 2        disease characteristics of feline heartworm

 3        disease.  And although we had not nailed it

 4        down in detail entirely for his PhD program,

 5        we presumed in my discussions with Chris and

 6        with other members who were likely to serve

 7        on his committee or who were involved in the

 8        past, that his doctoral disorientation would

 9        be a continuation in some sort of work that

10        he had done as a Master's candidate.

11   Q    Did he do an excess amount of research

12        during his Master's program that would have

13        carried over to the PhD program?

14   A    He did some work that certainly wasn't

15        included in any detail in his Master's

16        thesis.  We had talked about perhaps using

17        some of that additional work in pursuit of

18        his doctoral degree.  But until that

19        research and its details were identified in

20        a research proposal, submitted to the

21        committee, and approved, it's nothing more

22        than speculation and discussion.  Do you see

23        what I mean?  The committee has to approve
```

```
 1          whatever research you're going to do for

 2          your, in this case, your doctoral degree.

 3    Q     What research did he do -- All right.  You

 4          said heartworm?

 5    A     Uh-huh (positive response).

 6    Q     Feline heartworm research --

 7    A     Yes, ma'am.

 8    Q     -- for his Master's degree?

 9    A     Uh-huh (positive response).

10    Q     Who were members of his -- Was there an

11          advisory committee at the Master's level?

12    A     There was.  As I recall, it was myself,

13          Doctor Jenny Spencer, Doctor Joe Newton, and

14          I think we added Doctor Ray Dillon, Allen R.

15          Dillon, subsequently.

16    Q     All right.  Were those members going to

17          continue on as his advisers in the PhD

18          program?

19    A     Not necessarily.  We had not identified

20          those individuals definitively.  And it's

21          not uncommon at all for those who would

22          advise during the doctoral portion of a

23          program or research or career to be
```

1    different than those that would advise

2    during the Master's.  And the reason for

3    that is that if we did elect to pursue other

4    areas or if his research took turns that we

5    had not discussed yet or that we felt that

6    would be more productive, then it would be

7    wise, prudent, to include persons who were

8    experts in those areas who could better

9    advise us on those components of the

10   research.

11 Q  During the short time that Doctor Eiland was

12   enrolled in the PhD program, had his

13   research at that time continued from his

14   Master's, or was there a change?

15 A  Well, I'm not aware that we had decided in

16   any detail what we were going to do.  As you

17   had alluded to or mentioned earlier, Doctor

18   Eiland and I had certainly talked about

19   continuing and using some of the additional

20   data that we had not analyzed thoroughly and

21   pursue it further.  But until the committee

22   is formed and until the proposal is written

23   and signed off on by the PhD advisory

23

1    topic and to deal with specific issues.  A

2    committee member might say, "On page eight,

3    paragraph two, you mentioned something

4    that -- after having read it a second time,

5    I'm not so sure that you have evidence to

6    support that."

7         And then he would make a note --

8    Doctor Eiland would make a note, and then we

9    would make a decision about whether to

10   change it or leave it.  And you mentioned

11   what role of the major professor is.  The

12   role of the major professor is to oversee

13   that process and to make a decision when

14   there's disagreement between Doctor Eiland

15   and a committee member, between two

16   committee members.  Someone has to take

17   charge and manage the situation.  That's the

18   role of the major professor.

19         But having said that, the purpose

20   of the final examination is an assessment of

21   the candidate's skills in that area of

22   research and to -- if anything needs to be

23   addressed -- address any deficiencies that

1       are present in the feces in this case.

2    Q   Were there deficiencies that needed to be

3       addressed?

4    A   In Chris's Master's thesis?

5    Q   Right.

6    A   No.  Actually the committee was quite happy

7       with Doctor Eiland's performance in that

8       Master's thesis.

9    Q   What members were in attendance for that?

10   A   All of those members were in attendance.

11   Q   Okay.  Do you remember telling that

12      committee at that time that there was a

13      possibility that they would be asked to

14      serve as his advisory committee for his PhD

15      program?

16   A   We may have discussed -- The answer to your

17      question is, no, I do not remember

18      specifically saying that, but I'm not

19      denying that I didn't say it.  What we may

20      have talked about was Doctor Eiland has some

21      desire to continue in the program.  We --

22      We, at least at this point, may pursue

23      certain avenues that either were pursued,

1    practice.

2           So, if and when and under what

3    circumstances Chris and I discussed that, I

4    would not have discouraged him from pursuing

5    it.  Because during his Master's program, he

6    had performed certainly acceptably, and all

7    committees signed off on his work.  His

8    course work, at least to the extent that I

9    was familiar with it, was well done.  I

10   didn't have any problems with it.

11          So, to discuss a continuation

12   wouldn't be out of the ordinary at all under

13   those situations -- under that situation.

14   Q   What alternative employment paths or

15       professional paths did he discuss with you?

16   A   Well, I think -- I think Chris had mentioned

17       an interest in the pharmaceutical industry.

18       I had tried on a couple of occasions to --

19       after I had seen a couple of openings, to

20       contact individuals and had encouraged --

21       The way these things usually work is their

22       openings are discussed -- their openings are

23       posted on their web sites usually.  And I

```
 1          would ask Chris, "Go see if there's anything
 2          that you like and that interests you."  And
 3          then the process of application is via the
 4          Internet.  I said, "It always helps if you
 5          have someone that you know, and I know all
 6          of them."  And I said, "If there's any way
 7          that I can help, I would be happy to talk to
 8          them.  If you have a specific position that
 9          you're interested in, and if there's someone
10          that I can talk to that I know, I would
11          certainly be happy to do that."
12    Q     If a student at Auburn University gets his
13          Master's and then his -- what is it -- DV --
14                MR. KNIGHT:  DVM.
15    Q     -- M?  And then a PhD, does that improve his
16          marketability with a pharmaceutical company?
17    A     It could.  It could very well do that.  A
18          lot of it depends on the position to which
19          he's applying.  Positions in professional
20          services, which is a segment of our
21          industry, pharmaceutical industry in which
22          veterinarians actually oversee their field
23          veterinarians, that would not be a
```

1    study.  I'm not aware.  I've not seen a

2    record of a plan of study that a committee

3    which had not been based on what I'm

4    familiar with decided upon and signed.  I

5    have no such document.  We may have talked

6    about additional course work, or we may have

7    sat down, and probably did, since he had

8    enrolled in courses in the fall of 2003, and

9    probably did talk about course work.

10        But to tell you a bit about how

11    this works, the graduate school has made

12    every attempt to encourage mentors, major

13    professors and candidates to identify

14    committees as soon as possible, to identify

15    course work as soon as possible.  But

16    oftentimes, probably more often than not,

17    that doesn't necessarily happen, you know,

18    during the first few months, sometimes

19    during the first six months of a candidate's

20    program.  Certainly I would be a proponent

21    of doing it as early as possible.  But it's

22    not at all unusual for it not to be

23    submitted and signed on, decided upon, and

```
 1          placed in the file two or three months into

 2          a program officially.

 3    Q     How many months was he into this program?

 4          Do you remember?  I know this is December,

 5          and I'm not sure when the quarter started.

 6    A     The quarter starts August 15th now.  So,

 7          you're talking about four months.

 8    Q     So, after four months, you hadn't even

 9          started a plan of study?

10    A     No.  We had not drafted a plan of study.  We

11          had not decided on a committee yet at that

12          point.  And, again, that's not at all

13          unusual.

14    Q     At what point does that usually take place?

15    A     Well, it depends.  Some candidates who have

16          a very, very good idea of what they want to

17          do and have decided on their research topic

18          and have a good idea of supportive course

19          work that would be necessary, or if we, at

20          this point, would have been knowledge of

21          what supportive course work was necessary,

22          we could do it right away.  What you have to

23          remember is -- I mean, what you should
```

1        say, members of the Master's committee?

2    A   What do you mean by "know more about"?

3    Q   I'm just repeating what you just said, that

4        I think you testified that whoever is in

5        charge or the major professor plans or

6        drafts the plan of study because that's the

7        person that is in the position of knowing

8        more about the candidate, the PhD candidate.

9            MR. KNIGHT:  Object to the form.  I

10               think that's a

11               mischaracterization --

12           MS. DICKEY:  Okay.

13           MR. KNIGHT:  Yeah, I think that

14               mischaracterizes his testimony.

15   A   There may be members of the committee who

16       perhaps could have talked with Doctor Eiland

17       at one time or another about one particular

18       goal or aspiration that he had more so than

19       me.  So, there may be members of the

20       committee who maybe know more about what he

21       wants to do or at least what his latest take

22       on what he wants to do more than me.

23           But I wouldn't disagree with you.

1       deep.  And a molecular biologist on the

2       committee knowledge might be a mile deep and

3       an inch wide, if you see what I mean.

4   Q   I do.  How many other students besides

5       Doctor Eiland has shown an interest in

6       parasitology for the PhD program?

7   A   Over the course of my career, recently?

8   Q   Let's say in the last ten years.

9   A   Oh, gosh.  If I would have known you would

10      have asked that question, I would have

11      brought my vitae and could have given you

12      their names and when they started and when

13      they applied.  And there's always a number

14      of students who apply.

15  Q   Let me modify the question.  It might make

16      it easier.  After receiving a DVM, how many

17      students have you had who were interested in

18      getting a PhD after their DVM?

19  A   Or a Master's or a PhD or just a PhD?

20  Q   PhD.

21  A   I can't recall a single one; but if we were

22      to list those students at Auburn University

23      in the last ten years who fell into that

1    category, there would be very few too.

2    We've had some difficulty in recruiting

3    veterinarians into PhD programs.  And by

4    "we," I mean, Auburn University's College of

5    Veterinary Medicine because -- I'll offer a

6    variety of reasons.  Oftentimes, graduate

7    veterinarians want to practice.  They want

8    to hone those skills.  They've been going to

9    school for years.  They want to get out

10    there and use, that many have debt.  We do

11    have a few, one or two, at the college right

12    now that are pursuing a PhD immediately

13    after getting their DVM.  But when you

14    consider, you know, over the last five years

15    that we've graduated, you know, almost five

16    hundred students, the number that do that is

17    really very few.

18  Q   We talked earlier about research that Doctor

19    Eiland did while he was a student, both for

20    the Master's program and the PhD.  What

21    happens to that research when a student

22    leaves the university?

23  A   Well, historically, I think the policy of

1        they're help in interpretation of the

2        results or conduct of statistics or

3        preparation of tables.

4              I mean, the practice of science is

5        different in different laboratories.  Some

6        laboratories, if a person had lunch with

7        you, they might be a collaborating author.

8        In other laboratories, it's a bit more

9        demanding.  So, it just depends.

10   Q   Explain the process used at Auburn

11       University for selecting a major professor.

12   A   Well, normally, it would depend on the

13       application process.  If the applicant was

14       unbeknownst to us and applied via the

15       Internet or simply made inquiries to the

16       college but had an interest in one

17       discipline or another, that individual might

18       be given the names of persons to talk to.

19       If that person enrolled in the college -- or

20       enrolled in the graduate school and was

21       accepted because of prior record -- and

22       we've had students, for example, who came to

23       us from premiere institutions with graduate

1    you become Doctor Eiland's major professor?

2  A    Uh-huh (positive response).  And he and I --

3    because he was a student assistant, because

4    he had an interest in parasitology, I

5    decided that -- well, let's go ahead and try

6    to do a Master's.  Let's see how well this

7    works.  And in my program, I like to require

8    that students do Master's.  Some program

9    mentors will take students on for PhDs

10    without a Master's.  But my decision has

11    always been that that can be unwise because

12    the Master's gives you some idea of how well

13    they'll perform at a level that perhaps is

14    not as complex and is not as stressful.

15    PhD is a different program

16    entirely.  It requires more independence.

17    It requires more independent conception.  It

18    requires more work.  It requires more

19    intense work and more vast work oftentimes.

20    So, my feeling is that a Master's

21    degree allows me to gauge a student's

22    performance and then make a decision whether

23    or not to -- they might be an acceptable

1    happens, it certainly can delay their

2    progress.

3    Q    Okay.

4                    (At which time, a recess was

5                    taken.)

6    Q    When did you first become aware of Doctor

7         Eiland's interest in parasitology?

8    A    You know, I really don't know.  It's been --

9         Chris worked as a student assistant for us

10        for a number of years.  And my guess is that

11        it was probably brought up sometime during

12        his -- during his tenure as a student

13        assistant even before he got into veterinary

14        school, but I couldn't tell you exactly when

15        that was.

16   Q    Were you one of his professors in veterinary

17        school?

18   A    I was.

19   Q    Did you have an opportunity to form an

20        opinion of Doctor Eiland as a student?

21   A    As a professional student.  Well, you'll

22        have to keep in mind that I didn't interact

23        with Chris any more than any other

1  Q    Do you know of any positions of honor that

2       Chris Eiland held while he was a student?

3  A    I don't -- I don't recall any.  I'm not

4       saying that at one time or another I might

5       not have been aware if he participated in

6       this particular element of the professional

7       degree program or not; but at this point, I

8       don't recall anything specifically.

9  Q    Okay.

10 A    Excuse me.  Now, were you talking about,

11      like, offices held?

12 Q    Yes.

13 A    Yeah, I was aware that he was -- he was the

14      class president for the student.  Yes,

15      ma'am, I was aware of that.

16 Q    And when was that?

17 A    Well, I was aware that he was class

18      president when he was taking my course.

19      Now, he may have been class president prior

20      to that.  He may have been class president

21      after that.  But like I said, my

22      interactions with Chris are no more, no less

23      than any other student when they're in my

1    course.

2              So, you tend to be tuned in, if

3    you know what I mean, to what's going on

4    with a particular class and individuals in

5    that class while you're teaching them during

6    the year that you're teaching them. Then

7    they move on to the next year, even the next

8    semester. When we're done, your daily

9    interactions with them fall off.

10   Q    Okay. Did you recommend to Chris Eiland

11        that he continue his education beyond the

12        DVM program at Auburn University?

13   A    I may have.

14   Q    If you did, why would you have done that?

15   A    Well, a good bit of it probably had to do

16        with the fact that he had approached me and

17        had expressed an interest and had asked me,

18        "I have an interest. Do you think it's

19        something that I should do or could do?

20        Would it benefit me?" And my response would

21        have been the same as it was a minute ago:

22        "Could. And if you have an interest in

23        parasitology, I'll certainly do everything I

1        can to help you pursue it."

2   Q   Did you have discussions with Chris Eiland

3        about the possibility of teaching at Auburn

4        University at some point in the future?

5   A   No.  I might have said something like, and

6        perhaps did, that Doctor Hendrix and I will

7        be retiring soon, you know.  There will be

8        available positions.  But certainly it would

9        not have been my intention to either ensure

10       or to imply that he or anyone else could

11       simply move in or occupy those positions

12       without competing.  I mean, I wouldn't have

13       said that.

14  Q   But you could have suggested that that might

15       be a possibility for him?

16  A   I suppose I could suggest it.  It would be a

17       possibility for Heather too.  It could be a

18       possibility for any other graduate student.

19  Q   But have you discussed it with Heather?

20  A   Oh, of course.  We've discussed -- not

21       particularly my position, but we've

22       discussed any number of positions at

23       academic institutions when person's --

1    Q    How long did he work in the lab?

2    A    Well, like I said, there were probably two

3         or three years prior to his acceptance into

4         veterinary school, and then, maybe,

5         intermittently during his period of

6         enrollment in the professional degree

7         program.  And then, maybe, intermittently

8         during the conduct of his Master's.  His

9         project actually involved a lot of

10        collection off site.

11              So, he did much of his work at the

12        shelter and then would bring his specimens

13        back.  Oftentimes at later hours because,

14        obviously, he was a student and had to do

15        some of these things when he had the time to

16        do them.  And sometimes that would be

17        evenings and weekends when the others

18        wouldn't be around; not all the time, but

19        sometimes.

20   Q    Was there a certain number of hours that he

21        was required to work in the lab?

22   A    No.

23   Q    Was Jamie Butler working in the lab during

```
 1        hourly basis.  There are any number of ways
 2        that you can be involved without necessarily
 3        being an assistant, having an assistantship.
 4   Q    Did you have a good relationship with Chris
 5        Eiland when he was a student at Auburn
 6        University?
 7   A    Chris and I had a very good relationship
 8        during his professional degree program and
 9        as a student assistant and during the
10        majority of his Master's program.
11   Q    Did you receive complaints about Chris
12        Eiland from anybody?
13   A    Yes.
14   Q    Who did you receive complaints from?
15   A    Well, I received complaints from Jamie
16        Butler, Tracy Land, a number of student
17        assistants, whose names I can provide to
18        you:  Brandy Brunson, Kelly Joiner, Pete
19        Christopherson, Stuart Price.  I had -- had
20        an incident brought to my attention by Lori
21        Nelms.  I had a complaint from -- what is
22        her name?  She's our secretary in the front
23        office -- Miranda Webb, Linda King.  Perhaps
```

```
1          others.  Those are the ones that come to
2          mind right now.
3     Q    What were the complaints from Jamie Butler?
4     A    Well, I think you probably have a --
5               MR. KNIGHT:  No, we've produced no
6                    documents at this point.  They're
7                    due tomorrow.
8     A    Okay.  Then I'll outline them for you.  A
9          number of them, beginning in August of 2003,
10         near the end of August, began with
11         complaints of confrontation with other
12         students in the laboratory.  Demands made by
13         Chris about how he'd be addressed.  Chris
14         ordering Jamie that he would take -- he
15         could take calls.  He was a veterinarian.
16         He could take diagnostic calls.  And, of
17         course, that's not necessarily true.
18         Parasitologists are trained professionals.
19         After a period of time and a period of time
20         working in a laboratory and after a number
21         of years, you might be qualified to do that,
22         but just because you're a graduate
23         veterinarian doesn't necessarily mean that.
```

1       dealing with, is incorrect and improper.

2   Q   Does Jamie Butler receive a number of those

3       type calls in the lab?

4   A   The laboratory receives, yes, numerous calls

5       per week.

6   Q   Okay.

7   A   Do you want me to continue with these

8       people?

9   Q   Go ahead.  Just the complaints from Jamie

10      Butler.

11  A   Well, I might mention to you that she did

12      come to me afterwards and say that -- Well,

13      what I had said to her is why is all this

14      started in August?  Why don't -- Why haven't

15      I heard about this in the past.  And her

16      response to me was I just didn't bother you

17      with it.  We've had these sort of incidents

18      that occur even when Chris was a student

19      assistant.  I just didn't bother you with

20      them.  I managed them.  But at this point,

21      on that particular day, I was called.  I

22      was en route to visit my mother.  It was

23      Labor Day weekend of 2003, and I was

1      actually called by Tracy Land, the other

2      person who corroborated the confrontation

3      that was going on in the laboratory, and the

4      discomfort, part of the students and the

5      staff.

6              And so, I simply asked if I could

7      talk to Chris.  And I told Chris to go home.

8      You know, leave the laboratory, and let's

9      just move on.

10  Q  Are you talking about the Labor Day

11     weekend --

12  A  Right.

13  Q  -- you told him to leave the lab?

14  A  Well, I told him to go home and quit

15     confronting students, quit confronting

16     staff, just go home, and we'll deal with

17     this when I get back.

18  Q  Could you be more specific about the

19     confrontation with the students?

20  A  It was a demand to be called "Doctor

21     Eiland."  It was a challenge.  And I would

22     encourage you to talk with them if you want

23     to know the details.  Certainly, they shared

1           Jenny Spencer, who is next door.  She's

2           another person you can put on that list.

3           Other incidents that she could account for

4           you in detail better than me.  Not any one

5           of them certainly being that weighty, but a

6           combination of all of them over time.

7                       That and other instances that we

8           can talk about too as you move down that

9           list that created a situation in which daily

10          operation of the laboratory and further

11          advancement of Doctor Eiland in his research

12          didn't seem possible to me in the

13          laboratory.

14   Q      Would it have been unusual or would you

15          consider it wrong if Doctor Eiland wanted to

16          be addressed as Doctor Eiland?

17   A      I wouldn't necessarily consider it wrong.  I

18          would consider it inappropriate because he

19          had worked in the laboratory with those

20          students as a student assistant.  And for

21          weeks prior, months prior, he was referred

22          to as Chris, and all of a sudden because he

23          graduated in June, he wanted to be referred

```
 1        graduate students, Doctor Spencer, who's the

 2        post-doc research fellow, are not required

 3        to sign in and out or to document when they

 4        arrive or when they leave.

 5   Q    And Chris Eiland was not required?

 6   A    No.

 7   Q    Have you told me all the complaints from

 8        Jamie Butler --

 9   A    Well, again --

10   Q    -- that you remember?

11   A    Yeah.  Right.  I would ask that you visit

12        with her, talk to her.  She can share more

13        of them with you.

14   Q    Well, I understand that, and I may do that.

15        But what I'm asking you to share is the

16        complaints that she gave to you.

17   A    Well, certainly those are the ones that I

18        remember.  It's quite probable that she came

19        to me on other instances talking about this

20        or that, that I don't remember, that she can

21        document.

22   Q    Were these written complaints or verbal?

23   A    She has written and submitted to me a
```

1  chronology of problems and incidents.

2 Q But in August of 2003, did she submit

3  written complaints to you --

4 A No.

5 Q -- for Chris Eiland?

6 A No.  Not at that time.

7 Q When did she do a chronology?

8 A Sometime during fall of 2003.

9 Q Are you considered Jamie Butler's immediate

10  supervisor?

11 A Uh-huh (positive response).

12 Q What about Tracy Land?  What complaints did

13  she make to you?

14 A Her complaints are going to parallel and

15  corroborate Jamie's because they're in the

16  same laboratory.  Her desk is 10 feet away.

17  And so, the issues that face Jamie also face

18  Tracy.  I will tell you that she came to me

19  and she told me of an incident that was

20  quite bothersome to me about Doctor Eiland,

21  who had accounted to her, that he had had a

22  confrontation with a client when he was

23  working for Parkview Animal Hospital, in

```
 1        which he was angered by the client for one

 2        reason.  She came to me specifically and

 3        told me, "I think you ought to hear about

 4        this.  I'm very bothered by this."  Chris

 5        told me that he had subscribed to

 6        pornographic materials and had them sent to

 7        this individual whose name he got from the

 8        medical record in the clinic.  That's an

 9        incident that she brought to me very

10        concerned, bothered by it.

11   Q    When was that?

12   A    Fall of 2003.  Again, she can share with

13        you.  That's an additional detail that

14        didn't involve Ms. Butler that Ms. Land

15        shared with me in particular.  Another issue

16        that Jamie brought to my attention was a

17        student -- a young lady by the name of

18        Courtney, who was being harassed outside the

19        College of Veterinary Medicine by Doctor

20        Eiland after hours.  She suggested that

21        Courtney come and talk to me.  Courtney came

22        and talked to me and told me about

23        her encounters with Doctor Eiland late at
```

```
 1        night at her apartment building.  My

 2        response to Courtney was "Courtney, you need

 3        to contact campus security."  I said, "I

 4        can -- it's my responsibility to manage the

 5        laboratory and what goes on in the

 6        laboratory.  It's not my responsibility to

 7        police what goes on outside the laboratory."

 8        Not intending to sound like I wasn't

 9        concerned about Courtney, but I said, "At

10        this point, I would advise you to contact

11        campus security."  And, again, Courtney can

12        share with you the details of that.

13   Q    And when did Courtney come to you?

14   A    After Jamie had suggested that she come to

15        me.  And, again, that would have been the

16        fall of 2003.  All these events took place

17        between mid-August and early December, 2003.

18        Those are the principal incidents that I

19        recall in which they came to me.  And I'm

20        talking about Ms. Butler and Ms. Land.

21   Q    Okay.  Did Chris Eiland ever make a

22        complaint to you about Jamie Butler?

23   A    I don't recall.
```

1   Q   All right.  These complaints started in

2       August of 2003.  Did you go to Chris Eiland

3       in August of 2003 --

4   A   I did.

5   Q   -- with these complaints?

6   A   I did.

7   Q   Tell me about that.

8   A   I told him that his confrontation with

9       students is going to have to stop.  His

10      disruptions in the laboratory is going to

11      have to stop.  Quit moving file cabinets,

12      which -- quit discarding people's private

13      belongings.  Do your work and stay out of

14      the laboratory.  That was my first meeting

15      with Chris.

16   Q   Okay.  Stay out of the laboratory?

17   A   Well, stay out of their laboratory unless

18      your work required that you be in there.

19   Q   Was there another lab where he could have

20      gone?  I mean --

21   A   We have three laboratories on that hall.

22   Q   Okay.  Could he have gone to any of those

23      three as a graduate research assistant?

```
 1        taking place.

 2                  But, no, there were a number of

 3        persons who visited my office with what they

 4        would characterize as complaints about

 5        behavior.

 6   Q    Were all of the complaints similar in --

 7        I've heard confrontational and argumentative

 8        and wanted to be called "Doctor."

 9   A    I mean, I'll be happy to detail some of

10        them.  Some of them are certainly different

11        than that.

12             THE WITNESS:  Do you want me to go

13                  ahead and do that, then?

14             MR. KNIGHT:  Yeah.  I mean, Kay, if

15                  you --

16   Q    Well, let me ask you this:  What did Peter

17        Christopherson tell you?

18   A    Peter Christopherson told me that he found

19        Chris Eiland rummaging through Brandy

20        Brunson's desk looking for notes for a class

21        that he apparently had failed to attend or

22        that she had asked him for.  And he came to

23        me and said your graduate student should not
```

1           I'm not so sure that is her title, but she's

2           one of two secretaries in the downstairs

3           office in pathobiology, located right

4           outside the department head's office.

5    Q     Lori Nelms?

6    A     Lori Nelms was a graduate students of Joseph

7           Janicki at the time that all this was going

8           on.

9    Q     Is she a student now?

10   A     She's a professional student, veterinary

11          student, yes.

12   Q     Stuart Price?

13   A     He's a faculty member in the College of

14          Veterinary Medicine.

15   Q     Kelly Joiner?

16   A     She's a graduate student and resident in the

17          Department of Pathobiology.

18   Q     Brandy Brunson?

19   A     She's also a graduate student and a resident

20          in the Department of Pathobiology.

21   Q     Tracy Land?

22   A     She's another of my research assistants that

23          occupied the desk in close proximity to

```
 1        Jamie's.

 2    Q   All right.  After you had your initial talk

 3        with Doctor Eiland in 2003, August of 2003,

 4        when was the next time you talked with him

 5        about complaints?

 6    A   Perhaps three weeks later, and this related

 7        to the Brandy Brunson, Pete Christopherson

 8        incident and the course that they were

 9        taking in advanced endocrinology.

10    Q   And what did Doctor Eiland tell you?

11    A   Well, it was more what I told him.  I don't

12        recall the details of how he responded.  I

13        think he denied certain of the accusations

14        that they had made.

15             My response or my instructions

16        with him was to go to class.  He wasn't

17        going to class.  Go to class and take your

18        own notes, stay out of other people's desks,

19        don't confront those people in their work

20        places, and ask them why they didn't give

21        you the notes to the class.  Among, perhaps,

22        a couple of other things, but, again, it was

23        just another sit down and stop doing this.
```

1        This is creating too many problems here at

2        the College of Veterinary Medicine.  It's

3        creating an environment that's not conducive

4        to teaching research, what we do on a daily

5        basis.  So, just stop doing it.  And his

6        response, as I recall -- Doctor Eiland's

7        response -- was that, these are accusations,

8        it was their opinions, and I can't believe

9        you believe this, or something to that

10       extent.

11    Q   All right.  Did you have an occasion to talk

12        with Doctor Eiland after this discussion

13        about going through the desk regarding

14        complaints?

15    A   Yes.

16    Q   Okay.  When was the next time?

17    A   The next time was after Kelly Joiner came to

18        me and said that Doctor Eiland confronted me

19        on the front steps.  He frightened me.  He

20        wanted to ask me about the incident of going

21        through Brandy's desk.  As I recall, she

22        said, "I don't want to talk to you.  If you

23        want to talk to me, let's go talk to Doctor

84

```
1         came to me -- And this was another incident
2         in which they're in advanced endocrinology,
3         and Doctor Eiland had apparently fallen
4         asleep in class and remained asleep after
5         the class had left and was sitting there.
6         Doctor Sartin had come to me and said, "Are
7         you aware of Doctor Eiland not coming to
8         class and sleeping through class?"  And had
9         mentioned to me that he had continued to
10        sleep well after the class was over and
11        actually had brought other faculty members
12        to the room and said, "Look at that."  Amd
13        we've been out of there for 15 minutes.
14               So, Brandy shared that with me,
15        and then she proceeded to share the fact
16        that he had asked for notes.
17    Q   Did you discuss complaints -- not
18        necessarily -- I'm not talking about the
19        people making complaints.  But after the
20        complaints were made, did you discuss these
21        complaints with anyone else other than Chris
22        Eiland?
23    A   Not that I recall.
```

```
 1   Q   Okay.  Is there a reason why you didn't?
 2   A   Well, it's my responsibility as his adviser
 3       to -- to restore any sort of order or to
 4       request that this behavior stops.  That's
 5       the role of the major professor.  That's
 6       what I implied when I said it's not just
 7       academics.  It's other aspects of program
 8       and training too.  It's my responsibility.
 9   Q   What was the last complaint that you heard
10       against Doctor Eiland?
11   A   Well, there were several more.  The last one
12       that I heard was from Stuart Price, who
13       approached me in the hallway and said
14       that --
15           THE WITNESS:  Should I go ahead and
16               discuss this?
17           MR. KNIGHT:  Yeah.  Just go into it.
18   A   He approach me in the hall, and he said, "Is
19       Chris okay?"  And I said, "Why do you say
20       that."  He said, "Well, I was leaving work
21       at 11:30 or 12:00 on a Friday night or
22       Saturday night."  I can't remember exactly
23       what night it was.  And he said, "Chris
```

1        jumped out of the bushes and said that he

2        was picking plants, and he was going to take

3        them home and grow them and seemed a little

4        rattled and surprised."  And he said, "I

5        just thought that was a bit strange for

6        somebody in the middle of the night to be

7        out picking plants, and what's going on?"

8        And my response to Stuart was, "Stuart, I

9        have no idea what Doctor Eiland was doing."

10   Q    Did you talk with Doctor Eiland about that?

11   A    I don't believe I ever mentioned that

12        incident.  I may have.  I may have said that

13        Doctor Price -- but I don't recall.

14   Q    And who is Stuart Price?

15   A    He's a professor, associate professor, in

16        the Department of Pathobiology.

17   Q    Did you have any discussion with Doctor

18        Wolfe regarding Doctor Eiland and these

19        complaints?

20   A    I did.

21   Q    Tell me about that.

22   A    Well, after and -- and there were several

23        others that you've not asked me about.

1              He called me in and he said that,
2       "Doctor Blagburn, seems as though issues
3       related to Doctor Eiland have involved
4       others in the department besides you and
5       your people, and I can't have that and won't
6       have that."  And I said, "Understood."  And
7       he suggested to me that, "Well, the best
8       thing for you to do is talk to Doctor
9       Wolfe."  But he had suggested to me that,
10      "This is not working, that there are too
11      many issues of people inside the laboratory,
12      outside the laboratory, in the department
13      are fearful, unsure.  And you have to do
14      something about that."
15   Q   And what did you do?
16   A   Well, ultimately -- and there are actually a
17      couple of other incidents that occurred
18      after that.
19          THE WITNESS:  Should I share them?
20          MR. KNIGHT:  Yeah.
21   Q   Well, I haven't asked you that.  I wanted to
22      know -- Well, first of all, when did you
23      have this conversation with Doctor Wolfe?

1    A    Probably November of 2003.

2    Q    All right.  And Doctor Wolfe said, "You have

3         to do something about that."  And my

4         question was:  What did you do?

5    A    Well, I visited with Chris again --

6    Q    Okay.

7    A    -- and told him that these problems,

8         incidents, have to stop.  I'm getting

9         complaints outside the laboratory.  Now,

10        it's not just related to persons in and

11        around the parasitology division, the

12        parasitology laboratory.  Now, it relates to

13        anatomical pathologists, microbiologists

14        confronting me in the hallway, or graduate

15        students in physiology upstairs coming to me

16        and relating incidents that have happened.

17        This has got to stop.  Concentrate on your

18        program.  Forget about everyone else, and

19        get on with your program.

20   Q    Now, when you said to Chris Eiland, "This

21        has to stop," did you specifically lay out

22        all of the complaints?

23   A    Well, each time that I talked with him,

1    yeah, I summarized what the persons had told

2    me and what I knew.

3  Q   And what was his response?

4  A   In some instances, denial; in some

5        instances, just sort of shrugged them off as

6        being insignificant and not of any magnitude

7        to worry about.  Never, as I recall, an

8        admission of doing them.

9  Q   What did you think was going on?

10 A   Well, I didn't know.  I didn't know.  I

11       remember I asked Chris at one time, I said,

12       "Is there something I can help you with?

13       Are you having problems that I'm not aware

14       of?"  That's all I said.  I had no idea.  As

15       I had mentioned to you, in prior years, I

16       apparently wasn't privy to all of these

17       little incidents that were happening.  Jamie

18       later told me, as I mentioned to you, that

19       they happened periodically, but were just

20       not brought to my attention.

21 Q   Does it seem strange to you that someone

22       with those traits or behaviors that you

23       described would be elected president of the

```
1              matter what he wanted to do.  And I told him
2              I would be happy to do that.
3    Q    Including getting him another major
4              professor?
5    A    Well, it it's not my responsibility to get
6              him another major professor.  I resigned.  I
7              certainly would be willing to support him in
8              the form of a recommendation to anyone.  But
9              it's not my responsibility to find him a
10             major professor.
11   Q    Who is Gregory Skipper?
12   A    I don't know that name.
13   Q    Did you tell Doctor Eiland that he would
14             make a great parasitologist, just not at
15             Auburn University?
16   A    I don't remember that.  It doesn't sound
17             like something I would say.  I don't deny
18             saying it, but I don't remember saying it.
19             I just repeat it.  It doesn't sound like
20             something I would say to a student.
21   Q    Did you also tell Doctor Eiland to clean out
22             his office and turn in his keys for the lab?
23             MR. KNIGHT:  Object to the form.  Go
```

```
 1                    ahead and answer.
 2    Q    You can still answer.
 3    A    The -- It's customary for students who are
 4         no longer working in your laboratory to turn
 5         in their keys.  It's a commonplace request.
 6    Q    Did you receive a call, telephone call, from
 7         a Doctor Mark Janderlich?
 8    A    I did.
 9    Q    Do you remember about when that telephone
10         conversation took place?
11    A    Maybe -- You know, I really can't tell you.
12         It was while I was entering department head.
13         So, it probably would have been either
14         summer of 2004 or summer of 2005.  I don't
15         remember exactly when.
16    Q    What was the purpose of the call?
17    A    Doctor Janderlich is a former student of
18         mine.  And he said, "I'm thinking of hiring
19         Chris Eiland.  What can you tell me about
20         him?"  I said, "Well, Mark, I can't comment
21         on Chris's clinical skills.  I'll tell you
22         that he did a fine job for his Master's
23         thesis.  We had some personnel problems in
```

```
 1           are posted guidelines, or whatever you call
 2           them, whatever they call them there on the
 3           graduate school's web site.  Frankly, I have
 4           not seen that document.  I have not seen
 5           that.  I have had no cause to look at it
 6           over the years.  And when it was shown to
 7           me, that was the first time I saw it.
 8     Q     Was Doctor Eiland progressing toward his
 9           degree according to plan other than these
10           problems?
11     A     Which degree?
12     Q     The PhD.
13     A     Well, it was very early.  I mean, his course
14           work only began August 15th.  And so,
15           really, no progress had been made to speak
16           of.  So, to qualify his progression, I
17           think, would be premature at that point.
18     Q     Did you ever have discussions with anyone
19           about his progress?
20     A     I don't recall.  Perhaps I don't understand
21           the question.  Discussion with whom in
22           particular and about what?
23     Q     Anybody in particular about his progress in
```

1        the PhD program.

2   A    Not that I'm aware of.

3   Q    If Doctor Eiland had been accepted to

4        another department, would he have been able

5        to continue in his main field of interest,

6        which was parasitology?

7   A    I believe so.  I believe that there are

8        opportunities at Auburn University.  There

9        are numerous examples of -- I have a student

10       that I was on her committee, and she was in

11       soils and agronomy, but she's working on

12       parasites.  And so there's a lot of

13       interaction across campus.  And as I

14       mentioned, there's Doctor Sundermann.  You

15       know, there's Doctor Dillon.  There are

16       clinicians who certainly -- internists who

17       have skills in his area.  My opinion is

18       that, yes, there's opportunity.

19  Q    Did Doctor Wolfe tell you to either get rid

20       of Doctor Eiland or he would?

21  A    I don't know that those are his exact words,

22       but it was very clear to me that that's what

23       he meant.  Now, I don't -- I'd prefer not to

```
 1        view it as "get rid of Doctor Eiland."  His
 2        words -- And Doctor Wolfe is not the kind of
 3        individual that would have used that kind of
 4        language.  He would have more -- he would
 5        more than likely have said something like,
 6        "Doctor Blagburn, please solve this problem.
 7        And this is obviously not going to work in
 8        the department.  So, you as the adviser are
 9        the person to do something about it."  And
10        my decision, then, was to resign.
11   Q    Did you go back and have a discussion with
12        Doctor Wolfe after you made that decision?
13   A    I don't recall that I did, other than
14        routing my letter through him would have
15        been customary for me since a source of
16        support was in our department to route my
17        resignation letter to the department head.
18   Q    Did you try to get Doctor Eiland's
19        statistics incomplete grade changed to a
20        withdrawal?
21   A    I did make a couple of telephone calls to
22        Professor Billor -- is that it -- never
23        reached her.  I got her voice mail.  She
```

1       called me back a couple of times, and we

2       never spoke.  And then it occurred to me,

3       probably after our fourth attempt to talk,

4       that perhaps it was inappropriate for one

5       faculty member to try to encourage or

6       discuss another faculty member's grade

7       change policies.  So, I made no attempt

8       after that.

9    Q   Who is the point of contact for all

10       departments in the biomedical sciences

11       program?

12   A   At that time it was Joseph Janicki.  His

13       title was associate dean of research and

14       graduate studies.

15   Q   Was Doctor Eiland dismissed from the

16       Department of Pathobiology?

17   A   No.  We have no authority to dismiss anyone.

18       His support was in my laboratory.  When I

19       resigned, of course, it's not customary to

20       continue to support a graduate student with

21       your resources if that graduate student then

22       moves to a different laboratory.  It happens

23       all the time.  They simply procure support

1      students, whatever.  It would simply be a

2      letter and a change in that plan of study

3      naming a new professor as a major professor.

4      And then that would become a matter of

5      record, and it would go on file in Janicki's

6      office and with the graduate school.

7  Q   Would he have had to reapply to the graduate

8      program?

9  A   He remained an active graduate student in

10     good standing, and my resignation had

11     absolutely no impact or effect on his status

12     as a graduate student, either in the program

13     in biomedical sciences or at Auburn

14     University.

15 Q   Did you contact anyone at the Alabama

16     Wellness Committee in December of 2003?

17 A   No, ma'am, I did not.

18 Q   Do you know anyone who did?

19 A   I do.

20 Q   Who was that?

21 A   It was Doctor Charles Hendrix.

22 Q   Do you have any knowledge of Doctor Eiland

23     ever being diagnosed with excessive

1   Q   What department was Doctor Sundermann in?

2   A   She's in biological sciences.

3   Q   Okay.  Thank you.

4

5               (Deposition concluded at

6               approximately 4:12 p.m.)

7          *    *    *    *    *

8          FURTHER DEPONENT SAITH NOT

9

10             *    *    *

11

12    R E P O R T E R'S  C E R T I F I C A T E

13

14  STATE OF ALABAMA)

15  ELMORE COUNTY)

16

17       I, Jeana S. Boggs, Certified Professional

18  Reporter and Notary Public in and for the State of

19  Alabama at Large, do hereby certify on Monday, June

20  12, 2006, that pursuant to notice and stipulation on

21  behalf of the Plaintiff, I reported the deposition

22  of BYRON L. BLAGBURN, MS, PhD, who was first duly

23  sworn by me to speak the truth, the whole truth, and

Boggs Reporting & Video
334.264.6227/800.397.5590   www.boggsreporters.com

1  nothing but the truth, in the matter of CHRISTOPHER
2  B. EILAND, DVM, MS, Plaintiff, versus DR. BYRON L.
3  BLAGBURN, individually and in his official capacity,
4  DR. CHARLES HENDRIX, individually and in his
5  official capacity, DR. JOSEPH JANICKI, individually
6  and in his official capacity, DR. STEPHEN McFARLAND,
7  individually and in his official capacity, DR. ED
8  RICHARDSON, in his official capacity as President of
9  Auburn University, and DR. LAUREN WOLFE,
10  individually and in his official capacity,
11  Defendants, Civil Action No. CV-459-VPM, now pending
12  in the United States District Court for the  Middle
13  District, Eastern Division of  Alabama; that the
14  foregoing colloquies, statements, questions and
15  answers thereto were reduced to 122 typewritten
16  pages under my direction and supervision; that the
17  deposition is a true and accurate transcription of
18  the testimony/evidence of the examination of said
19  witness by counsel for the parties set out herein;
20  that the reading and signing of said deposition was
21  not waived by witness and counsel for the parties.
22          I further certify that I am neither of
23  relative, employee, attorney or counsel of any of

126

the parties, nor am I a relative or employee of such

attorney or counsel, nor am I financially interested

in the results thereof.  All rates charged are usual

and customary.

     This the 26th day of June, 2006.

_____
Jeana S. Boggs
Certified Court Reporter and
Notary Public
Commission expires: 8/14/2006