**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **Christopher B. Eiland, DVM, MS** ) <br> ) <br>     **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **Dr. Byron L. Blagburn, et al.,** ) <br> ) <br>     **Defendants** ) | **CIVIL ACTION NO.<br>2005-CV-459-W** |

**DEFENDANTS' REPLY BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to the Court's Order (Doc. # 27), Defendants Dr. Byron Blagburn, Dr. Charles Hendrix, Dr. Joseph Janicki, Dr. Stephen McFarland, Dr. Ed Richardson and Dr. Lauren Wolfe (collectively, the "Defendants") submit this brief in support of their motion for summary judgment and in reply to the opposition brief filed by Plaintiff, Dr. Christopher B. Eiland (Doc. # 29).

**I.    Eiland's Due Process Claims Fail as a Matter of Law.**

    **A.    Eiland was not dismissed from the Ph.D program.**

Dr. Eiland responds to the undisputed evidence demonstrating that he was never dismissed from the Ph.D program by pointing to a one-line excerpt from Dr. Blagburn's deposition testimony. Dr. Eiland argues that "[t]here is simply no way to confuse Dr. Blagburn's words when he stated in deposition that he did not think Dr. Wolfe use[d] the words 'get rid of him,' but it was clear to me that that's what he meant." *(Plaintiff's Opposition* (Doc. 29) at 35). Dr. Eiland neglects, however, to provide the full context surrounding Dr. Blagburn's statement, which is as follows:

171376.1

> Q.   Did Doctor Wolfe tell you to either get rid of Doctor Eiland or he would:
>
> A.   I don't know that those are his exact words, but it was very clear to me that that's what he meant. Now, I don't – I'd prefer not to view it as "get rid of Doctor Eiland." His words – And Doctor Wolfe is not the kind of individual that would have used that kind of language. He would have more – he would more than likely have said something like, "Doctor Blagburn, please solve this problem. And this is obviously not going to work in the department. So, you as the adviser are the person to do something about it." And my decision, then was to resign.

*Blagburn* at 101:19-102:10. Taken in its true context, this testimony reveals that Dr. Blagburn was never told by Dr. Wolfe, or anyone else for that matter, to dismiss Dr. Eiland from the Ph.D program. To be sure, Dr. Wolfe was concerned with Dr. Eiland's behavior and wanted the disruptions in the Parasitology laboratory to end. For this reason, he "contacted Dr. Blagburn and told him that something had to be done about Dr. Eiland's conduct." *Wolfe Decl.* at ¶ 4. But, as Dr. Wolfe has said all along, he "did not specify what Dr. Blagburn should do to resolve the issue and [he] never 'ordered' Dr. Blagburn to dismiss Dr. Eiland from the Ph.D program."[1] *Id.* Dr. Blagburn confirmed that he "spoke with Dr. Wolfe about Dr. Eiland's conduct [and that Dr. Wolfe informed him] that something had to be done about Dr. Eiland's conduct, although he did not specify what I should do, and he never ordered me to dismiss Dr. Eiland from the Ph.D program." *Blagburn Decl.* at ¶ 17.

Even if Dr. Blagburn had been told to dismiss Dr. Eiland from the Ph.D program (which clearly did not happen), the simple fact remains that Dr. Blagburn <u>never</u> did so. He merely resigned as Dr. Eiland's Major Professor. This fact is corroborated by Dr. Hendrix, who was present during the December 3, 2003 meeting. It is also corroborated by the documentary

---

[1]   In fact, because the Ph.D program is an inter-departmental program, Dr. Wolfe did not have the authority to dismiss a student from the program. *Wolfe Decl.* at ¶ 6. For this same reason, Dr. Blagburn also did not have the authority to unilaterally dismiss a student from the Ph.D program. *Blagburn Decl.* at ¶ 19.

171376.1                                  2

evidence, which shows that just a few days after the December 3, 2003 meeting, Dr. Blagburn wrote a memorandum to his superiors in the Graduate School, which stated: "Effective at the end of the Fall Semester, 2003, I will no longer serve as Dr. Christopher Eiland's PhD advisor." *(Defendants' brief,* (Doc. 25), *Exhibit A.).*

Further still, Dr. Eiland has conceded that just two days after his meeting with Dr. Blagburn, he met with Dr. Janicki, Associate Dean for Research and Graduate Studies and Dr. Blagburn's superior, who informed him that he had <u>not</u> been dismissed from the Ph.D program and that he could continue in the program by identifying a new Major Professor. *See Eiland* at 224:17-22 ("Q. And [Dr. Janicki] said that you were not dismissed from the Ph.D program, correct? A. At that point, I wasn't, but I would be if I didn't locate a new major professor …."). In addition, Dr. Eiland's brief has no response to the letter sent by Dr. Stephen L. McFarland, Dean of the Graduate School, which stated:

> In your letter of July 27, you made a number of complaints. The main complaint seemed to be you had been dismissed from the program. **According to the College of Veterinary Medicine and the Graduate School, you have not been terminated. You are still a student in good standing at Auburn University. No actions have been taken to terminate your admission to the Doctor of Philosophy program in biomedical sciences.** Your major professor has decided to resign from your committee. It is now your responsibility to identify another major professor, should you wish to continue in the program.

*(Defendants' brief,* (Doc. 25), *Exhibit C)* (emphasis added).

The evidence is clear to the point of being uncontraverted that Dr. Eiland was never dismissed from the Ph.D program. Drs. Blagburn and Hendrix are very clear that Dr. Eiland was never told during the December 3, 2003 meeting that he was dismissed from the Ph.D program. Even if Dr. Eiland was confused about his status in the program after this meeting, however, any confusion would have been resolved when Dr. Janicki expressly told Eiland that he was <u>not</u> dismissed from the Ph.D program. If that was not sufficient, the July 27 letter from Dr.

McFarland certainly should have resolved any lingering (although unjustified) confusion that Dr. Eiland may have had.[2]

Dr. Eiland argues in the alternative that "[i]f the Court determines that Eiland was not dismissed from the Department of Pathobiology, but that the only action tacken [sic] was that Dr. Blagburn stepped down as his major professor ..., then Dr. Eiland was constructively dismissed from the department." (*Plaintiff's Opposition* (Doc. 29) at 21). Dr. Eiland bases this argument on nothing more than his factually unsupported, subjective belief that "the only other person left at the Auburn University campus who could possibly assume the position as major professor" was Dr. Dillon. (*Id.* at 22.)

---

[2] In addition, Dr. Blagburn's actions after the December 3, 2003 meeting demonstrate that he knew that he was not dismissed from the Ph.D program. Dr. Eiland originally stated in his deposition that immediately after this meeting he asked Dr. Hendrix to serve as his Major Professor. *Eiland* at 251:6-17. Later in his deposition, however, after a break, Dr. Eiland stated that he had gotten "confused" and that he had actually not asked Dr. Hendrix to serve as his Major Professor in this meeting. *Id.* at 256:3-258:16. This change in his testimony is of little consequence, however, in light of Dr. Hendrix's testimony that Dr. Eiland did, in fact, ask him to serve as his Major Professor immediately following the December 3rd meeting. *Hendrix Decl.* at 3.

Moreover, the materials submitted by Dr. Hendrix in opposition to Defendants' summary judgment motion demonstrate that Dr. Eiland knew after the December 3rd meeting that he was not dismissed from the Ph.D program. Dr. Eiland has testified that he asked Dr. Dillon to serve as his Major Professor following Dr. Blagburn's resignation. *See Eiland* at 227:22-228:6. Until recently, Dr. Eiland has claimed that he asked Dr. Dillon to serve in that position sometime after his meeting with Dr. Janicki, who informed him that he could continue in the Ph.D program by identifying a new Major Professor. *Id.*; *see also Id.* at 253:3-254:8. However, in the affidavit submitted by Dr. Eiland in his opposition, he testified that he went to Dr. Dillon's office to ask him to serve as his Major Professor the day of the December 3rd meeting. *See Eiland Aff.* at 17 ("I went to Dr. Ray Dillon's office that same day (December 3, 2003)." This is significant because, if Dr. Eiland truly believed that he had been dismissed from the Ph.D program during the December 3rd meeting, why would he ask Dr. Dillon to serve as his Major Professor immediately following the meeting (and before he had even talked to Dr. Janicki)?

In sum, the evidence as a whole fails to create a genuine issue of fact as to whether Dr. Eiland was dismissed from the Ph.D program. *See Allen v. Tyson Foods,* 121 F. 3d 642, 646 (11th Cir. 1997).

First, Dr. Eiland has <u>conceded</u> that he could have continued in the Ph.D program by identifying a Major Professor outside the Department of Pathobiology; therefore it is disingenuous for him to now argue that Dr. Dillon was the only one who could have served as his Major Professor in his Ph.D program. *See Eiland* at 275:19-278:19.  What Dr. Eiland apparently means to say is that he believed Dr. Dillon was the only person who could have served as his Major Professor so that he could continue to focus his studies on the discipline of parasitology. This would certainly be an interesting position to take at this time however, considering that, Dr. Eiland had previously testified that he did not know which professors could have served as his Major Professor in a program of study focused on parasitology:

> Q. …. How do you know who could or who could not, which professors could or could not have served in the role of helping you – serving as your major professor so that you could ultimately be a parasitologist?
>
> A. I'm not sure.

*Eiland* at 267:4-10.

Regardless of what he now claims, it is well-documented in Dr. Eiland's deposition and in Defendants' principal brief that the main impediment to Dr. Eiland's locating a new Major Professor was his own lack of effort. *See Eiland* 275:12-18 (Q. So you took two steps. You go to Dr. Dillon on December 8, 2003. He says, I can't do it because of these reasons. You go to Dr. Hendrix. You ask him if he'll serve as your major professor. He says no. That's it? A. That's correct."); (*Defendants' brief* (Doc. 25) at 34-35).  Indeed, Dr. Blagburn testified that there are other Auburn professors outside the Department of Pathobiology who have the skills in the area of parasites that would have allowed them to serve as Dr. Eiland's Major Professor in his chosen discipline. *See Blagburn* at 101:3-18. Dr. Eiland would not know this, of course, because he did not ask those professors, nor did he ask anyone else for help in locating a new Major Professor.

*See Eiland* 274:14-16 ("Q. Did you ask anyone else at Auburn for help in locating another major professor? A. No.").

In any event, even if Dr. Dillon were the only faculty member who could have served as a Major Professor in the discipline of parasitology, to accept Dr. Eiland's argument that he was "constructively" dismissed from the Ph.D program, the Court would have to recognize what would be a new property interest. The Court would have to break new ground by declaring that a student has a property interest in completing a graduate program in a particular discipline of study. Recognizing such an interest would certainly be unwarranted considering that neither the Eleventh Circuit nor the United States Supreme Court has yet to even recognize that a student has a property interest in post-secondary education, much less in a particular course of study. *See Hamil v. Vertrees*, 2001 U.S Dist. LEXIS 1634 at *23 (M.D. Ala. 2001) ("no court has decided whether a protected property interest exists in a student's post-secondary education"); *see also Clements v. Eastern Kentucky University*, 2006 WL 146417 at *6 (E.D. Ky. 2006) ("Defendant did not brief the issue of whether there is a protected property interest in attaining a Master's Degree … and this issue has not been decided by the Supreme Court.").[3]

---

[3]     Dr. Eiland also argues that some procedures in an Auburn student handbook were not followed with respect to the termination of his employment as a Graduate Research Assistant ("GRA"). Even assuming, *arguendo*, that the Auburn faculty did not completely follow the procedures of the student handbook, this would not give rise to a due process violation. Courts have routinely held that "a college's failure to comply with its own regulations does not, by itself, constitute a due process violation." *Lowry v. The University of Alabama at Birmingham*, 1987 U.S. Dist. LEXIS 7963 at *25 (N.D. Ala. 1987); *see also Hallman v. Boutwell*, 2006 U.S. Dist. LEXIS 21917 at *23 (M.D. Ala. 2006) (*citing Smith v. State of Georgia*, 684 F.2d 729 (11th Cir. 1982) ("assuming for the sake of argument, that there was some deviation from standard operating procedures and/or agency regulations, such is not tantamount to a due process violation.").

Second, even if a violation of a university's internal procedures could give rise to a protectable property interest, the very same handbook whose procedures Dr. Eiland claims were not followed contains a grievance procedure. This procedure, known as the Graduate Assistants Grievance Policy, allows a student to grieve alleged improper conduct by a faculty member

> **B.  Eiland waived the right to seek redress of any deprivation of a property and/or liberty interest because he failed to utilize Auburn's grievance procedures.**

The Defendants demonstrated in their principal brief that, despite the fact that Dr. Eiland had access to a constitutionally sufficient grievance procedure within Auburn's internal procedures, he failed to timely and properly file a grievance related to Dr. Blagburn's alleged improper conduct. Defendants cited *Maples v. Martin*, 858 F.2d 1546 (11th Cir. 1988), a case virtually "on-point" with the instant case in that it too involved a situation where a due-process plaintiff had failed to utilize Auburn's grievance procedures. In *Maples*, the Eleventh Circuit expressly held that a failure to utilize a constitutionally sufficient grievance procedure waives a party's right to seek redress of an alleged deprivation of a constitutional right in a federal court. *See Maples*, 858 F.2d at 1551 (dismissing due process claim because "[t]he appellants failed to avail themselves of [the faculty grievance procedures] and presented no evidence that resort to it

---

which adversely affects a student assistantship. Dr. Eiland concedes that he did not attempt to file a grievance under this policy. *See Eiland [2]* at 137:13-138:14. This claim, therefore, is due be summarily rejected because the Eleventh Circuit has expressly held that a failure to utilize a constitutionally sufficient grievance procedure waives a party's right to seek redress of an alleged deprivation of a constitutional right in a federal court. *See Maples, infra*.

      Finally, Dr. Eiland's allegations related to his position as a GRA relates to his employment in the Parasitology laboratory. Dr. Eiland, however, has consistently maintained that he is not contending that any liberty and/or property interest was infringed by the termination of his employment in the Parasitology laboratory:

> Q. Yes. I guess basically what I'm asking is you're not contending as part of this lawsuit that you had a liberty or property interest that was infringed by your termination from the parasitology laboratory?
>
> A. As an employee, no.

*Eiland* at 248:11-17. Accordingly, it would be patently unfair, not to mention legally impermissible, for Dr. Eiland to now claim a due process violation related to the termination of his employment as a GRA when he has previously expressly denied asserting such a claim.

would have been futile. Thus an opportunity to be heard that would have met the requirements of due process was lost to the appellants by their own inaction.").

Dr. Eiland's brief does not respond at all to this argument. It is well-established in the Eleventh Circuit that the "[f]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned." *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000). Accordingly, because Dr. Eiland failed to address and therefore abandoned this issue, Defendants are entitled to summary judgment on Dr. Eiland's due process claims.

## II.     Eiland's Defamation Claims Fail as a Matter of Law.

Dr. Eiland has asserted five separate claims of defamation. Defendants moved for summary judgment on all five claims. In his opposition, Dr. Eiland failed address the two defamation claims asserted against Dr. Blagburn and therefore has abandoned these claims. *See Coalition for the Abolition of Marijuana Prohibition, supra.* The remaining defamation claims are addressed again below.

In support of the defamation claim asserted against Dr. Janicki, Dr. Eiland says nothing more than that "Dr. Janicki told Drs. Wolfe and Blagburn that Dr. Eiland had propositioned a female student to take a statistics exam for him." (*Plaintiff's Opposition* (Doc. 29) at 39). As demonstrated in Defendants' principal brief, however, Dr. Eiland does not actually know what Dr. Janicki said, *see Eiland [2]* at 62:4-7, and he admits that Dr. Janicki "could" have said that he had been "accused" of asking a fellow graduate student to take an examination for him - an undisputedly true and essentially benign statement. *Id.* at 61:17-62:1. In addition, Defendants showed that Dr. Janicki was entitled to summary judgment on this claim because any statement he made to Drs. Blagburn and Hendrix regarding an allegation of cheating against Dr. Eiland

was conditionally privileged, as it was made in the line and scope of his employment. Dr. Eiland has failed to demonstrate or, for that matter, even allege that the statement was made with malice. Consequently, Dr. Janicki is entitled to summary judgment on this claim.

Dr. Eiland's argument on his defamation claim against Dr. Hendrix is that "Dr. Blagburn confirms in his deposition testimony that Dr. Hendrix contacted the Alabama Wellness Center regarding allegations that Dr. Eiland was bipolar, OCD, and on drugs. If Dr. Blagburn was aware of that fact, then those allegations were also published to him." (*Plaintiff's Opposition* (Doc. 29) at 39). This argument – restructured on the fly to make Dr. Blagburn, not the Wellness Committee, the recipient of the supposedly defamatory statement – is fatally flawed in numerous respects. To begin, at no time has Dr. Blagburn testified that he was told by Dr. Hendrix that Eiland was bipoloar, OCD and/or on drugs. All that Dr. Blagburn said during his deposition was that he was aware that Dr. Hendrix had reported Dr. Eiland to the Alabama Professional Wellness Committee ("Wellness Committee"). *Blagburn* at 105:15-21. He did not state how he obtained this knowledge and there is no evidence to that effect. To assume that he obtained this knowledge from Dr. Hendrix is mere speculation. Second, even if Dr. Hendrix had personally informed Dr. Blagburn that he had reported Dr. Eiland to the Wellness Committee, this would simply not be a defamatory statement.

As to his final defamation claim, Dr. Eiland responds only that "Elizabeth Landreth told Dr. Eiland that he was being dismissed from the Department of Pathobiology because he was 'on drugs.'" (*Plaintiff's Opposition* (Doc. 29) at 39). As pointed out in Defendants' principal brief, however, Dr. Eiland conceded at deposition that he does not know who made this statement to Elizabeth Landreth. *Eiland [2]* at 92:2-22. He acknowledged that he does not know if any one of the Defendants made this statement, and he agrees that "[i]t could have been another employee

…. [or] it could have been a student." *Id.* Accordingly, because Dr. Eiland does not have affirmative evidence showing that one of the Defendants made this alleged statement, this claim also fails as a matter of law.

### III.   Eiland's Claim under the Rehabilitation Act of 1973 Fails as a Matter of Law.

In response to Defendants' argument for summary judgment on his Rehabilitation Act claim, Dr. Eiland asserts that "[i]t is clear from the evidence that the Defendants regarded Dr. Eiland as being bipolar and/or OCD." (*Plaintiff's Opposition* (Doc. 29) at 40). Dr. Eiland identifies no <u>evidence</u>, however, to support this vague, conclusory allegation.

As an initial matter, Dr. Hendrix never reported to the Wellness Committee that Dr. Eiland was bipolar, OCD and on drugs. Rather, pursuant to his ethical duty as a member of the Committee, Hendrix reported to the Wellness Committee that he suspected that Dr. Eiland might be suffering from some sort of impairment which could adversely affect his ability to safely practice veterinary medicine. *Hendrix Decl.* at ¶ 9. It is then up to the Chairman of the Wellness Committee, a physician, to handle the specific diagnosis of an illness, if any. *Id.*

In any event, Dr. Eiland misses the point of Defendants' argument. The issue of whether Dr. Hendrix regarded Dr. Eiland as having a mental impairment is irrelevant, as it is undisputed that Dr. Blagburn made the decision to resign as Dr. Eiland's Major Professor, and that Dr. Hendrix played no part in this decision. *Blagburn Decl.* at ¶ 19; *Hendrix Decl.* at ¶ 2; *see also Eiland [2]* at 148:20-149:4. Because the decision to resign was made solely by Dr. Blagburn, to sustain a claim under the Rehabilitation Act Dr. Eiland must demonstrate that <u>Blagburn</u> regarded him as having a disability and then terminated him for that reason. Dr. Eiland has produced no evidence whatsoever that even remotely suggests that Dr. Blagburn regarded him as having a disability. Accordingly, Defendants are entitled to summary judgment on this claim.

## IV.     **Defendants are Entitled to Qualified Immunity.**

In opposition to Defendants' arguments on qualified immunity, Dr. Eiland lamely asserts that a clearly established constitutional right was violated because case law has made clear that "university students could not be arbitrarily dismissed." (*Plaintiff's Opposition* (Doc. 29) at 38) (emphasis removed).

Dr. Eiland's position is inherently flawed in that it frames the "clearly established constitutional right" much too broadly. The Eleventh Circuit has expressly held that the determination of whether a right is "clearly established" is to be undertaken "<u>in light of the specific context of the case, not as a broad proposition, in an effort 'to ensure that before public officials are subjected to suit, they are on notice that their conduct is unlawful</u>.'" *Williams v. Consolidated City of Jackonsville*, 341 F.3d 1261, 1269 (11th Cir. 2003) (emphasis added). Thus, the "relevant inquiry is 'fact specific,' and the plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on 'materially similar' facts." *Burdshaw v. Snell*, 350 F. Supp. 2d 944, 948 (M.D. Ala. 2004) (*citing Rodgers v. Horsley*, 39 F.3d 308, 311 (11th Cir. 1994) and *Lassiter v. Alabama A & M, Board of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994)).

Even assuming Dr. Eiland's allegations to be true, he cannot carry his burden[4] of demonstrating that qualified immunity is inappropriate.[5] Eiland has simply failed to point to a case with "materially similar" facts which would have put the Defendants on notice that the conduct alleged against them was in any way unlawful.

---

[4]    *See Williams*, 341 F.3d at 1267 (once the defendant establishes that he was acting within his discretionary authority, "the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate.")

[5]    Dr. Eiland concedes that Defendants were performing discretionary functions. (*Plaintiff's Opposition* (Doc. 29) at 38).

171376.1                                             11

Even if the Court did accept Dr. Eiland's proffered "clearly established constitutional right" as legitimate, it would be of little consequence since, as explained in *Hamil*, neither the Eleventh Circuit nor the Supreme Court has formally recognized – and therefore "clearly established" – that a student has a property interest in post-secondary education. Therefore, because Dr. Eiland did not have a <u>clearly established</u> property interest in his enrollment in Auburn's Graduate School, the Defendant employees would be entitled to qualified immunity even if they had dismissed Dr. Eiland from the graduate program "arbitrarily" and without due process (which, of course, clearly did not happen).

No doubt recognizing this, Dr. Eiland requests this Court to be the first to recognize a property right in a student's post-secondary education. (*Plaintiff's Opposition* (Doc. 29) at 37-38). There are numerous reasons for the Court to decline to recognize such an interest, but even if the Court were so inclined it would have no bearing on the qualified immunity analysis, as the case law is clear that the "controlling decision" must pre-date the alleged wrongful conduct. *See Burdshaw,* 350 F. Supp. 2d at 948.

Accordingly, Defendants are entitled to qualified immunity with respect to Dr. Eiland's claims against Defendants in their individual capacities.

## **CONCLUSION**

Defendants respectfully request the Court to grant their motion for summary judgment because there is no genuine issue of material fact, and they are entitled to judgment in their favor as a matter of law.

Respectfully submitted this 6th day of September, 2006.

171376.1

12

                                        /s G. Lane Knight_____
                                            One of the Attorneys for Defendants

**OF COUNSEL:**

David R. Boyd (BOY005)
G. Lane Knight (KNI028)
Balch & Bingham LLP
105 Tallapoosa Street
Suite 200
Montgomery, Alabama 36104-2549
Telephone: (334) 834-6500
Facsimile: (334) 269-3115

171376.1                                           13

## CERTIFICATE OF SERVICE

  I hereby certify that on this 6th day of September, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing and/or that a copy of the foregoing has been served upon the following by United States Mail, properly addressed and postage prepaid to the following:

Kathryn Dickey, Esquire
322 Alabama Street
Montgomery, Alabama 36104


               /s G. Lane Knight
               Of Counsel