IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHRISTOPHER B. EILAND,            )
                                 )
           Plaintiff,            )
                                 )
     v.                          )        CASE NO. 3:05-CV-459-WKW
                                 )          (WO)
BYRON L. BLAGBURN, *et al.*,     )
                                 )
           Defendants.           )

## MEMORANDUM OPINION

Plaintiff Dr. Christopher Eiland ("Eiland") brought this action for denial of due

process rights, disability discrimination, defamation, and gender discrimination.[1] Eiland also

sought a declaratory judgment establishing the rights of the parties and petitioned for a writ

of mandamus pursuant to Alabama law directing the defendants to remedy the alleged

constitutional violations. By Order (Doc. # 37) dated September 28, 2007, the court granted

the defendants' Motion for Summary Judgment (Doc. # 24). The motion was granted for the

reasons stated in this memorandum opinion.[2]

## I. FACTS

Eiland is a former Auburn University ("Auburn") Ph.D. student who was also

_____

[1] Eiland dropped his gender discrimination claim. (Eiland Dep. 146:3-9.) Eiland's deposition
was taken over two days, and there are two transcripts. A citation to Eiland's first deposition on April
17, 2006 is designated as Eiland Dep. __:__; a citation to Eiland's second deposition taken on June 12,
2006, is designated as Eiland [2] Dep. __:__.

[2] Because the motion has been granted, allegations and responses are referred to in the past
tense.

employed by the Parasitology Laboratory at Auburn ("Laboratory").  Eiland sued Dr. Byron Blagburn, Dr. Charles Hendrix, Dr. Joseph Janicki, Dr. Stephen McFarland, Dr. Ed Richardson, and Dr. Lauren Wolfe ("defendants"),[3] who are or were members of the faculty and administration at Auburn.  Eiland's claims centered around his allegation that Dr. Blagburn ("Blagburn") dismissed him from Auburn's Ph.D. program on December 3, 2003. Because Eiland asserted a number of claims against the defendants and the facts underlying these allegations spanned several years, the facts underlying each of Eiland's three main claims, *i.e.* denial of due process, defamation, and discrimination violating the Rehabilitation Act of 1973, are discussed separately.

**A.**    ***Facts Related to Eiland's Due Process Claim***

Eiland alleged the defendants denied him due process because he was dismissed from the Ph.D. program at Auburn without a hearing.  The defendants responded that Eiland was not dismissed from his Ph.D. program, but that he voluntarily withdrew after Blagburn stepped down as his advisor.

**1.    Eiland's Time at Auburn Prior to His Ph.D. Program**

Prior to enrolling in his Ph.D. program at Auburn, Eiland had earned three degrees from Auburn.  He earned a Bachelor of Arts  in Animal and Diary Science, a Masters of Science in Pathobiology ("MS"), and a Doctor of Veterinary Medicine ("DVM").  While Eiland completed his MS, he worked with Blagburn who served as his advisor.

---

[3]  Each of the defendants was sued in his individual and official capacities except for Dr. Ed Richardson, the former President of Auburn, who was sued only in his official capacity.

Auburn requires students to complete a research project or thesis to receive a MS degree.   A student must identify a "Major Professor" to oversee the completion of the research project and to provide guidance and assistance while monitoring the student's research and progress in the classroom.  Additionally, the Major Professor helps the student establish his Academic Advisory Committee ("AAC").  The AAC is a group of faculty members who approve the student's plan of study, conduct required exams, and direct the student's research project.  The student must formally establish the AAC by getting the consent of each member of the AAC in writing.  For Eiland's MS research project, Blagburn served as Eiland's Major Professor;  Dr. Jennifer Spencer, Dr. Joseph Newton, and Dr. Ray Dillon were the members of Eiland's AAC.

Auburn's policy specifies that the student is responsible for selecting his Major Professor and establishing his AAC.  No professor at Auburn is required to serve as a Major Professor, and a professor may deny a student's request to serve in that role for any reason. A Major Professor can resign at any time and for any reason, including personality differences. (Blagburn Decl. ¶ 3.)

While a student must identify a Major Professor to complete the research project required for graduation, a student's status with Auburn is not affected if his Major Professor resigns.  A graduate student without a Major Professor remains in good standing with Auburn.  However, the student must identify a new Major Professor and establish an AAC to be able to complete the research project and graduate.

3

The research project requires the student to gather, record, and analyze research. For Eiland's MS research project, he studied feline heartworm infections in shelter animals. Dr. Dillon, a member of Eiland's AAC, suggested Eiland work on the project as part of his larger study explaining the interaction between chronic lung disease and heart disease in cats. To complete his project, Eiland gathered research data at the local humane society. The previous summer Dillon had employed four students to collect the same research data. Eiland was the only student who used this research to support a graduate thesis.

At Auburn, a student's research is the property of the school. (Blagburn Dep. 44:23-45:5.) When a student completes a thesis, the research remains at Auburn. (Blagburn Decl. ¶ 7.) However, Eiland claimed that Auburn must receive his permission to use his research. (Eiland Dep. 26:19-21.)

While earning his MS degree, Eiland worked with Blagburn in the Laboratory. Eiland began working as a Student Lab and Research Assistant and became a Graduate Student Research Assistant in 1998. Auburn designates Graduate Student Research Assistants as "temporary" University employees. (Blagburn Decl. ¶ 9.) Eiland was employed at the Laboratory until December 2003 when Blagburn dismissed him.

Faculty members and Eiland agreed that Eiland had a good relationship with the faculty during the period he worked on his MS and DVM degrees. Eiland was elected president of his veterinary class each year for four years. As class president, he frequently worked with faculty members and claimed he had a good relationship with the faculty.

Blagburn was not aware of students or faculty having problems with Eiland during this time. After receiving both his MS and DVM degrees, Eiland decided to stay at Auburn to pursue his Ph.D.

### 2.    Eiland Enrolled in Auburn's Ph.D. Program

Eiland officially enrolled in Auburn's Doctor of Philosophy program in Biomedical Sciences in the fall 2003 semester. The Ph.D. program is inter-departmental, meaning the student is not enrolled in a specific department at Auburn, so Eiland was not a part of the Department of Pathobiology. While the student's Major Professor is a member of a specific department, the Ph.D. student does not become a member of that department when he chooses his Major Professor.

### a.    Blagburn Agreed to Serve as Eiland's Major Professor

Blagburn agreed to serve as Eiland's Major Professor for his Ph.D. As in the MS program, students must complete both course work and a research project to earn a Ph.D. To complete the research project, Ph.D. students must identify a Major Professor and establish an AAC. (*Id.* ¶ 10.) Eiland and Blagburn had limited discussions about Eiland using his research from his MS for his Ph.D. research. However, they never identified what specific topic Eiland would research. Additionally, Eiland never established an AAC after entering his Ph.D. program. Some professors who served on his AAC for his MS informally discussed serving in that role again,[4] but Eiland never completed the paperwork required to

---

[4] Dr. Ray Dillon, who served on Eiland's AAC for his MS, was unaware that Eiland had enrolled in the Ph.D. program at Auburn. (Dillon Dep. 14:9-15:3.) Because he did not know Eiland was

establish an AAC.

### b.    Eiland Experienced Difficulties in the Ph.D. Program

Soon after Eiland entered the Ph.D. program, he experienced academic difficulties and exhibited behavioral problems. Blagburn received several complaints about Eiland, and these problems eventually led him to step down as Eiland's Major Professor and to terminate Eiland's employment in the Laboratory.

During the fall 2003 semester, Eiland registered for two classes: Experimental Statistics I and Advanced Endocrinology.  On his first Experimental Statistics I test, Eiland earned a "B," but he failed the second test.  He met with the course instructor, Dr. Nedret Billor, and discussed his performance.  Dr. Billor and Eiland agreed that Eiland would take an incomplete in the course and retake the course in the spring semester.  Eiland did not retake the course in the spring semester resulting in his incomplete becoming an "F."

Another student in the Experimental Statistics I class accused Eiland of cheating.  The student said Eiland asked her to take a test for him.  When Blagburn learned of the allegations against Eiland, he met with the graduate student who confirmed to him that Eiland had asked her to cheat.

Eiland denied asking the student to cheat and instead accused her of cheating in the class.  Eiland contended the student told him she compared answers with another student on the first test.  Eiland then told her that she had cheated and could be dismissed from Auburn.

---

enrolled in the Ph.D. program, it can be presumed he did not participate in these discussions.

Eiland believed this student accused him of cheating to protect herself: "I had assumed that maybe . . . I had scared her into thinking that I was going to report her for cheating, and she tried to do a preemptive strike and let them know that I had propositioned her to take the test." (Eiland Dep. 192:1-6.) No charges of academic dishonesty were brought before Auburn's Academic Honesty Committee.

Blagburn received reports that Eiland exhibited troubling behavior in the Laboratory and around Auburn. In the Laboratory, other employees complained because Eiland would not acknowledge co-workers who referred to him as "Chris" instead of "Dr. Eiland" after he earned his DVM degree, an allegation that Eiland denied. (*Id.* 140:2-12.) Blagburn perceived that Eiland's attitude "create[d] confrontation." (Blagburn Dep. 69:4-5.) Eiland's co-workers also alleged he rearranged the Laboratory and moved his co-workers' personal items. Blagburn also claimed Eiland moved the furniture in Blagburn's office without permission. Eiland did not remember ever permanently moving any furniture in the Laboratory. (Eiland Dep. 133:9-23.) Eiland was also seen searching through another student's desk without permission (Blagburn Decl. ¶ 15) but he claimed the student gave him permission to go into her desk to borrow notes (Eiland Aff. ¶ 26).

There were also reports of Eiland acting erratically outside the Laboratory. One Laboratory worker reported to Blagburn that Eiland told her he had become disgruntled with a customer in the animal hospital where he worked, so he subscribed to a pornographic magazine using the customer's name and address. Eiland denied this ever happened. (Eiland

Dep. 150:17-151:6.)   On another occasion, a faculty member saw Eiland digging up shrubbery on the Auburn campus at midnight.   Eiland did not remember digging up any shrubbery and was "pretty sure it didn't happen." (*Id.* 152:11-22.)

Another student employed in the Laboratory complained that Eiland was pursuing a romantic relationship with her.  She complained that he left flowers and cards on her car and showed up outside her apartment building late at night.  Eiland denied pursuing a relationship with her or following her home.  (*Id.* 142:11-20.)

The repeated complaints about Eiland caused concern among faculty members. Blagburn met with Eiland several times to discuss these problems and Blagburn warned Eiland that the complaints needed to stop and that he should focus on his program. Eventually Dr. Wolfe ("Wolfe"), the head of the Department of Pathobiology, met with Blagburn to discuss his concerns about Eiland's conduct.   Wolfe told Blagburn that something had to be done about Eiland.  Wolfe denied that he ordered Blagburn to dismiss Eiland.  (Wolfe Decl. ¶ 4.)  Eiland claimed Wolfe ordered Blagburn to dismiss Eiland from the Ph.D. program.   (Eiland Dep. 203:3-6.)

After Blagburn warned Eiland that the complaints against him needed to stop and that he should focus on the Ph.D. program, Blagburn learned of the cheating allegations against Eiland.  Because the reports against Eiland had continued, Blagburn decided to step down as his Major Professor.

### 3.    Blagburn Resigned as Eiland's Major Professor

On December 3, 2003, Blagburn met with Eiland to resign as Eiland's Major Professor. At Blagburn's request, Dr. Hendrix ("Hendrix"), a professor in the Laboratory, sat in on the meeting. Blagburn explained to Eiland he was stepping down because of Eiland's problems, including the cheating allegation, since he had joined the Ph.D. program. Blagburn also terminated Eiland's employment in the Laboratory and informed him his stipend would continue only until the end of January 2004.[5]

Eiland alleged Blagburn dismissed him from the Ph.D. program at this meeting and told him he would not have access to his research. Eiland denied that Blagburn simply resigned as his Major Professor and instead claimed Blagburn told him "[he] would make a great parasitologist, just not at Auburn." (Eiland Dep. 197:11-13.) Eiland stated he immediately requested a hearing but was denied one and told he was "lucky to be leaving with a clean record." (*Id.* 204:11-16.) Eiland also asserted that Blagburn called him a cheater. (Eiland Dep. [2] 71:18-72:2.)

Blagburn and Hendrix both denied that Eiland was told he was dismissed from the Ph.D. program. (Blagburn Decl. ¶ 21; Hendrix Decl. ¶ 2.) Blagburn admitted telling Eiland there was an accusation of cheating against him but denied calling Eiland a cheater. Both Blagburn and Hendrix contended that Eiland did not request a hearing and that Eiland was

---

[5] Eiland received the stipend for working in Blagburn's laboratory. Blagburn explained "it's not customary to continue to support a graduate student with your resources if that graduate student then moves to a different laboratory. It happens all the time. They simply procure support from the laboratory to which they relocate." (Blagburn Dep. 103:19-104:1.)

not told he would not have access to his research.

After the meeting, Eiland and Hendrix discussed potential faculty member "Major Professors" for Eiland. Hendrix recalled offering to help Eiland find a new Major Professor and talking about Dr. Mullen and Dr. Dillon as possibilities. (Hendrix Decl. ¶ 3.) At his deposition, Eiland admitted he talked with Hendrix about finding a new Major Professor. (Eiland Dep. 251:6-17.) Eiland claimed he did so despite his contention he was just dismissed from Auburn because "I was grasping at straws . . . it wasn't very clear to [me] what limitations were put on." (*Id.* 251:18-252:14.) Later in his deposition, Eiland claimed he had gotten "confused" and had not actually asked Hendrix to serve as his Major Professor that day. (*Id.* 256:3-258:16.)

On December 9, 2003, Blagburn officially resigned as Eiland's Major Professor. He sent a memorandum to Dr. Joseph Janicki ("Janicki"), the Associate Dean for Research and Graduate Studies, stating, "Effective at the end of Fall Semester, 2003, I will no longer serve as Dr. Christopher Eiland's PhD [sic] advisor." (Defs.' Ex. A.)

On December 5, 2003, Eiland met with Wolfe to discuss his status at Auburn. Eiland recalled Wolfe telling him he was dismissed from the Ph.D. program and that he could not go to another department or identify a new Major Professor. (Eiland Dep. 166:13-18.) Eiland admitted, however, that Wolfe never exactly said "you're being dismissed from . . . the Ph.D. program." (*Id.* 298:5-9.)

Wolfe was certain that he never told Eiland he was dismissed from the Ph.D. program.

10

Wolfe could not have dismissed Eiland because he does not have the authority to do so. (Wolfe Decl. ¶ 6.) Wolfe admitted he probably told Eiland that pursuing a Ph.D. might not be the best path for him. (*Id.*)

### 4.   **Eiland Met with Other Auburn Administrators**

On the same day Eiland met with Wolfe, he also had an appointment with Janicki, the Associate Dean for Research and Graduate Studies. Janicki occupied a higher position than Blagburn or Wolfe in the hierarchy of the graduate school. Janicki officially informed Eiland he was *not* dismissed from the Ph.D. program and could continue in the program by identifying a new Major Professor. Eiland confirmed in his deposition that Janicki stated he was not dismissed. (Eiland Dep. 224:17-22.) However, Eiland claimed he was not given sufficient time to find a new Major Professor and was constructively dismissed from the Ph.D. program.

After this meeting, Eiland attempted to find a new Major Professor. On December 8, 2003, Eiland asked Dr. Dillon to serve as his Major Professor. Dillon did not remember Eiland asking him to serve as a Major Professor but recalled Eiland asking him if he had research funding available. Dillon informed Eiland he could not support Eiland's research because his funding had been cut back. (Dillon Dep. 8:18-9:3.) Eiland also asked Hendrix to serve as his Major Professor, but Hendrix declined because he focuses solely on teaching and has never served as a student's Major Professor. Eiland took no further steps to locate a Major Professor. He never contacted Dr. Mullen, the professor Hendrix suggested he

contact when they met on December 3.

Eiland was enrolled in courses in the spring 2004 semester, but he never attended any classes. Auburn has a policy to drop a student from a class if the student fails to attend the first few class meetings, and Eiland was dropped from the roll. Eiland has not enrolled in any classes at Auburn since the spring 2004 semester.

### 5.    Eiland Attempted to File a Grievance

In July 2004, Eiland filed a grievance with Auburn concerning his dismissal from the Ph.D. program, claiming Auburn denied him due process by not providing him a hearing.[6] He sent the grievance to a number of administrators, including Dr. Stephen McFarland ("McFarland"), Dean of the Graduate School. After investigating Eiland's complaint, McFarland sent Eiland a letter on August 17, 2004, which confirmed that Eiland was a student in good standing with Auburn:

> According to the College of Veterinary Medicine and the Graduate School, **you have not been terminated. You are still a student in good standing at Auburn University.** No actions have been taken to terminate your admission to the Doctor of Philosophy program in biomedical sciences. Your major professor has decided to resign from your committee. It is now your responsibility to identify another major professor, should you wish to continue in this program.

(Defs.' Ex. C (emphasis added).) After he received this letter, Eiland took no further steps to identify a new Major Professor.

Auburn's Student Academic Grievance Policy ("SAGP") sets forth the procedures for

---

[6] Eiland also complained of receiving an F in Experimental Statistics I, but his grade in that class was not a subject of this lawsuit.

filing student academic grievances.  Rule 4.2 lists the procedures for hearings and requires that  "[g]rievances must be filed . . . within 20 class days of the term following that in which the grievance occurred."  (Defs.' Ex. E ¶ 4.2.1.)  The SAGP also provides that grievances must be provided in writing to the chairman of the Student Academic Grievance Committee ("SAGC").  (*Id.* ¶ 4.2.2.)

The SAGC dismissed Eiland's grievance because it did not comply with the timing or notice provisions of the SAGP.  Eiland claimed Blagburn dismissed him from the Ph.D. program on December 3, 2003, but he did not file his grievance until July 24, 2004.  Eiland sent his grievance to several faculty members and administrators but never sent the grievance to the chairman of the SAGC.  Eiland conceded he did "not completely" follow the procedures for filing a student academic grievance.  (Eiland Dep. [2] 54:16-19.)  Eiland claimed he failed to file his grievance within the time period because he was unsure if the SAGP applied to him.

Because he thought his Laboratory position was also improperly ended, Eiland considered filing a grievance under the Graduate Assistant Grievance Policy.  However, he never filed a grievance under that policy.  Eiland did argue the defendants denied him due process by failing to follow the Graduate Assistant Handbook when they terminated him from the Laboratory.

**B.    *Facts Related to Eiland's Defamation Claims***

Eiland alleged the defendants made defamatory statements about him as well.  The

13

facts surrounding each alleged statement are set out below.

First, Eiland asserted Janicki told Blagburn and Wolfe that Eiland had propositioned another student to take his Experimental Statistics I exam. Eiland learned of Janicki's statement when he met with Wolfe. Eiland conceded he was not present when Janicki made the statement and did not know what Janicki actually said. (*Id.* 62:4-7.) Eiland admitted Janicki may have said Eiland *was accused of* asking another student to take an examination for him. (*Id.* 61:17-62:1.) Blagburn confirmed that Janicki said Eiland was *accused* of cheating. (Blagburn Decl. ¶ 13.)

Eiland's second allegation was that when he met with Blagburn and Hendrix on December 3, 2003, Blagburn called him a cheater. Blagburn claimed he stated Eiland was accused of cheating but did not call him a cheater. Hendrix agreed that Blagburn never called Eiland a cheater.

The basis for Eiland's third defamation claim was that in February 2005, Blagburn told Dr. Janderlich that Eiland no longer was working on his Ph.D. at Auburn because he could not get along with the women in the pathobiology department. Eiland had applied for a job with Dr. Janderlich, a Montgomery veterinarian. When Dr. Janderlich called Blagburn for a reference, Blagburn acknowledged telling him that Eiland had some issues with people in the pathobiology department. (Blagburn Dep. 98:17-99:5.) Blagburn denied stating Eiland had problems with women in the Laboratory. (Blagburn Decl. ¶ 25.) During his deposition, Eiland admitted that he had problems with the women in the Laboratory. (Eiland

Dep. [2] 82:8-11.)

Eiland alleged Hendrix made defamatory statements about him to the Alabama Veterinary Wellness Program ("Wellness Program"), including that he had obsessive compulsive disorder, was on drugs, and was bipolar. The Wellness Program exists to identify problems that could lead to physical or mental impairment of a veterinarian affecting the ability to practice veterinary medicine safely. The Alabama Veterinary Professionals Wellness Committee ("Wellness Committee") supervises the Wellness Program. Hendrix served as one of fifteen veterinarians on the Wellness Committee. As a member of the Wellness Committee, Hendrix had an ethical duty to report the identity of any veterinary professional whom he felt had a substance abuse problem or mental impairment that could adversely affect his ability to practice as a veterinarian. (Hendrix Decl. ¶ 8.) Hendrix reported Eiland to the Wellness Committee after observing the dramatic change in Eiland's behavior when he entered the Ph.D. program. (*Id.* ¶ 9.)

Eiland's final defamation allegation was that Elizabeth Landreth heard he was dismissed from Auburn for bad behavior and drug use. Eiland conceded he does not know who made this statement and that the defendants may not have said it. (Eiland Dep. [2] 92:2-22.) He produced no other evidence that the statement was made.

**C.    *Facts Related to Eiland's Rehabilitation Act of 1973 Claim***

Eiland alleged the defendants violated his rights under the Rehabilitation Act of 1973, 29 U.S.C. § 794. Eiland admitted he has no disability or conditions that could be perceived

as a disability. (Eiland Dep. [2] 93:18-94:3.) Eiland alleged he was perceived as having obsessive compulsive disorder, being bipolar, and abusing drugs. Eiland admitted he had no direct evidence to prove he was perceived as having a disability and brought this claim because he was reported to the Wellness Committee. (*Id.* 94:20-95:6.) Eiland conceded he cannot point to facts showing Blagburn thought he had a disability. (*Id.* 95:21-96:19.)

## II. JURISDICTION AND VENUE

The court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). As to the claims arising under state law, the court exercises supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The parties did not contest personal jurisdiction or venue, and the court finds there are allegations sufficient to support both.

## III. STANDARD OF REVIEW

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). The movant can

meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). A genuine factual dispute exists if the "jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999) (citation omitted). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

### A.    *Due Process Claims*

Eiland claimed the defendants violated his rights under § 1983 by denying him his Fourteenth Amendment rights to due process. He contended the defendants deprived him of both substantive and procedural due process when they dismissed him from the Ph.D.

17

program at Auburn, terminated him from the Laboratory, denied him access to his research, and defamed his good name and reputation. Because Eiland has note established a prima facie case for a due process violation, these claims fail.

### 1.    Dismissal from the Ph.D. Program

Eiland claimed the defendants denied him both substantive and procedural due process when they terminated him from the Ph.D. program. Both substantive and procedural due process claims require the plaintiff to show he was denied a protected property right or liberty interest.[7] Eiland asked this court to recognize that post-secondary students have a protected property interest in continuing their education but acknowledged that the Supreme Court has not recognized this right.[8] However, Auburn's actions do not implicate such a property right because there is no genuine issue of material fact; the evidence showed Eiland was not dismissed from Auburn.

In ruling on a motion for summary judgment, a court must accept the non-moving party's evidence and should not weigh conflicting evidence or make credibility determinations. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). However, a court need not allow a case to go to a jury when "the inferences that are drawn

---

[7] The property interests protected by substantive due process are narrower than the property interests protected by procedural due process. The Constitution creates the property interests that are protected under substantive due process. State law generates the property interests protected under procedural due process. *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring).

[8] *See Ewing*, 474 U.S. at 222 (assuming, without deciding, that there is a constitutionally protectible property right in continued enrollment for a post-secondary education program).

18

from the evidence, and upon which the non-movant relies, are 'implausible.'" *Id.* at 743 (quoting *Matsushita*, 475 U.S. at 592-94). Based on the evidence presented, no rational jury could find Eiland was dismissed from Auburn.

Even accepting as true Eiland's allegation that Blagburn told him he was dismissed at their meeting, the subsequent actions taken by Auburn administrators and Eiland himself showed that he was not dismissed from the Ph.D. program. While Eiland claimed Wolfe also told him he was dismissed, he admitted he was never explicitly told that he was dismissed. However, Wolfe did not have the authority to dismiss Eiland. Moreover, when Eiland met with Janicki just two days after Blagburn purportedly dismissed him, Janicki told Eiland he was not dismissed. After his meeting with Janicki, Eiland understood that he was not dismissed because he asked two other professors to serve as his Major Professor. McFarland, the Dean of the Graduate School, also confirmed to Eiland in writing that he was not dismissed from the graduate school or the Ph.D. program. McFarland's letter repeated what Janicki had already told Eiland: "**you have not been terminated**. You are still a student in good standing at Auburn University . . . . Your major professor has decided to resign from your committee. It is now your responsibility to identify another major professor." (Defs.' Ex. C (emphasis added).) Eiland admitted that after he received this letter in August 2004, he believed he was still a student in good standing at Auburn. (Eiland Dep. 287:23-288:3.)

Eiland argued the evidence showed he was dismissed from Auburn, creating a genuine issue of material fact. However, any such inference is implausible.

Eiland argued in the alternative that he was improperly dismissed from the Department of Pathobiology.  (Pl.'s Resp. Br. at 21.)    However, Eiland could not be dismissed from the department because he was never enrolled in that department.  Eiland was enrolled in a Ph.D. program in Biomedical Sciences, which is inter-departmental; such Ph.D. students are not "in" any particular department within the graduate school.  While the student must select a Major Professor from within a department, the student himself does not become a member of the department.  Eiland could have selected a Major Professor in another department and would still have been eligible to earn the same degree.  Eiland's alternative claim is without merit because it has no basis in fact.

Eiland also alleged he was constructively dismissed from Auburn because he could not find a new Major Professor.  However, the evidence showed Eiland made feeble attempts to find a new Major Professor, asking only two professors.  Eiland asked Dr. Dillon, but he who could not take on another student because his funding was cut.[9]  Eiland also approached Hendrix, but he has never served as a Major Professor and is only a teaching professor. Eiland did not approach any other professors.  He never asked Dr. Gary Mullen, the professor Hendrix suggested to Eiland, to serve, nor did he seek help or advice from Blagburn or other professors.  Moreover, Eiland admitted he limited his search to professors with interests in parasites because working with other professors "would not have allowed me to follow my

---

[9]  Dr. Dillon remembered Eiland asking him about funding for research but does not recall Eiland asking him to serve as his Major Professor.  (Dillon Dep. 21:23-22:8.)  For purposes of this motion, the court assumes that Eiland did ask Dr. Dillon to serve as his Major Professor.

career track of being a professor of parasitology or working for a drug company representing parasiticides." (Eiland Dep. 277:18-21.) Eiland admitted he could have remained in the Ph.D. program if he found a Major Professor in another department. (*Id.* 277:22-278:2.) Blagburn testified that Eiland did not ask all the professors who had interests in parasites. Eiland's claim that he was constructively dismissed is contradicted by the undisputed evidence that he was less than diligent in his search and chose to limit his search for a new Major Professor.

Construing the facts in favor of Eiland, the court has no hesitation in determining that Eiland was not dismissed from the Ph.D. program or from the Department of Pathobiology, nor was he constructively dismissed. The defendants did not deprive him of due process on this basis.[10]

## 2.    Dismissal from the Parasitology Laboratory

Eiland alleged the defendants denied him procedural due process when they terminated him from the Laboratory by failing to follow the procedures in the Graduate

---

[10] Assuming *arguendo* that Eiland was dismissed from the Ph.D. program and the dismissal deprived him of a protected property interest, his procedural due process claims would still fail because he failed to utilize an available grievance procedure that met the requirements of due process. *See Maples v. Martin*, 858 F.2d 1546, 1551 (11th Cir. 1988). Eiland could have filed an academic grievance with the SAGC. Hendrix, a former chairman of the SAGC, testified that the SAGC is the appropriate body for filing a grievance about a Major Professor's actions. (Hendrix Decl. ¶ 6.) In a hearing before the SAGC, the student has the right to appear before an impartial tribunal, testify on his own behalf, present witnesses, and question witnesses presented by the adverse party. (*See* Defs.' Ex. E ¶¶ 4.2.5-4.2.9.) Eiland attempted to file a grievance, but it was dismissed because Eiland filed his grievance months after the deadline expired. He did not comply with notice requirements because he never sent his grievance to the chair of the SAGC. Eiland waived his right to seek redress for due process violations related to his alleged dismissal from the Ph.D. program because he did not utilize an available grievance procedure.

Assistant Handbook.[11] (*See* Pl's Resp. Br. at 36.)  The Eleventh Circuit has noted that the failure to follow regulations does not necessarily give rise to a constitutional claim.  *Smith v. Georgia*, 684 F.2d 729, 732 n.6 (11th Cir. 1982).  Assuming *arguendo* that Auburn violated its internal procedures and that gave rise to a protectible property interest, Eiland waived his right to seek redress because he did not utilize Auburn's grievance procedures.

A party cannot claim a violation of procedural due process if that party failed to utilize an available grievance procedure that meets the requirements of due process.  *Maples*, 858 F.2d at 1551.  In *Maples*, faculty members at Auburn challenged their transfers to a different department, claiming they were denied a property right.  The faculty members did not use Auburn's grievance procedures for faculty members and did not argue that utilizing the grievance procedure would have been futile.  The court found the defendants could not claim a due process violation because "an opportunity to be heard that would have met the requirements of due process was lost to appellants by their own inaction."  *Id.*

Eiland had an opportunity to file a grievance about his termination from the Laboratory but chose not to do so.  Eiland claimed the defendants failed to follow the Graduate Assistant Handbook when they terminated him; this same handbook contained the Graduate Assistants Grievance Policy, which applies specifically to graduate assistant grievances.  (Pl.'s Ex. 6 at 12.)  Eiland never filed or even attempted to file a grievance under

---

[11]  At his deposition, Eiland testified he was not claiming a due process violation when he was terminated from the Laboratory. (*See* Eiland Dep. 248:11-17.)  However, in his Response Brief, he argued he was improperly terminated from the Laboratory because the defendants failed to follow the Graduate Assistant Handbook.  (Pl.'s Resp. Br. at 36-37.)

this policy.  (Eiland Dep. [2] 137:13-138:14.)  The Graduate Assistant Grievance Policy provided Eiland an opportunity for administrative review, which he chose not to pursue.  As a result, the defendants did not deny Eiland due process.  *See Maples*, 858 F.2d at 1551.

###    3.    <u>Access to Research Project</u>

Eiland alleged he was deprived of a property interest in the research he collected to support his MS thesis because Blagburn denied him access to the research.  While working on his MS project, he collected extra data, which he planned to use for his Ph.D.  (Eiland Dep. [2] 141:8-20.)  Blagburn testified that he did deny not Eiland access to his research. Hendrix, who witnessed the discussion between Blagburn and Eiland, agreed that Blagburn never told Eiland he would not have access to his research.

Regardless of the apparent dispute over access to research, the evidence showed that the research belonged to Auburn not Eiland.  Eiland conducted his research as a part of Dr. Dillon's larger project, and Dr. Dillon had previously employed four students to collect this same type of data.  Moreover, Auburn has a policy that student-collected research is the property of Auburn, not the student.  (Blagburn Decl. ¶ 7.)  As Blagburn described "the policy of the University is that data generated at the university remains the property of the university, remains in the laboratory of the principal investigator, or, in this case the major professor."  (Blagburn Dep. 44:18-45:5.)  When a student completes a thesis, the research remains at Auburn.  (Blagburn Dep. ¶ 7.)  Eiland agreed that when a student leaves Auburn "they don't take [the research] home with them.  They would leave it with the school.  The

actual information and raw data would be left at Auburn University." (Eiland Dep. 56:17-57:1.)

Moreover, even if Eiland had a property interest in his research, he failed to show the Fourteenth Amendment protects this type of property interest. Eiland did not identify a contract, statute, regulation, or ordinance that provides a graduate student with a property interest in the research collected to support a research project. Eiland did not establish a due process claim on this basis.

### 4.     Infringement on Eiland's Good Name and Reputation

In his complaint, Eiland contends his "liberty rights in his good name and reputation . . . were infringed upon without due process of law being provided to him under the Federal and State constitutions." (Compl. ¶ 15.)[12]   To state such a claim, the plaintiff must show more than an injury to his reputation; he must also show a government official deprived him of a previously recognized property or liberty interest. *Cypress Ins. Co. v. Clark*, 144 F.3d 1435, 1436 (11th Cir. 1998) The plaintiff must show, *inter alia*, the government employer made the stigmatizing statement "public." *Gilder-Lucas v. Elmore County Bd. of Educ.*, 399 F. Supp. 2d 1267, 1273 (M.D. Ala. 2005).

 Eiland's claims fail because he did not show the government's conduct deprived him of a property or liberty interest.  As noted above, Eiland was not terminated from the

---

[12]  Eiland did not identify specific statements made by the defendants that were false and stigmatizing.  The court assumed Eiland meant to assert the statements that he alleged were defamatory also infringed his liberty rights in his good name.

Laboratory.  Instead, Blagburn stepped down as his Major Professor, which does not implicate a property or liberty interest.  Also, Eiland did not prove public dissemination of a stigmatizing statement.  Of the five statements Eiland claimed were defamatory, only the statement that Elizabeth Landreth heard that Eiland was on drugs could be considered publicly disseminated.  However, Eiland conceded he did not know if the defendants even made this statement.  Eiland did not show the defendants made stigmatizing statements depriving him of a property interests.  His claims therefore fail.

**B.    *Defamation***

Eiland asserted the defendants made defamatory statements about him.  He alleged five instances of the defendants making such statements, but he failed to establish a prima facie case of defamation for any of his allegations.  All five of his defamation claims fail to meet the standard for defamation under Alabama state law, under which a plaintiff must show

> 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting to at least negligence; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*Brassfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1424, 1436 (M.D. Ala. 1996).

**1.    Janicki's Allegation of Cheating**

Eiland's first claim of defamation was that Janicki told Blagburn and Wolfe that Eiland had asked another student to take an examination for him.  Blagburn was present

when Janicki made the statement, and he testified that Janicki said Eiland was accused of cheating, not that he had cheated. (Blagburn Decl. ¶ 13.)  Eiland learned of Janicki's comment from Wolfe; he was not present when Janicki made the comment and admitted he *did not know* what exactly Janicki said.  He conceded Janicki could have said he was accused of cheating.  (Eiland Dep. [2] 62:4-7.)

Eiland bore the burden of proving the defendant made the statement.  "In an action for libel or slander, the plaintiff must prove, unless it shall be admitted by the defendant, the facts showing that the alleged defamatory matter was published or spoken of the plaintiff."  Ala. Code § 6-5-182.  Eiland did not show Janicki made a statement that Eiland was a cheater.  Eiland's only evidence was his own testimony about Janicki's statement, and this included his admission that he did not know what Janicki said.

### 2.    <u>Blagburn's Allegation of Cheating</u>

In his complaint, Eiland alleged Blagburn called him a cheater in front of Hendrix during their December 3, 2003 meeting. (Compl. ¶ 15.)  While Eiland raised this claim in his complaint, he did not brief this issue.  (*See* Pl. Resp. Br. 39.)  A plaintiff abandons a claim if the plaintiff fails "to list an enumerated claim and brief an issue in a memorandum of law in opposition to a defendant's motion for summary judgment."  *Great S. Wood Pres., Inc. v. Am. Home Assurance Co.*, __ F. Supp. 2d __, 2007 WL 2409723, at *9 (M.D. Ala. Aug. 21, 2007); *see, e.g., Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1284 n.6 (11th Cir. 2003).  Eiland abandoned this defamation claim by failing to argue it in the motion for

summary judgment.

### 3.    Blagburn's Employment Reference to Janderlich

In his complaint, Eiland claimed Blagburn made a defamatory statement when he gave an employment reference to Dr. Janderlich. Because Eiland did not brief this issue in his response to the motion for summary judgment, this claim fails. (*See* Pl. Resp. Br. 39.)

### 4.    Hendrix's Report to the Wellness Committee

In his complaint Eiland alleged that Hendrix defamed him by reporting him to the Wellness Committee. Eiland did not present this argument in his response to the motion for summary judgment; instead he reformulated his argument alleging that Hendrix defamed him by telling Blagburn that he had reported Eiland to the Wellness Committee. Both of these claims fail.

When Hendrix reported Eiland to the Wellness Committee, he made a conditionally privileged communication, which by definition is not defamation. To state a prima facie case of defamation, a plaintiff must show an unprivileged communication was made to a third party. *Brassfield*, 953 F. Supp. at 1436. Alabama law designates that "all investigations, filings, reports, and submissions to the Wellness Committee are to be considered privileged and confidential." Ala. Code § 34-29-111(f). When Hendrix reported Eiland to the Wellness Committee, he made a privileged communication.

Eiland also asserted Hendrix made a defamatory statement about Eiland by telling Blagburn that he had reported Eiland to the Wellness Committee. At his deposition, Blagburn

testified that Hendrix reported Eiland to the Wellness Committee. (Blagburn Dep. 105:15-21.) From this testimony, Eiland concluded that Hendrix told Blagburn that he had reported Eiland and also that Eiland suffered from obsessive compulsive disorder, was bipolar, and was on drugs. However, Eiland presented no evidence that such a communication ever occurred. Because Eiland relied on speculation only, this contention fails.

### 5.    Statements Made to Elizabeth Landreth

Eiland alleged the defendants made a defamatory statement about him because someone told Elizabeth Landreth that he was dismissed from the Department of Pathobiology because he was on drugs. Eiland admitted he did not know if the defendants made the statement and admitted another student or employee could have said it. (Eiland Dep. [2] 92:2-22.) Because Eiland did not present evidence showing one of the defendants made this statement, his claim fails as a matter of law.

### C.    *Rehabilitation Act of 1973*

Eiland claimed he was entitled to relief under the Rehabilitation Act of 1973, 29 U.S.C. § 794, because he was dismissed from the Ph.D. program and the Laboratory for having a disability. He claimed he was perceived as being bipolar and having obsessive compulsive disorder. Eiland failed to state a prima facie claim.

The Rehabilitation Act of 1973 provides a cause of action for "[an] otherwise qualified individual with a disability in the United States . . . [who] solely by reason of her or his disability . . . [is] subjected to discrimination under any program or activity receiving Federal

financial assistance." 29 U.S.C. § 794(a).  An individual is disabled for purposes of the Rehabilitation Act if the person has a physical or mental impairment or is regarded as having such an impairment.  29 U.S.C. § 705(20)(B).

Eiland's claim that he was dismissed from the Ph.D. program for having a disability fails because Eiland was not dismissed from the Ph.D. program.  Eiland also alleged Blagburn dismissed him from the Laboratory because he was perceived as having a disability.  Eiland admitted he brought this claim because Hendrix reported him to the Wellness Committee. (Eiland Dep. [2] 94:20-95:6.)  However, Blagburn, not Hendrix, made the decision to terminate Eiland from the Laboratory.  (Blagburn Decl. ¶ 19; Hendrix Decl. ¶ 2; *see also* Eiland Dep. [2] 148:20-149:4.)  Eiland admitted he has no evidence to suggest Blagburn perceived him to have a disability, other than the fact that Blagburn "let him go."  (Eiland Dep. [2] 96:13-19.)  Eiland relied on speculation, not evidence, to support this claim; therefore it was dismissed.

### D.    *Other Claims and Arguments*

The defendants additionally argued they were entitled to qualified immunity.  Finding Eiland failed to establish a prima facie case on any cause of action, the court declines to address this argument.  In his complaint, Eiland also sought a declaratory judgment and a writ of mandamus.  On the record before the court, he is not entitled to either form of relief.

## V.  CONCLUSION

Because there were no genuine issues of material fact, the defendants' Motion for

Summary Judgment was GRANTED.

    An appropriate judgment will be entered.

    DONE this 5th day of October, 2007.

                      /s/   W.  Keith Watkins

                    UNITED STATES DISTRICT JUDGE